**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADVANCED FLOWER CAPITAL INC. and AFC AGENT LLC,<br><br>                Plaintiffs,<br><br>        -against-<br><br>MICHAEL KANOVITZ and JON LOEVY,<br><br>                Defendants. | Civil Action No. _____<br><br>**COMPLAINT** |

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................... 1

JURISDICTION AND VENUE .............................................................................................. 5

FACTUAL ALLEGATIONS ................................................................................................... 7

   A. Loevy and Kanovitz and the JG Holdco Enterprise ......................................................... 7

   B. The Credit Agreement and Shareholder Guaranty ........................................................ 10

   C. The JG Borrowers' Failure to Meet Financial Covenants ............................................. 13

   D. The Events of Default Defendants Repeatedly Hid from AFC ...................................... 16

      1. Improper Fund Transfers ......................................................................................... 18

         a. Improper Uses of Proceeds. ............................................................................. 18

         b. Impermissible Restricted Payments ................................................................ 19

            (i) Restricted Payments Between September 30, 2021, and June 30, 2022 ......... 20

            (ii) Restricted Payments Between June 30 and August 25, 2022. ....................... 21

            (iii)Restricted Payments After August 2022. ...................................................... 22

         c. Failure to Maintain Financial Covenants ........................................................ 24

         d. Improper Affiliate Transactions ...................................................................... 26

         e. Improper Asset Disposal .................................................................................. 26

      2. Defendants' Other Misconduct ................................................................................ 28

         a. Failure to Pay Vendors and Taxes. ................................................................. 28

         b. Fabricated Disbursement Request. .................................................................. 29

      3. Defendants Engage in a Pattern of Fraud to Cover Their Tracks ............................. 30

         a. False Perfection Certificate .............................................................................. 30

         b. False and Misleading Financial Covenant Certifications and Financial
            Statements. ....................................................................................................... 33

         c. False Draw Requests. ....................................................................................... 36

CLAIMS FOR RELIEF ........................................................................................................ 37

COUNT I: VIOLATIONS OF RICO, 18 U.S.C. § 1962(C) (Against All Defendants) .............. 37

   A. The JG HoldCo Enterprise ........................................................................................... 37

   B. Pattern of Racketeering ................................................................................................ 38

   C. Predicate Acts .............................................................................................................. 39

      1. Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343 ........................... 39

      2. Money Laundering in Violation of 18 U.S.C. § 1957 ............................................... 42

   D. Scienter ........................................................................................................................ 43

E.  RICO Causation and Damages ........................................................................... 45

COUNT II: VIOLATIONS OF RICO, 18 U.S.C. § 1962(D) (Against All Defendants) ............. 46

COUNT III: BREACH OF CONTRACT (Against All Defendants) ........................................... 47

COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACT (Against All Defendants).... 50

COUNT V: FRAUD (Against Defendant Loevy) ........................................................................ 51

COUNT VI: AIDING AND ABETTING FRAUD (Against Defendant Kanovitz).................... 54

COUNT VII: CONVERSION (Against All Defendants) ............................................................. 55

PRAYER FOR RELIEF ............................................................................................................... 56

Plaintiffs Advanced Flower Capital Inc. and AFC Agent LLC (collectively "AFC") by and through their undersigned counsel, for their Complaint against defendants Michael Kanovitz and Jon Loevy allege as follows:

## NATURE OF THE ACTION

1.      In 2014, first cousins Jon Loevy and Michael Kanovitz co-founded a cannabis business called "Justice Grown" (also known as "Justice Cannabis Co."), which operates through a network of subsidiaries that roll up to an ultimate parent, JG HoldCo LLC ("JG HoldCo"). Loevy and Kanovitz are the majority owners and co-managers of JG HoldCo.  They are also 50/50 owners and co-managers of Hayden Manager LLC ("Hayden Manager"), the manager of JG HoldCo's subsidiaries.

2.      Through Justice Grown, Defendants have engaged in a pattern of fraudulent and deceitful conduct to induce AFC to lend Justice Grown more and more money for construction of cannabis facilities while instead using the money to line their own pockets and prop up other business ventures, hiding Justice Grown's continual defaults under the loan agreement, and denying AFC access to sufficient collateral for that loan.

3.      To carry out their unlawful scheme, Defendants have conducted a criminal enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).  Specifically, Defendants have knowingly and intentionally made, or caused others to make, false and materially misleading statements to AFC, including in loan documents, compliance certificates, and draw requests.  These false and misleading statements were crimes of mail or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 and money laundering in violation of 18 U.S.C. § 1957.

4.      Defendants' racketeering activity was calculated to harm AFC by inducing AFC to continue to lend Justice Grown money while depriving AFC of adequate collateral and sources

of funds for repayment.  Defendants knew that if they did not constantly misrepresent facts about Justice Grown, AFC would stop advancing funds and instead accelerate the outstanding loans.

5.      AFC is the direct victim and target of Defendants' unlawful scheme.  Defendants' criminal enterprise has caused AFC to lend money to Justice Grown—an amount of money that would be smaller if Defendants had truthfully disclosed the state of Justice Grown's financials and Defendants' depletion of borrower funds for other businesses and themselves—that is unlikely to be repaid in full.

6.      As a result, AFC has been damaged and is entitled to recover all of its losses resulting from Defendants' wrongdoing, including punitive damages and treble damages under RICO's civil remedy provisions, *see* 18 U.S.C. §1964(c), along with the costs of this suit and reasonable attorneys' fees; an injunction prohibiting Defendants from further engaging in their illegal practices; and other relief as provided for by law.

7.      Founded in July 2020, AFC is an institutional lender to the commercial real estate sector that primarily originates, structures, underwrites, invests in, and manages senior secured loans and other types of commercial real estate loans and debt securities, with a specialization in loans to cannabis industry operators in states that have legalized medical or adult-use cannabis.

8.      On April 5, 2021, AFC entered into a credit agreement (the "April 2021 Credit Agreement") with certain Justice Grown affiliates through which AFC agreed to fund up to $46,150,000 to finance the construction of Justice Grown cultivation and processing sites and dispensaries in New Jersey (the "NJ Project").

9.      To provide additional security for this loan, AFC and Loevy and Kanovitz also signed a shareholder guaranty (the "Shareholder Guaranty") on the same day, under which Loevy and Kanovitz personally guaranteed the borrowers' obligations under the April 2021

Credit Agreement, and any subsequent loan documents, for certain losses and liabilities to AFC. Loevy and Kanovitz guaranteed, among other things, losses and liabilities for any material breach of representations and warranties in the loan documents; fraud, malfeasance, or intentional misrepresentations by Loevy or Kanovitz or a borrower under their control; and the intentional misapplication, misappropriation, or conversion of Justice Grown monies by Loevy or Kanovitz or a borrower under their control.

10.      In September 2021, in connection with Justice Grown's restructuring, AFC entered into the Second Amended and Restated Credit Agreement (the "Credit Agreement") with several Justice Grown-affiliated entities (the "JG Borrowers," defined more precisely below) to finance the NJ Project and the construction of cultivation and processing sites and dispensaries in Pennsylvania (the "PA Project," and collectively with the NJ Project, the "Projects").

11.      The Credit Agreement permits the JG Borrowers to use the proceeds of AFC's loans to finance construction and capital expenditures for the Projects, to fund an interest payment account, to repay certain limited outstanding debt, and to pay transaction fees and expenses.  The JG Borrowers granted AFC a security interest in substantially all of their assets as collateral and agreed not to engage in unauthorized, deceitful, or self-dealing transactions using AFC's funds.

12.      Problems began as soon as the ink dried.  The JG Borrowers defaulted on the Credit Agreement multiple times—failing to use funds as required, transferring assets to other Loevy and Kanovitz-owned entities that were not parties to the Credit Agreement, failing to meet the financial covenants, and accruing substantial unauthorized liabilities.

13.      In danger of having the loan accelerated, Defendants then agreed among themselves to begin hiding the truth from AFC.  Defendants repeatedly falsely certified that the

JG Borrowers had not experienced an "Event of Default," when in fact JG Borrowers had experienced multiple such events. Defendants also provided quarterly compliance certificates and financial statements that intentionally misrepresented the JG Borrowers' financial state and hid the JG Borrowers' unlawful payments to other Justice Grown entities and, ultimately, to Loevy and Kanovitz. And when AFC—not knowing about the misrepresentations—agreed to forbear from exercising its remedies under the Credit Agreement, Defendants lied again. Specifically, they omitted several valuable assets from a "perfection certificate" that should have identified all potential Justice Grown assets available as collateral.

14.     AFC has learned that Justice Grown is nothing more than a network of failing subsidiaries playing musical chairs with their cash to suit Defendants' desires. Defendants have used AFC funds lent to Justice Grown as if those funds were deposits in their personal piggy banks. Defendants ultimately transferred nearly $20 million dollars from the Projects' accounts to other Loevy and Kanovitz-owned entities, including Justice Grown entities located in Illinois, Massachusetts, Michigan, and California, and a management company in which Loevy and Kanovitz own nearly 90% of the equity interest.

15.     With its funding improperly diverted, the PA Project rotted on the vine, accruing millions in unpaid taxes and liabilities and suffering repeated setbacks in construction. At the same time, Defendants continued to seek funding under the Credit Agreement based on false representations and for false purposes.

16.     The PA Project ultimately failed, and AFC recently initiated mortgage foreclosure proceedings with respect to the real property owned by one of the JG Borrowers and might soon initiate foreclosure proceedings on additional assets that will return only pennies on the dollar for AFC's loans to the JG Borrowers. The NJ Project hangs on, but only barely. The JG Borrowers

have had to bring in a consultant to help manage the operations, with Defendants regularly standing in his way, concerned that he might uncover their fraud—ultimately leading to Defendants recently firing that consultant.

17.     In sum, Defendants have conducted a criminal enterprise through which they have unlawfully deprived AFC of millions of dollars.  AFC turns to this Court as a last resort to confirm its rights, seek redress, and prevent Defendants from engaging in any further misconduct.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction over Plaintiffs' RICO claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) and supplemental subject matter jurisdiction over Plaintiffs' other claims under 28 U.S.C. § 1367(a).

19.     The Court also has subject matter jurisdiction over all claims under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the jurisdictional minimum.  Upon information and belief, all Defendants are citizens of the State of Illinois.  Plaintiffs are (a) a corporation organized and existing under the laws of the State of Maryland with its principal place of business in Florida, and (b) a Delaware limited liability company with no member being a citizen of Illinois.

20.     The Court has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b), because Defendants Loevy and Kanovitz have consented to this Court's jurisdiction over them.

21.     Venue is proper in this District under 18 U.S.C. § 1965(b), because Defendants Loevy and Kanovitz have agreed to the propriety of this venue.

## THE PARTIES

22.     Plaintiff Advanced Flower Capital Inc. is a corporation organized and existing under the laws of the State of Maryland with its principal place of business in West Palm Beach, Florida.  Advanced Flower Capital Inc. is a publicly traded institutional lender that originates, structures, and underwrites loans secured by commercial real estate and other types of financing solutions.

23.     Plaintiff AFC Agent LLC is a Delaware limited liability company with its principal place of business in West Palm Beach, Florida.  AFC Agent LLC is the administrative agent under the Credit Agreement and is successor-in-interest in that capacity to AFC Management, LLC.

