

**Michael B. Homer**
(617) 693-9732
mhomer@dynamisllp.com

May 23, 2025

<u>**VIA ECF**</u>

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> **Re:**    ***Advanced Flower Capital Inc. and AFC Agent LLC v. Michael Kanovitz and Jon
> Loevy*, No. 1:25-CV-02996-PKC**

Dear Judge Castel:

On behalf of Defendants Michael Kanovitz and Jon Loevy (the "Defendants"), we respectfully submit this pre-motion letter seeking leave to file a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b). Pursuant to Your Honor's Individual Practices, we note that the Court has set an initial pretrial conference for June 9, 2025.

This case is the second of three related lawsuits, all filed in the past several months, all arising out of the same dispute over the same loan. The first and third of these lawsuits were both filed in the U.S. District Court for the District of New Jersey, on March 7, 2025, and April 17, 2025, respectively. Those suits are actively being litigated before the Honorable Zahid N. Quraishi, as discussed below.

Defendants previously filed a pre-motion letter requesting leave to file a motion to transfer this case to Judge Quraishi in New Jersey, where this case would be consolidated with the first-filed and third-filed of the pending trilogy of cases. *See* Dkt. 11. In that pre-motion letter, Defendants also requested that the Court stay Defendants' time to answer the Complaint pending resolution of Defendants' anticipated motion to transfer. *Id.* at 1. Both requests are pending.

Given that today is the deadline for Defendants to answer, and Defendants' request to stay that deadline remains pending, Defendants are filing this pre-motion letter to request leave to file a motion to dismiss, and to stay the time to answer until further order of the Court. In the event the Court ultimately does not transfer this case to the District of New Jersey to join the other related cases, the Court should dismiss the Complaint, as set forth below.

### I.    <u>Background</u>

Plaintiffs are affiliates of a lender (hereafter, "AFC") which issues high-interest loans to cannabis companies to build cannabis cultivation facilities and dispensaries. *See* Dkt. 1 ("Compl."), at ¶ 7. Defendants are two full-time attorneys who run a law firm in Chicago, are who also are the primary investors in a Delaware limited liability company (hereafter, "JG HoldCo LLC" or

"HoldCo") that owns entities in several states holding licenses to grow and sell cannabis. *Id.* ¶¶ 1, 24, 25, 156.

This lawsuit arises out of a loan agreement between AFC, as the lender, and a number of HoldCo's corporate entities (hereafter, the "Borrowers"). AFC agreed to loan the Borrowers approximately $75 million to build and develop eight cannabis facilities: one cultivation facility and three cannabis dispensaries in each of New Jersey and Pennsylvania.

AFC's Complaint contends the Borrowers have defaulted on the loan. Based on that premise, and in the context of trying to get the upper hand in contentious negotiations, AFC filed this RICO lawsuit seeking to hold the individual Defendants liable for "causing" the corporate Borrowers to default on the loan. In connection with the alleged default, Plaintiffs accuse the individual Defendants of civil RICO violations, breach of contract, tortious interference, fraud, aiding and abetting fraud, and conversion.

Broadly speaking, AFC seeks to hold Defendants personally liable for the Borrowers' alleged loan default on two theories. First, AFC seeks to hold Defendants liable under a Shareholder Guaranty, pursuant to which Defendants agreed, under very limited circumstances, to personally guarantee the obligations of the corporate Borrowers in the loan agreement. Second, AFC seeks to hold Defendants liable for RICO violations and other fraudulent acts stemming from alleged misconduct and misrepresentations attributed to the Defendants that caused the Borrowers' alleged loan default.

## II. <u>A Federal District Court Has Already Declared that the Loan Is Not in Default</u>

There is an insurmountable threshold problem with AFC's lawsuit, one that is fatal to this action. After AFC filed this Complaint alleging that Defendants conspired under RICO to cause the corporate Borrowers to default on the loan, those same Borrowers obtained an order from another federal district court <u>declaring that the Borrowers "are not in breach or default" of that loan</u>. *See Hayden Gateway LLC and Bloc Dispensary LLC v. Advanced Flower Capital Inc. and AFC Agent LLC,* No. 3:25-CV-02789-ZNQ-JBD, Dkt. 47 (Order granting Preliminary Injunction) ("ORDERED that the Court hereby DECLARES that, as of the date of this Order [May 9, 2025], Plaintiffs [the Borrowers] are not in breach or default of" the loan).

Judge Quraishi made that finding after having been presented with hundreds of pages of briefing on the same issues presented in the instant lawsuit, and after conducting an eight-hour evidentiary hearing at which dozens of exhibits were admitted and five witnesses testified, including one of the Defendants now before this Court, and AFC's CEO. *See id.,* Dkt. 46 (Opinion with extensive findings of fact). That evidentiary hearing, held before Judge Quraishi on May 2, 2025, addressed the same issue at the crux of the lawsuit pending before this Court—whether the loan is actually in default, and whether these Defendants and their company breached the loan's terms by committing misconduct. *Compare* Dkt. 1 (Complaint in present litigation), *with Hayden Gateway LLC and Bloc Dispensary LLC v. Advanced Flower Capital Inc. and AFC Agent LLC,* No. 3:25-CV-02789-ZNQ-JBD, at Dkt. 1 (Complaint), and 7, 19, 28 (briefing).

