## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADVANCED FLOWER CAPITAL INC. and AFC AGENT LLC, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL KANOVITZ and JON LOEVY, <br><br> Defendants. | Civil Action No. 1:25-cv-02996-PKC |

## AMENDED COMPLAINT

Plaintiffs Advanced Flower Capital Inc. and AFC Agent LLC (collectively "AFC" or "Plaintiffs"), by and through their undersigned counsel, allege as follows in support of their Amended Complaint against defendants Michael Kanovitz and Jon Loevy (collectively "Defendants"):

### NATURE OF THE CLAIMS

1.    Defendants Jon Loevy and Michael Kanovitz are two Chicago attorneys who own and control a network of cannabis companies.  This action against them seeks to recover tens of millions of dollars that they fraudulently diverted from loans provided by AFC to facilitate the development of two of their cannabis projects in Pennsylvania and New Jersey.  Rather than use AFC's funds for their required purpose, Defendants secretly funneled nearly $20 million to other entities they owned while repeatedly lying to AFC about defaults, financial performance, and available collateral.

2.    AFC is an institutional lender to the commercial real estate sector with a specialization in loans to cannabis industry operators in states that have legalized medical or adult-use cannabis.  Cannabis is a nascent industry in which operators often do not have access

to traditional sources of funding, such as federally-insured banks, and so need to turn to alternative sources of funding such as AFC.

3.    Defendants built their multi-state cannabis operations starting in 2014 when they co-founded "Justice Grown" (also known as "Justice Cannabis Co."). They structured their business as a complex network of subsidiaries that roll up to an entity called JG HoldCo LLC ("JG Holdco"). Defendants are majority owners and co-managers of the parent company and co-managers of its key subsidiaries through an entity called Hayden Manager LLC.

4.    In 2021, AFC agreed to lend certain of Defendants' companies up to $75.4 million to build cannabis facilities in New Jersey and Pennsylvania. Given the substantial risks involved, AFC required Defendants to sign a Shareholder Guaranty. Unlike ordinary guaranties that only create liability when borrowers default on payments, this guaranty also made Defendants immediately and personally liable for specific misconduct—including fraud, misappropriation of funds, and material misrepresentations—regardless of whether the underlying loan was current or in default. The Shareholder Guaranty created immediate "primary and original" liability for Defendants' bad acts, explicitly stating it was "not merely the creation of a surety relationship" and "shall not be contingent" on AFC's exercise of other remedies.

5.    After signing the loan agreements, Defendants immediately exploited AFC's trust and began systematically violating the loan terms. They diverted nearly $20 million in loan proceeds to or for the benefit of non-borrower entities they owned and controlled, in direct violation of a "Restricted Payments" prohibition that specifically barred any payments to affiliates or to Defendants personally when the borrowers were not in compliance with financial covenants—which they never were. For example, in January 2022, Defendants used nearly $1

million in AFC loan proceeds ($966,762) to pay off a debt owed by their law firm to a litigation finance company and having nothing to do with the borrowers' business. Over the relevant years, Defendants funneled an additional $15.9 million to their management company, $2.3 million to their Illinois cannabis operations, and millions more to other affiliates across multiple states. Additionally, Defendants failed to pay over $10 million in taxes and vendor obligations owed by the borrowers, creating liens that diminished AFC's collateral value.

6.     Throughout this misconduct, Defendants repeatedly falsely certified to AFC that no defaults under the loan documents existed and that they had made no Restricted Payments. Defendants also submitted quarterly financial statements and compliance certificates pursuant to the loan documents that deliberately understated their cash outflows by omitting the Restricted Payments, making their financial condition appear better than it actually was. Between November 2021 and February 2025, Defendants caused the submission of 97 such false certifications to obtain over $41 million in additional loan advances, each time lying about their compliance with the restrictions they were systematically violating. Despite AFC's extraordinary efforts to work cooperatively with Defendants—including multiple amendments to the loan documents and forbearance agreements—Defendants continued their deception. They even concealed valuable affiliate assets in excess of $10 million from a required disclosure certificate, depriving AFC of additional collateral security.

7.     Defendants' systematic fraud caused the New Jersey project to suffer delay and financial setbacks and Pennsylvania project to fail. The Pennsylvania project collapsed entirely, accruing millions in unpaid taxes and vendor liabilities. The New Jersey project has finally become fully operational today after years of significant obstacles.

8.     AFC now seeks to hold Defendants liable under the Shareholder Guaranty and

otherwise for the substantial damages their misconduct caused.  To that end, AFC brings claims against Defendants for breach of the Shareholder Guaranty, fraud, tortious interference with contract, aiding and abetting fraud, and conversion.[1]

## JURISDICTION AND VENUE

9.    The Court has subject matter jurisdiction over all claims under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the jurisdictional minimum.  Upon information and belief, both Defendants are citizens of the State of Illinois.  Plaintiffs are (a) a corporation organized and existing under the laws of the State of Maryland with its principal place of business in Florida, and (b) a Delaware limited liability company with no member being a citizen of Illinois.

10.    The Court has personal jurisdiction over all Defendants because Defendants Loevy and Kanovitz have expressly consented to this Court's jurisdiction over them through their execution of the Shareholder Guaranty (*see* Ex. A).  Section 24(b) of the Shareholder Guaranty provides: "The provisions regarding choice of law and venue and jury trial waiver set forth in Section 13 of the Credit Agreement are applicable to each Guarantor fully as though such Guarantor were a party thereto, and such provisions are hereby incorporated herein by reference, *mutatis mutandis*."  Section 13(c) of the Credit Agreement (and amendments thereto) explicitly provides that each loan party to that agreement "irrevocably and unconditionally submits to the non-exclusive jurisdiction of the state and federal courts located in the state of New York…"

---

[1] Certain borrowers filed an action in the U.S. District Court for the District of New Jersey seeking declaratory and injunctive relief to prevent AFC from exercising its rights under the Credit Agreement.  An injunction was entered on May 9, 2025, and the matter is currently on appeal to the Third Circuit.  That case concerns the March 2024 Forbearance Agreement and whether the borrowers are in default under the loan agreements.  This action, by contrast, seeks to hold Defendants personally liable for their individual misconduct under their guaranty, which created immediate liability regardless of the loan's status.

11.    All claims in this action arise out of or relate to the loan documents subject to the forum selection clause. Specifically, Defendants' misconduct involves, among other things, the diversion of loan proceeds, concealment of collateral, and violations of the Credit Agreement's restrictions on payments.    Further, Defendants are liable for such misconduct under the Shareholder Guaranty.

12.    Defendants' consent to this Court's jurisdiction was knowing and voluntary.    The forum selection clause was the product of negotiation between sophisticated commercial parties; indeed, Defendants themselves are lawyers who engage in multi-jurisdictional litigation (including in this Court, where they have filed multiple cases) and who knowingly agreed to the jurisdiction clause in the Shareholder Guaranty.

13.    Venue is also proper in this District because Defendants have agreed to this venue.

## PARTIES

14.    Plaintiff Advanced Flower Capital Inc. is a corporation organized and existing under the laws of the State of Maryland with its principal place of business in West Palm Beach, Florida.    AFC is a publicly traded institutional lender that originates, structures, and underwrites loans secured by commercial real estate and other types of financing solutions.

15.    Plaintiff AFC Agent LLC is a Delaware limited liability company with its principal place of business in West Palm Beach, Florida.    AFC Agent LLC is the administrative agent under the Credit Agreement and is successor-in-interest in that capacity to AFC Management, LLC.

16.    Defendant Michael Kanovitz resides in the State of Illinois.    Kanovitz co-founded JG HoldCo with Loevy.    Kanovitz is also a Partner, director, and secretary of the law firm, Elgron, Inc., an Illinois corporation, doing business under the name "Loevy & Loevy."

