## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ADVANCED FLOWER CAPITAL INC.
and AFC AGENT LLC,

      Plaintiffs,

v.

MICHAEL KANOVITZ and JON LOEVY,

      Defendants.

No. 1:25-cv-02996 (PKC)

ORAL ARGUMENT REQUESTED

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS AMENDED COMPLAINT

Michael B. Homer
Constantine P. Economides
DYNAMIS LLP
175 Federal Street, Suite 1200
Boston, MA 02110
(617) 693-9732

*Counsel for Defendants Michael Kanovitz
and Jon Loevy*

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

THE AMENDED COMPLAINT ................................................................................... 4

LEGAL STANDARD .................................................................................................... 5

ARGUMENT .................................................................................................................. 6

  I. THIS COURT LACKS PERSONAL JURISDICTION OVER THE DEFENDANTS........... 6

    A.   AFC Cannot Show That the Forum Selection Clause Was Reasonably Communicated to Defendants Loevy and Kanovitz............................................................................. 8

    B.   AFC Cannot Show That the Forum Selection Clause Was Mandatory, Rather than Permissive. ................................................................................................................. 9

    C.   AFC Cannot Show That the Claims and Parties Involved in This Suit are Subject to the Forum Selection Clause. ..................................................................................... 10

  II. PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED… ............................................................................................................. 11

    A.   Count I Should Be Dismissed Because Plaintiffs Fail to Plausibly Allege that Defendants Breached the Shareholder Guaranty. ................................................... 11

       1.   No Obligations Are Due and Payable. ..................................................... 11

       2.   AFC Has Not Sustained Any Losses that Could Trigger a Guaranty. ...................... 12

    B.   Count II Should Be Dismissed Because Plaintiffs Fail to Adequately Plead Tortious Interference as a Matter of Law. ............................................................................... 13

    C.   Counts III and IV Should Be Dismissed Because Plaintiffs Fail to Plausibly Allege Fraud and Plead Fraud with Particularity. ............................................................... 15

       1.   AFC's Fraud Claims Fail Rule 9(b)'s Particularity Requirement. ........................... 17

       2.   AFC Fails to Plead Facts Giving Rise to a Strong Interference of Scienter. ............ 19

       3.   AFC Wrongly Miscasts a Legal Conclusion as a Fraudulent Misstatement. ........... 21

       4.   The Perfection Certificate Allegations Fail to Plausibly State a Claim for Fraud.... 22

D.  Count V Should Be Dismissed Because Plaintiffs Fail to Plead a Single Element of Conversion. .................................................................................................................. 23

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*9310 Third Ave. Assocs., Inc. v. Schaffer Food*,
    210 A.D.2d 207 (2d Dept. 1994) ............................................................................................ 24

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ...................................................................................................... 19

*AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.*,
    2003 WL 21203503 (S.D.N.Y. May 22, 2003) ...................................................................... 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................................... 5, 6, 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................................. 5

*Brookdale Univ. Hosp. & Med. Ctr., Inc. v. Health Ins. Plan of Greater N.Y.*,
    2009 WL 928718 (E.D.N.Y. Mar. 31, 2009) ........................................................................ 19

*City of Long Beach v. Agostisi*,
    221 A.D.3d 776 (2d Dept 2023) ........................................................................................... 21

*Corley v. Vance*,
    365 F. Supp. 3d 407 (S.D.N.Y. 2019) .................................................................................. 18

*Diamond v. ShiftPixy, Inc.*,
    2021 WL 3085405 (S.D.N.Y. July 19, 2021) ....................................................................... 14

*Flexborrow LLC v. TD Auto Fin. LLC*,
    255 F. Supp. 3d 406 (E.D.N.Y. 2017) ............................................................................ 19, 20

*Glob. Seafood Inc. v. Bantry Bay Mussels Ltd.*,
    659 F.3d 221 (2d Cir. 2011) .................................................................................................. 10

*Glob. View Ltd. Venture Cap. v. Great Cent. Basin Expl., L.L.C.*,
    288 F. Supp. 2d 473 (S.D.N.Y. 2003) .................................................................................. 24

*Global View Ltd. Venture Cap*,
    288 F. Supp. (S.D.N.Y. 2003) ............................................................................................... 24

*HSCM Bermuda Fund Ltd. v. Newco Cap. Grp. VI LLC*,
    619 F. Supp. 3d 434 (S.D.N.Y. 2022) ............................................................................ 23, 24

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) ............................................................................ 20

*In re Ticketplanet.com*,
   313 B.R. 46 (Bankr. S.D.N.Y. 2004)................................................................. 25

*Jack L. Inselman & Co., Inc. v. FNB Fin. Co.*,
   41 N.Y.2d 1078 (1977) ...................................................................................... 14

*Kaman Aerospace Corp. v. Cent. Copters, Inc*.,
   2023 WL 5530684 (D. Conn. Aug. 28, 2023) ................................................... 8

*Kelly v. MD Buyline, Inc.*,
   2 F. Supp. 2d 420 (S.D.N.Y. 1998) ................................................................... 14

*Knox v. Countrywide Bank*,
   4 F. Supp. 3d 499 (E.D.N.Y. 2014) ................................................................... 22

*Lehrer v. J&M Monitoring, Inc*.,
   2022 WL 2392441 (S.D.N.Y. July 1, 2022)................................................. 6, 18

*Lerner v. Fleet Bank, N.A*.,
   459 F.3d 273 (2d Cir.2006) ........................................................................... 6, 23

*Manufacturers Hanover Trust Co. v. Chemical Bank*,
   160 A.D.2d 113 (1st Dept. 1990) ....................................................................... 24

*Meet Recruitment Inc. v. Neuro42, Inc*.,
   2025 WL 1677407 (S.D.N.Y. June 13, 2025) .............................................. 9, 10

*Miller v. United States ex rel. Miller*,
   110 F. 4th 533 (2d Cir. 2024) ............................................................................ 19

*Mills v. Polar Molecular Corp*.,
   12 F.3d 1170 (2d Cir. 1993) ................................................................................ 6

*Moses v. Martin*,
   360 F. Supp. 2d 533 (S.D.N.Y. 2004) ............................................................... 23

*MTS Logistics, Inc. v. Innovative Commodities Group, LLC*,
   442 F. Supp. 3d 738 (S.D.N.Y. 2020) ................................................................. 7

*Murtha v. Yonkers Child Care Ass'n, Inc.*,
   383 N.E.2d 865 (N.Y. 1978) .............................................................................. 14

*My Goals Sols., Inc. v. Coiana,*
　　2025 WL 833878 (S.D.N.Y. Mar. 14, 2025)...................................................................... 8

*Ony, Inc. v. Cornerstone Therapeutics, Inc.,*
　　2012 WL 1835671 (W.D.N.Y. May 18, 2012)................................................................ 10

*Phillips v. Audio Active Ltd.,*
　　494 F.3d 378 (2d Cir. 2007) ............................................................................................ 8

*Recovery Racing III, LLC v. MAG Retail Holdings-FLI, LLC,*
　　2025 WL 1736832 (E.D.N.Y. June 23, 2025) ................................................................. 9