24.     Upon information and belief, Defendant Michael Kanovitz resides in the State of Illinois.  Kanovitz co-founded JG HoldCo with Loevy.  Kanovitz owns 44.7% of JG HoldCo and 50% of Hayden Manager.  Alongside Loevy, Kanovitz serves as manager of both JG HoldCo and Hayden Manager.  Kanovitz is also a Partner, director, and secretary of the law firm, Elgron, Inc., an Illinois corporation, doing business under the name "Loevy & Loevy."  Upon information and belief, Kanovitz is a cousin of Defendant Jon Loevy.

25.     Upon information and belief, Defendant Jon Loevy resides in the State of Illinois.  Loevy co-founded JG HoldCo and, together with his wife, owns 44.7% of JG HoldCo.  Loevy also owns 50% of Hayden Manager, the manager of JG HoldCo's LLC subsidiaries.  Alongside Kanovitz, Loevy serves as manager of both JG HoldCo and Hayden Manager.  Loevy is also the Founding Partner, director, and president of the law firm, Elgron, Inc., an Illinois corporation, doing business under the name "Loevy & Loevy."  Upon information and belief, Loevy is a cousin of Defendant Michael Kanovitz.

## FACTUAL ALLEGATIONS

**A.    Loevy and Kanovitz and the JG Holdco Enterprise**

26.    Under the control of Loevy and Kanovitz, JG HoldCo is the ultimate parent company to a wide range of cannabis companies and related management companies.  The relevant JG HoldCo subsidiaries are shown below, along with JG HoldCo's percentage ownership:



27.    Upon information and belief, Hayden Manager, an Illinois limited liability company, serves as manager of all LLC subsidiaries under JG HoldCo.  Loevy and Kanovitz are the sole members of Hayden Manager, each with a 50% ownership interest.  Under the Amended & Restated Operating Agreement of Hayden Manager, "all rights with respect to management of [Hayden Manager] are reserved to [Loevy and Kanovitz]."  Hayden Manager also manages the JG Borrowers that are 100% owned directly by Loevy and Kanovitz:



28.    JG HoldCo owns 100% of Pier Cove LLC, which is a cannabis cultivation and manufacturing company located in Pennsylvania.  Pier Cove LLC is managed by Hayden Manager.

29.    JG HoldCo owns 100% of Hayden Gateway LLC, which owns several dispensaries located in Pennsylvania.  Hayden Gateway LLC is managed by Hayden Manager.

30.    JG HoldCo owns 87% of Bloc Dispensary LLC (f/k/a JG New Jersey LLC), which owns a cannabis cultivation and manufacturing company and several dispensaries in New Jersey.  Bloc Dispensary LLC is managed by Hayden Manager.

31.    JG HoldCo owns 90% of JG Michigan LLC, which owns a cannabis dispensary located in Michigan and other assets.  JG Michigan LLC is managed by Hayden Manager.

32.    JG HoldCo owns 100% of JG IL LLC, which owns, among other assets, a cannabis cultivation and manufacturing company and multiple cannabis dispensaries that are in the process of being opened in Illinois.  JG IL LLC is managed by Hayden Manager.

33.    JG HoldCo owns 100% of Oakland Manager LLC ("Oakland Manager"), a corporate entity that JG HoldCo uses for operational and financial management, including

payroll services, technology, and accounting. Oakland Manager is managed by Hayden Manager.

34.     Upon information and belief, JG HoldCo owns: (a) 100% of Matanzas Alliance LLC, which holds cannabis licenses for cultivation, manufacturing, and distribution in California, and (b) 100% of Hayden RP LLC, which holds a cannabis license for cultivation. These entities are managed by Hayden Manager.

35.     JG Michigan LLC, JG IL LLC, Oakland Manager, Matanzas Alliance LLC, and Hayden RP LLC are referred to herein as the "Non-Borrower JG Entities."

36.     Loevy and Kanovitz each own 50% of SRG Waretown LLC, a New Jersey limited liability company; SRG 1761 North Olden LLC, a New Jersey limited liability company; and SRG 1474 Prospect LLC, a New Jersey limited liability company. SRG Waretown LLC owns property for a dispensary in New Jersey. SRG 1761 North Olden LLC owns property for a dispensary in New Jersey. SRG 1474 Prospect owns property for cultivation and manufacturing of cannabis in New Jersey. All three entities are managed by Hayden Manager.

37.     Loevy and Kanovitz each own 50% of SRG 272 Main Street LLC, a Pennsylvania limited liability company, and SRG HI Park LLC, a Pennsylvania limited liability company. SRG 272 Main Street LLC owned two dispensaries at the time of the Credit Agreement but no longer holds any assets. SRG HI Park LLC owns property for the cultivation and manufacturing of cannabis in Pennsylvania. Both entities are managed by Hayden Manager. These entities, together with Pier Cove LLC, are referred to herein as the "PA Borrowers." Collectively, SRG Waretown LLC, SRG 1761 North Olden LLC, SRG 1474 Prospect LLC, Bloc Dispensary LLC, and the PA Borrowers are referred to throughout as the "JG Borrowers."

38.     Upon information and belief, Loevy and Kanovitz each owned a direct or indirect beneficial interest in TC Applico, a Missouri limited liability company, which sold certain assets in June 2024 and directed a substantial portion of the proceeds to Oakland Manager.  Upon information and belief, before its sale of assets, TC Applico owned at least three dispensary licenses in Missouri, along with leases or subleases for three dispensaries in Missouri. According to public reporting, TC Applico was controlled by JG HoldCo.

**B.     The Credit Agreement and Shareholder Guaranty**

39.     AFC and Bloc Dispensary LLC, Hayden Gateway, Pier Cove, SRG 272 Main Street LLC, SRG 1761 North Olden LLC, SRG 1474 Prospect LLC, SRG HI Park LLC, and JG HoldCo entered into the April 2021 Credit Agreement on April 5, 2021.  In that agreement, AFC committed to lending those entities up to $46,150,000 to finance the NJ Project.  At the same time, AFC and Defendants Loevy and Kanovitz also entered into the Shareholder Guaranty. Under the Shareholder Guaranty, Loevy and Kanovitz personally guaranteed certain "Guaranteed Obligations," including "losses, expenses, charges, costs or liability to any member of the Lender Group" arising from, among other things:

   a.  "any material breach of any representation and warranty in the Credit Agreement or any other Loan Document";

   b.  any failure by a JG Borrower or any subsidiary guarantor (collectively, the "Loan Parties" and each, a "Loan Party") to pay "any Taxes or other governmental charges or charges for labor and materials";

   c.  "fraud, malfeasance or intentional misrepresentation by Guarantors (or either of them) or if Guarantors (or either of them) direct, or otherwise knowingly cause any Loan Party or any other Person directly Controlled by such Guarantor to commit fraud or malfeasance or to make an intentional misrepresentation (with each Guarantor and each Person directed or knowingly caused by any Guarantor to take an action described herein, being referred to herein as a "Designated Party") in connection with the Loan Documents or any Loans, including any such conduct to the extent it causes any material breach of any provision of the Loan Documents";

-10-

    d.    "the intentional misapplication, misappropriation or conversion by any Designated Party of (x) any income, revenue or other collections or other amounts derived from the operation of the Collateral Properties in each case due to be paid or delivered to Agent under the Loan Documents, and (y) funds received by a Designated Party for payment of taxes, other governmental charges or charges for labor and materials that can create Liens or any portion of the Collateral Properties to the extent the same are not so applied."

40.    The April 2021 Credit Agreement contains several relevant definitions. These definitions were carried through in all amendments to, and restatements of, the April 2021 Credit Agreement and incorporated into the Shareholder Guaranty and the forbearance agreements.

41.    The April 2021 Credit Agreement defines the term "Loan Document," to include any "instrument or agreement entered into, now or in the future, by Parent or any Loan Party or any shareholder of Parent or any Loan Party, and any member of the Lender Group in connection with this Agreement."

42.    The April 2021 Credit Agreement defines the term Loan Party as "any Borrower or any Subsidiary Guarantor."

43.    The April 2021 Credit Agreement defines "Affiliate" as "any other Person that controls, is controlled by, or is under common control." The Non-Borrower JG Entities are all "Affiliates" of the JG Borrowers under the Credit Agreement because they are under common control with the JG Borrowers—either through JG HoldCo or through Loevy and Kanovitz.

44.    On or about September 30, 2021, in connection with Justice Grown's restructuring, AFC and the JG Borrowers entered into the Credit Agreement.

45.    Under the Credit Agreement, AFC increased the amount of money it would lend under the April 2021 Credit Agreement, committing to lend the JG Borrowers up to $75,400,000 to finance the JG Borrowers' development of the Projects.

46.    The Credit Agreement requires the JG Borrowers to maintain compliance with certain financial covenants. The financial covenants include minimum adjusted EBITDA, free

cash flow, fixed charge coverage ratio, cash balance, combined net income, and a maximum total leverage ratio for each quarter. Failure to comply with these financial covenants results in an Event of Default under the Credit Agreement and provides AFC with the ability to exercise rights and remedies under the Credit Agreement and the law.

47. The Credit Agreement requires the JG Borrowers to certify compliance with these financial covenants on a quarterly basis. At the end of each quarter, the JG Borrowers are required to deliver to AFC a certification of compliance and a financial certificate attaching quarterly financial statements for (a) JG HoldCo's operations, and (b) the JG Borrowers and their subsidiaries' operations.

48. The JG Borrowers are also required to provide AFC with the calculations backing up the JG Borrowers' compliance with the financial covenants, including the minimum free cash flow covenant. Free cash flow is calculated by deducting from the JG Borrowers' adjusted EBITDA certain cash payments going out, including unfinanced capital expenditures, cash interest, principal repayment, tax payments, restricted payments and fixed charges, and one-time cash charges excluded from net income. The JG Borrowers show this calculation by listing out each of the categories as separate line items in the backup. The JG Borrowers also include a table calculating fixed charges.

49. The Credit Agreement also requires the JG Borrowers to deliver unaudited financial statements on a monthly and quarterly basis and audited financial statements on an annual basis. The failure of the JG Borrowers to comply with these requirements results in an Event of Default under the Credit Agreement and gives AFC the right to exercise all rights and remedies under the Credit Agreement and the law.

50.     The Credit Agreement identifies certain violations and other misconduct by the Loan Parties as "Events of Default."  Events of Default include making restricted payments, engaging in affiliate transactions, failing to make required principal or interest payments, failing to satisfy covenants and other agreements, entering into bankruptcy or insolvency, and effectuating a change of control.  Events of Default allow AFC to exercise certain remedies against the JG Borrowers.

## C.      The JG Borrowers' Failure to Meet Financial Covenants

51.     The JG Borrowers struggled to comply with their obligations under the Credit Agreement almost immediately after signing it.  AFC tried to work with the JG Borrowers to get them on the right track, but multiple defaults on financial covenants necessitated changes to the Credit Agreement, including the JG Borrowers' failure to meet the Credit Agreement's minimum adjusted EBITDA, free cash flow, total leverage ratio, fixed charge coverage ratio, and net income financial covenants.

52.     With each new amendment and agreement, AFC gave up valuable contractual rights and entitlements to payments—all in reasonable reliance on the JG Borrowers' representations about their financial performance and compliance with the Credit Agreement.

53.     In early 2022, AFC and the JG Borrowers entered into Amendment No. 1 to the Credit Agreement, dated and effective as of June 30, 2022 ("Amendment No. 1").  Amendment No. 1 imposed additional conditions and controls, including a requirement that the JG Borrowers meet certain funding milestones, among other things, in exchange for AFC waiving past breaches of the financial covenants.  Loevy signed Amendment No. 1 on behalf of JG Borrowers in his capacity as manager of Hayden Manager and represented in the amendment that "[n]o Default or Event of Default exists."