Here, AFC seeks to hold Defendants liable for committing RICO violations that supposedly caused the corporate Borrowers to default on the loan. But a federal judge now has declared that the

Borrowers are not, in fact, in default on the loan. That determination against AFC is fatal to this lawsuit. AFC cannot plausibly allege here that Defendants committed misconduct which caused the Borrowers to default on the loan, when the loan has been affirmatively declared to be not in default, and when a federal court has enjoined AFC from acting on the very allegations at the heart of this Complaint.[1]

Therefore, even if this Court had personal jurisdiction over the Defendants (it does not), and even if the Complaint stated a claim upon which relief can be granted (it does not), the Complaint still should be dismissed because Plaintiffs cannot plausibly allege that Defendants caused Borrowers to default on the loan. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### III.    Pursuant to Rule 12(b)(2), the Complaint Must Be Dismissed Because This Court Lacks Personal Jurisdiction Over Defendants

"On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Forstech Technical Nigeria Limited & Chidi Adabanya v. The Shell Petroleum Development Company Of Nigeria Limited (Spdc)*, No. 24 CIV. 7629 (PAE), 2025 WL 1435203, at *3 (S.D.N.Y. May 19, 2025). "Where . . . discovery has not yet commenced, the plaintiff need only put forth legally sufficient allegations of jurisdiction to survive a motion to dismiss for lack of personal jurisdiction." *Id.* "However, a plaintiff may not rely on conclusory non-fact-specific jurisdictional allegations to overcome a motion to dismiss." *Id.*

AFC has not met—and cannot meet—that burden. AFC alleged only that "[t]he Court has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b), because Defendants Loevy and Kanovitz have consented to this Court's jurisdiction over them." Compl. ¶ 20. For two primary reasons, that cursory statement is insufficient.

First, "'a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant.'" *Bayshore Capital Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 118 (S.D.N.Y. 2023) (quoting *PT United Can Co. Ltd. v. Crown Cork & Seal Co.*, Inc., 138 F.3d 65, 71 (2d Cir. 1998)). "Therefore, personal jurisdiction over at least one defendant must be present through traditional means before one may invoke . . . 18 U.S.C. § 1965(b)." *Id.*

Plaintiffs' reliance on § 1965(b) is thus misplaced. Plaintiffs must still show that at least one Defendant has minimum contacts with New York, but Plaintiffs have failed to allege those requisite facts, because they cannot. This dispute primarily involves facilities and events in New Jersey (and Pennsylvania). Not one aspect of this dispute occurred in New York. *See generally* Dkt. 11 (describing in detail how this case has nothing to do with New York).

Second, Plaintiffs' allegation of "consent" is insufficient. "[C]onclusory statements, which offer no facts identifying specific conduct or actions in New York that gave rise to [the plaintiff]'s

---

[1] AFC unlawfully had helped itself to more than $1.8MM from the Borrowers' bank accounts on the basis of the alleged default, money that AFC returned after Judge Quraishi ruled the loan is not in default.

claims, fall far short of the required prima facie case for personal jurisdiction[.]" *ICICI Bank Ltd. v. Doshi*, No. 19-CV-11788-LTS-SLC, 2025 WL 965637, at *7 (S.D.N.Y. Mar. 31, 2025) (cleaned up).

Plaintiffs do not allege any facts about how, when, or where Defendants "consented" to personal jurisdiction in this Court. Defendants were not parties to the Credit Agreement by which the corporate Borrowers consented to New York jurisdiction, and the agreement they entered (the Shareholder Guaranty, discussed below) talks only about venue, not jurisdiction. Absent such allegations, the Court cannot assess whether—let alone conclude that—either Defendant somehow consented to personal jurisdiction.

Thus, Plaintiffs' allegations fail under Rule 12(b)(2), and the Complaint must be dismissed for lack of personal jurisdiction.

**IV.   <u>Pursuant to Rule 12(b)(6), the Complaint Must Be Dismissed for Failure to State a Claim Upon Which Relief May Be Granted</u>**

**A.  Defendants Did Not Breach the Shareholder Guaranty (Count III), and Defendants Did Not Tortiously Cause the Borrowers to Breach the Loan Agreement (Count IV)**

Plaintiffs allege that Defendants breached the Shareholder Guaranty (the "SG"), a typical "bad boy guaranty," pursuant to which the Defendants agreed to guarantee the Borrowers' obligations under the loan agreement under certain narrowly-defined circumstances. For the following reasons, however, those allegations are insufficient to state a cognizable claim of breach of contract or tortious interference.