17.    Defendant Jon Loevy resides in the State of Illinois.    Loevy is also a Founding

Partner, director, and president of Loevy & Loevy.

## FACTUAL ALLEGATIONS

### I.    LOEVY AND KANOVITZ CONTROL JG HOLDCO AND THE JG BORROWERS.

18.    Loevy and Kanovitz control a multi-state network of cannabis companies that includes entities that borrowed from AFC and numerous non-borrowing affiliates, giving Defendants the ability to direct the actions of multiple entities and coordinate activities between them.

19.    JG HoldCo serves as the ultimate parent company in this network.  Loevy and Kanovitz each own 44.7% of JG HoldCo.  The relevant JG HoldCo subsidiaries are shown below, along with JG HoldCo's percentage ownership:



20.    Upon information and belief, Hayden Manager, an Illinois limited liability company, serves as manager of all the LLC subsidiaries under JG HoldCo.  Loevy and Kanovitz are the sole members of Hayden Manager, each with a 50% ownership interest.  Under the Amended & Restated Operating Agreement of Hayden Manager, "*all rights with respect to*

*management of [Hayden Manager] are reserved to [Loevy and Kanovitz].*" No one else has managerial authority. Because Defendants Loevy and Kanovitz are the sole owners of Hayden Manager, which manages all of the JG Borrowers, any action taken by the JG Borrowers was at the behest of Loevy and Kanovitz, or at the behest of individuals directed by Loevy and Kanovitz through Hayden Manager.

21. The Credit Agreement discussed below includes multiple borrowing entities. Three of these borrowers are JG HoldCo subsidiaries managed by Hayden Manager: Pier Cove LLC ("Pier Cove"), Hayden Gateway LLC ("Hayden"), and Bloc Dispensary LLC (f/k/a JG New Jersey LLC) ("Bloc").

22. The remaining borrowers are owned directly by Defendants. Loevy and Kanovitz each directly own 50% of SRG Waretown LLC, SRG 1761 North Olden LLC, and SRG 1474 Prospect LLC, all New Jersey limited liability companies. SRG Waretown LLC and SRG 1761 North Olden LLC own the real estate on which Bloc's dispensaries are located, SRG 1474 Prospect owns the real estate on which Bloc's cultivation and manufacturing facility in New Jersey is located. All three entities are managed by Hayden Manager.

23. Loevy and Kanovitz also directly own 50% of borrowers SRG 272 Main Street LLC and SRG HI Park LLC, both of which are Pennsylvania limited liability companies. SRG 272 Main Street LLC owned two properties, including a dispensary, at the time of the Credit Agreement but no longer holds any assets. SRG HI Park LLC owns the real estate on which Pier Cove's cultivation and manufacturing facility in Pennsylvania is located. Both entities are managed by Hayden Manager. These two entities, together with Pier Cove LLC, are referred to herein as the "PA Borrowers."

24. These ownership interests are depicted in the chart below:



25.    Collectively, Bloc, Hayden, SRG Waretown LLC, SRG 1761 North Olden LLC, SRG 1474 Prospect LLC, and the PA Borrowers are referred to throughout as the "JG Borrowers."

26.    JG HoldCo owns additional subsidiaries that are not borrowers under the Credit Agreement, including JG Michigan LLC, JG IL LLC, Oakland Manager LLC ("Oakland Manager"), Matanzas Alliance LLC, and Hayden RP LLC.

27.    JG Michigan LLC owns a cannabis dispensary located in Michigan and other assets.

28.    JG IL LLC owns, among other assets, a cannabis cultivation and manufacturing company and multiple cannabis dispensaries that are in the process of being opened in Illinois.

29.    Oakland Manager is a corporate entity that JG HoldCo uses for operational and financial management.

30.    Matanzas Alliance LLC holds cannabis licenses for cultivation, manufacturing, and distribution in California.

31.    Hayden RP LLC holds a cannabis license for cultivation.

32.    These non-borrowing JG HoldCo subsidiaries are collectively referred to herein as

the "Non-Borrower JG Entities."

33.    Defendants also had interests in other cannabis entities.  Upon information and belief, Loevy and Kanovitz each owned a direct or indirect beneficial interest in TC Applico, a Missouri limited liability company, which sold certain assets in June 2024 and directed a substantial portion of the proceeds to Oakland Manager.  Upon information and belief, before its sale of assets, TC Applico owned at least three dispensary licenses in Missouri, along with leases or subleases for three dispensaries in Missouri.  According to public reporting, TC Applico was controlled by JG HoldCo.  As explained below, Defendants later failed to disclose their interest in TC Applico to AFC and directed sale proceeds to other entities they controlled.

## II.    THE CREDIT AGREEMENT AND SHAREHOLDER GUARANTY

34.    AFC provided financing to Defendants' cannabis operations in Pennsylvania and New Jersey through two related agreements.  On April 5, 2021, AFC, the JG Borrowers (except SRG Waretown LLC), and JG HoldCo entered into the April 2021 Credit Agreement under which AFC committed to lending up to $46,150,000 to finance the building of a cannabis cultivation and manufacturing facility, as well as three retail cannabis dispensaries, under Bloc's integrated license (the "NJ Project").  The NJ Project was scheduled for completion by July 2022.  AFC closed the initial loan for $22 million, secured by the JG Borrowers' assets in New Jersey.  Defendants were required to contribute $10 million of additional equity by June 28, 2021.[2]

35.    To secure this substantial loan, Defendants Loevy and Kanovitz executed a Shareholder Guaranty on the same day.  Under the Shareholder Guaranty, they became

---

[2] Defendants failed to fund their $10 million equity funding requirement by the deadline of June 28, 2021.  Rather than declaring a default at the time, AFC later entered into the Second

personally liable for specific "Guaranteed Obligations," including, without limitation, losses arising from material breaches of loan document representations, failure to pay taxes and vendor charges, fraud or intentional misrepresentations, and intentional misapplication or conversion of funds.

36.     On September 30, 2021, the parties entered into the Second Amended and Restated Credit Agreement, which increased the facility to $75,400,000 and expanded the borrower group to include SRG Waretown LLC.  The additional proceeds were designated for advancing the NJ Project ($3 million), as well as three retail medical dispensaries and a cultivation facility in Pennsylvania (the "PA Project") ($40.4 million), and repaying existing indebtedness associated with the PA Project ($10 million).

(i)     Key Loan Terms and Restrictions

37.     The Credit Agreement [3] contained numerous representations, warranties, and covenants designed to protect AFC and ensure proper use of loan proceeds, including requiring that all written information provided to AFC be true, correct, and complete in all material respects, with no material misstatement of fact and no omission of any material fact necessary

---

Amended and Restated Credit Agreement which required $5 million in equity funding by November 26, 2021 and an additional $5 million in equity funding due on February 28, 2022.

[3] The April 2021 Credit Agreement contains several relevant definitions.  These definitions were carried through in all amendments to, and restatements of, the April 2021 Credit Agreement and incorporated into the Shareholder Guaranty and the forbearance agreements:

a.     "Loan Document" is defined to include any "instrument or agreement entered into, now or in the future, by Parent or any Loan Party or any shareholder of Parent or any Loan Party, and any member of the Lender Group in connection with this Agreement."

b.     "Loan Party" is defined as "any Borrower or any Subsidiary Guarantor."

c.     "Affiliate" is defined as "any other Person that controls, is controlled by, or is under common control."  The Non-Borrower JG Entities are all "Affiliates" of the JG Borrowers under the Credit Agreement because they are under common control with the JG Borrowers—either through JG HoldCo or through Loevy and Kanovitz.

to make the statements contained therein not misleading.

38.    The Credit Agreement also required the borrowers to exercise strict financial discipline.  The JG Borrowers were required to maintain compliance with specific financial covenants each quarter, including minimum adjusted EBITDA, free cash flow, fixed charge coverage ratio, cash balance, and combined net income, plus a maximum total leverage ratio. Failure to comply with any of these financial covenants constituted an Event of Default that would trigger AFC's remedies under the Credit Agreement.