*Rombach v. Chang,*
　　355 F.3d 164 (2d Cir.  2004) ......................................................................................... 19

*Sheppard v. Manhattan Club Timeshare Ass'n, Inc.,*
　　2012 WL 1890388 (S.D.N.Y. May 23, 2012) ............................................................... 20

*Singh v. NYCLT 2009-A Trust,*
　　2016 WL 3962009 (S.D.N.Y. July 20, 2016) ............................................................... 22

*Tanzman v. La Pietra,*
　　8 A.D.3d 706 (3d Dept 2004) ....................................................................................... 21

*Tropp v. Corp. of Lloyd's,*
　　385 F. App'x 36 (2d Cir. 2010)................................................................................... 7, 8

*United Republic Ins. Co. v. Chase Manhattan Bank,*
　　168 F. Supp. 2d 8 (N.D.N.Y. 2001)......................................................................... 24, 25

*Vanguard Logistics Services (USA), Inc. v. Beemac, Inc.,*
　　2025 WL 1663926 (S.D.N.Y. June 12, 2025) ............................................................. 7, 8

*Wells Fargo Bank Nw., N.A. v. Sundowner Alexandria, LLC,*
　　2010 WL 3238948 (S.D.N.Y. Aug. 16, 2010) .............................................................. 13

*Zamora v. FIT Int'l Grp. Corp.,*
　　834 F. App'x 622 (2d Cir. 2020) .................................................................................. 24

Rules

Federal Rule of Civil Procedure 9(b) ..................................................................................... 6
Federal Rule of Civil Procedure 12(b)(6) ............................................................................. 5
Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) ...................................................... 1
Rule 12(b)(2)........................................................................................................................... 7

Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), Defendants Michael Kanovitz and Jon Loevy (collectively, "Defendants") respectfully move the Court for an order dismissing the Amended Complaint (Dkt. No. 24) in its entirety, with prejudice.

## INTRODUCTION

This case arises out of a loan that Plaintiffs Advanced Flower Capital Inc. and AFC Agent LLC (collectively, "AFC" or "Plaintiffs") made for approximately $60 million to a group of corporate entities (the "JG Borrowers") to build cannabis businesses in New Jersey and Pennsylvania. (Dkt. No. 24 ("Am. Compl."), ¶ 4.). AFC alleges that the loan is in default. *See generally id.* ¶ 6. By this lawsuit, AFC has sued not the corporate borrowers, but the Defendants, two full-time attorneys who run a law firm, and who are also the primary investors in a Delaware limited liability company ("JG HoldCo") that owns the JG Borrowers. *See id.* ¶ 19.

AFC seeks to hold Defendants personally liable for the alleged loan default on two theories. First, Defendants executed a Shareholder Guaranty (the "SG"), pursuant to which Defendants agreed, under very limited circumstances, to personally guaranty the obligations of the JG Borrowers in the loan agreement. Second, AFC seeks to hold Defendants liable for fraud and conversion stemming from alleged misconduct and misrepresentations attributed to Defendants that allegedly caused the loan to be in default.

The key premise of AFC's Amended Complaint is its allegation that the loan is in default. But that issue was already litigated in a separate suit in New Jersey, where a federal judge expressly found no default or breach by the JG Borrowers. Seeking another bite at the apple, AFC has attempted to recast its unsuccessful breach of contract claims against the JG Borrowers in New Jersey as contract and tort claims against the JG Borrowers' individual owners in New York. As set forth below, the resulting claims fail to state any legally viable causes of action, and must therefore be dismissed.

## BACKGROUND

It is important for the Court to understand how the parties got to this point. The following background, drawn from the record in the New Jersey litigation, is critical to understanding that this lawsuit is a baseless attempt to gain leverage in a loan renegotiation.

As adduced at the preliminary injunction proceedings, the record of which the Court can take judicial notice, AFC recently came into a financial crisis of its own. It is a publicly traded company, whose stock price is cratering, losing half of its value in the past six months. As a predatory lender relying on high fees and high-interest loans (exploiting the unavailability of traditional financing in the cannabis industry), AFC's portfolio is faring poorly, and it has run out of money. It is in danger of insolvency and is by all appearances struggling to make its required shareholder dividends.

Shortly after the parties entered into the 2024 Forbearance Agreement, AFC began to make demands that the Defendants contribute $30 million in cash plus other valuable collateral to the loan package. Because the loan was no longer in default, and Defendants were not personally obligated under the JG Borrowers' loan agreement in any event, Defendants refused. AFC then threatened Defendants that unless they met AFC's demands, Plaintiffs would bring a RICO lawsuit against them personally, accusing them of criminal misconduct, thereby causing them professional and reputational harm. AFC gave Defendants a deadline by which they had to come up with tens of millions of dollars in cash and collateral, or AFC would try to destroy them by accusing them of criminal RICO conduct. Having done nothing wrong, and with the loan not in default, Defendants refused to be extorted.

The deadline set by AFC elapsed. The next day, on April 10, 2025, AFC followed through with its threat, suing Defendants for criminal wire and mail fraud in violation of the RICO Act. Dkt. No. 1. AFC spokespeople gave quotes to media services, such as Law360, which publicized the criminal RICO allegations against Defendants to the entire legal community. *See, e.g.*, Mike Curley,

"Attorney Owners Of Pot Co. Accused Of $46M RICO Scheme," Law360 (Apr. 11, 2025), https://www.law360.com/articles/2324561/attorney-owners-of-pot-co-accused-of-46m-rico-scheme.

After that, three things happened.

First, on May 9, a federal judge affirmatively declared that the loan was not in default at all— a conclusion completely at odds with AFC's salacious allegations that Defendants stole almost $20 million from the loan collateral package. As discussed in Defendants' contemporaneously filed motion to transfer, Judge Zahid N. Quraishi of the District of New Jersey held an all-day evidentiary hearing at which all of the relevant loan documents in this case were introduced, and five witnesses testified, including AFC's CEO and one of the individual Defendants in this case (Michael Kanovitz). (*See* Dkt. No. 32, ("Mot. to Transfer") at 2.) Every breach alleged by AFC, including most of the same purported breaches alleged here, were explicitly considered and rejected by Judge Quraishi, who thus affirmatively "DECLARE[D] that, as of the date of this Order, [the JG Borrowers] are not in breach or default of the parties' Credit Agreement and 2024 Forbearance Agreement." *Hayden Gateway LLC, et al., v. Advanced Flower Capital Inc., et al.*, No. 3:25-CV-02789-ZNQ-JBD (D.N.J.) ("Hayden Gateway LLC"), Dkt. No. 47 at 1 (Order Granting Preliminary Injunction). The Court granted the JG Borrowers a preliminary injunction, prohibiting AFC from taking any further actions to foreclose unless and until the JG Borrowers actually default or the loan term expires. *Id.*

Second, on May 13, Defendants filed with this Court a letter explaining why the RICO allegations were factually baseless and legally frivolous. *See generally* Dkt. No. 15. In response to that letter, AFC asked to amend the complaint. *See generally* Dkt. No. 18.