54.     The JG Borrowers soon failed to satisfy the funding milestones under Amendment No. 1, and they informed AFC that they would fail to satisfy minimum adjusted EBITDA, free cash flow, maximum total leverage ratio, fixed charge coverage ratio, and net income financial covenants for the next two quarters (Q3 and Q4 2022).

55.     AFC and the JG Borrowers thus entered into Amendment No. 2 to the Credit Agreement, effective as of August 26, 2022 ("Amendment No. 2"). This time AFC preemptively waived financial covenant breaches for the next two quarters (Q3 and Q4 2022) and agreed to lend the JG Borrowers more money, upsizing the credit facility by more than $8 million, in exchange for, among other things, additional equity cash contributions to the JG Borrowers. Loevy signed Amendment No. 2 on behalf of JG Borrowers in his capacity as manager of Hayden Manager and represented in the amendment that "[n]o Default or Event of Default exists."

56.     A few months later, AFC and the JG Borrowers entered into Amendment No. 3 to the Credit Agreement, effective as of December 31, 2022 ("Amendment No. 3"). In Amendment No. 3, AFC agreed to, among other things, allow the JG Borrowers to pay up to 75% of their interest payments in kind (instead of in cash) until March 31, 2023, in exchange for, among other things, JG Borrowers delivering evidence of the additional equity contributions previously promised. Loevy signed Amendment No. 3 on behalf of JG Borrowers in his capacity as manager of Hayden Manager and represented in the amendment that "[n]o Default or Event of Default exists."

57.     Four months later, AFC and the JG Borrowers entered into Amendment No. 4 to the Credit Agreement effective as of April 26, 2023 ("Amendment No. 4"). In Amendment No. 4, AFC agreed to, among other things, extend the period for which the JG Borrowers could

request loans from AFC and allowed the JG Borrowers to pay up to 75% of their interest payments in kind (instead of cash) until April 30, 2023.  Loevy signed Amendment No. 4 on behalf of JG Borrowers in his capacity as manager of Hayden Manager and represented in the amendment that "[n]o Default or Event of Default exists."

58.     The JG Borrowers still could not get on track.  So AFC and the JG Borrowers entered into a forbearance agreement on September 12, 2023 (the "2023 Forbearance Agreement").  In this agreement, the JG Borrowers forced AFC's hand, requiring it to fund an additional $1,600,000 in protective advances to preserve and protect the collateral because the JG Borrowers had failed to do so.  AFC also agreed to forbear from exercising remedies for known Events of Default in exchange for further controls to get the Projects' construction on schedule and the JG Borrowers' agreement to deliver to AFC proceeds from the disposition of certain assets.

59.     Only one month later, the JG Borrowers defaulted under the Credit Agreement again by failing to deliver monthly financial statements for October 2023.  The JG Borrowers also missed the next deadline to deliver monthly financial statements for November 2023.

60.     The JG Borrowers then stopped making interest and principal payments on the AFC loans.  They missed a cash interest payment for December 2023, resulting in a default under the Forbearance Agreement, and they missed a principal payment due on January 1, 2024, a cash interest payment for January 2024, and a principal payment due on February 1, 2024, each resulting in an Event of Default under the Credit Agreement.  Despite AFC's best efforts to salvage the lending relationship, the JG Borrowers continued to miss payments, failed to comply with financial covenants, and generally mismanaged the Projects through early 2024.

61.     The parties entered into yet another forbearance agreement on March 6, 2024 (the "2024 Forbearance Agreement").  In the 2024 Forbearance Agreement, AFC gave up many of its rights and remedies under the Loan Documents (including the ability to accelerate the loans and foreclose on certain assets) in order to help make things work with the JG Borrowers.

62.     In both Forbearance Agreements, AFC and the JG Borrowers agreed that the JG Borrowers would deliver to AFC the proceeds of equity contributions by Loevy and Kanovitz for AFC to hold in escrow and distribute to the JG Borrowers as necessary to fund the Projects.  The JG Borrowers could access the funds only by delivering to AFC a draw request.

63.     Immediately before entering into the 2024 Forbearance Agreement, AFC became aware that the JG Borrowers likely had experienced several previously undisclosed Events of Default.  When AFC sought information about these issues before signing the 2024 Forbearance Agreement, the JG Borrowers started covering their tracks.  Suspecting potential wrongdoing by Justice Grown, AFC insisted on a carve-out from the 2024 Forbearance Agreement permitting it to assert certain claims based on fraud or intentional misconduct by JG HoldCo, the JG Borrowers, Loevy, or Kanovitz without breaching the 2024 Forbearance Agreement.  This agreement ensured that the JG Borrowers could potentially still succeed while AFC investigated potential fraud or misconduct.  Upon such investigation, AFC has started to become aware of the extent of Defendant's deceit.

**D.    The Events of Default Defendants Repeatedly Hid from AFC**

64.     Through Loevy, the JG Borrowers represented that "[n]o Default or Event of Default exist[ed]" on June 30, 2022, when they entered into Amendment No. 1; on August 22, 2022, when they entered into Amendment No. 2; on December 31, 2022, when they entered into Amendment No. 3; and on April 26, 2023, when they entered into Amendment No. 4.  These representations were false.

65.    Through Loevy, the JG Borrowers also represented that "other than the Specified Defaults," "[n]o Default, Event of Default or Forbearance Default" had occurred or were continuing when Loevy signed the 2023 Forbearance Agreement and when he signed the 2024 Forbearance Agreement.  Again, these representations were not true.

66.    Loevy executed each amendment to the Credit Agreement and the 2023 and 2024 Forbearance Agreements on behalf of each of the JG Borrowers in his capacity as manager of Hayden Manager, and upon information and belief, he did so in consultation and with the acquiescence of Defendant Kanovitz.

67.    Unbeknownst to AFC when it entered into Amendment Nos. 1, 2, 3, and 4 and the 2023 and 2024 Forbearance Agreements, Defendants were engaged in an elaborate shell game designed to extract more and more money from AFC, hide assets, cover their fraud, and use the AFC proceeds to further their own personal goals.  This shell game resulted in numerous undisclosed Events of Default.

68.    At Defendants' instruction, direction, and control, the JG Borrowers had been unlawfully shifting money for years to Affiliates owned by Defendants Loevy and Kanovitz solely to enrich those individuals.

69.    In addition, Defendants—either directly or indirectly—engaged in other misconduct that harmed AFC, including by failing to pay taxes and vendors and by submitting false disbursement requests to AFC to secure even more cash for themselves.

70.    Defendants conspired to hide their misdeeds and conceal the undisclosed Events of Default by submitting to AFC false and misleading financial covenant certifications and fabricated financial statements for the JG Borrowers.

1.        **Improper Fund Transfers**

71.        Between September 2021 and July 2023, Defendants, on their own or through

Hayden Manager, caused the JG Borrowers to transfer nearly $20 million to other entities owned

or controlled by Defendants Loevy and Kanovitz.

| Non-Borrower JG Entity Recipient | Total Amount Transferred Prior to June 30, 2022 | Total Amount Transferred Between June 30, 2022, and August 26, 2022 | Total Amount Transferred After August 26, 2022 |
|---|---|---|---|
| Oakland Manager | $8,667,519.32 | $2,182,336.22 | $5,036,160.44 |
| Law Finance Group/Loevy & Loevy | $966,762.00 | -- | -- |
| JG IL | $871,345.07 | $172,039.98 | $1,292,005.13 |
| JG Massachusetts | $7,100.79 | $878.21 | $9,150.83 |
| JG Michigan | $39,104.03 | -- | -- |
| JG CA | $1,269.27 | $284.21 | $1,666.92 |
| **TOTAL** | **$10,553,100.48** | **$2,355,538.62** | **$6,338,983.32** |

72.        The payments listed above were expressly prohibited by the Credit Agreement

and constituted Events of Default.

73.        The payments were Events of Default under the Credit Agreement because they

were (a) improper uses of proceeds; (b) impermissible restricted payments; (c) improper affiliate

transactions; and (d) improper asset disposals.

a.        **Improper Uses of Proceeds.**

74.        The payments listed above were undisclosed Events of Default under Section

8.1(b)(i) because the JG Borrowers used proceeds of AFC's financing in violation of the Credit

Agreement's restrictions.  Section 6.13 of the Credit Agreement states that the JG Borrowers are

prohibited from using the proceeds of AFC's loans for any purpose other than specified

categories of Project expenses, to fund an interest payment account, to repay specifically

scheduled debts, and to pay specific transaction fees and expenses.  Permissible expenses include

"financ[ing] future construction" on the Projects, capital expenditures for the Projects, and funding the purchase of additional collateral properties, among others.  Using the proceeds of AFC's loans to pay Affiliates—much less to personally enrich Loevy and Kanovitz—is not permitted.

75.    The JG Borrowers' wire transfer activity shows that proceeds of the AFC's loans went to the Non-Borrower JG Entities or other third parties.  For example, on or about January 18, 2022, the JG Borrowers made a payment of $966,762.00 to Law Finance Group to pay off a debt Loevy and Kanovitz's law firm, Loevy & Loevy, owed to Law Finance Group.  The JG Borrowers were not permitted to use funds to pay Loevy & Loevy's debt to Law Finance Group because it had not been scheduled as permissible debt the JG Borrowers could pay off under Section 6.13.  Under Section 8.01(b)(i), the violation of any covenant in Section 6 of the Credit Agreement (including Section 6.13) results in an Event of Default.

### b.    Impermissible Restricted Payments

76.    In addition, the Credit Agreement restricts the JG Borrowers' ability to make certain payments (referred to as "Restricted Payments" in the Credit Agreement).  At all times, Section 6.8 of the Credit Agreement has barred the JG Borrowers from making, or causing a subsidiary to make, any Restricted Payments unless at the time of the payment (a) there was not an ongoing Event of Default and the payment would not cause an Event of Default; and (b) the JG Borrowers were in "pro forma compliance with" enumerated financial covenants, both before and after the payment.  But the right to make Restricted Payments grew narrower with amendments to the Credit Agreement.

(i)     *Restricted Payments Between September 30, 2021, and June 30, 2022.*

77.     From execution, Section 1.1 of the Credit Agreement defined Restricted Payments to include, among other things, any payment or distribution "to the direct or indirect holders of Stock issued by any Loan Party in their capacity as such" and for "management fees or advisory fees to any Affiliate of a Loan Party."  Management fees or advisory fees are broadly defined to include "any allocation or sharing of overhead, selling, general or administrative expenses" or "other shared business expenses."

78.     The JG Borrowers unlawfully transferred $10,553,100.48 to the Non-Borrower JG Entities between September 30, 2021, and June 30, 2022.  These payments were unlawful because they were direct or indirect payments "to the direct or indirect holders of Stock issued by any Loan Party in their capacity as such" or "management fees or advisory fees" to Affiliates of the JG Borrowers.  These payments were not allowed because there were ongoing Events of Default, including the JG Borrowers' failure to maintain the financial covenants.