1.  <u>No Obligations Are Due and Payable</u>

The SG provides that each guarantor

> guaranties to [AFC] as and for such Guarantor's own debt, until the final payment in full thereof, in cash, has been made, the due payment of the Guaranteed Obligations, *when and as the same shall become due and payable,* whether at maturity, pursuant to a mandatory prepayment requirement, by acceleration, or otherwise, and after the expiration of any applicable grace and notice period under the Credit Agreement or any of the other Loan Documents. . . .

SG § 2 (emphasis added).[2]

Here, the operative agreement is the 2024 Forbearance Agreement, and under that contract—which accounts for all previous defaults—the principal under the loan agreement does not mature until May 2026. *See* Complaint ¶¶ 61-63. The only Obligations that are "due and payable" are the Borrowers' monthly loan payments. AFC has not alleged (nor could it) that the Borrowers are not

---

[2] "It is well-settled that where the claim is for breach of contract, the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiff's claim." *Lehrer v. J&M Monitoring, Inc.*, No. 20-CV-6956 (KMK), 2022 WL 2392441, at *1 (S.D.N.Y. July 1, 2022) (cleaned up).

**Boston**                    **Miami**                    **New York**

current on those payments—because they are. AFC thus cannot hold Defendants liable on a guarantee that has not been implicated.[3]

### 2. AFC Has Not Sustained Any Losses

To the extent that AFC alleges that any amounts apart from loan payments are due, that allegation likewise fails as a matter of law.

The Complaint falsely claims that Defendants are personally liable for all payments under the loan agreement. Rather, under the terms of the attached agreements, the Defendants personally guaranteed (again, under a defined and very discrete set of circumstances) only a set of obligations defined in the SG as the "Guaranteed Obligations." The Guaranteed Obligations "means any losses, expenses, charges, costs, or liability to [AFC] arising from" a number of specified events. SG § 1. Those events include fraud on the part of the Defendants, a material breach of warranty, or a failure to pay taxes. SG § 1.

AFC alleges (with no factual support) that the Borrowers have accrued an accounts-payable balance of more than $7 million and unpaid taxes of more than $3 million. Even assuming for purposes of the motion the truth of that allegation (which Defendants dispute), AFC has failed to allege any "losses, expenses, charges, costs, or liability" to AFC as a consequence. Rather, AFC alleges that "[t]hese amounts *will attach* to any potential foreclosure of assets belonging to the PA Borrowers," and therefore AFC "foreseeably *will suffer* damages" in the future, should that eventuality come into play. Compl. ¶ 204 (emphasis added).

That allegation is plainly insufficient. The above-referenced eventuality is contingent on the coming to pass of all of the following possible future events: (1) Borrowers default on their loan in a manner giving rise to a right to foreclose; (2) AFC forecloses on a Pennsylvania property; (3) AFC receives a money judgment as to that foreclosure; (4) there are still unpaid taxes and bills in some amount to be determined on the date of the judgment; and (5) AFC's recovery on that judgment is reduced by that undetermined, hypothetical amount.

Those speculative possibilities do not constitute "losses, expenses, charges, costs, or liability to [AFC] arising from" the alleged accrued balances. Therefore, the obligations under the SG have not been triggered (even assuming the Complaint's non-conclusory allegations are true). Because there are no amounts currently "due and payable" under the SG, AFC has failed to allege a breach of the SG. *Wells Fargo Bank Nw., N.A. v. Sundowner Alexandria, LLC*, No. 09 CIV. 7313 BSJ FM, 2010 WL 3238948, at *3 (S.D.N.Y. Aug. 16, 2010) ("Although the Court must accept the material facts alleged in the complaint as true, when the content of the contracts conflicts with allegations about those contracts made in the Complaint, the actual language of the contracts must control.").

---

[3] Indeed, after reviewing evidence of the Borrowers' payments and conduct under the 2024 Forbearance Agreement, Judge Quraishi acknowledged the applicability of that contract, and ruled that the Borrowers are not in breach or default. *See Hayden Gateway LLC and Bloc Dispensary LLC v. Advanced Flower Capital Inc. and AFC Agent LLC*, No. 3:25-CV-02789-ZNQ-JBD, Dkt. 47 (Order granting Preliminary Injunction).

**Boston**                    **Miami**                    **New York**

3. <u>AFC Has Not Adequately Pled Tortious Interference</u>

Count IV alleges that the individual Defendants caused the corporate Borrowers to breach the loan agreement. Of course, Judge Quraishi has already assessed the relevant evidence and determined that AFC should be enjoined from claiming and pursuing remedies for such alleged defaults. Absent a breach, there could not be tortious interference, so this claim, too, must be dismissed.