39.    The Credit Agreement also restricted how borrowed funds could be used.  The Credit Agreement set forth specific uses for all loan proceeds, and unless the JG Borrowers were in pro forma compliance with all financial covenants, they were prohibited from making "Restricted Payments," which included distributions to equity holders or payments to Affiliates. The agreement further restricted transactions with affiliates unless conducted on arm's-length terms.

40.    To ensure compliance with its terms, the Credit Agreement required extensive reporting and certifications.  The JG Borrowers had to deliver quarterly compliance certificates, financial statements, and supporting calculations, including calculations necessary to arrive at the Total Leverage Ratio, the Fixed Charge Coverage Ratio, Free Cash Flow, Combined Net Income, and Adjusted EBITDA as separate line items.  Each draw request required certification that no default existed and that all representations remained true and correct.

41.    The Credit Agreement also required timely payment of taxes, governmental charges, and vendor obligations, along with compliance with all applicable laws and maintenance of necessary licenses and permits.

42.    Events of Default under the Credit Agreement included, without limitation, making

prohibited Restricted Payments, engaging in improper Affiliate transactions, failing to make required principal or interest payments, breaching financial covenants or other loan terms, entering into bankruptcy or insolvency proceedings, and effectuating an unauthorized change of control. Upon an Event of Default, AFC could exercise its rights and remedies under the Credit Agreement and applicable law. These included acceleration of the debt, termination of AFC's lending commitments and the loan documents, and control of or foreclosure on secured collateral.

*(ii)    Shareholder Guaranty Terms*

43.    As an extra layer of protection for AFC, Defendants executed the Shareholder Guaranty.

44.    Under the Shareholder Guaranty, Loevy and Kanovitz personally guaranteed certain "Guaranteed Obligations," including "losses, expenses, charges, costs or liability to any member of the Lender Group" arising from, among other things:

   a. "any material breach of any representation and warranty in the Credit Agreement or any other Loan Document";

   b. "any failure by a JG Borrower or any subsidiary guarantor (collectively, the "Loan Parties" and each, a "Loan Party") to pay "any Taxes or other governmental charges or charges for labor and materials";

   c. "fraud, malfeasance or intentional misrepresentation by Guarantors (or either of them) or if Guarantors (or either of them) direct, or otherwise knowingly cause any Loan Party or any other Person directly Controlled by such Guarantor to commit fraud or malfeasance or to make an intentional misrepresentation (with each Guarantor and each Person directed or knowingly caused by any Guarantor to take an action described herein, being referred to herein as a "Designated Party") in connection with the Loan Documents or any Loans, including any such conduct to the extent it causes any material breach of any provision of the Loan Documents";

   d. "the intentional misapplication, misappropriation or conversion by any Designated Party of (x) any income, revenue or other collections or other amounts derived from the operation of the Collateral Properties in each case due to be paid or delivered to Agent under the Loan Documents, and (y) funds received by a Designated Party for payment of taxes, other governmental

charges or charges for labor and materials that can create Liens or any portion of the Collateral Properties to the extent the same are not so applied."

45.    Each guarantor's liability was "a primary and original obligation," "not merely the creation of a surety relationship," and "immediate" rather than contingent on AFC's exercise of other remedies.

46.    The Shareholder Guaranty expressly provides that the guaranty applies equally to all amendments and modifications of the April 2021 Credit Agreement, ensuring Defendants remained personally liable as the loan terms evolved.

### III.    THE AMENDMENTS TO THE CREDIT AGREEMENT AND FORBEARANCE AGREEMENTS NECESSITATED BY THE JG BORROWERS' DEFAULTS

47.    The JG Borrowers struggled to comply with their obligations under the Credit Agreement almost immediately after signing it.  AFC attempted to work cooperatively with the JG Borrowers despite their continuous missed construction deadlines and financial covenant violations.  However, AFC was misled into doing so because, rather than disclose the full extent of their defaults and misconduct, Defendants induced AFC to enter into a series of amendments to the Credit Agreement by concealing ongoing Events of Default and misrepresenting the borrowers' true financial condition and compliance with the Credit Agreement.  With each amendment, AFC surrendered valuable contractual rights and payment entitlements in reasonable reliance on these false representations about compliance with the Credit Agreement.

### A.    Amendment No. 1 (June 30, 2022)

48.    By June of 2022, it appeared that the JG Borrowers had mismanaged the original $22 million loan, creating construction shortfalls that threatened project completion. Defendants' misallocations included significant working capital overruns and improper Restricted Payments to Affiliates.

49.    Unbeknownst to AFC, the JG Borrowers had made over $10 million in undisclosed

Restricted Payments in breach of the Credit Agreement, including a debt payoff of $966,762.00 to Law Finance Group, $8,667,519.32 in transfers to Oakland Manager, and $871,345.07 in transfers to JG IL LLC.

50.     Unaware that Defendants were improperly diverting loan proceeds, AFC agreed to enter into Amendment No. 1 to the Credit Agreement, effective as of June 30, 2022 ("Amendment No. 1").  In Amendment No. 1, AFC agreed to a limited waiver of past known breaches of the financial covenants and redirected approximately $13.5 million in remaining loan availability from the PA Project to the higher-valued NJ Project.  In exchange, AFC obtained additional protections, including enhanced conditions and controls and requirements that the JG Borrowers meet certain operational milestones, and required additional equity contributions by August 31, 2022 from Loevy.  Because Defendants contributed only $7.243 million of the original $10 million equity commitment that AFC had required for the costs and operations of the NJ Project, Amendment No. 1 required an additional $5 million in equity (waiving the $2.757 shortfall of the original contribution) and any additional contributions necessary to complete the NJ Project.

51.     Amendment No. 1 also explicitly tightened the Restricted Payments provision to permit only certain tax payments, subject to review and verification by AFC.  It also expanded the Restricted Payments definition to explicitly prohibit "directly or indirectly mak[ing] any payment of any kind to Jon Loevy, Michael Kanovitz, their Affiliate (other than the Loan Parties) or any family member of any of the foregoing Persons or Affiliates (including, without limitation, rent payments and any payments of Indebtedness owed to any of them)."  Prior to Amendment No. 1, the operating entities had been paying rent to the SRG entities; due to the JG Borrowers' default, AFC determined that closer operational oversight was necessary, and

thus prohibited even related-party rent payments under Amendment No. 1.

52.    Amendment No. 1 also contained a representation and warranty by the JG Borrowers that, as of its signing and after giving effect to the Amendment, no Default or Event of Default existed under the Credit Agreement existed.  Loevy, in his capacity as manager of Hayden Manager, provided this representation and warranty on behalf of the JG Borrowers.  As discussed below, the representation and warranty was knowingly false when made.

**B.    Amendment No.  2 (August 26, 2022)**

53.    The JG Borrowers soon failed to satisfy the operational milestones under Amendment No. 1 and informed AFC that they would also fail to satisfy multiple financial covenants for the next two quarters (Q3 and Q4 2022).  Specifically, they projected failures on minimum adjusted EBITDA, free cash flow, fixed charge coverage ratio, and net income requirements, plus the maximum total leverage ratio.

54.    AFC and the JG Borrowers thus entered into Amendment No. 2 to the Credit Agreement, effective as of August 26, 2022 ("Amendment No. 2").  AFC preemptively waived financial covenant breaches for the next two quarters (Q3 and Q4 2022) and agreed to lend the JG Borrowers more money, upsizing the credit facility by more than $8 million (which resulted in a loan amount of $83.5 million) in exchange for, among other things, adding the Pennsylvania cultivation license as collateral and additional equity cash contributions to the JG Borrowers by Defendants of $10 million by December 31, 2022, subject to reduction if the JG Borrowers maintained sufficient minimum operating cash flow on its balance sheet.