Third, on June 20, AFC filed the Amended Complaint, and simply dropped the RICO allegations without explanation. On information and belief, AFC did not issue any press releases when it quietly dropped all of the (unfounded) RICO allegations from its RICO complaint.

## THE AMENDED COMPLAINT

The first 19 pages of the Amended Complaint recount the history of the loan. This is misdirection. There is no dispute that the loan has had a troubled history, or that over its first two years, the JG Borrowers repeatedly fell into default. Between the Covid pandemic, regulatory delays, construction problems, and other issues, the JG Borrowers quickly fell behind on this predatory cannabis loan. Defendants do not dispute that the JG Borrowers could not make their payments and went into default multiple times. *See* Am. Compl. ¶¶ 47-64.

However, each time the JG Borrowers fell into default, instead of foreclosing, AFC renegotiated the loan—always on the condition that Defendants personally put millions of dollars into AFC's pockets. Over the course of nine agreed renegotiations, Defendants drained their savings and put everything they had into the loan, a total of more than $18 million, to keep their nascent company afloat and positioned to eventually become profitable in the emerging cannabis industry. In consideration for those substantial additional payments, AFC willingly excused the JG Borrowers' prior defaults and moved forward. *See generally* Am. Compl. ¶¶ 34-68.

In March 2024, the JG Borrowers and AFC renegotiated the parties' obligations a final time. Am. Compl. ¶¶ 65-67. The goal was to right-size the exorbitant interest payments to a sustainable level that the JG Borrowers could satisfy and finally ensure that the loan could stay out of default. The resulting agreement, referred to in the Amended Complaint as the "2024 Forbearance Agreement," established, *inter alia*, a cash-sweep mechanism for the JG Borrowers' monthly payments, with a minimum payment of $250,000 per month to AFC.

It is extremely telling that AFC leans so heavily on the JG Borrowers' prior defaults, which are the focus of the vast majority of the Amended Complaint's factual allegations. Those earlier

defaults do not support any of the relief sought.[1]  The JG Borrowers paid dearly for forbearance for each of those prior defaults, including millions of dollars in additional equity contributions, *see* Am. Compl. ¶ 67, culminating in the 2024 Forbearance Agreement, which finally reduced the interest rate and set the monthly repayment at terms the JG Borrowers could satisfy.  Notably, AFC does not allege that the JG Borrowers missed even a single monthly payment after entering the 2024 Forbearance Agreement.  That is because (as Judge Quraishi found), the JG Borrowers never defaulted again, making every payment on time, continuing through the present.

In sum, the lawsuit pending before this Court is predicated on the claim that the Defendants supposedly violated the "bad boy" Shareholder Guarantee, by which they had promised to backstop the JG Borrowers' loan in the event of default, if the Defendants personally committed fraud.  But AFC cannot plausibly allege here that Defendants committed fraud which caused the Borrowers to default on the loan, when the loan has been affirmatively declared to be not in default, and a federal court has enjoined AFC from acting on the very allegations at the heart of this Amended Complaint.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires "more than a sheer possibility" of unlawful conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," because

---

[1] As Judge Quraishi rightly observed, given that AFC decided not to call the loan, and instead to extend forbearance in exchange for significant consideration: "[s]o how do you [AFC] go back now, after all that time, and say they are in default from Day 1?  That to me seems a little bit disingenuous." *See Hayden Gateway*, Dkt. No. 36 (May 2, 2025 H'rg Tr.) at 91.

the Federal Rules do "not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-679.

The Amended Complaint, which alleges fraud, is also subject to the familiar heightened pleading requirements of Federal Rule of Civil Procedure 9(b). In order to comply with Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

## ARGUMENT

## I.    THIS COURT LACKS PERSONAL JURISDICTION OVER THE DEFENDANTS.

AFC alleges that Defendants consented to personal jurisdiction by virtue of a forum selection clause in the Shareholder Guaranty. *See* Am. Compl. ¶¶ 10-12 (citing Section 24(b) of the Shareholder Guarantee). That clause reads as follows:

> 24.    **Service of Process; Choice of Law and Venue; Jury Trial Waiver**.
>
>    (a)    Each party to this Guaranty irrevocably consents to service of process in the manner provided for notices in Section 18 of this Guaranty, and each of the Guarantors hereby appoints the Borrower Representative as such Guarantor's agent for service of process. Nothing in this Guaranty or any other Loan Document will affect the right of any party to this Guaranty to serve process in any other manner permitted by law.
>
>    (b)    The provisions regarding choice of law and venue and jury trial waiver set forth in Section 13 of the Credit Agreement are applicable to each Guarantor fully as though such Guarantor were a party thereto, and such providers are hereby incorporated herein by reference, *mutatis mutandis*.

Ex. 1 (Shareholder Guaranty), § 24.[2] Section 13 of the Credit Agreement provides in pertinent part:

---

[2] "It is well-settled that where the claim is for breach of contract, the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiff's claim." *Lehrer v. J&M Monitoring, Inc.*, No. 20-CV-6956 (KMK), 2022 WL 2392441, at *1 n.1 (S.D.N.Y. July 1, 2022) (cleaned up).

> (c)     PARENT AND EACH LOAN PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK, SITTING IN THE COUNTY OF WESTCHESTER OR NEW YORK, AT THE REQUIRED LENDER'S DISCRETION, AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT.   EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.   NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST PARENT OR ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

Ex. 2 (Second Amended and Restated Credit Agreement), § 13.[3]

Those provisions, however, are insufficient to show that Defendants consented to personal jurisdiction, and AFC has not alleged any other basis for personal jurisdiction.  Consequently, the Amended Complaint must be dismissed under Rule 12(b)(2).

"Parties may agree to both jurisdiction and venue in another forum through contractual forum selection clauses, but such clauses must be valid and enforceable."  *Vanguard Logistics Services (USA), Inc. v. Beemac, Inc*., No. 24-CV-08527 (MMG), 2025 WL 1663926, at *1 (S.D.N.Y. June 12, 2025) (internal citations omitted).  "In the Second Circuit, a party seeking to enforce a forum selection clause must demonstrate that: '(1) the clause was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely permissive; and (3) the claims and parties involved in the suit are subject to the forum selection clause.'" *MTS Logistics, Inc. v. Innovative Commodities Group, LLC*, 442 F. Supp. 3d 738, 747 (S.D.N.Y. 2020) (quoting *Tropp v. Corp. of Lloyd's*, 385 F. App'x 36, 37 (2d Cir. 2010)).

---

[3] The Shareholder Guaranty and original Credit Agreement are dated April 5, 2021. The Credit Agreement was subsequently replaced with an Amended & Restated Credit Agreement, dated April 29, 2021, and again with a Second Amended and Restated Credit Agreement, dated September 30, 2021.  It is unclear whether AFC contends that the Shareholder Guaranty incorporated Section 13 of the original, amended, or second amended version of the Credit Agreement.  Moreover, it is unclear if those three versions of Section 13 differ.  Plaintiffs did not attach any of those contracts to their pleadings.