79.     These payments were direct or indirect payments "to the direct or indirect holders of Stock issued by any Loan Party in their capacity as such" because the payments were made to other direct or indirect subsidiaries of JG HoldCo as payments for services, payments to the Non-Borrower JG Entities for outstanding bills, payments to vendors or other third parties directly on the Non-Borrower JG Entities' behalf, and other distributions to Non-Borrower JG Entities.  JG HoldCo, as the direct or indirect equity holder of the JG Borrowers, benefitted from the payments.  Beyond the payments to the Non-Borrower JG Entities that were barred under the Restricted Payments covenant, on January 18, 2022, the JG Borrowers paid off a $966,762.00 debt Loevy & Loevy owed to Law Finance Group.  This payment meets the Credit Agreement's definition of payments "to the direct or indirect holders of Stock issued by any Loan Party in

their capacity as such" because any payment to, or on behalf of, Kanovitz and Loevy (or their

law firm), constitutes a direct or indirect payment to a direct or indirect holder of stock given

Loevy and Kanovitz's direct ownership of certain JG Borrowers and indirect ownership of the

JG Borrowers through their ownership of JG HoldCo.

80.     Certain of these payments also constitute "management fees or advisory fees"

because the money was used to pay management fees or administrative and business expenses to

the Non-Borrower JG Entities.  The Credit Agreement's definition of Restricted Payments

specifies that the phrase "management fees or advisory fees" should be read broadly to include

"any allocation or sharing of overhead, selling, general or administrative expenses, taxes or other

shared business expenses."

81.     There were several ongoing Events of Default at the time the JG Borrowers made

these payments or distributions, as memorialized in the recitals to Amendment No. 1 and the

2023 Forbearance Agreement.  Additionally, the JG Borrowers delivered a compliance

certificate for Q4 2021 certifying that the JG Borrowers failed to comply with the minimum net

income covenant; a compliance certificate for Q1 2022 certifying that the JG Borrowers failed to

comply with the minimum adjusted EBITDA covenant, the maximum total leverage ratio

covenant, the minimum fixed charge coverage ratio covenant, and the minimum net income

covenant; and a compliance certificate for Q2 2022 certifying that the JG Borrowers failed to

comply with all financial covenants.

*(ii)     Restricted Payments Between June 30 and August 25, 2022.*

82.     Amendment No. 1, signed on June 30, 2022, clarified that Restricted Payments

include any direct or indirect "payment of any kind to Jon Loevy, Michael Kanovitz, their

Affiliate (other than the Loan Parties) or any family member of any of the foregoing Persons or

Affiliates (including, without limitation, rent payments and any payments of Indebtedness owed to any of them)."

83.     After the parties signed Amendment No. 1, but before they signed Amendment No. 2, the Credit Agreement prohibited the JG Borrowers from making any Restricted Payments other than "Permitted Tax Payments."

84.     The JG Borrowers unlawfully transferred $2,355,538.62 to the Non-Borrower JG Entities between June 30 and August 26, 2022.  These payments constituted Restricted Payments because the funds were used to directly or indirectly make payments or distributions "to the direct or indirect holders of Stock issued by any Loan Party in their capacity as such," pay "management fees or advisory fees" to an "Affiliate of a Loan Party," and for the additional reason that they were payments to Loevy, Kanovitz, or their Affiliates.  These payments were obviously not "Permitted Tax Payments," so they were an Event of Default.

*(iii)     Restricted Payments After August 2022.*

85.     The JG Borrowers unlawfully transferred $6,338,983.32 to the Non-Borrower JG Entities after August 26, 2022.  These payments also constitute Restricted Payments as direct or indirect payments or distributions "to the direct or indirect holders of Stock issued by any Loan Party in their capacity as such," direct or indirect payments of "management fees or advisory fees" or as payments to Loevy, Kanovitz, or their Affiliates, for the same reasons as in earlier periods.

86.     The payments in this period were not allowed under Amendment No. 1 but were further prohibited under Amendment No. 2, which required that (a) the payments be "review[ed] and verifi[ed]" by AFC; and (b) at the time of payment, the JG Borrowers were in compliance with an expanded list of financial covenants.  The JG Borrowers did not submit these payments to AFC for review and verification, as required by Amendment No. 2.  Additionally, the JG

Borrowers were out of compliance with financial covenants when they made these payments, as evidenced by the Q3 2022, Q4 2022, Q1 2023, Q2 2023 and Q3 2023 compliance certificates.

87.     In sum, all of the Restricted Payments to the Non-Borrower JG Entities in all three periods meet the relevant definition of impermissible Restricted Payments because they were direct or indirect (a) payments or distributions "to the direct or indirect holders of Stock issued by any Loan Party in their capacity as such," (b) payments of "management fees or advisory fees to any Affiliate of a Loan Party," or (c) payments to Loevy, Kanovitz, or their Affiliates.  Such Restricted Payments constitute Events of Default under Section 8.1(b)(i) of the Credit Agreement because the JG Borrowers "fail[ed] to perform or observe any covenant or other agreement contained in . . . Section 6," which bars the Restricted Payments the JG Borrowers made.

88.     Because Defendants Loevy and Kanovitz are the sole owners of Hayden Manager, which manages all of the JG Borrowers, any action taken by the JG Borrowers was at the behest of Loevy and Kanovitz, or at the behest of individuals directed by Loevy and Kanovitz through Hayden Manager.  That is consistent with Loevy and Kanovitz's management responsibilities identified in Hayden Manager's operating agreement, which specifies that "all rights with respect to the management of [Hayden Manager] are reserved to [Loevy and Kanovitz]."  Given that Hayden Manager is responsible for overseeing the operations of the JG Borrowers, Loevy and Kanovitz have managerial authority over the JG Borrowers as well.

89.     The Restricted Payments to the Non-Borrower JG Entities should have been used to fulfill the JG Borrowers' obligations to AFC under the Credit Agreement and are therefore losses and liabilities arising from the JG Borrowers' breach of representations and warranties.

90.     Further, none of these Restricted Payments were ever included as Specified

Defaults in the 2023 or 2024 Forbearance Agreement, and AFC did not waive the defaults

arising from these payments in any of the amendments to the Credit Agreement or the

Forbearance Agreements.

### c.     Failure to Maintain Financial Covenants

91.     Because the payments to Non-JG Borrower Entities required the JG Borrowers to

be in pro forma compliance with the financial covenants both before and after giving effect to the

payments, the JG Borrowers' failure to maintain compliance with those covenants barred all of

these payments.

92.     The Credit Agreement requires the JG Borrowers to maintain compliance with

certain financial covenants.  The financial covenants include minimum adjusted EBITDA, free

cash flow, fixed charge coverage ratio, cash balance, and combined net income, and a maximum

total leverage ratio for each quarter.  Failure to comply with these financial covenants is an Event

of Default under Section 8.1(b)(i) of the Credit Agreement and provides AFC with the ability to

exercise rights and remedies under the Credit Agreement and the law.

93.     The Credit Agreement requires the JG Borrowers to certify compliance with these

financial covenants on a quarterly basis.  At the end of each quarter, the JG Borrowers are

required to deliver to AFC a certification of compliance and a financial certificate attaching

quarterly financial statements for (a) JG HoldCo's operations, and (b) the JG Borrowers and their

subsidiaries' operations.

94.     The JG Borrowers admitted in these certifications that they failed to comply with

at least one financial covenant for every period between Q4 2021 and Q3 2023:

95.      For each period from March 31, 2022, through September 30, 2023, the JG

Borrowers certified that they failed to comply with the financial covenant found in Section 7.1 of

the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed minimum adjusted EBITDA amount.

96.     For each period from December 31, 2021, through September 30, 2023, the JG Borrowers certified that they failed to comply with the financial covenant found in Section 7.2 of the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed minimum free cash flow amount.

97.     For each period from March 31, 2022, through September 30, 2023, the JG Borrowers certified that they failed to comply with the financial covenant found in Section 7.3 of the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed maximum total leverage ratio.

98.     For each period from March 31, 2022, through September 30, 2023, the JG Borrowers certified that they failed to comply with the financial covenant found in Section 7.4 of the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed minimum fixed charge coverage ratio.

99.     For each period from September 30, 2022, through September 30, 2023, the JG Borrowers certified that they failed to comply with the financial covenant found in Section 7.5 of the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed minimum cash balance amount.

100.     For all periods for which the JG Borrowers have submitted compliance certifications, from December 31, 2021, through September 30, 2023, the JG Borrowers certified that they failed to comply with the financial covenant found in Section 7.6 of the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed minimum net income amount.

101.    Because the JG Borrowers failed to maintain compliance with the financial covenants over all relevant periods, the payments to the Non-Borrower JG Entities were barred under Section 6.8 of the Credit Agreement.

### d.    Improper Affiliate Transactions

102.    The payments to Non-Borrower JG Entities were also Events of Default because Section 6.12 of the Credit Agreement prohibits the JG Borrowers from entering into "any transaction with any Affiliate of any Loan Party or any of its Subsidiaries (including the payment [of any] management, advisory, consulting fees or the like)," except as specifically permitted in the covenant.  Permitted exceptions include (a) transactions on fair and reasonable terms that are "fully disclosed" to AFC if they involve payments by a Loan Party in excess of $10,000 per fiscal year and are no less favorable as would be obtained in an arm's length transaction with a non-Affiliate, (b) permitted Restricted Payments, (c) compensation and indemnification payments to employees, officers and outside directors, and (d) transactions between Loan Parties.  The payments were not permitted Restricted Payments, and none of the other permitted exceptions apply.

### e.    Improper Asset Disposal

103.    The payments to Non-JG Borrowers and Oakland Manager were also Events of Default under Section 8.1(b)(i) because the JG Borrowers violated the Credit Agreement's disposal of assets covenant.  Section 6.4 of the Credit Agreement prohibits the JG Borrowers from transferring or otherwise disposing of any of its assets except in limited circumstances, including for certain "Permitted Dispositions."

104.    The Restricted Payments made to Non-Borrower JG Entities and other third parties were impermissible disposals of assets of the JG Borrowers because, given the recipients, uses, and sizes of these payments, none of the Credit Agreement's exceptions apply.

105.    None of the breaches associated with these payments were waived in the amendments to the Credit Agreement or included as Specified Defaults in the 2023 and 2024 Forbearance Agreements.

106.    And despite the fact that each payment was an Event of Default under the Credit Agreement, none were disclosed to AFC as existing Events of Default.

107.    Had AFC been fully aware of the undisclosed Events of Default, it would not have entered into the Credit Agreement amendments and instead could have exercised rights and remedies in the Credit Agreement, including accelerating the loans.  AFC also increased the loan commitment by $8 million in reliance on material misrepresentations when it entered into Amendment No. 2.  AFC would not have parted with that money had it been aware of the truth and instead would have invested those funds in more profitable ventures.  AFC also agreed to forego cash interest payments, among other things, in Amendment No. 3 and Amendment No. 4, in reasonable reliance on the representations that there were no undisclosed Events of Default.  Had AFC been aware of the undisclosed Events of Default, it would not have agreed to forego contractual rights in Amendment Nos. 3 and 4.

108.    Had AFC been fully aware of the undisclosed Events of Default, it would not have entered into the 2023 or 2024 Forbearance Agreements.  Although AFC knew about some Events of Default before entering into the 2024 Forbearance Agreement, AFC did not know, and could not have known, the extent of the JG Borrowers' violations.  AFC therefore agreed to reduce the interest rate relying on the representations by the JG Borrowers that there were no further undisclosed Events of Default.  If it had known the full truth, AFC would have never entered into the 2024 Forbearance Agreement and would have demanded harsher penalties and additional payments for protection in exchange for forbearance.  Instead, AFC supported Loevy

and Kanovitz's business and provided a helping hand in their time of need while, unbeknownst to AFC, Loevy and Kanovitz were abusing AFC's generosity and transferring proceeds of AFC's loans and any excess funds away from the business and AFC's collateral assets.