In addition, Count IV is legally defective. "Where the defendant is an officer of a corporation that is party to a contract, they are generally not considered third parties to the contract who can interfere with it." *Diamond v. ShiftPixy, Inc*., No. 20-CV-7305 (LJL), 2021 WL 3085405, at *19 (S.D.N.Y. July 19, 2021). "A director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken." *Id.* "Similarly, an agent cannot be held liable for inducing its principal to breach a contract with a third person, at least where it is acting on behalf of its principal and within the scope of its authority." *Id.* "The policy behind this rule is that [t]o hold otherwise would be dangerous doctrine, and would subject corporate officers and directors continually to liability on corporate contracts and go far toward undermining the limitation of liability which is one of the principal objects of corporations." *Id.*

Those principles foreclose Plaintiffs' allegations of tortious interference by the individual Defendants, who are alleged only to have acted on behalf of the "JG Borrowers" that purportedly breached a contract. *See* Compl. ¶¶ 26-27, 212-214.

**B. Plaintiffs Failed to Allege Cognizable Claims for Fraud, RICO Violations, or Conversion**

The remaining five counts allege various versions of fraud. Those counts include AFC's RICO claims (Counts I and II), its fraud claims (Counts V and VI), and its conversion claim (Count VII).

The fraud allegations, in turn, rest largely upon an interpretation of the "Restricted Payments" provision of the loan agreement. The connection between an alleged corporate breach of a loan agreement and individual liability of the company's part-owners is tenuous, convoluted, and poorly explicated in the Complaint. That obfuscation is by design. When the allegations are unpacked, they are plainly insufficient.

The bulk of AFC's allegations turn on AFC's theory that the corporate Borrowers (not the Defendants) defaulted on their loan, because, in 2021-2023, they made some unidentified number of transactions transferring money from a Pennsylvania bank account to other HoldCo entities (although, notably, not to the Defendants). AFC does not claim that these alleged transfers were unlawful in themselves, but rather that they supposedly constituted a breach of portions of the loan agreement governing the use of loan proceeds and inter-company transfers (the "Restricted Payments"). *See, e.g.,* Compl. ¶¶ 76, 87. According to AFC, as a result of these alleged (but unidentified) Restricted Payments, the Borrowers (but not the Defendants) were in a continuous state of default from late 2021 through mid 2023. *See, e.g., id.* ¶¶ 64-73, 162-170.

**Boston**                    **Miami**                    **New York**

Even assuming that Judge Quraishi had not already enjoined AFC from seeking to pursue such alleged breaches, Plaintiffs' Restricted Payments allegations fail to state a claim.

### 1. The Restricted Payments and "False" Statements Allegations Fail

During the time period at issue, the Borrowers (but not the Defendants) were required to file quarterly and annual financial reports and compliance certificates detailing the financial circumstances of the Borrowers. Also during that period, the Borrowers (but not the Defendants) were required to submit draw requests whenever they needed to pay contractors or otherwise expend loan funds for their approved purposes. Each time the Borrowers submitted a quarterly compliance certificate or a draw request, they were required to certify that the Borrowers (but not the Defendants) were not in default. Finally, during that period, the Borrowers and AFC renegotiated the loan agreement roughly six times, including four amendments and two forbearance agreements. In each case, the Borrowers (but not the Defendants) were required to certify that the Borrowers were not in default.

As a result, AFC alleges that, during that period, the Borrowers (but not the Defendants) submitted eight compliance certificates, "nearly 100" draw requests (Compl. ¶ 146), and six loan amendments, each of which "falsely" certified the Borrowers were not in default.

AFC contends that the individual Defendants are liable for those "false" statements. Defendant Loevy is allegedly liable because he signed the loan amendments in his capacity as a manager of the Borrowers and "directed" various officers of the Borrowers to sign the compliance certificates and the Draw Applications. Defendant Kanovitz is allegedly liable because, AFC claims, he "had actual knowledge" of the alleged misrepresentations (although not a single fact is alleged as evidence of that purported knowledge), he "fail[ed] to disclose or correct" them, and he "benefit[ed] from" them in some unspecified manner. Compl. ¶¶ 233-34.[4]

Those alleged "false statements" form the basis for five of the seven counts in this lawsuit: AFC's RICO claims (Counts I and II), its fraud claims (Counts V and VI), and its conversion claim (Count VII). (The remaining two counts, which sound in contract, are discussed above.)

In virtually every case, the alleged "false statement" was a certification that the Borrowers were not in default. Accordingly, the bulk of the Complaint turns on whether the alleged "Restricted Payments" were, in fact, a default.

AFC's Complaint fails to identify a single one of these purportedly improper Restricted Payments or to otherwise provide non-conclusory allegations that such payments constituted any type of default. The Complaint provides no dates, payees, or dollar amounts. While the Complaint alleges a total of just over $19 million in allegedly restricted payments between September 2021 and July

---

[4] AFC also seeks to hold Loevy accountable for an allegedly false omission unrelated to the Restricted Payments, to wit, AFC's contention that Loevy failed to disclose certain entities as HoldCo "affiliates" in a Perfection Certificate prepared in connection with one of the forbearance agreements. *See* Compl. ¶¶ 218-21. However, none of those entities are, in fact, HoldCo affiliates, and Judge Quraishi already found that the loan is not in default on this or any other basis.