55.    Amendment No. 2 prohibited the JG Borrowers from making any Restricted Payments other than permitted tax payments until Q4 2022, after which Restricted Payments were only permitted if the JG Borrowers were in pro forma compliance with required financial covenants and no Default or Event of Default had occurred, was occurring, or would result from

such payment.  All Restricted Payments were subject to AFC's review and approval at all times.

56.    Amendment No. 2 contained a representation and warranty by the JG Borrowers that, as of its signing, no Default or Event of Default existed under the Credit Agreement. Loevy, in his capacity as manager of Hayden Manager, provided this representation and warranty on behalf of the JG Borrowers.  As discussed below, this representation and warranty was  knowingly false when made.

### C.    Amendment No. 3 (December 31, 2022)

57.    A few months later, AFC and the JG Borrowers entered into Amendment No. 3 to the Credit Agreement, effective as of December 31, 2022 ("Amendment No.  3").  AFC made further concessions to help the struggling JG Borrowers, agreeing (among other concessions) to allow up to 75% of interest payments through March 31, 2023 to be paid in kind (rather than cash).  AFC also permitted Defendants to pay Amendment No. 3's $5 million equity requirement in $1 million monthly installments from January through May 2023.  In exchange, the JG Borrowers were required to provide evidence of payment of previous equity contributions. Defendants ultimately only contributed $1.9 million of the $5 million.  The Restricted Payments prohibitions remained unchanged.

58.    Amendment No. 3 contained a representation and warranty by the JG Borrowers that, as of its signing, no Default or Event of Default existed under the Credit Agreement. Loevy, in his capacity as manager of Hayden Manager, provided this representation and warranty on behalf of the JG Borrowers.  As discussed below, this representation and warranty was  knowingly false when made.

### D.    Amendment No.  4 (April 26, 2023)

59.    Four months after executing Amendment No. 3, AFC and the JG Borrowers entered into Amendment No. 4 to the Credit Agreement effective as of April 26, 2023 ("Amendment

No. 4"). AFC continued its accommodating approach, extending the loan request period and allowing the JG Borrowers to continue paying up to 75% of their interest in kind (rather than cash) through April 30, 2023. The Restricted Payments prohibitions remained unchanged.

60.    Amendment No. 4 contained a representation and warranty by the JG Borrowers that, as of its signing, no Default or Event of Default existed under the Credit Agreement. Loevy, in his capacity as manager of Hayden Manager, provided this representation and warranty on behalf of the JG Borrowers. As discussed below, this representation and warranty was knowingly false when made.

### E.    September 2023 Forbearance

61.    By September 2023, the JG Borrowers' continued struggles required more drastic intervention. The JG Borrowers had committed a multitude of defaults under the Credit Agreement. In addition to payment and financial covenant defaults, construction-related disputes involving the PA Project had resulted in mechanics' liens, and the JG Borrowers failed to timely notify AFC of liens, lawsuits, and contract breaches. After the JG Borrowers failed to make their interest payments in June and July 2023, AFC and the JG Borrowers entered into a forbearance agreement on September 12, 2023 (the "2023 Forbearance Agreement"). Because Defendants had failed to contribute the required equity and properly manage the NJ and PA Projects, AFC was forced to fund an additional $1.6 million in protective advances to preserve the collateral. In exchange for forbearing from exercising remedies on known Events of Default, AFC obtained enhanced controls over the NJ Project's construction and the JG Borrowers' agreement to deliver proceeds from any asset dispositions.

62.    Only one month later, the JG Borrowers defaulted under the Credit Agreement again by failing to deliver monthly financial statements for October 2023. The JG Borrowers also missed the next deadline to deliver monthly financial statements for November 2023.

63.    The JG Borrowers then stopped making interest and principal payments on the AFC loans.  They missed a cash interest payment for December 2023, resulting in a default under the Forbearance Agreement, and they missed a principal payment due on January 1, 2024, a cash interest payment for January 2024, and a principal payment due on February 1, 2024, each resulting in an Event of Default under the Credit Agreement.  Despite AFC's best efforts to salvage the lending relationship, the JG Borrowers continued to miss payments, failed to comply with financial covenants, and generally mismanaged the NJ and PA Projects through early 2024.

64.    The September 2023 Forbearance Agreement contained a representation and warranty by the JG Borrowers that, as of its signing, no Default or Event of Default existed other than certain specified defaults under the Credit Agreement.[4]  Loevy, in his capacity as manager of Hayden Manager, provided this representation and warranty on behalf of the JG Borrowers. As discussed below, this representation and warranty was  knowingly false when made.

**F.    March 2024 Forbearance**

65.    The deteriorating situation required yet another forbearance agreement on March 6, 2024 (the "2024 Forbearance Agreement").  Despite the JG Borrowers' continued failures, AFC agreed to surrender significant rights and remedies under the Loan Documents—including the ability to accelerate the loans and foreclose on certain assets in connection with specified defaults—in a final attempt to salvage the financing relationship.

66.    The March 2024 Forbearance Agreement contained a representation and warranty by the JG Borrowers that, as of its signing, no Default or Event of Default existed other than

---

[4] The September 2023 Forbearance Agreement identified 16 Specified Defaults including missed interest payments, liens filed against collateral assets, construction contract violations, failure to report liens and contract violations, and failure to notify AFC of lawsuits.

certain specified defaults.[5]  Loevy, in his capacity as manager of Hayden Manager, provided this representation and warranty on behalf of the JG Borrowers.  As discussed below, this representation and warranty was  knowingly false when made.

67.     Both Forbearance Agreements provided for additional equity contributions ($3 million under each) that the JG Borrowers would deliver for AFC to hold in escrow and distribute to and on behalf of the JG Borrowers as necessary to fund the Projects.  The JG Borrowers could access the funds only by delivering to AFC a draw request.

68.     Immediately before entering into the 2024 Forbearance Agreement, AFC developed reason to suspect that the JG Borrowers might have experienced several previously undisclosed Events of Default.  When AFC sought information about these issues before signing the 2024 Forbearance Agreement, Defendants became evasive and appeared to be concealing information.  Rather than abandon the financing relationship entirely, AFC negotiated protective measures for the 2024 Forbearance Agreement.  Specifically, AFC insisted on a carve-out permitting it to pursue claims based on fraud or intentional misconduct by Defendants or the borrowing entities without violating the forbearance terms. This carve-out allowed AFC to give the Projects one final chance to succeed while preserving its right to seek recourse for any discovered misconduct.

## IV.     DEFENDANTS' PATTERN OF DECEIT

69.     Throughout the period in which AFC was amending the Credit Agreement and forbearing from exercising remedies thereunder, the Borrowers were constantly and admittedly

---

[5] The March 2024 Forbearance Agreement identified 21 Specified Defaults.  In addition to the categories of defaults identified in the September 2023 Forbearance Agreement, the JG Borrowers had committed various additional breaches, including cannabis licensing violations, failure to pay taxes, failure to defend title and AFC's liens against mechanic's liens, and misuse of funds.

in default of various financial covenants. AFC waived the breaches it was aware of as part of its effort to keep the JG Borrowers in business and preserve its ability to recover on its loan. In fact, AFC did not take any fee as consideration for any of the amendments or forbearance agreements after Amendment No. 3. What AFC did not know, however, was that there were additional defaults, defalcations and there was other misconduct that Defendants committed, caused and/or were aware of that they chose not to disclose to AFC and, as described above, represented and warranted did not exist.

70.    Had AFC been fully aware of the undisclosed Events of Default, it would not have entered into the Credit Agreement amendments and instead could have exercised the rights and remedies in the Credit Agreement, including accelerating the loans. AFC also increased the loan commitment by $8 million in reliance on material misrepresentations when it entered into Amendment No. 2. AFC would not have parted with that money had it been aware of the truth and instead would have invested those funds in more profitable ventures. AFC also agreed to forgo cash interest payments, among other things, in Amendment No. 3 and Amendment No. 4, in reasonable reliance on the representations that there were no undisclosed Events of Default. Had AFC been aware of the undisclosed Events of Default, it would not have agreed to forgo contractual rights in Amendment Nos. 3 and 4.