"If all three of these requirements are met, the forum selection clause is presumed enforceable[.]" *Id.* (citing *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007)). "Even where a forum selection clause is presumptively enforceable, the party opposing enforcement can rebut that presumption by showing that, under the circumstances, enforcement would be unreasonable or unjust." *Beemac, Inc.*, 2025 WL 1663926, at *1.

As the party seeking to enforce a forum selection clause, AFC has the burden to satisfy those three factors. But AFC has not met—and cannot meet—that burden.[4]

### A.    AFC Cannot Show That the Forum Selection Clause Was Reasonably Communicated to Defendants Loevy and Kanovitz.

"When the forum selection clause is not included in the actual contract . . . enforcement presents a closer question. In such circumstances, courts generally consider whether the party seeking to enforce a forum selection clause contained in another document made that document available to the other party and sufficiently directed the other party's attention to it." *Kaman Aerospace Corp. v. Cent. Copters, Inc.*, No. 3:22-CV-1445 (SVN), 2023 WL 5530684, at *5 (D. Conn. Aug. 28, 2023). AFC cannot make the required showing here.

As stated above, the operative text is *not* contained in the Shareholder Guaranty underlying AFC's claims. Rather, the Shareholder Guaranty purports to incorporate portions of a separate

---

[4] AFC declined to put in the record any full version of the Credit Agreement, or even a full version of the forum selection clause contained therein, instead providing an out-of-context and substantively incomplete excerpt. *See* Am. Compl. ¶ 10 ("Section 13(c) of the Credit Agreement (and amendments thereto) explicitly provides that each loan party to that agreement 'irrevocably and unconditionally submits to the non-exclusive jurisdiction of the state and federal courts located in the state of New York…'"). On this record, therefore, AFC has not met its burden on that threshold ground alone. *See My Goals Sols., Inc. v. Coiana*, No. 1:24-CV-01900-MKV, 2025 WL 833878, at *5 (S.D.N.Y. Mar. 14, 2025) ("Without including the language of the forum selection clause, the Court cannot determine—as it must in order to enforce a forum selection clause—whether the clause is mandatory or permissive or whether the forum selection clause is drafted broadly enough to cover the conduct alleged here[.]").

agreement (the Credit Agreement) between other signatories (the JG Borrowers, not Loevy or Kanovitz). There is nothing in the record showing when and how AFC reasonably communicated that particular forum selection clause to the Defendants in connection with the Guaranty.

The operative text, moreover, fails to reasonably communicate to the parties that they would be consenting to personal jurisdiction in New York for claims under the Shareholder Guaranty. The Shareholder Guaranty never mentions "jurisdiction" at all. Although it incorporates *some* portions of Section 13 of the Credit Agreement, it does not incorporate the portions referencing jurisdiction. Specifically, Section 13 of the Credit Agreement contains provisions covering numerous topics, including: contractual validity, construction, interpretation and enforcement; jury trials; jurisdiction; venue; judgment enforcement; and damages limitations. The Shareholder Guaranty, in turn, incorporates only "the provisions regarding choice of law and venue and jury trial waiver set forth in Section 13 of the Credit Agreement of the Shareholder Guaranty." Ex. 1, § 24(b). That text does not reasonably communicate to the parties that, by executing the Shareholder Guaranty, they were agreeing to personal jurisdiction in New York. On this record, therefore, AFC has not met its burden under the first factor.

**B.    AFC Cannot Show That the Forum Selection Clause Was Mandatory, Rather than Permissive.**

"A forum selection clause is mandatory when it grants exclusive jurisdiction to a particular forum. In contrast, a permissive forum selection clause only reflects the contracting parties' consent to resolve disputes in a certain forum, but does not require that disputes be resolved in that forum." *Recovery Racing III, LLC v. MAG Retail Holdings-FLI, LLC*, No. 24-CV-08394 (DG) (ST), 2025 WL 1736832, at *3 (E.D.N.Y. June 23, 2025) (collecting cases); *Meet Recruitment Inc. v. Neuro42, Inc.*, No. 1:25-CV-00782 (SDA), 2025 WL 1677407, at *2 (S.D.N.Y. June 13, 2025) ("A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the

designated forum or incorporates obligatory venue language." (quoting *Glob. Seafood Inc. v. Bantry Bay Mussels Ltd.*, 659 F.3d 221, 225 (2d Cir. 2011)).

Accordingly, in evaluating the enforceability of forum selection clauses, courts focus on whether the subject provision refers to "exclusive" jurisdiction. *Compare Ony, Inc. v. Cornerstone Therapeutics, Inc.*, No. 11-CV-1027S, 2012 WL 1835671, at *5 (W.D.N.Y. May 18, 2012), *aff'd*, 720 F.3d 490 (2d Cir. 2013) ("[T]he language of the . . . agreement refers only to the 'non-exclusive jurisdiction' of New York courts and contains no express consent to personal jurisdiction. Accordingly, the . . . agreement alone is insufficient to establish that these Defendants consented to personal jurisdiction in New York."), *with Neuro42, Inc.*, 2025 WL 1677407, at *2 ("[T]he clause states that 'the parties submit to the exclusive authority of the jurisdiction of the courts of the State of New York', which reflects obligatory venue language.").

Under those standards, this forum selection clause is plainly not mandatory. The clause explicitly references "non-exclusive jurisdiction." It also states that the forum selection is "at the required lender's discretion." Ex. 2, § 13. Thus, the clause cannot be deemed "mandatory," and AFC cannot meet its burden under this second factor.

## C. **AFC Cannot Show That the Claims and Parties Involved in This Suit are Subject to the Forum Selection Clause.**

Even if the subject forum selection clause were mandatory (it is not), AFC cannot show that the Defendants are subject to that clause. The Defendants are not parties to the Credit Agreement containing the forum selection clause. Although they are parties to the Shareholder Guaranty, that contract never refers to jurisdiction—not even in its language incorporating specific portions of the Credit Agreement. Under this factor, too, AFC has not met its burden.

In sum, AFC has failed to establish personal jurisdiction against either Defendant. AFC relies solely on a theory of consent to jurisdiction via a forum selection clause, yet AFC cannot

meet any, let alone all, of the factors for enforcing such a clause. Thus, the Amended Complaint must be dismissed under Rule 12(b)(2) for lack of personal jurisdiction.

## II. PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

The Court should dismiss the Amended Complaint in its entirety because Plaintiffs fail to state any claim upon which relief may be granted, and because Plaintiffs' fraud claims fall well short of satisfying Rule 9(b).

### A. Count I Should Be Dismissed Because Plaintiffs Fail to Plausibly Allege that Defendants Breached the Shareholder Guaranty.

Count I alleges that Defendants breached the Shareholder Guaranty, a typical "bad boy guaranty" pursuant to which Defendants agreed to guarantee the JG Borrowers' obligations under the loan agreement under certain narrowly defined circumstances. Count I fails to state a cognizable claim for breach of contract because no obligations are yet due and payable under the agreement, and Plaintiffs have not sustained any losses that could trigger a guaranty.