**2.    Defendants' Other Misconduct**

109.    In addition to the wrongful payments described above, the JG Borrowers—under Defendants' direction and control—committed other undisclosed Events of Default and engaged in other acts of misconduct to enrich themselves at AFC's expense, including by failing to pay vendors and taxes and by submitting false distribution requests to AFC.

**a.    Failure to Pay Vendors and Taxes.**

110.    In the years since executing the Credit Agreement, the JG Borrowers repeatedly failed to pay vendors, contractors, and taxes, leading to significant losses and liabilities to AFC in violation of Section 5.6 and Section 5.15 of the Credit Agreement, among others, constituting an Event of Default under Section 8.1(b)(ii) of the Credit Agreement.

111.    Upon information and belief, the PA Borrowers have accrued an accounts payable balance in an amount of $7,013,127.88 as of February 10, 2025, and unpaid taxes in an amount of $3,495,250 through June 30, 2023, totaling $10,508,377.88.

112.    AFC might soon need to initiate foreclosure proceedings on the property owned by Hayden Gateway and Pier Cove that serves as collateral to the Credit Agreement.  If AFC does so, it will be entitled to any proceeds derived from the disposition of those properties, but those proceeds will first be used to pay any unpaid taxes and charges, reducing the amount of proceeds available to AFC to pay down the JG Borrowers' debt.

113.    Because Loevy and Kanovitz are obligated under the Shareholder Guaranty to cover any losses or liabilities to AFC arising from "the failure by a Loan Party to pay any Taxes or other governmental charges or charges for labor and materials," they are required to pay the

$10,508,377.88 balance to AFC, which will otherwise be diverted from a foreclosure sale to pay unpaid invoices and taxes.

114.    AFC's right to the $10,508,377.88 balance was not waived in the amendments to the Credit Agreement or included as Specified Defaults in the 2023 and 2024 Forbearance Agreements.

115.    Because the $10,508,377.88 balance will attach to any potential foreclosure, it will reduce the amount the JG Borrowers will have to pay down their obligations to AFC under the Credit Agreement, and as such, constitute losses and liabilities arising from the JG Borrowers' breach of representations and warranties.

### b.    Fabricated Disbursement Request.

116.    Continuing the pattern of deceit, the JG Borrowers—at Defendants' direction— submitted invoices to AFC between November 2022 and September 2023 for false purposes.  In November 2022, the JG Borrowers submitted to AFC a disbursement request under the Credit Agreement for $473,000.64.  The JG Borrowers concurrently delivered to AFC an invoice numbered S26402 from a third party, Precision, for extraction equipment, noting that $408,814 of the disbursement would be used to pay the Precision invoice.

117.    AFC advanced the requested funds, but the JG Borrowers did not use the money to pay the invoice they submitted.  In August 2023, the JG Borrowers contacted AFC with a summary of amounts due and payable for the NJ Project, including an unpaid sum of "about $408k for the extraction equipment."  AFC informed the JG Borrowers that funds for the extraction equipment had already been disbursed.  In September 2023, the JG Borrowers submitted a new invoice #QU04472 from Agrify (formerly Precision) for $435,897.93, which included $408,814 from the first invoice and additional costs for tax and shipping of the equipment.  In other words, the JG Borrowers took AFC's $408,814 disbursement and did not

use it to pay for the equipment it said the money would be used to purchase. AFC has never

received an explanation for the above actions, despite repeated calls for an explanation. And

there were multiple draw requests for Precision equipment, so the fabricated request amount

could be even higher. On information and belief, the JG Borrowers transferred some of the

funds received in response to Precision disbursement requests to Oakland Manager.

**3.    Defendants Engage in a Pattern of Fraud to Cover Their Tracks**

118.    Defendants engaged in additional acts of fraud in an effort to keep their scheme

under wraps. Specifically, they facilitated the provision of an intentionally false perfection

certificate in order to hide assets, submitted to AFC false and misleading financial covenant

certifications, and transmitted to AFC false and misleading draw requests—all in an effort to

hide the fact that they were siphoning funds away from the JG Borrowers and transferring those

funds to other entities owned or managed by Loevy and Kanovitz, for the benefit of Loevy and

Kanovitz.

**a.    False Perfection Certificate**

119.    In light of the JG Borrowers' mismanagement of the Projects and persistent

violations of the Credit Agreement, the 2024 Forbearance Agreement required the JG Borrowers

to provide a perfection certificate (the "Perfection Certificate") identifying assets that could serve

as additional collateral to secure the Credit Agreement.

120.    The purpose of the Perfection Certificate was to give AFC a complete

understanding of all assets belonging to the JG Borrowers, JG HoldCo, and all of their Affiliates,

so that AFC could maximize its collateral package.

121.    AFC intentionally drafted the "Form of Perfection Certificate" attached to the

2024 Forbearance Agreement broadly: Section 5.16 of the 2024 Forbearance Agreement

specified that the Perfection Certificate must include information about assets belonging to JG

HoldCo and its direct or indirect subsidiaries or to "any Affiliate or other Person, including any present or former officer, employee, director, member of management or consultant . . . which owns any cannabis assets."

122.    On or about May 9, 2024, the JG Borrowers submitted the final Perfection Certificate, signed by Loevy.

123.    Upon information and belief, Healing Through Cannabis LLC, an Ohio limited liability company ("Healing Through Cannabis"), is affiliated with Justice Grown and is the owner of three dispensary licenses in Ohio, including a provisional license for the operation of a dispensary located in Springfield, Ohio.

124.    Upon information and belief, Growing Jobs Missouri LLC, a Missouri limited liability company ("Growing Jobs Missouri"), is affiliated with Justice Grown and owns several cannabis licenses.

125.    Upon information and belief, Botavi Wellness LLC, an Illinois limited liability company ("Botavi Wellness"), is affiliated with Justice Grown and owns several cannabis licenses.

126.    Despite the contractual obligation to identify all assets belonging to JG HoldCo and its direct or indirect subsidiaries or to any Affiliate, Defendant Loevy, acting on behalf of JG HoldCo, submitted a Perfection Certificate that intentionally failed to identify several significant JG HoldCo Affiliates and their assets, including at least TC Applico, Healing Through Cannabis, Botavi Wellness, and Growing Jobs Missouri.

127.    Upon information and belief, TC Applico, Healing Through Cannabis, Botavi Wellness, and Growing Jobs Missouri are Affiliates of JG HoldCo.

128.    Upon information and belief, non-party Vince Field, the Vice President of Business Development of Justice Grown in 2021, signed the license applications for TC Applico and Growing Jobs Missouri.

129.    Upon information and belief, non-party Alexzandra Fields is Justice Grown's Chief Executive Officer and President and was also the President of Healing Through Cannabis and signed a memorandum of understanding in August 2024 to sell licenses owned by Healing Through Cannabis for $4.75 million.

130.    On or about June 26, 2024, TC Applico sold assets to non-party BeLeaf for $17.5 million.  TC Applico directed BeLeaf to pay $6.75 million of the proceeds to Oakland Manager on TC Applico's behalf.  Loevy signed the asset purchase agreement for that sale on behalf of JG HoldCo, which owns Oakland Manager.

131.    Given that the TC Applico assets sold for $17.5 million, of which JG HoldCo's interest was at least $6.75 million, and Healing Through Cannabis assets sold for $4.75 million, these assets would have been material collateral to AFC.

132.    Even if the transfer of sale proceeds were to pay off a pre-existing debt TC Applico owed to Oakland Manager, rather than to funnel money to Loevy and Kanovitz, that debt should have been identified on the Perfection Certificate as an asset of Oakland Manager. Either way, Loevy executed a false Perfection Certificate.

133.    If AFC had known the extent of these assets, such assets would have been added to AFC's collateral package as security for the obligations under the Credit Agreement, reducing the significant risks AFC is undertaking with respect to the loans to the JG Borrowers.  Further, AFC should have been paid down with the proceeds of the sales of TC Applico's assets and Healing Through Cannabis' assets.

b.    **False and Misleading Financial Covenant Certifications and Financial Statements.**

134.    At Defendants' direction and under their control, the JG Borrowers repeatedly misrepresented their financial condition, as evidenced by the false and misleading financial statements delivered to AFC along with the JG Borrowers' compliance certificates.

135.    The Credit Agreement requires the JG Borrowers to maintain compliance with certain financial covenants.  The financial covenants include minimum adjusted EBITDA, free cash flow, fixed charge coverage ratio, cash balance, and combined net income, and a maximum total leverage ratio for each quarter.  Failure to comply with these financial covenants results in an Event of Default under the Credit Agreement and allows AFC to exercise rights and remedies under the Credit Agreement and the law.

136.    The Credit Agreement requires the JG Borrowers to certify compliance with these financial covenants on a quarterly basis.  At the end of each quarter, the JG Borrowers are required to deliver to AFC a certification of compliance and a financial certificate attaching quarterly financial statements for (a) JG HoldCo's operations, and (b) the JG Borrowers and their subsidiaries' operations.

137.    The JG Borrowers are also required to provide AFC with the calculations backing up the JG Borrowers' compliance with the financial covenants, including the free cash flow covenant.  Free cash flow is calculated by deducting from the JG Borrowers' adjusted EBITDA certain cash payments going out, including unfinanced capital expenditures, cash interest, principal repayment, tax payments, restricted payments and fixed charges, and one-time cash charges excluded from net income.  The JG Borrowers show this calculation by listing out each of the categories as separate line items in the backup.  The JG Borrowers provide separate backup describing the payments made for fixed charges alone without restricted payments.

138.    On or about February 11, 2022, the JG Borrowers delivered by email to AFC unaudited financial statements, covenant compliance calculations, and backup for Q4 2021.  The unaudited financial statements, covenant compliance calculations, and backup misrepresented that no Restricted Payments had been made in Q4 2021, despite the JG Borrowers having made $2,202,150.15 in Restricted Payments in Q4 2021.

139.    On or about October 7, 2022, the JG Borrowers delivered by email to AFC a compliance certificate for Q2 2022.  On or about November 8, 2022, the JG Borrowers delivered by email to AFC a compliance certificate for Q3 2022.  On or about December 12, 2022, the JG Borrowers delivered by email to AFC compliance certificates for Q4 2021 and Q1 2022.

140.    The certificates sent in October, November, and December of 2022 indicated that the JG Borrowers' free cash flow for Q4 2021 was -$2,340,000, for Q4 2021 through Q1 2022 was -$4,027,000, for Q4 2021 through Q2 2022 was -$6,988,000, and for the full 12 month period for Q4 2021 through Q3 2022 was -$7,523,000.  These figures were false because they did not include the Restricted Payments made during those quarters.  On February 11, 2022, and November 30, 2022, the JG Borrowers provided unaudited financial statements, covenant compliance calculations, and backup that falsely reflected no Restricted Payments made in Q4 2021, Q1 2022, Q2 2022, or Q3 2022, despite the JG Borrowers having made $2,202,150.15 in restricted payments in Q4 2021, $5,223,701.45 in Q1 2022, $3,442,095.42 in Q2 2022, and $5,797,298.96 in Q3 2022.