**Boston**                    **Miami**                    **New York**

2023, it gives no further information, including any facts about *why* the Restricted Payments are supposedly "Restricted." Compl. ¶ 71.

Due to the profound lack of particularity, neither the Defendants nor this Court can determine how many payments were allegedly made (dozens? hundreds? thousands?), when they were made, to whom they made, or what they were payments for—much less whether they were "Restricted Payments" at all.

2. <u>The Fraud Counts Fail Rule 9(b)'s Requirement to Plead with Particularity</u>

Fed. R. Civ. P. 9(b) requires particularity in pleading the "circumstances constituting fraud." This particularity requirement applies not just to causes of action denominated "fraud," but to any cause of action "based on plaintiff's allegations of fraud." *Apace Comm'ns, Ltd. v. Burke,* 522 F. Supp. 2d 509, 514 (W.D.N.Y. 2007). The primary purpose of the particularity requirement is "to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir. 2000).

Here, AFC's allegations of fraud nearly all relate to a series of statements that Borrowers were not in default. While AFC has provided some information about when those statements were made and by whom, it has failed to "explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 2006); *accord Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir. 1993). The Complaint does not identify a single alleged Restricted Payment or explain how any individual transaction constituted a default. As a result, Defendants lack sufficient information to respond to the allegations, and the Complaint fails on that basis.

In particular, federal courts require plaintiffs alleging fraudulent transactions to identify specific transactions, including the parties, the dates, the amounts, and the purposes of those transactions. When there are hundreds or thousands of such transactions, plaintiffs need not provide that level of detail as to every transaction, but they must "at least provide some representative examples of the alleged fraud." *U.S. ex rel. Alsaker v. CentraCare Health Sys., Inc.,* No. CIV. 99-106(JRTRLE), 2002 WL 1285089, at *4 (D. Minn. June 5, 2002); *see also In re Level 8 Apparel, LLC,* No. 16-13164 (JLG), 2021 WL 279620, at *12 (Bankr. S.D.N.Y. Jan. 26, 2021) ("The Trustee's reference to the intentional fraudulent transfer of "all assets" of the Debtors does not comport with Rule 9(b)'s mandate that allegations of fraud be pled with particularity because it does not give Capstone 'sufficient notice of the time, place, and content of the alleged fraud.'").

The dearth of detail surrounding the alleged $19 million in "Restricted Payments" that forms the backbone of the fraud-related counts is fatal to AFC's Complaint.

3. <u>A Legal Conclusion is Not a Fraudulent Statement</u>

Under New York law, "[t]he elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *City of Long Beach v. Agostisi,* 221 A.D.3d 776, 778 (2d Dept 2023). Moreover, the plaintiff must show by clear and convincing evidence that the representation was "false

**Boston**                                    **Miami**                                    **New York**

and *known by the defendant to be false." Tanzman v. La Pietra,* 8 A.D.3d 706, 707 (3d Dept 2004) (emphasis added).

As noted, the bulk of AFC's allegations rely on a claim that Loevy and people he "directed" (albeit without any facts to support that allegation) certified that the Borrowers were not in default, when, in AFC's view, they were in default. But a declaration that an entity is, or is not, in default of a complex loan agreement is a matter of professional legal opinion. It is not actionable as a fraud.

Legal conclusions and opinions are not "representations of fact," and therefore cannot serve as the basis for a fraud claim. *Petrello v. White,* 412 F. Supp. 2d 215, 228 (E.D.N.Y. 2006), *aff'd,* 344 F. App'x 651 (2d Cir. 2009); *see also Singh v. NYCLT 2009-A Trust,* Case No. 14 Civ. 2558 (RWS), 2016 WL 3962009, at *7 (S.D.N.Y. July 20, 2016), *aff'd* 683 F. App'x 76 (2d Cir. 2017) ("It is well settled that fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law.") (citation and quotations omitted); *3 E. 54th St. New York, LLC v. Patriarch Partners, LLC,* 90 A.D.3d 418, 419 (1st Dept 2011) ("Contrary to plaintiff's contention, these bare legal conclusions, especially as they concern claims of fraud, are not entitled to be accepted as true on a motion to dismiss on the pleadings. . . .").

Nor can a party "reasonably rely" on such opinions (especially a sophisticated commercial entity such as AFC, with an army of lawyers at its disposal). *Mann v. Rusk,* 14 A.D.3d 909, 788 (3d Dept 2005) ("[T]hese allegations are insufficient to state a cause of action inasmuch as plaintiff could not reasonably rely on the legal opinions or conclusions of another party's attorney.").

Thus, AFC's fraud claims, relying on a certification that Borrowers were not in default, are insufficient as a matter of law. *See Knox v. Countrywide Bank,* 4 F. Supp. 3d 499, 508 (E.D.N.Y. 2014) ("The foregoing discussion demonstrates the flaw in plaintiffs' primary theory of fraud, which rests on their legal conclusion that Countrywide was not the 'holder in due course' of the 2004 note because it was split from the mortgage. Of course, a legal conclusion of this nature is not entitled to the presumption of truth.").