71.    Had AFC been fully aware of the undisclosed Events of Default, it would not have entered into the 2023 or 2024 Forbearance Agreements and would have demanded harsher penalties and additional payments for protection in exchange for forbearance.

**A.    Defendants Admitted a Narrow Set of Breaches.**

72.    The quarterly compliance certifications that the Credit Agreement required the JG Borrowers to deliver to AFC (see Schedule 5.1) revealed a pattern of continuous financial covenant violations. The JG Borrowers admitted in these certifications they failed to comply

with at least one financial covenant for every period between Q4 2021 and Q3 2023:

- For each period from March 31, 2022 through September 30, 2023, the JG Borrowers certified that they failed to comply with the financial covenant found in Section 7.1 of the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed minimum adjusted EBITDA amount.

- For each period from December 31, 2021 through September 30, 2023, the JG Borrowers certified that they failed to comply with the financial covenant found in Section 7.2 of the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed minimum free cash flow amount.

- For each period from March 31, 2022 through September 30, 2023, the JG Borrowers certified that they failed to comply with the financial covenant found in Section 7.3 of the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed maximum total leverage ratio.

- For each period from March 31, 2022 through September 30, 2023, the JG Borrowers certified that they failed to comply with the financial covenant found in Section 7.4 of the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed minimum fixed charge coverage ratio.

- For each period from September 30, 2022 through September 30, 2023, the JG Borrowers certified that they failed to comply with the financial covenant found in Section 7.5 of the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed minimum cash balance amount.

- For all periods from December 31, 2021 through September 30, 2023 for which the JG Borrowers submitted compliance certifications, the JG Borrowers certified that they failed to comply with the financial covenant found in Section 7.6 of the Credit Agreement, which requires the JG Borrowers to maintain compliance with an agreed minimum net income amount.

73.    Each failure to comply with any financial covenant in Section 7 of the Credit Agreement constituted an independent Event of Default under Section 8.1.

**B.    Defendants Repeatedly Hid Events of Default from AFC In Breach of The Credit Agreement's Representations and Warranties**.

**1.    Defendants Failed To Disclose Improper Restricted Payments.**

74.    Defendants systematically looted AFC's financing for their personal benefit.  At Defendants' instruction, direction, and control, the JG Borrowers unlawfully transferred millions of dollars in loan proceeds or cash collateral to affiliates owned by Defendants over a period of

years, in direct violation of the Credit Agreement's restrictions.

75.    As shown below, between September 2021 and July 2023, Defendants, on their own or through Hayden Manager, caused the JG Borrowers to transfer nearly $20 million to or for the benefit of other entities owned or controlled by Defendants Loevy and Kanovitz:

| Non-Borrower JG Entity Recipient | Total Amount Transferred Prior to June 30, 2022 (Amendment No. 1) | Total Amount Transferred Between June 30, 2022, and August 26, 2022 (Amendment No. 2) | Total Amount Transferred After August 26, 2022 |
|---|---|---|---|
| Oakland Manager | $8,667,519.32 | $2,182,336.22 | $5,030,535.44 |
| Law Finance Group/Loevy & Loevy | $966,762.00 | -- | -- |
| JG IL | $871,345.07 | $172,039.98 | $1,292,005.13 |
| JG Massachusetts | $7,100.79 | $878.21 | $9,150.83 |
| JG Michigan | $39,104.03 | -- | -- |
| JG CA | $1,269.27 | $284.21 | $1,666.92 |
| SRG Regional Parkway Note | $93,875.00 | | |
| **TOTAL** | **$10,646,975.48** | **$2,355,538.62** | **$6,333,358.32** |

76.    The Restricted Payments listed above were not only expressly prohibited by Section 6.8 of the Credit Agreement, but also constituted Events of Default under other provisions of the Credit Agreement because they were improper uses of proceeds, improper affiliate transactions, and improper asset disposals.

77.    *Improper Use of Proceeds.*  These undisclosed transfers constituted Events of Default under Section 8.1 because the JG Borrowers used AFC's loan proceeds in violation of the Credit Agreement's use restrictions. Section 6.13 strictly limits loan proceeds to specified purposes: Project construction and capital expenditures, funding an interest payment account, repaying specifically scheduled debts, and paying approved transaction fees and expenses.  The Credit Agreement does not permit using loan proceeds to cover expenses for non-borrower

affiliates, pay payroll on behalf of borrowers or affiliates or to enrich Defendants personally.

78.     Wire transfer records confirm that AFC loan proceeds were diverted to non-borrower entities and third parties.  For example, on January 18, 2022, the JG Borrowers used nearly $1 million in cash collateral ($966,762.00) to pay off a debt that Defendants' law firm, Loevy & Loevy, owed to a company called Law Finance Group.  This payment was prohibited because Loevy & Loevy's debt was not among the specifically scheduled debts that the JG Borrowers were permitted to repay under Section 6.13.  This violation of the use-of-proceeds covenant constituted an Event of Default under Section 8.1.

79.     In another example, on November 11, 2022, the JG Borrowers submitted a disbursement request to AFC that included $408,814 for extraction equipment from Precision (Invoice #S26402 dated November 9, 2022).  AFC advanced the funds, but the JG Borrowers later admitted that Precision was never paid for this equipment; upon information and belief, the funds were diverted and used to make multiple distributions and payroll payments on behalf of Oakland Manager.

80.     *Improper Affiliate Transactions.*  The payments to Non-Borrower JG Entities were also Events of Default because Section 6.12 of the Credit Agreement prohibits the JG Borrowers from entering into "any transaction with any Affiliate of any Loan Party or any of its Subsidiaries (including the payment [of any] management, advisory, consulting fees or the like)," except as specifically permitted in the covenant.  Permitted exceptions include (a) transactions on fair and reasonable terms that are "fully disclosed" to AFC if they involve payments by a Loan Party in excess of $10,000 per fiscal year and are no less favorable as would be obtained in an arm's length transaction with a non-Affiliate; (b) permitted Restricted Payments; (c) compensation and indemnification payments to employees, officers and outside directors; and (d) transactions

between Loan Parties.  The payments were not permitted Restricted Payments, and none of the other permitted exceptions apply.

81.     _Improper Asset Disposal_.  The payments to Non-Borrower JG Entities were also Events of Default under Section 8.1(b)(i) because the JG Borrowers violated the Credit Agreement's disposal of assets covenant.  Section 6.4 of the Credit Agreement prohibits the JG Borrowers from transferring or otherwise disposing of any of its assets except in limited circumstances, including for certain "Permitted Dispositions."

82.     The Restricted Payments made to Non-Borrower JG Entities and other third parties were impermissible disposals of assets of the JG Borrowers because, given the recipients, uses, and sizes of these payments, none of the Credit Agreement's exceptions apply.

83.     None of the breaches associated with these payments were waived in the amendments to the Credit Agreement or included as Specified Defaults in the 2023 and 2024 Forbearance Agreements.  And despite the fact that each payment was an Event of Default under the Credit Agreement, none were disclosed to AFC as existing Events of Default.

**2.     Defendants Failed to Disclosure Their Failure to Pay Vendors and Taxes.**

84.     In the years since executing the Credit Agreement, the JG Borrowers repeatedly failed to pay vendors, contractors, and taxes, in violation of Section 5.6 and Section 5.15 of the Credit Agreement, among others, constituting an Event of Default under Section 8.1(b)(ii) of the Credit Agreement.

85.     Upon information and belief, the PA Borrowers have accrued an accounts payable balance in an amount of $5,477,067.59 as of June 16, 2025, and unpaid taxes in an amount of $5,135,520.70 through 2024, totaling $10,612,588.29.