#### 1. No Obligations Are Due and Payable.

The Court should dismiss AFC's breach of contract claim because no obligations are yet due and payable under the contract. The SG provides that each Guarantor guaranties to AFC:

> [A]s and for such Guarantor's own debt, until the final payment in full thereof, in cash, has been made, the due payment of the Guaranteed Obligations, <u>when and as the same shall become due and payable</u>, whether at maturity, pursuant to a mandatory prepayment requirement, by acceleration, or otherwise, and after the expiration of any applicable grace and notice period under the Credit Agreement or any of the other Loan Documents[.]

Ex. 1 (Shareholder Guaranty), § 2 (emphasis added).

Here, the operative agreement is the 2024 Forbearance Agreement—the most recent iteration of the Credit Agreement—which continues in full force and does not mature until May 2026. *See* Am. Compl. ¶¶ 65-67. Under that agreement, the only obligations that are "due and payable" are the

JG Borrowers' monthly loan payments. The JG Borrowers continue to make these monthly loan payments, and AFC continues to accept them.

The Amended Complaint does not allege that the JG Borrowers are not current on their monthly loan payments (nor could it plausibly allege as much, given Judge Quraishi's finding that the loan is not in default). Accordingly, there is nothing due and payable, and Defendants' shareholder guaranty obligations are not actionable. *See Deutsche Bank AG v. AMBAC Credit Products, LLC*, No. 04 CIV. 5594 (DLC), 2006 WL 1867497, at *9 (S.D.N.Y. July 6, 2006) ("Of course, if the conditions precedent to a defendant's duty to perform have not been met, breach is not possible.").

### 2. AFC Has Not Sustained Any Losses that Could Trigger a Guaranty.

To the extent that AFC alleges that any amounts apart from monthly loan payments are due, that is wrong as a matter of law. Defendants personally guaranteed (under very limited circumstances) only a set of obligations defined in the Shareholder Guaranty as the "Guaranteed Obligations." "Guaranteed Obligations" means "any losses, expenses, charges, costs, or liability to [AFC] arising from" a number of specified events. Ex. 1 (Shareholder Guaranty), § 1. Those specified events include fraud on the part of Defendants, a material breach of warranty, or a failure to pay taxes. *Id.*

AFC alleges "[u]pon information and belief" (and with no factual support) that the JG Borrowers have accrued an accounts-payable balance of more than $5 million and unpaid taxes of more than $5 million through 2024. Am. Compl. ¶ 85. Even assuming the truth of that allegation (which Defendants dispute), AFC has failed to allege any "losses, expenses, charges, costs, or liability" to AFC as a consequence. Rather, AFC merely alleges that these amounts could someday "attach to *any potential foreclosure*" and in that event "reduce the amount the JG Borrowers will have to pay down their obligations to AFC." Am. Compl. ¶ 87 (emphasis added).

In other words, AFC alleges that these hypothetical balances *might,* in the future, result in losses covered by the Shareholder Guaranty, but only if a foreclosure possibly becomes appropriate should the JG Borrowers someday default. AFC thus might or might not have potential future losses covered by the Shareholder Guaranty in the event that: (1) the JG Borrowers default on their loan in a manner giving rise to a right to foreclose; (2) AFC forecloses on a Pennsylvania property (which Judge Quraishi enjoined them from doing); (3) AFC receives a money judgment as to that foreclosure; (4) there are still unpaid taxes and bills in some amount to be determined on the date of the judgment; and (5) the foreclosure sale is insufficient and results in a shortfall, such that AFC's recovery on that judgment is reduced by that undetermined, hypothetical amount of unpaid taxes and bills.

What AFC definitely does not have or allege are any "losses, expenses, charges, costs, or liability to [AFC] arising from" the alleged accrued balances. Therefore, the obligations under the Shareholder Guaranty have not been triggered, and Defendants are not liable under that agreement for AFC's hypothetical future losses, losses which may or may not come to pass.

In sum, because there are no amounts currently "due and payable" under the Shareholder Guaranty, AFC has failed to allege a breach of that agreement. Count I should therefore be dismissed. *See Wells Fargo Bank Nw., N.A. v. Sundowner Alexandria, LLC*, No. 09 CIV. 7313 (BSJ), 2010 WL 3238948, at *3 (S.D.N.Y. Aug. 16, 2010) ("Although the Court must accept the material facts alleged in the complaint as true, when the content of the contracts conflicts with allegations about those contracts made in the Complaint, the actual language of the contracts must control.") (cleaned up).

**B.    Count II Should Be Dismissed Because Plaintiffs Fail to Adequately Plead Tortious Interference as a Matter of Law.**

Count II alleges that Defendants caused the JG Borrowers to breach the Credit Agreement. The Court should dismiss Count II because Plaintiffs have failed to plausible allege any breach of contract, as discussed above, and one logically cannot be liable for tortiously causing a breach of

contract where it has already been determined that contract has not been breached. *See, e.g., AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.*, No. 02 CIV. 1363 (PKL), 2003 WL 21203503, at *4 (S.D.N.Y. May 22, 2003) ("In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party . . . .") (quoting *Jack L. Inselman & Co., Inc. v. FNB Fin. Co.,* 41 N.Y.2d 1078, 1080 (1977)).

All of that aside, the Court should dismiss Count II because it is legally defective. Under New York law, "a plaintiff cannot impose individual liability on a corporate officer or director because the defendant took actions in his official capacity that caused the company to breach its contract with the plaintiff." *Kelly v. MD Buyline, Inc.*, 2 F. Supp. 2d 420, 439 (S.D.N.Y. 1998); *accord Murtha v. Yonkers Child Care Ass'n, Inc.*, 383 N.E.2d 865, 866 (N.Y. 1978) ("A director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken.") (internal punctuation omitted).

The reason is obvious: if the law were otherwise, then every claim of breach of contract by an entity would give rise to a parallel claim of tortious interference by that entity's agent. *AIM Int'l Trading, L.L.C.*, 2003 WL 21203503, at *6. Thus, under New York law, "company officers" cannot be "sued individually for causing their own company to breach a contract." *Id.* (citing *Kelly*, 2 F. Supp. 2d at 439; *Murtha*, 383 N.E.2d 865, 865-66; *see also Diamond v. ShiftPixy, Inc.*, No. 20-CV-7305 (LJL), 2021 WL 3085405, at *19 (S.D.N.Y. July 19, 2021) ("Where the defendant is an officer of a corporation that is party to a contract, they are generally not considered third parties to the contract who can interfere with it.") (internal punctuation omitted).

C.    **Counts III and IV Should Be Dismissed Because Plaintiffs Fail to Plausibly Allege Fraud and Plead Fraud with Particularity.**

Count III (alleging fraud) and Count IV (alleging aiding and abetting fraud) are simply reconstrued versions of AFC's flawed breach of contract claim against the JG Borrowers. Similar to the spurious RICO claim which Plaintiffs wisely abandoned, these fraud claims are actually just ordinary commercial contract claims (against entities other than these Defendants) disguised as intentional torts, with no legal basis. These fraud claims rely on the JG Borrowers' (but not the Defendants') alleged breach of the "Restricted Payments" provision of the loan agreement (to which Defendants were not parties). The connection between an alleged corporate breach of a loan agreement and individual liability of the company's part-owners is tenuous, convoluted, and poorly explicated in the Amended Complaint. That obfuscation is by design, but fails to withstand scrutiny.