141.    On April 3, 2023, the JG Borrowers delivered by email to AFC the compliance certificate for Q4 2022.  The certificate stated that their free cash flow for the preceding 12 months was -$11,885,000, which was false because it did not include the Restricted Payments made during that quarter.  On April 4, 2023, the JG Borrowers provided unaudited financial

statements, covenant compliance calculations, and backup that falsely reflected no Restricted Payments made in Q4 2022, despite the JG Borrowers having made $3,514,178.56 in Restricted Payments in Q4 2022.

142.    On May 5, 2023, the JG Borrowers delivered by email to AFC the compliance certificate for Q1 2023.  The certificate stated that their free cash flow for the preceding 12 months was -$13,241,000, which was false because it did not include the Restricted Payments made during that quarter.  Along with the compliance certificate, the JG Borrowers provided unaudited financial statements, covenant compliance calculations, and backup that falsely reflected no Restricted Payments made in Q1 2023, despite the JG Borrowers having made $96,017.78 in Restricted Payments in Q1 2023.

143.    On May 5, 2023, the JG Borrowers delivered by email to AFC the compliance certificate for Q2 2023.  The certificate stated that their free cash flow for the preceding 12 months was -$13,921,000, which was false because it did not include the Restricted Payments made during that quarter.  On July 31, 2023, the JG Borrowers provided unaudited financial statements, covenant compliance calculations, and backup that falsely reflected no Restricted Payments made in Q2 2023, despite the JG Borrowers having made $493,815.52 in Restricted Payments in Q2 2023.

144.    On November 1, 2023, the JG Borrowers delivered by email to AFC the compliance certificate for Q3 2023.  The certificate stated that their free cash flow for the preceding 12 months was -$14,223,000, which was false because it did not include the Restricted Payments made during that quarter.  Along with the compliance certificate, the JG Borrowers provided unaudited financial statements, covenant compliance calculations, and backup that

falsely reflected no Restricted Payments made in Q3 2023, despite the JG Borrowers having made $1,397,475.07 in Restricted Payments in Q3 2023.

145.    None of the Restricted Payments made during these financial quarters was permitted under the Credit Agreement or waived by AFC in any waiver or amendment documentation, rendering each statement false or misleading.

        **c.    False Draw Requests.**

146.    Under the Credit Agreement and the Forbearance Agreements, if the JG Borrowers wanted additional funds from the AFC loans or disbursements of the equity contributions, the JG Borrowers were required to submit a signed draw request stating, among other things, that no Event of Default had occurred.  Between September 30, 2021, and February 13, 2025, the JG Borrowers submitted draw requests to AFC requesting disbursement of proceeds nearly 100 times, and AFC disbursed the money in reliance on the certifications provided in the draw request forms.

147.    On information and belief, Defendants caused Fields—in a romantic relationship with Kanovitz—to sign equity contribution draw request forms and caused those forms to be submitted to AFC by email twice: once on June 19, 2024, and again on November 4, 2024. Those draw request forms falsely represented and warranted that "[n]o Default or Event of Default has occurred and is continuing."

148.    On information and belief, Defendants caused Justice Grown's Chief Legal Officer, P. Gail Brashers-Krug, to sign a draw request for loan proceeds and caused the form to be submitted to AFC one time on September 22, 2023, and to sign draw request forms for disbursements of equity contributions and caused those forms to be submitted to AFC by email 17 times: September 1, 2023; October 25, 2023 (two draw requests); December 1, 2023; December 22, 2023; February 1, 2024; February 28, 2024; March 20, 2024; April 25, 2024; May

31, 2024; August 24, 2024; August 29, 2024; September 27, 2024; October 29, 2024; December 11, 2024; January 1, 2025; and February 13, 2025.  The draw requests falsely represented and warranted that "[n]o Default or Event of Default has occurred and is continuing."

149.    AFC honored the draw requests submitted by JG Borrowers in reasonable reliance on the representations and warranties contained therein.

150.    As explained above, the representation that "[n]o Default or Event of Default has occurred and is continuing" was false when made in each and every draw request.

## CLAIMS FOR RELIEF

## COUNT I: VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)
(Against All Defendants)

151.    AFC incorporates by reference the foregoing allegations as though set forth herein.  At all relevant times, AFC was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

152.    At all relevant times, each of the Defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

**A.    The JG HoldCo Enterprise**

153.    Since approximately April 5, 2021, Defendants Loevy and Kanovitz (collectively, the "Enterprise Members") have formed and participated in an association-in-fact enterprise (the "JG HoldCo Enterprise") within the meaning of 18 U.S.C. § 1961(4).  The JG HoldCo Enterprise is structured through the formal and informal relationships among the JG HoldCo Enterprise and the Enterprise Members (each of whom has an ownership interest in JG HoldCo) and the interrelated roles and functions of the Enterprise Members in the fraudulent scheme.

154.    At all relevant times, each of the Enterprise Members was, and is, a person that exists separate and distinct from the JG HoldCo Enterprise.

155.    The JG HoldCo Enterprise has a common purpose of extracting money from AFC with the intention of misappropriating that money under the auspices of JG HoldCo's otherwise legitimate business, and on information and belief, using those misappropriated funds for the personal and professional benefit of Loevy and Kanovitz.

156.    The JG HoldCo Enterprise is engaged in, and its activities affected, interstate commerce, as evidenced by JG HoldCo's subsidiary holdings in multiple States, including the JG Borrowers and Non-Borrower JG Entities.

157.    Loevy and Kanovitz led the JG HoldCo Enterprise by leveraging their control over JG HoldCo and Hayden Manager to direct the actions of the officers and employees of the JG Borrowers and the Non-Borrower JG Entities to further the JG HoldCo Enterprise's fraudulent objectives.  Loevy and Kanovitz orchestrated the fraudulent acquisition of funds from AFC and the subsequent transfer of those funds to the Non-Borrower JG Entities to benefit the JG HoldCo Enterprise.

158.    On information and belief, the Enterprise Members agreed to act in concert for the purpose of diverting funds away from JG HoldCo's otherwise legitimate business activities and repayment of AFC funds for the benefit of Loevy and Kanovitz.

**B.    Pattern of Racketeering**

159.    The Enterprise Members conducted or participated, directly or indirectly, in the conduct of the JG HoldCo Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described above and below, and others to be identified after further investigation and discovery.

160.    The predicate acts of racketeering activity were related because they were committed for the purpose of (a) concealing or obfuscating the Enterprise Members' misuse of

AFC funds; (b) inducing AFC to disburse funds based on false and fraudulent representations and omissions; (c) diverting the funds to Non-Borrower JG Entities and other unauthorized purposes; and (d) enriching the Enterprise Members and their affiliates at the expense of AFC. These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission.

161.    The predicate acts of racketeering activity were not isolated incidents but were part of a continuous scheme in that they occurred repeatedly from at least November 18, 2021, to February 13, 2025, and pose a threat of continued criminal activity due to the continued domination by Defendants of the JG HoldCo Enterprise.

**C.    Predicate Acts**

**1.    Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343**

162.    The Enterprise Members engaged in a scheme to defraud AFC through the false and fraudulent submission of draw requests, compliance certificates, and other documents and communications sent via mail and wire to fraudulently obtain funds from AFC and conceal the diversion of these funds for other unauthorized purposes.  The Enterprise Members accomplished their scheme to defraud Plaintiff by:

163.    Causing the JG Borrowers to submit, or authorizing and facilitating the submission of, 97 draw requests to AFC, each of which was signed by one or more of the Enterprise Members' authorized representatives, certifying that there had been no Event of Default under the Credit Agreement, despite there being repeated undisclosed Events of Default. Each of the draw requests was transmitted by mail, wire, or private interstate commercial carrier to Plaintiff, who relied on the Enterprise Members' false and fraudulent representations and omissions and disbursed the funds in response to the draw requests.  The specific draw requests, who submitted them, and the dates and amounts of the disbursements are as follows:

a.  Between November 18, 2021, and February 13, 2025, Loevy and Kanovitz used their positions as owners of JG HoldCo to instruct officers and employees of JG HoldCo to submit fraudulent draw requests by interstate wire, United States mail, or private interstate commercial carrier to AFC, as part of their scheme to extract money from AFC through the JG Borrowers.  Despite Loevy and Kanovitz being aware that they were repeatedly causing Events of Default under the Credit Agreement by transferring money to Affiliates, between November 18, 2021, and February 13, 2025, Loevy and Kanovitz caused 97 draw requests—all of which falsely certified that there was no Event of Default under the Credit Agreement— to be submitted to AFC for a total of $41,797,706.35.  AFC reasonably relied on those fraudulent certifications and disbursed $41,797,706.35 to the JG Borrowers as a result.

164.  Causing the JG Borrowers to submit, or authorizing and facilitating the submission of, at least eight compliance certificates to AFC, each of which was signed by one or more of the Enterprise Members' authorized representatives, certifying that there had been no Event of Default under the Credit Agreement, despite there being repeated Events of Default. Each compliance certificate was further used to conceal the Events of Default, by affirmatively certifying that there had been no defaults, but also by misrepresenting the JG Borrowers' free cash flow and representing by omission that there had been no transfers to Affiliates.  Each of the compliance certificates was transmitted by mail, wire, or private interstate commercial carrier to AFC officers or employees, who relied on the false and fraudulent representations and omissions contained therein and continued to extend credit to the JG Borrowers under the Credit Agreement.  The dates of the specific compliance certificates, who submitted them, and the

amount they fraudulently omitted from the total free cash flow amounts reported in the compliance certificates are as follows:

a. October 7, 2022: Signed by CFO Lawrence Firestone; overstating free cash flow by omitting $3,442,095.42 in Restricted Payments.

b. November 8, 2022: Signed by CFO Lawrence Firestone; overstating free cash flow by omitting $5,797,298.96 in Restricted Payments.

c. December 12, 2022: Signed by CFO Lawrence Firestone; overstating free cash flow by omitting $2,202,150.15 in Restricted Payments.

d. December 12, 2022: Signed by CFO Lawrence Firestone; overstating free cash flow by omitting $5,223,701.45 in Restricted Payments.

e. April 3, 2023: Signed by CFO Lawrence Firestone; overstating free cash flow by omitting $3,514,178.56 in Restricted Payments.

f. May 5, 2023: Signed by CFO Lawrence Firestone; overstating free cash flow by omitting $96,017.78 in Restricted Payments.

g. May 5, 2023: Signed by President Alexzandra Fields; overstating free cash flow by omitting $493,815.52 in Restricted Payments.

h. November 1, 2023: Signed by President Alexzandra Fields; overstating free cash flow by omitting $1,397,475.07 in Restricted Payments.

165. Sending or causing to be sent various emails, letters, and other communications to AFC, or authorizing and facilitating the sending of such communications, containing false and fraudulent representations and omissions regarding the JG Borrowers' compliance with the Credit Agreement, the use of the loan proceeds, the financial condition and performance of the JG Borrowers and the Projects, and the existence and nature of any Events of Default. Each of

these communications was transmitted by mail, wire, or private interstate commercial carrier to employees at AFC, who relied on the Enterprise Members' false and fraudulent representations and omissions and continued to extend credit to the JG Borrowers under the Credit Agreement.

166.    Through such patterns of racketeering activity, each of the Enterprise Members conducted or participated, directly or indirectly, in the conduct of the affairs of the JG HoldCo Enterprise in violation of 18 U.S.C. § 1962(c).