### 4. AFC Also Failed to Allege Scienter

AFC has also failed to allege that Defendants had the mental state and knowledge required to establish fraud. As noted above, "[a] cause of action for fraud requires proof of a representation of fact which is false and known to be false when made, which is offered to deceive another and with the intention to induce the other to act or refrain from acting." *Koagel v. Ryan Homes, Inc.,* 167 A.D.2d 822, 822 (4th Dept 1990).

What is more, "simple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b). The plaintiffs must set forth specific facts supporting an inference of fraud." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 339 (5th Cir. 2008). Simply alleging that a defendant "must have known" that a statement was false or "must have been privy" to the truth is patently insufficient. *Flexborrow LLC v. TD Auto Fin. LLC,* 255 F. Supp. 3d 406, 423 (E.D.N.Y. 2017).

Nor is it sufficient to allege "a generalized profit motive" or claim that "a defendant stands to gain economically from fraud." *Brookdale Univ. Hosp. & Med. Ctr., Inc. v. Health Ins. Plan of*

*Greater N.Y.,* No. 07-CV-1471 RRM/LB, 2009 WL 928718, at *6 (E.D.N.Y. Mar. 31, 2009) (collecting cases). Such allegations "do not satisfy the heightened pleading requirements of Rule 9(b)." *Flexborrow,* 255 F, Supp. 3d at 421.

AFC's Complaint is rife with claims that Defendants (who indisputably had full-time jobs in another industry) "knew" something, without a single specific fact in support. *See, e.g.,* Compl. ¶ 214 (alleging that Defendants "knew" the alleged Restricted Payments were wrong); ¶ 225 (alleging that Loevy "knew that these misrepresentations were false when he (or others he directed) made them").

Even worse are the multiple claims that Defendants "must have known" something, simply because they partly owned the company. *See, e.g.,* Compl. ¶¶ 190-91 (alleging Loevy and Kanovitz "had knowledge of" unspecified "unlawful endeavors . . . by virtue of [their] control over the JG Borrowers"); ¶ 208 ("it is not credible to suggest that millions of dollars were moved around for the benefit of Loevy and Kanovitz's other entities without their knowledge and consent"); ¶ 233 ("Kanovitz had actual knowledge of Loevy's fraud, as he served as an even larger owner of JG HoldCo and a co-manager of Hayden Manager.").

There are no allegations tending to show that Defendants knew about any of the Restricted Payments; knew the Restricted Payments were an Event of Default; or knew that various employees were signing compliance certificates or draw requests. Nor is there a single fact tending to show that Defendants intended to defraud AFC and made any statements with the intention that AFC rely thereon. Under all of the law cited above, the Complaint plainly fails to clear the bar for alleging fraud.[5]

### 5. The RICO Counts Fail

Section 1962 of the RICO Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c). A violation of §1962(c) requires AFC to show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985).

As a threshold matter, AFC's two RICO counts fail for all of the reasons set forth above: a lack of personal jurisdiction over Defendants, a failure to allege fraud with the particularity required by Rule 9(b), and an absence of allegations of any factual misstatement or scienter.

---

[5] Plaintiffs' inability to plead facts undoubtedly motivates their haste to get to discovery. *See* Dkt. 14 (letter from Plaintiffs opposing Defendants' request to stay the deadline for a responsive pleading pending resolution of Defendants' upcoming motion to transfer, on the grounds that "AFC is entitled to take discovery now"). That is an improper strategy. Where, as here, Plaintiffs cannot surmount Rule 9(b), they are not entitled to discovery to try to build a case. *See, e.g., Sabby Volatility Warrant Master Fund Ltd. v. Safety Shot, Inc.,* No. 24 CIV. 920 (NRB), 2025 WL 833871, at *4 (S.D.N.Y. Mar. 17, 2025) ("The purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists.").

In addition, the RICO claims contain so many fatal legal errors that a fulsome discussion is not possible in this format, but Defendants outline the most obvious defects below. [6]

### a. Plaintiffs Fail to Identify an Enterprise

The "first rule" of pleading a RICO case "is that a plaintiff must identify the enterprise." *Jennings v. Emry*, 910 F.2d 1434, 1439-40 (7th Cir. 1990). In addition, a "RICO plaintiff must allege a structure for the making of decisions separate and apart from the alleged racketeering activities, because the existence of an enterprise at all times remains a separate element which must be proved." *Wagh v. Metris Direct, Inc.*, 348 F.3d 1102, 1112 (9th Cir. 2003).

AFC's Complaint conspicuously fails to identify an enterprise. Instead, the Complaint states *ipse dixit* as follows:

> Since approximately April 5, 2021, Defendants Loevy and Kanovitz (collectively, the "Enterprise Members") have formed and participated in an association-in-fact enterprise (the "JG HoldCo Enterprise") within the meaning of 18 U.S.C. § 1961(4). The JG HoldCo Enterprise is structured through the formal and informal relationships among the JG HoldCo Enterprise and the Enterprise Members (each of whom has an ownership interest in JG HoldCo) and the interrelated roles and functions of the Enterprise Members in the fraudulent scheme.