86.     None of these Events of Default were disclosed to AFC as existing Events of

Default nor were they waived in the amendments to the Credit Agreement or included as Specified Defaults in the 2023 and 2024 Forbearance Agreements.

87.    Because the $10,612,588.29 balance will attach to any potential foreclosure, it will reduce the amount the JG Borrowers will have to pay down their obligations to AFC under the Credit Agreement, and as such, constitute losses and liabilities to AFC arising from the JG Borrowers' breach of representations and warranties.

88.    Because Loevy and Kanovitz are obligated under the Shareholder Guaranty to cover any losses or liabilities to AFC arising from "the failure by a Loan Party to pay any Taxes or other governmental charges or charges for labor and materials," they are required to pay the $10,612,588.29 balance to AFC, which will otherwise be diverted from a foreclosure sale to pay unpaid invoices and taxes.

89.    AFC's right to the $10,612,588.29 balance was not waived in the amendments to the Credit Agreement or included as Specified Defaults in the 2023 and 2024 Forbearance Agreements.

### 3.    Defendants Fabricated Disbursement Requests.

90.    Continuing their pattern of deception, Defendants caused the JG Borrowers to submit fraudulent invoices to AFC between November 2022 and September 2023.  In November 2022, the JG Borrowers requested a disbursement of $473,000.64, supporting the request with invoice number S26402 from Precision for extraction equipment.  The JG Borrowers represented that $408,814 of the disbursement would be used to pay this Precision invoice.

91.    AFC advanced the requested funds, but the JG Borrowers did not use the money to pay the invoice they submitted.  In August 2023, the JG Borrowers contacted AFC with a summary of amounts due and payable for the NJ Project, including an unpaid sum of "about $408k for the extraction equipment."  AFC informed the JG Borrowers that funds for the

extraction equipment had already been disbursed. In September 2023, the JG Borrowers submitted a new invoice #QU04472 from Agrify (formerly Precision) for $435,897.93, which included $408,814 from the first invoice and additional costs for tax and shipping of the equipment. In other words, the JG Borrowers took AFC's $408,814 disbursement and did not use it to pay for the equipment it said the money would be used to purchase. AFC has never received an explanation for the above actions, despite repeated calls for an explanation. And there were multiple draw requests for Precision equipment, so the fabricated request amount could be even higher. On information and belief, the JG Borrowers transferred some of the funds received in response to Precision disbursement requests to Oakland Manager, reflecting an impermissible Restricted Payment.

### 4. Defendants Delivered an Incomplete and Misleading Perfection Certificate to Hide Potential Collateral.

92.    In light of the JG Borrowers' mismanagement of the Projects and persistent violations of the Credit Agreement, the 2024 Forbearance Agreement required the JG Borrowers to provide a perfection certificate (the "Perfection Certificate") identifying assets that could serve as additional collateral to secure the Credit Agreement.

93.    The purpose of the Perfection Certificate was to give AFC a complete understanding of all assets belonging to the JG Borrowers, JG HoldCo, and all of their Affiliates, so that AFC could maximize its collateral package.

94.    AFC intentionally drafted the "Form of Perfection Certificate" attached to the 2024 Forbearance Agreement broadly: Section 5.16 of the 2024 Forbearance Agreement specified the form of the Perfection Certificate, which required information about assets belonging to JG HoldCo and its direct or indirect subsidiaries or to "any Affiliate or other Person, including any present or former officer, employee, director, member of management or consultant . . . which

owns any cannabis assets."

95.    On or about May 9, 2024, the JG Borrowers submitted the final Perfection Certificate, signed by Loevy.

96.    Despite the contractual obligation to identify all assets belonging to JG HoldCo and its direct or indirect subsidiaries or to any Affiliate, Defendant Loevy, acting on behalf of JG HoldCo, submitted a Perfection Certificate that intentionally failed to identify several significant JG HoldCo Affiliates and their assets, including at least: (i) TC Applico, which sold certain assets in June 2024 and directed a substantial portion of the proceeds to Oakland Manager; (ii) Healing Through Cannabis, an Ohio limited liability company affiliated with Justice Grown that owns three dispensary licenses in Ohio; (iii) Botavi Wellness LLC, an Illinois limited liability company affiliated with Justice Grown that owns several cannabis licenses; and (iv) Growing Jobs Missouri LLC, a Missouri limited liability company affiliated with Justice Grown that owns several cannabis licenses.

97.    By failing to include these businesses on the Perfection Certificate, Loevy was able to orchestrate the sale of their assets without pledging the proceeds as material collateral for the Credit Agreement.

98.    For example,  TC Applico's license applications were signed by Vince Field, the Vice President of Business Development of Justice Grown in 2021, supporting the inference that he was working at the behest of Loevy and Kanowitz.  So when TC Applico sold assets for $17.5 million, of which JG HoldCo's interest was at least $6.75 million, those proceeds should have been included as collateral.  Instead the funds were transferred to Oakland Manager.  By omitting TC Applico from the Perfection Certificate, Loevy concealed the proceeds from AFC.

99.    The Perfection Certificate also failed to disclose Healing Through Cannabis, and

the fact that its president, Alexzandra Fields, who also is CEO of Justice Grown, signed a memorandum of understanding to sell assets worth $4.75 million.

100.    If AFC had known the extent of these assets, it would have required that such assets be added to AFC's collateral package as security for the obligations under the Credit Agreement in exchange for the concessions in the Amendments and Forbearance Agreements, reducing the significant risks AFC is undertaking with respect to the loans to the JG Borrowers. Further, AFC should have been paid down with the proceeds of the sales of TC Applico's assets and Healing Through Cannabis' assets.

### 5.    Defendants Signed and Delivered False and Misleading Financial Covenant Certifications and Financial Statements.

101.    The Credit Agreement required the JG Borrowers to maintain compliance with certain financial covenants. The Credit Agreement requires the JG Borrowers to certify compliance with these financial covenants on a quarterly basis, including detailed calculations supporting that certification.

102.    At Defendants' direction and under their control, the JG Borrowers repeatedly misrepresented their financial condition, as evidenced by the false and misleading financial statements delivered to AFC along with the JG Borrowers' compliance certificates.

103.    For example, on February 11, 2022, the JG Borrowers provided AFC with unaudited financial statements, covenant compliance calculations, and backup for Q4 2021, each of which failed to disclose the $2,202,150.15 in Restricted Payments the JG Borrowers made in that quarter, in violation of Section 5.1 of the Credit Agreement.

104.    Likewise, the compliance certificates the JG Borrowers delivered in October, November, and December of 2022 each misrepresented the JG Borrowers' free cash flows, concealing the fact that the JG Borrowers made Restricted Payments in the amount of

$5,223,701.45 in the first quarter of 2022; $3,442,095.42 in the second quarter of 2022; and $5,797,298.96 in the third quarter of 2022. Each of these false and misleading compliance certificates was a breach of Section 5.1, and constituted an independent Event of Default.

105.    The story repeated every quarter: the compliance certificate, financial statements, and covenant compliance calculations that the JG Borrowers delivered on April 3, 2023, covering the fourth quarter of 2022, failed to report $3,514,178.56 in Restricted Payments. The JG Borrowers made the same kind of misrepresentations in the contractually-required disclosures they delivered in May, July, and November of 2023 as well.

106.    None of the Restricted Payments made over these two years—totaling $19,335,872.42—was permitted under the Credit Agreement or waived by AFC in any waiver or amendment documentation, rendering each statement false or misleading.

### 6.    Defendants Falsified Certified Draw Requests.

107.    Under the Credit Agreement and the Forbearance Agreements, if the JG Borrowers wanted additional funds from the AFC loans or disbursements of the equity contributions, the JG Borrowers were required to submit a signed draw request stating, among other things, that no Event of Default had occurred. Between September 30, 2021, and February 13, 2025, the JG Borrowers submitted draw requests to AFC requesting disbursement of proceeds nearly 100 times, and AFC disbursed the money in reliance on the certifications provided in the draw request forms.