AFC's fraud allegations are based on the theory that the corporate JG Borrowers (but not Defendants) allegedly defaulted on their loan, because in 2021-23, the JG Borrowers made an unidentified number of transactions transferring money from the JG Borrowers' Pennsylvania bank account to other JG HoldCo entities. *See, e.g.*, Am. Compl. ¶¶ 19, 74-83. AFC does not allege that these unidentified transfers were inherently fraudulent, but rather that they constituted a breach of the contract provisions governing the use of loan proceeds and inter-company transfers (defined in the Amended Complaint as "Restricted Payments"). *Id.* ¶¶ 5, 76, 83. According to AFC, as a result of those alleged (but unidentified) Restricted Payments, the JG Borrowers were in a continuous state of default from September 2021 through July 2023. *Id*. ¶¶ 75-76.

During that time period, the JG Borrowers (but not Defendants) were required to file quarterly and annual financial reports and compliance certificates detailing the financial circumstances of the JG Borrowers. *Id.* ¶ 101. Also during that period, the JG Borrowers (but not Defendants) were required to submit draw requests whenever they needed to pay contractors or

otherwise expend loan funds for their approved purposes. *Id.* ¶ 108. Finally, during that period, the JG Borrowers (but not Defendants) and AFC renegotiated the loan agreement roughly six times, including four amendments and two forbearance agreements. *See generally id.* ¶¶ 34-68.

Each time the JG Borrowers filed a quarterly compliance certificate, submitted a draw request, or signed an amendment renegotiating the loan, the JG Borrowers (but not Defendants) were required to certify that the JG Borrowers were not in default. *Id.* ¶¶ 101, 108. As a result, AFC alleges that the JG Borrowers (but not Defendants) filed eight compliance certificates, submitted "nearly 100" draw requests, and signed six loan amendments, all of which "falsely" certified that the JG Borrowers were not in default. *Id.* ¶¶ 6, 107-08, 137, 145.

The Amended Complaint contends that the Defendants are personally liable for each of these allegedly false statements. According to AFC, Defendant Loevy is allegedly liable because he signed the loan amendments in his capacity as a manager of the JG Borrowers, and supposedly "directed" various JG Borrowers' officers to sign the compliance certificates and draw request applications. *Id.* ¶¶ 107-08. Defendant Kanovitz is allegedly liable because, AFC claims, he "had actual knowledge" of the alleged false statements, *id.* ¶ 146, but the sole basis for that critical allegation is that Kanovitz owned a larger equity share than Loevy in JG HoldCo. *Id.* AFC also alleges that Kanovitz "substantially assisted Loevy" by "failing to disclose or correct" the alleged false statements, and that Kanovitz "benefit[ed] from" the alleged false statements in some unspecified manner. *Id.* ¶ 147.

In short, AFC alleges that the individual Defendants committed fraud because the corporate JG Borrowers made Restricted Payments, which constituted a default, which thereby allegedly rendered false the JG Borrowers' certifications that the JG Borrowers were not in default. These allegations fail to plausibly state a claim for fraud for at least three reasons. First, the Amended Complaint fails to allege the Restricted Payments with the requisite particularity, even after amending

16

to try again.  Second, the Amended Complaint fails to sufficiently allege scienter.  Third, the JG Borrowers' certifications that the loan was not in default are legal conclusions, not fraudulent misstatements, and those sorts of legal conclusions cannot be the basis for a fraud claim.

### 1. AFC's Fraud Claims Fail Rule 9(b)'s Particularity Requirement.

AFC fails to allege the Restricted Payments, which form the backbone of its fraud claims, with the particularity required by Rule 9(b).  Even after Defendants' pre-filing letter called out the problem, whereupon AFC asked for leave to re-plead, the Amended Complaint still provides no dates, payees, dollar amounts, or circumstances for any of the payments, apart from two (addressed below). The Amended Complaint alleges a total of just over $19 million in Restricted Payments between September 2021 and July 2023, but it provides no further clarifying information whatsoever.  *Id.* ¶ 75. A summary table purports to break the payments down into six categories by payee, *see id.*, but as Defendants pointed out before AFC amended (yet AFC continues to ignore), even that is wrong; the payee identified for the vast majority of the payments -- $16 million of the $19 million -- is "Oakland Manager," an entity that did not even have a bank account until after July 2023.

Due to the Amended Complaint's profound lack of particularity, neither Defendants nor the Court can determine how many Restricted Payments were allegedly made (dozens? hundreds? thousands?), when they were made, to whom they were made, who approved them, or, what they were payments for.  Accordingly, it is impossible to determine from the Amended Complaint whether they were actually "Restricted Payments" or otherwise constituted breaches of the loan agreement.

Only two specific payments are identified in the Amended Complaint.  The first is a loan re-payment for $966,762 made to a company that loaned Defendants money, money which was in turn loaned to Defendants' cannabis company.  *See id.* ¶ 78.  AFC's pleading fails to explain how this was a "Restricted Payment" that breached the loan agreement, apart from AFC's conclusory allegation

that the transfer was made "to pay off a debt" owed by Defendants' law firm. *Id.* This single conclusory allegation, with no factual support, cannot save the Amended Complaint's failure to allege the Restricted Payments with the particularity required by Rule 9(b). *See Corley v. Vance*, 365 F. Supp. 3d 407, 456 (S.D.N.Y. 2019), *aff'd sub nom. Corley v. Wittner*, 811 F. App'x 62 (2d Cir. 2020).

The second payment fares even worse. This November 2022 disbursement for $408,814, intended to pay for manufacturing lab equipment, *see id.* ¶ 79, was a payment made in error that was repaid in short order after Defendants learned about it, long before the March 2024 Forbearance.[5] In any event, to the extent the disbursement ran afoul of any portion of the JG Borrowers' contract, that breach was remedied and then expressly forborne upon in writing in exchange for valuable consideration under the 2024 Forbearance Agreement, which specifically listed this event as one of the actions that AFC agreed to forbear. *See* Ex. 3 (2024 Forbearance Agreement), Sch. 1 ¶ 20 (listing as a forborne "Specified Default" the "draw request made in November 2022 for $408,814 for extraction equipment"). This 2022 payment cannot now serve as a basis for a fraud claim, when it was explicitly acknowledged and forborne by Plaintiffs in the 2024 Forbearance Agreement.