### 2.    Money Laundering in Violation of 18 U.S.C. § 1957

167.    The Enterprise Members engaged in a scheme to launder money obtained from AFC through the fraudulent submission of draw requests, compliance certificates, and other documents and communications sent via mail and wire, to divert the funds to Non-Borrower JG Entities.  The Enterprise Members accomplished their scheme to launder money by:

168.    Conducting or attempting to conduct financial transactions involving the proceeds of specified unlawful activity, namely, the violations of 18 U.S.C. §§ 1341 and 1343 described above.  These transactions were carried out with the intent to promote the carrying on of such unlawful activity, or to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity.  The Enterprise Members repeatedly defrauded AFC via submission of the draw requests and compliance certificates described above, which led to subsequent disbursement of cash to the JG Borrowers.  The Enterprise Members then engaged in a series of transfers of the monies they received through their fraudulent draw requests in violation of 18 U.S.C. §§ 1341 and 1343 to avoid detection by AFC when it subsequently sent that money to the Non-Borrower JG Entities.  Once these illicit proceeds were outside the purview of AFC, the Enterprise Members were able to profit off them.

169.    A substantial portion of the monies that the Enterprise Members received through their fraudulent draw requests were then transferred to the Non-Borrower JG Entities only days

later, where the Enterprise Members were able to avoid detection of their fraudulent scheme.  As an example, in April 2022, AFC sent $2,505,121.90 to the JG Borrowers in response to a draw request that contained a fraudulent certification that there was no ongoing Event of Default.  In that same month, the Enterprise Members made the JG Borrowers transfer at least $1,120,827.22 to the Non-Borrower JG Entities.  Similarly, in October 2022, AFC sent $1,504,842.79 to the JG Borrowers in response to a draw request which contained a fraudulent certification that there was no ongoing Event of Default.  In that same month, the Enterprise Members made the JG Borrowers transfer at least $1,142,138.28 to the Non-Borrower JG Entities.

170.    Through such patterns of racketeering activity, each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the JG HoldCo Enterprise in violation of 18 U.S.C. § 1962(c).

**D.    Scienter**

171.    Each of the Enterprise Members had the motive to commit the aforementioned violations of 18 U.S.C. §§ 1341, 1343, and 1957, as demonstrated by, *inter alia*, the following facts:

172.    The Enterprise Members stood to earn millions of dollars from the fraudulent scheme or, on information and belief, stood to secure indirect pecuniary benefits from its perpetration, and they were motivated to avoid liability and exposure for their misconduct.

173.    The Enterprise Members knew that if they disclosed their fraudulent activities, they would lose access to AFC's funds through the JG Borrowers and face liability and potential criminal prosecution.  In addition, the JG Borrowers would face termination of the Credit Agreement, acceleration of the JG Borrowers' debt, enforcement of collateral, and legal action by Plaintiff, likely bankrupting JG HoldCo, Kanovitz, and Loevy and ending the Enterprise Members' unfettered access to funds that should have been directed to the JG Borrowers.

174.    Each of the Enterprise Members had the opportunity to commit the
aforementioned violations of 18 U.S.C. §§ 1341, 1343, and 1957, because they managed and
controlled the JG Borrowers, had access to and control of the JG Borrowers' books, records,
accounts, and communications, and/or had the authority and ability to submit or cause the
submission of draw requests, compliance certificates, and other financial documents and
communications to AFC.

175.    In addition, the circumstances surrounding the aforementioned violations of 18
U.S.C. §§ 1341, 1343, and 1957 demonstrate conscious misbehavior and knowledge by each of
the Defendants that they were engaging in a scheme to defraud Plaintiff as demonstrated by, inter
alia, the following facts:

176.    The Enterprise Members repeatedly submitted or caused to be submitted false
compliance certifications, financial statements, draw requests, and distribution requests that
contained intentionally false and misleading information.

177.    The Enterprise Members continued with their fraudulent scheme even after AFC
discovered and confronted them with evidence of their misconduct.

178.    The Enterprise Members made false and misleading statements to AFC to prevent
AFC from pursuing claims and rights against the JG Borrowers, JG HoldCo, and the Enterprise
Members.

179.    The Enterprise Members acted in concert and coordination with each other and
with the Non-Borrower JG Entities and other insiders to be identified during discovery, in
furtherance of the common purpose and objective of the fraudulent scheme.

180.    Each of the Defendants committed and aided and abetted the foregoing predicate
violations of 18 U.S.C. §§ 1341, 1343, and 1957 with the specific intent to defraud Plaintiff of its

rights and interests under the Credit Agreement and the related Loan Documents, and to enrich themselves and their affiliates at the expense of Plaintiff.

**E.      RICO Causation and Damages**

181.    As a direct and proximate result of the foregoing violations of 18 U.S.C. § 1962(c) by the Defendants, Plaintiff suffered an immediate and direct injury from the Defendants' racketeering activity.  The damages to Plaintiff's business and property include, but are not limited to, the following:

182.    The loss of the principal amount of the loans extended to the JG Borrowers under the Credit Agreement, which totaled $89,915,769 as of March 17, 2024 , plus accrued and unpaid interest, fees, costs, and expenses.

183.    The loss of the value of the collateral securing the loans, which was impaired and diminished by the Defendants' breaches of the Credit Agreement, the Events of Default, and the fraudulent transfers to the Non-Borrower JG Entities and other unauthorized recipients.

184.    The loss of the opportunity to enforce the rights and remedies under the Credit Agreement and the related loan documents, which was frustrated and delayed by the Defendants' fraudulent scheme.

185.    The attorneys' fees and costs incurred by Plaintiff in connection with the enforcement of the Credit Agreement and the related Loan Documents, the investigation and exposure of the Defendants' fraudulent scheme, litigation involving the JG Borrowers or Affiliates, and the pursuit of this action.

186.    As a direct and proximate result of such conduct, AFC's business and property interests have been damaged in an amount to be proven at trial, and it is entitled to recover all of its damages, including treble damages, together with the costs of this suit and reasonable attorneys' fees.

## <u>COUNT II: VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)</u>
### (Against All Defendants)

187.    AFC incorporates by reference the foregoing allegations as though set forth herein.

188.    Defendants have each unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

189.    As described in Count I, two or more people, including each of the Defendants, agreed to (and did) commit numerous violations of 18 U.S.C. § 1962(c) to further their unlawful schemes.

190.    Loevy agreed to further the unlawful scheme as described above in Count I, as demonstrated by the fact that he clearly had knowledge of and facilitated and authorized the unlawful endeavors, including by virtue of his control over the JG Borrowers and JG HoldCo. Moreover, Loevy directly participated in and executed many of the fraudulent statements described above.

191.    Kanovitz agreed to further the unlawful scheme as described above in Count I, as demonstrated by the fact that he clearly had knowledge of and facilitated and authorized the unlawful endeavors, including by virtue of his control over the JG Borrowers and JG HoldCo.

192.    Each Defendant was aware of the fraudulent nature of the JG HoldCo Enterprise and knowingly participated by contributing to the execution of the scheme, as described above.

193.    As a direct and proximate result of such conduct, AFC's business and property interests have been damaged in an amount to be proven at trial, and it is entitled to recover all of its damages, including treble damages, together with the costs of this suit and reasonable attorneys' fees.

## COUNT III: BREACH OF CONTRACT
(Against All Defendants)

194.    AFC incorporates by reference the foregoing allegations as though set forth herein.

195.    Although Defendants signed the Shareholder Guaranty before the Credit Agreement, the Shareholder Guaranty makes clear that it applies equally to the JG Borrowers' obligations under any amendments, restatements, supplements, or modifications of the April 2021 Credit Agreement, which includes the Credit Agreement.

196.    AFC has fully performed all obligations required of it under the Shareholder Guaranty except for any obligations from which it was excused from performing.

197.    The Shareholder Guaranty makes Loevy and Kanovitz automatically liable for any losses and liabilities incurred by AFC arising from (a) a "material breach of any representation and warranty in the Credit Agreement or any other Loan Documents," and (b) "the failure by a Loan Party to pay any Taxes or other governmental charges or charges for labor and materials."

198.    The JG Borrowers (a) repeatedly and materially breached representations and warranties in the amendments to the Credit Agreement and in the 2023 and 2024 Forbearance Agreements—all of which are Loan Documents—by failing to disclose the then-existing Events of Default and (b) materially breached the representations and warranties in the 2024 Forbearance Agreement with respect to delivery of a complete Perfection Certificate.

199.    Loevy and Kanovitz repeatedly and materially breached the Shareholder Guaranty by failing to pay for losses and liabilities to AFC caused by the JG Borrowers, including: (a) making improper Affiliate transfers and Restricted Payments prohibited by the Credit Agreement, i.e., making payments to the Non-Borrower JG Entities between September 2021

and August 2023; (b) failing to maintain financial covenants; (c) breaching a representation in the 2024 Forbearance Agreement by excluding TC Applico, Growing Jobs Missouri, Botavi Wellness, and Healing Through Cannabis from the Perfection Certificate; and (d) failing to pay taxes or other governmental charges or charges for labor and materials.

200.    Each Affiliate transaction and Restricted Payment constituted an Event of Default under the Credit Agreement.  Despite these Events of Default occurring between September 2021 and August 2023, the JG Borrowers represented in each of the Forbearance Agreements and in each amendment to the Credit Agreement, all of which were signed by Loevy, that there had been no Event of Default.

201.    The JG Borrowers repeatedly failed to comply with the financial covenants in Sections 7.1 through 7.6 of the Credit Agreement for each period they provided compliance certificates.  Every failure to comply with the financial covenants constituted an Event of Default.  Despite these Events of Default occurring between December 31, 2021, and September 30, 2023, the JG Borrowers represented in each of the Forbearance Agreements and in each amendment to the Credit Agreement, all of which were signed by Loevy, that there had been no Event of Default.

202.    The JG Borrowers materially breached a representation in the 2024 Forbearance Agreement by excluding TC Applico, Growing Jobs Missouri, Botavi Wellness, and Healing Through Cannabis and their assets from the associated Perfection Certificate because TC Applico, Growing Jobs Missouri, Botavi Wellness, and Healing Through Cannabis are Affiliates of JG HoldCo, and Oakland Manager—also an Affiliate of JG HoldCo—had an interest in TC Applico's, Growing Jobs Missouri's, and Healing Through Cannabis's assets.  The JG Borrowers' failure to identify Affiliates of JG HoldCo or those Affiliates' assets as required by

Section 5.16 of the 2024 Forbearance Agreement constitutes a misrepresentation in the 2024 Forbearance Agreement.

203.    Because AFC was deprived of the opportunity to include TC Applico's, Growing Jobs Missouri's, Botavi Wellness's, and Healing Through Cannabis's assets in its collateral package, AFC has suffered damages, including the loss of collateral and security for the financing it provided the JG Borrowers under the Credit Agreement.

204.    The PA Borrowers have accrued an accounts payable balance in an amount of $7,013,127.88 as of February 10, 2025, and unpaid taxes in an amount of $3,495,250 through June 30, 2023, with additional unpaid taxes continuing to accrue through today's date.  These amounts will attach to any potential foreclosure of assets belonging to the PA Borrowers.  AFC is entitled to any sale proceeds from such a foreclosure.  Because the accounts payable balance and unpaid taxes will reduce the amounts AFC will obtain under any such foreclosure, AFC has suffered or foreseeably will suffer damages.

205.    Loevy and Kanovitz are automatically liable for these losses and liabilities because they stem from material breaches of representations and warranties in Loan Documents, and the failure of the Loan Parties to pay taxes and charges for labor and materials.