Compl. ¶ 153.

It is black letter law that a RICO complaint must allege the existence of an enterprise "distinct from the person conducting the affairs of the enterprise." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004). In addition, a RICO plaintiff must allege "solid information regarding the hierarchy, organization, and activities of this alleged association-in-fact enterprise, from which [the Court] could fairly conclude that its members functioned as a unit." *Id.* at 174.

AFC's RICO allegations fail to identify an enterprise distinct from the Defendants, and fail to identify the hierarchy and organization of any alleged enterprise. These failures are fatal and must result in dismissal of AFC's RICO counts.

---

[6] In addition to the arguments above, Plaintiffs' deficient allegations do not show that Plaintiffs were injured by racketeering or that they otherwise have standing to assert RICO claims. Although constitutional standing is a subject matter jurisdiction issue under Rule 12(b)(1), Defendants (without waiving any rights) acknowledge the precedent that Rule 12(b)(6) is the appropriate vehicle to assess "RICO standing." *See, e.g.*, *Farag v. XYZ Two Way Radio Serv., Inc*., No. 20-CV-4191(EK)(LB), 2022 WL 3030346, at *3 (E.D.N.Y. Aug. 1, 2022), *aff'd*, No. 22-1795, 2023 WL 2770219 (2d Cir. Apr. 4, 2023) ("The Second Circuit has explained that RICO standing should be addressed under Rule 12(b)(6): lack of RICO standing does not divest the district court of jurisdiction over the action, because RICO standing, unlike other standing doctrines, is sufficiently intertwined with the merits of the RICO claim that such a rule would turn the underlying merits questions into jurisdictional issues.").

*b.  Plaintiffs Fail to Identify a Pattern or Continuity*

Perhaps the most obvious flaw in AFC's RICO claims is their failure to identify a pattern or continuity. To survive a motion to dismiss, a RICO complaint must allege not just predicate acts, but a "pattern" of racketeering, which requires "continuity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239 (1989). To satisfy the continuity element, a plaintiff must show "a threat of *continuing* racketeering activity." *Id.* at 239 (emphasis added).

While the various circuits have developed slightly different tests for continuity and pattern, all agree that "it is virtually impossible for plaintiffs to state a RICO claim" based on a "single scheme with a single injury to a single specified victim." *Bridges v. Lezell L., PC,* 842 F. Supp. 2d 261, 266 (D.D.C. 2012). Courts have uniformly found that a "scheme" to defraud a single victim, even if it extends over the course of years and involves many predicate acts, simply does not establish pattern or continuity, and therefore cannot support a RICO claim. *See, e.g.*, *One World, LLC v. Onoufriadis*, No. 21-374-CV, 2021 WL 4452070, at *2 (2d Cir. Sept. 29, 2021) (affirming dismissal of RICO claims because the complaint alleged only "a discrete number of predicate acts—all wire transfers— and a single victim"); *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 173 (2d Cir. 2004) (affirming dismissal of RICO claims because "Plaintiffs have alleged that [defendant] engaged in a single scheme to defraud two creditors by quickly moving his assets to his relatives and then concealing the existence of those assets . . . [and] however egregious [that] fraud on Plaintiffs may have been, [Plaintiffs] have failed to allege that [defendant] engaged in a pattern of racketeering activity"); *see also Edmondson & Gallagher v. Alban Towers Tenants Association,* 48 F.3d 1260 (D.C. Cir. 1995) (affirming dismissal of RICO claim for failing to establish sufficient pattern in a single-scheme, single-injury set of facts); *Efron v. Embassy Suites (Puerto Rico), Inc.,* 223 F.3d 12, 21 (1st Cir. 2000) ("Taken together, the acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners. This cannot be a RICO violation.").

In short, "a defendant who commits various criminal acts in the course of one fraudulent scheme has not committed a pattern of racketeering." *Beck v. Manufacturers Hanover Trust Co.,* 645 F. Supp. 675, 683 (S.D.N.Y. 1986) *accord MinedMap, Inc. v. Northway Mining, LLC,* No. 21-1480-CV, 2022 WL 570082, at *2 (2d Cir. Feb. 25, 2022) (explaining that "courts must consider . . . the complexity and number of the schemes, and the number of participants and victims," and affirming dismissal of RICO claims "because they are more akin to garden variety breach of contract and tort claims that a large-scale civil RICO claim").

AFC has alleged no pattern or continuity. Instead, it has alleged, at most, that Defendants Loevy and Kanovitz engaged in a years-long scheme to defraud AFC. Here, as in so many of the cases cited above, "the RICO pattern is alleged to be constituted by a series of mail and wire frauds all directed at consummating a single fraud . . . . This is an insufficient allegation to meet the pattern requirement." *Terra Res. I v. Burgin,* 664 F. Supp. 82, 85 (S.D.N.Y. 1987).