108.    On information and belief, Defendants directed Fields to sign equity contribution draw request forms and caused those forms to be submitted to AFC twice: once on June 19, 2024, and again on November 4, 2024. Those draw request forms falsely represented and warranted that "[n]o Default or Event of Default has occurred and is continuing."

109.    On information and belief, Defendants directed Justice Grown's Chief Legal

Officer, P. Gail Brashers-Krug, to sign a draw request for loan proceeds and caused the form to be submitted to AFC one time on September 22, 2023, and to sign draw request forms for disbursements of equity contributions and caused those forms to be submitted to AFC 17 times: September 1, 2023; October 25, 2023 (two draw requests); December 1, 2023; December 22, 2023; February 1, 2024; February 28, 2024; March 20, 2024; April 25, 2024; May 31, 2024; August 24, 2024; August 29, 2024; September 27, 2024; October 29, 2024; December 11, 2024; January 1, 2025; and February 13, 2025.  The draw requests falsely represented and warranted that "[n]o Default or Event of Default has occurred and is continuing."

110.    AFC honored the draw requests submitted by JG Borrowers in reasonable reliance on the representations and warranties contained therein.

111.    As explained above, the representation that "[n]o Default or Event of Default has occurred and is continuing" was false when made in each and every draw request.

### CLAIMS FOR RELIEF

### COUNT I: BREACH OF CONTRACT
(Against All Defendants)

112.    AFC incorporates by reference the foregoing allegations as though set forth herein.

113.    The Shareholder Guaranty applies equally to the JG Borrowers' obligations under April 2021 Credit Agreement and to any amendments, restatements, supplements, or modifications thereto.

114.    AFC has fully performed all obligations required of it under the Shareholder Guaranty except for any obligations from which it was excused from performing.

115.    The Shareholder Guaranty makes Loevy and Kanovitz automatically liable for any losses and liabilities incurred by AFC arising from (a) a "material breach of any representation and warranty in the Credit Agreement or any other Loan Documents," (b) "the failure by a Loan

Party to pay any Taxes or other governmental charges or charges for labor and materials," (c) "fraud, malfeasance or intentional misrepresentation by Guarantors," or (d) "the intentional misapplication, misappropriation or conversion" of funds due to AFC under the Loan Documents or designated for the payment of tax, governmental charges, or charges for labor and materials.

116.    The JG Borrowers (a) repeatedly and materially breached representations and warranties in the amendments to the Credit Agreement and in the 2023 and 2024 Forbearance Agreements—all of which are Loan Documents—by failing to disclose the then-existing Events of Default and (b) materially breached the representations and warranties in the 2024 Forbearance Agreement for the same reasons, and additionally with respect to delivery of a complete Perfection Certificate.

117.    The JG Borrowers have accrued an accounts payable balance of at least $5,477,067.59 and unpaid taxes of at least $5,135,520.70.

118.    The JG Borrowers, at Defendants behest, have engaged in fraud, malfeasance and intentional misrepresentation by repeatedly certifying to AFC that no defaults existed in order to induce AFC into extending the lifeline of the loan and disbursing more funds that Defendants then diverted to or on behalf of their other entities.

119.    The JG Borrowers diverted, misapplied, and misappropriated funds due to AFC by making numerous Restricted Payments prohibited by the Loan Documents, each and every one of which constitutes a breach thereof.

120.    Loevy and Kanovitz have breached the Shareholder Guaranty by failing to pay for losses and liabilities to AFC caused by the above-described misconduct, including but not limited to: the loss of collateral for the loan AFC provided the JG Borrowers under the Credit Agreement and the amendments thereto, the diminution in collateral value during the forbearance period and

lost opportunity to exercise remedies when assets had greater value, additional advances made in reliance on false certifications, professional fees and costs incurred in managing the loan, and expenses incurred in investigating and seeking to remedy Defendants' misconduct.

121.    As a direct and proximate result of such conduct, AFC has been damaged in an amount to be proven at trial and is entitled to recover all of its damages, including punitive damages, along with any other relief the Court deems just and proper.

## COUNT II: TORTIOUS INTERFERENCE WITH CONTRACT
(Against All Defendants)

122.    AFC incorporates by reference the foregoing allegations as though set forth herein.

123.    At all relevant times, a valid and binding Credit Agreement existed between AFC and the JG Borrowers that outlined the terms and conditions under which AFC would provide financing to the Loan Parties.

124.    Loevy and Kanovitz, as officers and majority owners of JG HoldCo and owners of Hayden Manager, were fully aware of the existence and terms of the Credit Agreement between AFC and the JG Borrowers.

125.    Despite this knowledge, Loevy and Kanovitz intentionally, willfully, and without justification interfered with the Credit Agreement by overseeing or directing the misappropriation and diversion of funds from the JG Borrowers to the Non-Borrower JG Entities, which they have substantial interests in, in the form of improper Affiliate transfers and Restricted Payments. Loevy and Kanovitz knew that these improper Affiliate transfers and Restricted Payments contributed to and exacerbated the JG Borrowers' repeated failures to comply with the financial covenants found in Sections 7.1 through 7.6 of the Credit Agreement because the JG Borrowers were already out of compliance with the financial covenants, and making those transfers only put the JG Borrowers further out of compliance.  Each of the failures to comply with the financial

covenants, both before and after giving effect to the payments, constituted an independent Event of Default.  And the improper Affiliate transfers and Restricted Payments were also prohibited by the negative covenants in Sections 6.12 and 6.8 of the Credit Agreement and therefore constituted Events of Default under Section 8.1(b)(i) of the Credit Agreement.

126.    Loevy and Kanovitz's willful interference was motivated by personal gain rather than the gain to the JG Borrowers or affiliated entities, as evidenced by the improper Affiliate transfers and Restricted Payments.

127.    In fact, the willful interference by Loevy and Kanovitz directly resulted in multiple breaches of the Credit Agreement by the JG Borrowers, including the failure to make timely interest and principal payments, and the failure to maintain financial covenants and provide accurate financial documentation.

128.    These breaches impaired AFC's ability to collect on the Loan, directly impairing its business.  Defendants' use of their position as officers of JG HoldCo to enrich themselves at AFC's direct expense means they are properly considered to be third parties under AFC's claim for tortious interference.

129.    As a direct and proximate result of such conduct, AFC has been damaged in an amount to be proven at trial and is entitled to recover all of its damages, including punitive damages, along with any other relief the Court deems just and proper.

## COUNT III: FRAUD
(Against Defendant Loevy)

130.    AFC incorporates by reference the foregoing allegations as though set forth herein.

131.    In connection with the execution of the 2024 Forbearance Agreement, Loevy, on behalf of JG HoldCo, provided a Perfection Certificate that was required to include information about all assets belonging to JG HoldCo, its subsidiaries, and any Affiliates or related entities.

132.    Loevy knowingly made a material misrepresentation by intentionally omitting TC Applico from the Perfection Certificate, despite being aware that TC Applico was a JG Holdco Affiliate with substantial assets and that such assets would be material to AFC's agreement to the 2024 Forbearance Agreement.

133.    This omission was a deliberate attempt to induce AFC to enter into the 2024 Forbearance Agreement under false pretenses, by concealing the full scope of JG HoldCo's assets and preventing AFC from expanding its collateral package to include TC Applico or TC Applico's assets.

134.    Loevy acted with scienter, because he was fully aware of the existence and value of TC Applico, given that he signed the agreement under which TC Applico sold its assets and derived at least $6.75 million, and intentionally chose not to disclose it in the Perfection Certificate, thereby making a knowingly false representation.