That AFC would highlight these two transactions as the *only* examples of allegedly violative "Restricted Payments" reveals the utter lack of substance to their fraud allegations. As described above, AFC's allegations of fraud nearly all relate to statements that the JG Borrowers were not in default. Although AFC has provided some information about when those statements were made and

---

[5] AFC had disbursed to the JG Borrowers $408,814 to pay for an invoice for extraction laboratory equipment. After the JG Borrowers terminated their prior CEO and CFO, the new leadership unwittingly submitted a second draw request for the same lab equipment. AFC pointed out the prior disbursement, and the JG Borrowers promptly repaid the entire amount to AFC. While Defendants acknowledge these facts are not alleged in the Amended Complaint and thus outside of the Court's purview for this motion to dismiss, Defendants are compelled to correct the record, in light of AFC's knowing and wrongful attempts to smear their reputations.

by whom, AFC has failed to "explain why the statements were fraudulent." *Miller v. United States ex rel. Miller*, 110 F. 4th 533, 543 (2d Cir. 2024); *accord Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) ("To meet the pleading standard of Rule 9(b), this Court has repeatedly required, among other things, that the pleading explain why the statements were fraudulent.") (cleaned up). Doing so would require AFC to describe with specificity the Restricted Payments that allegedly put the JG Borrowers in default, and thus rendered their certifications false. AFC has utterly failed to do so. Other than the two examples discussed above, which were not pled with particularity nor constituted defaults, AFC has not alleged *any* identifying information about the remaining purported transactions. This dearth of detail surrounding the alleged $19 million in Restricted Payments is fatal to AFC's fraud claims. The Court should therefore dismiss those claims for failing to conform to Rule 9(b).

## 2. AFC Fails to Plead Facts Giving Rise to a Strong Interference of Scienter.

AFC's fraud claims must also be dismissed because AFC has not, and cannot, allege any specific facts "giv[ing] rise to a strong inference of fraudulent intent," as required by Rule 9(b). *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). The Second Circuit has repeatedly cautioned that courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations." *Id.* (internal quotation marks and citation omitted); *see also Lerner*, 459, F.3d at 290 (same). Simply alleging that a defendant must have known that a statement was false or "must have been privy" to the truth is patently insufficient. *Flexborrow LLC v. TD Auto Fin. LLC,* 255 F. Supp. 3d 406, 423 (E.D.N.Y. 2017). Nor is it sufficient to allege "a generalized profit motive" or claim that a defendant stands to gain economically from fraud. *Brookdale Univ. Hosp. & Med. Ctr., Inc. v. Health Ins. Plan of Greater N.Y.,* No. 07-CV-1471 (RRM)(LB), 2009 WL 928718, at *6 (E.D.N.Y.

Mar. 31, 2009) (collecting cases).  Such allegations "do not satisfy the heightened pleading requirements of Rule 9(b)." *Flexborrow,* 255 F. Supp. 3d at 421 (citation omitted).

AFC's original complaint could not surmount this hurdle, and the Amended Complaint fares no better.  It, too, is rife with the same bald claims that Defendants "knew" something, without alleging a single specific fact supporting an inference (much less the requisite "strong inference") that Defendants knew the thing alleged.  *See, e.g.*, Am. Compl. ¶ 125 (alleging that Defendants "knew" the alleged Restricted Payments were improper); ¶ 138 (alleging that Loevy "knew that these misrepresentations were false when he (or others he directed) made them").

Even worse are the multiple claims that Defendants must have known something simply because they partly owned the company.  *See id.* ¶ 146 (alleging that Kanovitz "had actual knowledge of" unspecified fraud "as [Kanovitz] served as an even larger owner of JG HoldCo"). This "guilt by association is impermissible" when pleading fraud.  *In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 695 (2d Cir. 2009); *Sheppard v. Manhattan Club Timeshare Ass'n, Inc.*, No. 11 CIV. 4362 (PKC), 2012 WL 1890388, at *5 (S.D.N.Y. May 23, 2012) (Castel, J.) ("The fraud claim also fails to satisfy the requirement of Rule 9(b) that circumstances amounting to fraud be pleaded as to each individual defendant, and not premised on guilt by association.").

Indeed, the 39-page Amended Complaint is bereft of a single allegation of a specific actual fact tending to show that Defendants:

- knew about the existence of the alleged Restricted Payments;

- knew that the Restricted Payments, or any of the alleged non-monetary defaults, constituted Events of Default; or

- knew that various employees were signing compliance certificates or draw requests.

Nor does the Amended Complaint allege a single fact tending to show that Defendants intended to defraud AFC, or that Defendants made any statements with the intention that AFC rely thereon.

Even the two specific examples of Restricted Payments alleged by AFC, discussed above, fail to satisfy the elements of fraud on the part of Defendants. *See* Am. Compl. ¶¶ 78-79. Plaintiffs do not allege that Defendants made a false statement; that they did so with knowledge that the statement was false or with the intent to defraud; that they knew the payment to be an Event of Default; that they intended AFC to rely on the statement; that AFC actually did reasonably rely on the statement; or that AFC was damaged in some way as a result. Thus, AFC does not sufficiently allege even the scienter element of its fraud claims, much less allege specific facts giving rise to a strong inference that Defendants acted with fraudulent intent. This plainly fails to pass muster under Rule 9(b), and AFC's fraud claims should be dismissed, especially given that AFC asked for and was provided an opportunity to replead after Defendants raised these very objections.

### 3. AFC Wrongly Miscasts a Legal Conclusion as a Fraudulent Misstatement.

Independently, the Amended Complaint suffers from another dispositive flaw. As discussed above, the bulk of AFC's allegations rely on a claim that Defendant Loevy and people he "directed" certified that the JG Borrowers were not in default, when, in AFC's view, the JG Borrowers were in default. This allegation is an insufficient legal basis for a fraud claim.

Under New York law, "[t]he elements of a cause of action for fraud require a material misrepresentation of a fact, *knowledge of its falsity,* an intent to induce reliance, justifiable reliance by the plaintiff and damages." *City of Long Beach v. Agostisi,* 221 A.D.3d 776, 778 (2d Dept 2023) (emphasis added) (citations omitted). Moreover, the plaintiff must show by clear and convincing evidence that the representation was "false and *known by the defendant to be false.*" *Tanzman v. La Pietra,* 8 A.D.3d 706, 707 (3d Dept 2004) (emphasis added) (citations omitted).

A declaration that an entity is, or is not, in default of a complex loan agreement whose multiple and self-referential iterations comprise roughly one thousand pages is, by necessity, a legal

conclusion, and a matter of professional legal opinion.  It is certainly not "a material misrepresentation of fact," as required by New York law to support a claim of fraud.  *See Knox v. Countrywide Bank,* 4 F. Supp. 3d 499, 508 (E.D.N.Y. 2014) ("The foregoing discussion demonstrates the flaw in plaintiffs' primary theory of fraud, which rests on their legal conclusion that Countrywide was not the 'holder in due course' of the 2004 note because it was split from the mortgage.  Of course, a legal conclusion of this nature is not entitled to the presumption of truth."); *Singh v. NYCTL 2009-A Tr.,* No. 14 Civ. 2558 (RWS), 2016 WL 3962009, at *7 (S.D.N.Y. July 20, 2016), *aff'd*, 683 F. App'x 76 (2d Cir. 2017) ("It is 'well settled' that 'fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law.'" (citing 37 Am. Jur. 2D of Fraud & Deceit § 101 (2014))).

In sum, AFC's fraud claims rely upon certifications that the JG Borrowers were not in default, which are legal conclusions and opinions, not misrepresentations of fact, and therefore these fraud claims are insufficient as a matter of law.