206.    The Shareholder Guaranty also makes Loevy and Kanovitz liable for any losses and liabilities incurred by AFC arising from (c) "fraud, malfeasance or intentional misrepresentation"; and (d) "the intentional misapplication, misappropriation or conversion" of funds, to the extent Loevy or Kanovitz directed, or otherwise knowingly caused, any Loan Party or any other person directly controlled by Loevy or Kanovitz, to commit such conduct.

207.    Loevy and Kanovitz control, manage, or direct all conduct undertaken by the JG Borrowers by virtue of their roles as owners of JG HoldCo and Hayden Manager.

208.    Even if the payments described above were not effectuated directly by Loevy and Kanovitz, it is not credible to suggest that millions of dollars were moved around for the benefit of Loevy and Kanovitz's other entities without their knowledge and consent.

209.    All the losses and liabilities associated with the breaches of the Credit Agreement described above meet at least one of the categories that Loevy and Kanovitz agreed to guarantee.

210.    As a direct and proximate result of such conduct, AFC has been damaged in an amount to be proven at trial and is entitled to recover all of its damages, along with any other relief the Court deems just and proper.

### <u>COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACT</u>
(Against All Defendants)

211.    AFC incorporates by reference the foregoing allegations as though set forth herein.

212.    At all relevant times, a valid and binding Credit Agreement existed between AFC and the JG Borrowers that outlined the terms and conditions under which AFC would provide financing to the Loan Parties.

213.    Loevy and Kanovitz, as officers and majority owners of JG HoldCo and owners of Hayden Manager, were fully aware of the existence and terms of the Credit Agreement between AFC and the JG Borrowers.

214.    Despite this knowledge, Loevy and Kanovitz intentionally, willfully, and without justification interfered with the Credit Agreement by overseeing or directing the misappropriation and diversion of funds from the JG Borrowers to the Non-Borrower JG Entities, which they have substantial interests in, in the form of improper Affiliate transfers and Restricted Payments.  Loevy and Kanovitz knew that these improper Affiliate transfers and Restricted Payments contributed to and exacerbated the JG Borrowers' repeated failures to

comply with the financial covenants found in Sections 7.1 through 7.6 of the Credit Agreement because the JG Borrowers were already out of compliance with the financial covenants, and making those transfers only put the JG Borrowers further out of compliance. Each of the failures to comply with the financial covenants, both before and after giving effect to the payments, constituted an independent Event of Default. And the improper Affiliate transfers and Restricted Payments were also prohibited by the negative covenants in Sections 6.12 and 6.8 of the Credit Agreement and therefore constituted Events of Default under Section 8.1(b)(i) of the Credit Agreement.

215.    The willful interference by Loevy and Kanovitz directly resulted in multiple breaches of the Credit Agreement by the JG Borrowers, including the failure to make timely interest and principal payments, and the failure to maintain financial covenants and provide accurate financial documentation.

216.    As a direct and proximate result of such conduct, AFC has been damaged in an amount to be proven at trial and is entitled to recover all of its damages, including punitive damages, along with any other relief the Court deems just and proper.

## COUNT V: FRAUD
(Against Defendant Loevy)

217.    AFC incorporates by reference the foregoing allegations as though set forth herein.

218.    In connection with the execution of the 2024 Forbearance Agreement, Loevy, on behalf of JG HoldCo, provided a Perfection Certificate that was required to include information about all assets belonging to JG HoldCo, its subsidiaries, and any Affiliates or related entities.

219.    Loevy knowingly made a material misrepresentation by intentionally omitting TC Applico from the Perfection Certificate, despite being aware that TC Applico was a JG Holdco

Affiliate with substantial assets and that such assets would be material to AFC's agreement to the 2024 Forbearance Agreement.

220.    This omission was a deliberate attempt to induce AFC to enter into the 2024 Forbearance Agreement under false pretenses, by concealing the full scope of JG HoldCo's assets and preventing AFC from expanding its collateral package to include TC Applico or TC Applico's assets.

221.    Loevy acted with scienter, because he was fully aware of the existence and value of TC Applico, given that he signed the agreement under which TC Applico sold its assets and derived at least $6.75 million, and intentionally chose not to disclose it in the Perfection Certificate, thereby making a knowingly false representation.

222.    AFC relied on the completeness and accuracy of the Perfection Certificate when agreeing to the 2024 Forbearance Agreement, believing that it had an accurate understanding of JG HoldCo's assets and collateral.

223.    As a direct and proximate result of Loevy's fraudulent inducement, AFC was deprived of the opportunity to include TC Applico's, Growing Jobs Missouri's, Botavi Wellness's, and Healing Through Cannabis's assets in its collateral package, causing AFC to suffer damages, including but not limited to the loss of collateral and security for the financing it provided the JG Borrowers under the Credit Agreement.

224.    Loevy also committed fraud by making material misrepresentations of fact to AFC by (a) falsely certifying that no Event of Default had occurred or was continuing in each of the amendments to the Credit Agreement and the Forbearance Agreements, which were signed by Loevy; (b) falsely certifying in compliance certificates that there had been no Event of Default under the Credit Agreement, despite there being repeated Events of Default in the

compliance certificates that Loevy caused to be submitted; (c) falsely certifying in compliance certificates the amount of the JG Borrowers' free cash flow and that there had been no Restricted Payments; (d) falsely representing that the Perfection Certificate was complete and accurate despite omitting TC Applico, Healing Through Cannabis, Botavi Wellness, and Growing Jobs Missouri and their assets, which was signed by Loevy; (e) making others falsely certify that no Event of Default had occurred or was continuing in each of the draw requests sent to AFC, and (f) making others misrepresent the JG Borrowers' free cash flow and misrepresent that there had been no transfers to Affiliates in the compliance certificates described above.

225.    Loevy knew that these misrepresentations were false when he (or others he directed) made them, or acted with reckless disregard for the truth.

226.    Loevy intended for AFC to rely on these misrepresentations in order to obtain or retain the financing provided by AFC under the Credit Agreement and to avoid the consequences of the JG Borrowers' breaches and defaults.

227.    AFC justifiably relied on these misrepresentations in entering into and continuing the lending relationship with the JG Borrowers, in agreeing to the amendments and the Forbearance Agreements, and in honoring the JG Borrowers' draw requests.

228.    AFC sustained damages as a result of its reliance on these misrepresentations, including but not limited to, the loss of interest and principal payments, the loss of collateral and security, and the loss of opportunity to exercise its rights and remedies.

229.    As a direct and proximate result of such conduct, AFC has been damaged in an amount to be proven at trial and is entitled to recover all of its damages, including punitive damages, along with any other relief the Court deems just and proper.

## COUNT VI: AIDING AND ABETTING FRAUD
### (Against Defendant Kanovitz)

230.    AFC incorporates by reference the foregoing allegations as though set forth herein.

231.    Loevy committed fraud against AFC by intentionally omitting TC Applico, Healing Through Cannabis, Botavi Wellness, and Growing Jobs Missouri and their assets from the Perfection Certificate, thereby inducing AFC to enter into the 2024 Forbearance Agreement under false pretenses and depriving AFC of the opportunity to include these assets in its collateral package.

232.    Loevy also committed fraud by making material misrepresentations of fact to AFC by (a) falsely certifying that no Event of Default had occurred or was continuing in each of the amendments to the Credit Agreement and the Forbearance Agreements, which were signed by Loevy; (b) falsely certifying in compliance certificates that there had been no Event of Default under the Credit Agreement, despite there being repeated Events of Default in the compliance certificates that Loevy caused to be submitted; (c) falsely certifying in compliance certificates the amount of the JG Borrowers' free cash flow and that there had been no Restricted Payments; (d) falsely representing that the Perfection Certificate was complete and accurate despite omitting TC Applico, Healing Through Cannabis, Botavi Wellness, and Growing Jobs Missouri and their assets, which was signed by Loevy; (e) making others falsely certify that no Event of Default had occurred or was continuing in each of the draw requests sent to AFC, and (f) making others misrepresent the JG Borrowers' free cash flow and misrepresent that there had been no transfers to Affiliates in the compliance certificates described above.

233.    Kanovitz had actual knowledge of Loevy's fraud, as he served as an even larger owner of JG HoldCo and a co-manager of Hayden Manager.  On information and belief,

Kanovitz also had access to and control over the information and assets of the JG Borrowers and their Affiliates, including the Non-Borrower JG Entities, TC Applico, Healing Through Cannabis, Botavi Wellness, and Growing Jobs Missouri.

234.    Kanovitz substantially assisted Loevy in advancing their frauds, by failing to disclose or correct Loevy's misrepresentation, by ratifying and reaffirming the Shareholder Guaranty in connection with the 2024 Forbearance Agreement, by benefiting from the sale of TC Applico's assets, by benefiting from AFC's grant of the JG Borrowers' draw requests, and by refusing to cover the losses and liabilities caused by Loevy's fraud.

235.    As a direct and proximate result of Kanovitz's aiding and abetting Loevy's fraud, AFC suffered damages, including but not limited to the loss of collateral and security for the financing it provided the JG Borrowers under the Credit Agreement.

236.    As a direct and proximate result of such conduct, AFC has been damaged in an amount to be proven at trial and is entitled to recover all of its damages, including punitive damages, along with any other relief the Court deems just and proper.

## COUNT VII: CONVERSION
### (Against All Defendants)

237.    AFC incorporates by reference the foregoing allegations as though set forth herein.

238.    AFC had a possessory right or interest in the funds it disbursed to the JG Borrowers under the Credit Agreement, which were to be used only for the specified uses authorized by the Credit Agreement.

239.    Loevy and Kanovitz, through their control and direction of the JG Borrowers, exercised unauthorized dominion over the funds, interfering with AFC's rights, by misappropriating and diverting the funds to the Non-Borrower JG Entities, by failing to pay the

invoice for the extraction equipment and using the funds for some other purpose, and by failing to pay taxes, trade vendors, and contractors, resulting in liens and liabilities that diminished AFC's collateral.

240.    The conduct of Loevy and Kanovitz as alleged deprived AFC of property or legal rights or otherwise caused injury, and was fraudulent, oppressive, malicious and in conscious disregard of the rights of AFC, including rights beyond those due under the Credit Agreement or Shareholder Guaranty.

241.    As a direct and proximate result of such conduct, AFC has been damaged in an amount to be proven at trial and is entitled to recover all of its damages, including punitive damages, along with any other relief the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, AFC respectfully requests that this Court:

a)    Award AFC damages on its Complaint against Defendants, including treble damages pursuant to RICO, and the costs and expenses of this action, including reasonable attorney's fees as permitted by law;

b)    Award AFC punitive damages against Defendants;

c)    Award AFC pre-judgment and post-judgment interest;

d)    Enjoin Defendants, their agents, servants, officers, directors, employees, representatives, successors, and assigns, and all others acting in concert or participation with Defendants, from directly or indirectly conducting or causing to be conducted any of the activities described in the Complaint; and

e)    Grant such other and further relief to AFC as the Court deems just and appropriate under the circumstances.

Dated:  New York, New York                    O'MELVENY & MYERS LLP
       April 10, 2025


By: /s/ *Abby F. Rudzin*
     Abby F. Rudzin, Bar No. 4126330
     arudzin@omm.com
     Alexander C. Miller, Bar No. 5951611
     alexandermiller@omm.com

     1301 Avenue of the Americas
     Suite 1700
     New York, New York  10019-6022
     Ph: +1 212 326 2000
     Fx: +1 212 326 2061

     Attorneys for Plaintiffs
     Advanced Flower Capital Inc. and AFC Agent
     LLC