6.  The Conversion Count Fails

Conversion under New York law is "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a

superior possessory right of another in the property." *Atlanta Shipping Corp., v. Chemical Bank,* 818 F.2d 240, 249 (2d Cir. 1987).

AFC claims Defendants exercised control over (1) specific property, to which (2) AFC had a superior possessory interest. Neither of those allegations is true, as a matter of law.

First, under New York law, a fungible sum of money does not constitute "property" for purposes of a conversion claim. To state a cause of action for conversion of money, the money must be "described or identified in the same manner as a specific chattel." *9310 Third Ave. Assocs., Inc. v. Schaffer Food,* 210 A.D.2d 207, 208 (2d Dept 1994) (cleaned up). In other words, the money must be "specifically identifiable and segregated." *Manufacturers Hanover Trust Co. v. Chemical Bank,* 160 A.D.2d 113, 124 (1st Dept 1990).

Here, AFC merely refers to "the funds it dispersed" to the Borrowers. AFC's conversion claim must fail on that ground alone. There is no indication of an identifiable fund or otherwise segregated amount, nor is there any description of the alleged transfer or transfers from which the Court could infer a specifically identified fund of money. *Glob. View Ltd. Venture Cap. v. Great Cent. Basin Expl., L.L.C.,* 288 F. Supp. 2d 473, 480 (S.D.N.Y. 2003); *accord United Republic Ins. Co. v. Chase Manhattan Bank,* 168 F. Supp. 2d 8, 19 (N.D.N.Y. 2001), *aff'd,* 40 F. App'x 630 (2d Cir. 2002) ("In the instant case, the $14,000,000.00 in question was mingled in the Alpha Trust with the $13,000,000.00 from the UCIC loan. These mingled funds were then loaned to LGI, which then paid the Lender Banks their respective amounts due. The funds are now so dispersed that they are not identifiable or segregated. Therefore, an action for conversion is not appropriate.").

Second, AFC does not allege a possessory right in the funds, much less a right superior to the Borrowers', to whom they loaned money on terms that required repayment with interest. "To sustain a conversion claim, acts must be alleged that are unlawful or wrongful that are not a mere violation of contractual rights." *In re Ticketplanet.com,* 313 B.R. 46, 69 (Bankr. S.D.N.Y. 2004). Thus, "[f]or purposes of a conversion claim, the Court will not deem a plaintiff to have immediate possessory rights over money where that money represents damages in contract." *Id.* This too is fatal to AFC's conversion claim, as illustrated by the example below:

> Plaintiff does not have a legal ownership or a right of possession in the $14,000,000.00 it loaned to the [Borrower]. It voluntarily made the loan and accepted specific collateral in return. [Borrower] thereafter had authorization to control the funds . . . . Plaintiff had no intent to retain or exercise control. [Plaintiff] agreed to be paid back in monthly payments as part of the contract, not paid back from the specific funds that it loaned to the trust. It cannot now claim a possessory or ownership interest in that which it freely gave away as a loan in a contract that was bargained for and supported by consideration. The claim here is essentially a breach of contract claim for the [Borrower's] failure to repay the loan from [Plaintiff], or for the lack of value of the consideration or collateral that plaintiff received. Neither theory is actionable under a conversion claim.

*United Republic Ins. Co. v. Chase Manhattan Bank,* 168 F. Supp. 2d 8, 19 (N.D.N.Y. 2001), *aff'd,* 40 F. App'x 630 (2d Cir. 2002).

In short, a plaintiff cannot convert a breach of contract claim into a conversion claim. If AFC contends that the Borrowers breached their contract by making Restricted Payments, the obvious path would be for AFC to try to prove that in a breach of contract lawsuit against the Borrowers. Such a lawsuit is dead on arrival, however, given that another Court has already rejected AFC's argument that the loan is in default at all.

## V.   **Conclusion and Proposed Briefing Schedule**

AFC might or might not have a valid breach of contract claim against the Borrowers (although Judge Quraishi has already ruled that AFC does not). What AFC does not have, however, is a valid claim against the individual Defendants named in this lawsuit.

If the Court decides not to transfer this case to Judge Quraishi in the District of New Jersey under 28 U.S.C. §1404(a), to, among other reasons, avoid the possibility of inconsistent judgments, or dismiss it for lack personal jurisdiction over the Defendants, the Court should dismiss the Complaint on the grounds that none of the seven substantive counts states a legally cognizable claim under New York or federal law, and all counts must be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

Defendants propose filing their anticipated motion to dismiss within fourteen (14) days of the Court granting Defendants permission to file.  Defendants propose that the parties' briefing schedule follow the default rules set forth in Local Civil Rule 6.1(b).

Dated: May 23, 2025

Respectfully submitted,

By: */s/ Michael B. Homer*
Michael B. Homer
DYNAMIS LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
(617) 693-9732
MHomer@dynamisllp.com

*Counsel for Michael Kanovitz, Jon Loevy*

**Boston**                    **Miami**                    **New York**