135.    AFC relied on the substantial completeness and accuracy of the Perfection Certificate before agreeing to the 2024 Forbearance Agreement, believing that it had an accurate understanding of JG HoldCo's assets and collateral.

136.    As a direct and proximate result of Loevy's fraudulent inducement, AFC was deprived of the opportunity to include TC Applico's, Growing Jobs Missouri's, Botavi Wellness's, and Healing Through Cannabis's assets in its collateral package, causing AFC to suffer damages, including but not limited to the loss of collateral and security for the financing it provided the JG Borrowers under the Credit Agreement.

137.    Loevy also committed fraud by making material misrepresentations of fact to AFC by (a) falsely certifying that no Event of Default had occurred or was continuing in each of the amendments to the Credit Agreement and the Forbearance Agreements, which were signed by

Loevy; (b) falsely certifying in compliance certificates that there had been no Event of Default under the Credit Agreement, despite there being repeated Events of Default in the compliance certificates that Loevy caused to be submitted; (c) falsely certifying in compliance certificates the amount of the JG Borrowers' free cash flow and that there had been no Restricted Payments; (d) falsely representing that the Perfection Certificate was complete and accurate despite omitting TC Applico, Healing Through Cannabis, Botavi Wellness, and Growing Jobs Missouri and their assets, which was signed by Loevy; (e) making others falsely certify that no Event of Default had occurred or was continuing in each of the draw requests sent to AFC; and (f) making others misrepresent the JG Borrowers' free cash flow and misrepresent that there had been no transfers to Affiliates in the compliance certificates described above.

138.    Loevy knew that these misrepresentations were false when he (or others he directed) made them, or acted with reckless disregard for the truth.

139.    Loevy intended for AFC to rely on these misrepresentations in order to obtain or retain the financing provided by AFC under the Credit Agreement and to avoid the consequences of the JG Borrowers' breaches and defaults.

140.    AFC justifiably relied on these misrepresentations in entering into and continuing the lending relationship with the JG Borrowers, in agreeing to the amendments and the Forbearance Agreements, and in honoring the JG Borrowers' draw requests.

141.    AFC sustained damages as a result of its reliance on these misrepresentations, including but not limited to, the loss of interest and principal payments, the loss of collateral and security, and the loss of opportunity to exercise its rights and remedies.

142.    As a direct and proximate result of such conduct, AFC has been damaged in an amount to be proven at trial and is entitled to recover all of its damages, including punitive

damages, along with any other relief the Court deems just and proper.

## COUNT IV: AIDING AND ABETTING FRAUD
### (Against Defendant Kanovitz)

143.    AFC incorporates by reference the foregoing allegations as though set forth herein.

144.    Loevy committed fraud against AFC by intentionally omitting TC Applico, Healing Through Cannabis, Botavi Wellness, and Growing Jobs Missouri and their assets from the Perfection Certificate, thereby inducing AFC to enter into the 2024 Forbearance Agreement under false pretenses and depriving AFC of the opportunity to include these assets in its collateral package.

145.    Loevy also committed fraud by making material misrepresentations of fact to AFC by (a) falsely certifying that no Event of Default had occurred or was continuing in each of the amendments to the Credit Agreement and the Forbearance Agreements, which were signed by Loevy; (b) falsely certifying in compliance certificates that there had been no Event of Default under the Credit Agreement, despite there being repeated Events of Default in the compliance certificates that Loevy caused to be submitted; (c) falsely certifying in compliance certificates the amount of the JG Borrowers' free cash flow and that there had been no Restricted Payments; (d) falsely representing that the Perfection Certificate was complete and accurate despite omitting TC Applico, Healing Through Cannabis, Botavi Wellness, and Growing Jobs Missouri and their assets, which was signed by Loevy; (e) making others falsely certify that no Event of Default had occurred or was continuing in each of the draw requests sent to AFC; and (f) making others misrepresent the JG Borrowers' free cash flow and misrepresent that there had been no transfers to Affiliates in the compliance certificates described above.

146.    Kanovitz had actual knowledge of Loevy's fraud, as he served as an even larger owner of JG HoldCo and a co-manager of Hayden Manager.  On information and belief,

Kanovitz also had access to and control over the information and assets of the JG Borrowers and their Affiliates, including the Non-Borrower JG Entities, TC Applico, Healing Through Cannabis, Botavi Wellness, and Growing Jobs Missouri.

147. Kanovitz substantially assisted Loevy in advancing their frauds, by failing to disclose or correct Loevy's misrepresentation, by ratifying and reaffirming the Shareholder Guaranty in connection with the 2024 Forbearance Agreement, by benefiting from the sale of TC Applico's assets, by benefiting from AFC's grant of the JG Borrowers' draw requests, and by refusing to cover the losses and liabilities caused by Loevy's fraud.

148. As a direct and proximate result of Kanovitz's aiding and abetting Loevy's fraud, AFC suffered damages, including but not limited to the loss of collateral and security for the financing it provided the JG Borrowers under the Credit Agreement.

149. As a direct and proximate result of such conduct, AFC has been damaged in an amount to be proven at trial and is entitled to recover all of its damages, including punitive damages, along with any other relief the Court deems just and proper.

## COUNT V: CONVERSION
### (Against All Defendants)

150. AFC incorporates by reference the foregoing allegations as though set forth herein.

151. AFC had a possessory right or interest in the funds it disbursed to the JG Borrowers under the Credit Agreement, which were to be used only for the specified uses authorized by the Credit Agreement.

152. Loevy and Kanovitz, through their control and direction of the JG Borrowers, exercised unauthorized dominion over the funds, interfering with AFC's rights, by misappropriating and diverting the funds to the Non-Borrower JG Entities, by failing to pay the invoice for the extraction equipment and using the funds for some other purpose, and by failing

to pay taxes, trade vendors, and contractors, resulting in liens and liabilities that diminished AFC's collateral.

153.    The conduct of Loevy and Kanovitz as alleged deprived AFC of property or legal rights or otherwise caused injury, and was fraudulent, oppressive, malicious and in conscious disregard of the rights of AFC, including rights beyond those due under the Credit Agreement or Shareholder Guaranty.

154.    As alleged, the funds provided by AFC under the Credit Agreement were provided for a particular purpose and the use of those funds for unauthorized purposes constitutes conversion.

155.    Moreover, the funds in this case are specifically identifiable.  For example, the Forbearance Agreements established an escrow account for funds and the Credit Agreement separately allocated funds in a specific, named account for the Interest Reserve.

156.    As a direct and proximate result of such conduct, AFC has been damaged in an amount to be proven at trial and is entitled to recover all of its damages, including punitive damages, along with any other relief the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, AFC respectfully requests that this Court:

a)    Award AFC damages against Defendants, and the costs and expenses of this action, including reasonable attorney's fees as permitted by law;

b)    Award AFC punitive damages against Defendants;

c)    Award AFC pre-judgment and post-judgment interest;

d)    Enjoin Defendants, their agents, servants, officers, directors, employees, representatives, successors, and assigns, and all others acting in concert or participation with Defendants, from directly or indirectly conducting or causing to be conducted any of the

activities described in the Complaint; and

      e)      Grant such other and further relief to AFC as the Court deems just and appropriate under the circumstances.

Dated: June 20, 2025                         Respectfully submitted,
       New York, New York

                                      **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

                            By:    */s/ Kevin S. Reed*

                                 Kevin S. Reed
                                 Alex Zuckerman
                                 295 Fifth Avenue
                                 New York, NY 10016
                                 (212) 849-7000
                                 kevinreed@quinnemanuel.com
                                 alexzuckerman@quinnemanuel.com

                                 Jason Sternberg
                                 2601 South Bayshore Dr., Suite 1550
                                 Miami, FL. 33133
                                 (305) 402-4880
                                 jasonsternberg@quinnemanuel.com

                                 *Attorneys for Plaintiffs Advanced Flower Capital, Inc. and AFC Agent LLC*