### 4.    The Perfection Certificate Allegations Fail to Plausibly State a Claim for Fraud.

AFC also contends the Defendants committed fraud by failing to disclose certain entities as JG HoldCo "affiliates" in a Perfection Certificate prepared in connection with the 2024 Forbearance Agreement.  *See* Am. Compl. ¶¶ 92-96, 130-136.  AFC allegedly "relied on the substantial completeness and accuracy of the Perfection Certificate before agreeing to the 2024 Forbearance Agreement, believing that it had an accurate understanding of JG HoldCo's assets and collateral." *Id.* ¶ 135.  These allegations fail to plausibly state a claim for relief for at least two reasons.

First, in *Hayden Gateway LLC*, the JG Borrowers submitted uncontradicted evidence proving that (1) the undisclosed entities alleged by AFC are not, in fact, "affiliates" of JG HoldCo, and (2) the JG Borrowers' General Counsel had previously disclosed the information to AFC in any event.  AFC

offered no proof to the contrary. And Judge Quraishi rejected these allegations in finding there was no default. At a minimum, these allegations are therefore not plausible. *Iqbal*, 556 U.S. at 662.

Second, AFC fails to plausibly allege how this alleged failure to disclose these entities in a Perfection Certificate was material. *See Lerner*, 459 F. 3d at 290 (to state a cause of action for fraud under New York law, "a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury" (citation omitted)). AFC does not allege, for example, that Defendants fraudulently *over*stated JG HoldCo's assets and collateral, such that AFC would not have entered the 2024 Forbearance Agreement had they known that the security for their loan was much less than they had bargained for. In short, the Amended Complaint fails to plausibly allege how or why AFC would have refused to renegotiate the loan had AFC known about this purported additional collateral. This too requires dismissal for failure to state a claim.

### D. Count V Should Be Dismissed Because Plaintiffs Fail to Plead a Single Element of Conversion.

Count V purports to allege conversion. Given that the loan is not in default, this claim too fails the plausibility test. Moreover, this claim should be dismissed because AFC fails to plead either element of conversion.

Conversion under New York law is "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *HSCM Bermuda Fund Ltd. v. Newco Cap. Grp. VI LLC*, 619 F. Supp. 3d 434, 442 (S.D.N.Y. 2022) (quoting *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004)). "The two key elements of conversion are (1) the plaintiff's possessory right or interest in the property and (2) the defendant's dominion over the property or interference with it, in derogation of the plaintiff's rights." *Id.* (quoting *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x

622, 629 (2d Cir. 2020)).  AFC alleges Defendants exercised control over specific property, to which

AFC had a superior possessory interest.  These allegations fail as a matter of law.

First, under New York law, a fungible sum of money does not constitute "property" for

purposes of a conversion claim.  "To state a cause of action for conversion of money, the money must

be 'described or identified in the same manner as a specific chattel.'"  *Glob. View Ltd. Venture Cap.*

*v. Great Cent. Basin Expl., L.L.C.*, 288 F. Supp. 2d 473, 480 (S.D.N.Y. 2003) (quoting *9310 Third*

*Ave. Assocs., Inc. v. Schaffer Food,* 210 A.D.2d 207, 208 (2d Dep't 1994)).  "In other words, the

money must be 'specifically identifiable and segregated.'"  *Id.* (quoting *Manufacturers Hanover Trust*

*Co. v. Chemical Bank,* 160 A.D.2d 113, 124 (1st Dep't 1990)).

Here, AFC's conversion claim merely refers to "the funds [AFC] disbursed to the JG

Borrowers."  Am. Compl. ¶ 151.  AFC's conversion claim fails on that ground alone, because "[t]here

is no indication of an identifiable fund or otherwise segregated amount, nor is there any description

of the alleged transfer or transfers from which the Court could infer a specifically identified fund of

money."  *Glob. View Ltd. Venture Cap,* 288 F. Supp. at 480; *accord United Republic Ins. Co. v. Chase*

*Manhattan Bank,* 168 F. Supp. 2d 8, 19 (N.D.N.Y. 2001), *aff'd,* 40 F. App'x 630 (2d Cir. 2002),

*mandate recalled, order vacated sub nom.*, 315 F.3d 168 (2d Cir. 2003) ("In the instant case, the

$14,000,000.00 in question was mingled in the Alpha Trust with the $13,000,000.00 from the UCIC

loan. These mingled funds were then loaned to LGI, which then paid the Lender Banks their

respective amounts due. The funds are now so dispersed that they are not identifiable or segregated.

Therefore, an action for conversion is not appropriate.").

Second, AFC does not have a possessory right in the funds—money which AFC voluntarily

disbursed as a loan in a contract that was bargained for and supported by consideration—much less a

right superior to that of the JG Borrowers.  The law on that is clear: "To sustain a conversion claim,

acts must be alleged that are unlawful or wrongful that are not a mere violation of contractual rights."

*In re Ticketplanet.com,* 313 B.R. 46, 69 (Bankr. S.D.N.Y. 2004). Thus, "[f]or purposes of a conversion claim, the Court will not deem a plaintiff to have immediate possessory rights over money where that money represents damages in contract." *Glob. View Ltd. Venture Cap.*, 288 F. Supp. at 479. As held in a similar case:

> Plaintiff does not have a legal ownership or a right of possession in the $14,000,000.00 it loaned to the [Borrower]. It voluntarily made the loan and accepted specific collateral in return. [Borrower] thereafter had authorization to control the funds . . . . Plaintiff had no intent to retain or exercise control. [Plaintiff] agreed to be paid back in monthly payments as part of the contract, not paid back from the specific funds that it loaned to the trust. It cannot now claim a possessory or ownership interest in that which it freely gave away as a loan in a contract that was bargained for and supported by consideration. The claim here is essentially a breach of contract claim for the [Borrower's] failure to repay the loan from [Plaintiff], or for the lack of value of the consideration or collateral that plaintiff received. Neither theory is actionable under a conversion claim.

*United Republic Ins. Co.*, 168 F. Supp. 2d at 19.

In short, AFC's conversion claim is yet another futile attempt to convert a routine breach of contract claim against certain borrower entities (a fight that AFC already lost) into an intentional tort against the Defendants, who were not even parties to the loan. If AFC wants to continue to insist that the JG Borrowers breached their contract by making purported Restricted Payments, perhaps it will persuade the Third Circuit to reverse Judge Qurashi. But even that result would not justify relief against these Defendants.

## **CONCLUSION**

The Court should dismiss AFC's Amended Complaint in its entirety, because the Court lacks personal jurisdiction over Defendants pursuant to Rule 12(b)(2), all five claims fail to state a claim pursuant to Rule 12(b)(6), and the fraud claims fail to conform to Rule 9(b).

Dated:  July 25, 2025

Respectfully submitted,

*/s/  Michael B. Homer*

Michael B. Homer
Constantine P. Economides
DYNAMIS LLP
175 Federal Street, Suite 1200
Boston, MA 02110
(617) 693-9732
mhomer@dynamisllp.com

*Counsel for Defendants Michael Kanovitz and Jon Loevy*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically and served on all counsel of record on July 25, 2025, via the Court's ECF system.

*/s/ Michael B. Homer*
Michael B. Homer