# **EXHIBIT 2**

*Execution Version*

**SECOND AMENDED AND RESTATED CREDIT AGREEMENT**

**by and among**

**JG NEW JERSEY LLC,**
**SRG 1761 NORTH OLDEN LLC,**
**SRG 1474 PROSPECT LLC,**
**SRG WARETOWN LLC,**
**HAYDEN GATEWAY LLC,**
**PIER COVE LLC,**
**SRG 272 MAIN STREET LLC,**
**AND**
**SRG HI PARK LLC**
**as Borrowers,**

**JG HOLDCO LLC,**
**as Parent,**

**THE OTHER LOAN PARTIES THAT ARE PARTY HERETO,**

**THE LENDERS THAT ARE PARTY HERETO,**
**as Lenders,**

**AFC MANAGEMENT, LLC,**
**as Agent**

**and**

**A BDC WAREHOUSE, LLC,**
**as Documentation Agent**

**Dated as of September 30, 2021**

**THIS INDEBTEDNESS GOVERNED HEREBY HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR U.S. FEDERAL INCOME TAX PURPOSES. FOR FURTHER INFORMATION REGARDING THE ISSUE PRICE, THE AMOUNT OF ORIGINAL ISSUE DISCOUNT, THE ISSUE DATE AND THE YIELD TO MATURITY OF SUCH INDEBTEDNESS, THE HOLDER OF THIS NOTE SHOULD CONTACT JON LOEVY AT ADDRESS: 311 N. ABERDEEN STREET, SUITE 420, CHICAGO, IL 60607 AND E-MAIL: JON@LOEVY.COM, WHO WILL PROMPTLY MAKE SUCH INFORMATION AVAILABLE.**

TABLE OF CONTENTS

Page

1.    DEFINITIONS AND CONSTRUCTION. .................................................................... 1
    1.1    Definitions ....................................................................................................... 1
    1.2    Accounting Terms ......................................................................................... 34
    1.3    Code ............................................................................................................... 34
    1.4    Construction .................................................................................................. 34
    1.5    Schedules and Exhibits ................................................................................ 35
    1.6    Appointment of Borrower Representative. ................................................ 35
2.    LOAN AND TERMS OF PAYMENT. ..................................................................... 36
    2.1    Term Loans ................................................................................................... 36
    2.2    Borrowing Procedures ................................................................................. 37
    2.3    Payments; Termination of Commitments; Prepayments ......................... 38
    2.4    Promise to Pay ............................................................................................. 41
    2.5    Interest Rates, Payments and Calculations .............................................. 41
    2.6    Fees ................................................................................................................ 44
    2.7    Crediting Payments ...................................................................................... 45
    2.8    Designated Account ...................................................................................... 45
    2.9    Maintenance of Loan Account; Statements of Obligations ..................... 45
    2.10   Financial Examination and Other Fees ..................................................... 46
    2.11   Capital Requirements .................................................................................. 46
    2.12   Reserve Account. .......................................................................................... 47
    2.13   Adjustments for Failure to Fund ............................................................... 48
3.    CONDITIONS; TERM OF AGREEMENT. ............................................................. 48
    3.1    Conditions Precedent to the Extension of Credit on the Closing Date ............... 48
    3.2    Conditions Precedent to the Extension of Credit on the Restatement Date ........ 50
    3.3    Conditions Precedent to Additional Extensions of Credit ...................... 53
    3.4    Term ............................................................................................................... 54
    3.5    Effect of Maturity ........................................................................................ 54
    3.6    Early Termination by the Borrowers ......................................................... 54
    3.7    Conditions Subsequent. ............................................................................... 55
4.    REPRESENTATIONS AND WARRANTIES. ......................................................... 56
    4.1    Title to Assets; No Encumbrances ............................................................. 56
    4.2    [Reserved] ...................................................................................................... 56

TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | 4.3 | [Reserved] | 56 |
| | 4.4 | Due Organization and Qualification; Subsidiaries | 56 |
| | 4.5 | Due Authorization; No Conflict | 57 |
| | 4.6 | Litigation | 57 |
| | 4.7 | Compliance with Laws; Permits; Licenses | 58 |
| | 4.8 | Historical Financial Statements; No Material Adverse Effect | 58 |
| | 4.9 | Solvency | 58 |
| | 4.10 | Employee Benefits | 59 |
| | 4.11 | Environmental Condition | 59 |
| | 4.12 | Real Property | 59 |
| | 4.13 | Broker Fees | 60 |
| | 4.14 | Complete Disclosure | 60 |
| | 4.15 | Indebtedness | 60 |
| | 4.16 | Patriot Act; Foreign Corrupt Practices Act | 60 |
| | 4.17 | Payment of Taxes | 60 |
| | 4.18 | Margin Stock | 61 |
| | 4.19 | Governmental Regulation | 61 |
| | 4.20 | Sanctions | 61 |
| | 4.21 | Employee and Labor Matters | 61 |
| | 4.22 | Material Contracts | 61 |
| | 4.23 | PEP | 62 |
| | 4.24 | Location of Collateral | 62 |
| | 4.25 | EEA Financial Institutions | 62 |
| | 4.26 | Intellectual Property | 62 |
| | 4.27 | Anti-Money Laundering Laws | 63 |
| | 4.28 | Representations Not Waived | 63 |
| 5. | | AFFIRMATIVE COVENANTS. | 63 |
| | 5.1 | Financial Statements, Reports, Certificates | 63 |
| | 5.2 | Collateral Reporting | 64 |
| | 5.3 | Existence | 64 |
| | 5.4 | Inspection; Appraisals | 64 |

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|

| 5.5 | Maintenance of Properties | 64 |
|---|---|---|
| 5.6 | Taxes | 65 |
| 5.7 | Insurance | 65 |
| 5.8 | Compliance with Laws | 66 |
| 5.9 | Environmental | 66 |
| 5.10 | Disclosure Updates | 67 |
| 5.11 | Formation or Acquisition of Subsidiaries | 67 |
| 5.12 | Additional Real Property | 67 |
| 5.13 | Further Assurances | 68 |
| 5.14 | Lender Meetings | 68 |
| 5.15 | Material Contracts | 68 |
| 5.16 | Books and Records | 69 |
| 5.17 | Board Member; Board Observer Rights | 69 |
| 5.18 | Cooperation with REIT | 70 |
| 5.19 | Board Meetings | 70 |
| 5.20 | Management Agreement | 70 |
| 5.21 | Regulatory Approvals. | 70 |
| 5.22 | Communications with Governmental Authorities | 70 |
| 6. | NEGATIVE COVENANTS. | 70 |
| 6.1 | Indebtedness. | 71 |
| 6.2 | Liens. | 71 |
| 6.3 | Restrictions on Fundamental Changes. | 71 |
| 6.4 | Disposal of Assets. | 71 |
| 6.5 | Change Name. | 71 |
| 6.6 | Nature of Business. | 71 |
| 6.7 | Prepayments and Amendments. | 71 |
| 6.8 | Restricted Payments. | 72 |
| 6.9 | Accounts. | 72 |
| 6.10 | Accounting Methods. | 72 |
| 6.11 | Investments. | 72 |
| 6.12 | Transactions with Affiliates. | 73 |

OMM_US:80200477.9

TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | 6.13 | Use of Proceeds | 73 |
| | 6.14 | Benefit Plans. | 73 |
| | 6.15 | Limitation on Issuance of Stock. | 74 |
| | 6.16 | Sale and Leaseback Transactions | 74 |
| | 6.17 | Key Employee Salaries. | 74 |
| | 6.18 | Cash Management | 74 |
| | 6.19 | Construction Contracts | 74 |
| | 6.20 | Post-Closing Capital Contribution | 74 |
| 7. | | FINANCIAL COVENANTS | 74 |
| | 7.1 | Minimum Adjusted EBITDA. | 74 |
| | 7.2 | Minimum Free Cash Flow. | 75 |
| | 7.3 | Maximum Total Leverage Ratio. | 76 |
| | 7.4 | Minimum Fixed Charge Coverage Ratio | 76 |
| | 7.5 | Minimum Cash Balance. | 76 |
| | 7.6 | Minimum Net Income. | 76 |
| 8. | | EVENTS OF DEFAULT. | 77 |
| | 8.1 | Events of Default. | 77 |
| | 8.2 | Equity Cure. | 79 |
| 9. | | THE LENDER GROUP'S RIGHTS AND REMEDIES. | 80 |
| | 9.1 | Rights and Remedies. | 80 |
| | 9.2 | Remedies Cumulative | 81 |
| | 9.3 | Sale of Licenses | 81 |
| 10. | | TAXES AND EXPENSES. | 83 |
| 11. | | WAIVERS; INDEMNIFICATION. | 83 |
| | 11.1 | Demand; Protest; etc. | 83 |
| | 11.2 | The Lender Group's Liability for Collateral | 83 |
| | 11.3 | Indemnification. | 84 |
| 12. | | NOTICES. | 84 |
| 13. | | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER. | 85 |
| 14. | | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS. | 86 |
| | 14.1 | Assignments and Participations. | 86 |

TABLE OF CONTENTS
(continued)

Page

14.2    Successors. ........................................................................................... 88

15.    AMENDMENTS; WAIVERS. ............................................................................ 88

15.1    Amendments and Waivers. ................................................................... 88

15.2    No Waivers; Cumulative Remedies. ...................................................... 89

16.    AGENT; THE LENDER GROUP. ..................................................................... 89

16.1    Appointment and Authorization of Agent. ............................................ 89

16.2    Delegation of Duties. ............................................................................ 90

16.3    Liability of Agent. ................................................................................. 90

16.4    Reliance by Agent. ................................................................................ 90

16.5    Notice of Default or Event of Default. .................................................. 91

16.6    Credit Decision. .................................................................................... 91

16.7    Costs and Expenses; Indemnification. ................................................... 91

16.8    Agent in Individual Capacity. ............................................................... 92

16.9    Successor Agent. ................................................................................... 92

16.10  Lender in Individual Capacity. ............................................................. 93

16.11  Withholding Taxes. ............................................................................... 93

16.12  Collateral Matters. ................................................................................ 95

16.13  Erroneous Payment. .............................................................................. 96

16.14  Agency for Perfection. .......................................................................... 99

16.15  Payments by Agent to the Lenders. ...................................................... 99

16.16  Concerning the Collateral and Related Loan Documents. ..................... 99

16.17  Several Obligations; No Liability ......................................................... 99

16.18  Documentation Agent ........................................................................... 99

17.    GENERAL PROVISIONS. ............................................................................. 100

17.1    Effectiveness. ...................................................................................... 100

17.2    Section Headings. ................................................................................ 100

17.3    Interpretation. ..................................................................................... 100

17.4    Severability of Provisions. .................................................................. 100

17.5    Counterparts; Electronic Execution. .................................................... 100

17.6    Revival and Reinstatement of Obligations; Certain Waivers. .............. 100

17.7    Confidentiality. ................................................................................... 101

- v -

TABLE OF CONTENTS
(continued)

Page

17.8    Debtor-Creditor Relationship......................................................................... 101

17.9    Public Disclosure. ........................................................................................... 101

17.10   Survival. .......................................................................................................... 102

17.11   PATRIOT Act ................................................................................................. 102

17.12   Integration. ...................................................................................................... 102

17.13   Joint and Several. ............................................................................................ 102

17.14   Acknowledgment and Consent to Bail-In of EEA Financial Institutions.......... 102

17.15   Schedules. ........................................................................................................ 103

17.16   Amendment and Restatement; Joinder. ........................................................... 103

**EXHIBITS AND SCHEDULES**

Exhibit A                   Form of Assignment and Acceptance
Exhibit B                   Form of Compliance Certificate
Exhibit C                   Form of Term Loan Request

Schedule A-1                Agent's Account
Schedule A-2                Authorized Persons
Schedule C-1                Commitments
Schedule D-1                Designated Account
Schedule P-1                Permitted Liens
Schedule P-2                Permitted Holders
Schedule Z                  Collateral Properties

Schedule 3.7                Conditions Subsequent
Schedule 4.4(b)             Capitalization of Loan Parties
Schedule 4.4(c)             Jurisdictions of Organization of Loan Parties
Schedule 4.6(b)             Litigation
Schedule 4.7(d)             Cannabis Licenses
Schedule 4.11               Environmental Matters
Schedule 4.12(a)            Real Property
Schedule 4.12(b)            Title Commitments
Schedule 4.12(g)            Collateral Property Matters
Schedule 4.13               Broker Fees
Schedule 4.15               Existing Indebtedness
Schedule 4.22               Material Contracts
Schedule 4.24               Collateral Locations
Schedule 4.26               Intellectual Property
Schedule 5.1                Financial Statements, Reports, Certificates
Schedule 5.2                Collateral Reporting
Schedule 5.7                General Contractor Additional Insurance Provisions
Schedule 6.6                Nature of Business
Schedule 6.13               Payoff Debt

**SECOND AMENDED AND RESTATED CREDIT AGREEMENT**

**THIS SECOND AMENDED AND RESTATED CREDIT AGREEMENT** (this "Agreement"), is entered into as of September 30, 2021, by and among **JG NEW JERSEY LLC**, a New Jersey limited liability company, **SRG 1761 NORTH OLDEN LLC**, a Delaware limited liability company, and **SRG 1474 PROSPECT LLC**, a Delaware limited liability company, **SRG WARETOWN LLC**, a New Jersey limited liability company, **HAYDEN GATEWAY LLC**, a Pennsylvania limited liability company, **PIER COVE LLC**, a Pennsylvania limited liability company, **SRG 272 MAIN STREET LLC**, a Pennsylvania limited liability company, and **SRG HI PARK LLC**, a Pennsylvania limited liability company, the other Loan Parties party hereto from time to time, **JG HOLDCO LLC**, a Delaware limited liability company ("Parent"), each lender identified on the signature pages hereof (each such lender, together with its respective successors and permitted assigns, is referred to hereinafter, individually as a "Lender" and collectively, as the "Lenders"), **AFC MANAGEMENT, LLC**, a Delaware limited liability company, as agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "Agent"), and **A BDC WAREHOUSE, LLC**, a Delaware limited liability company, as documentation agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "Documentation Agent").

**W I T N E S S E T H:**

**WHEREAS**, JG New Jersey LLC, SRG 1761 North Olden LLC, and SRG 1474 Prospect LLC (collectively, the "Existing Borrowers") entered into that certain Amended and Restated Credit Agreement, dated as of April 29, 2021 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"), by and among the Existing Borrowers, Parent, the lenders party thereto, and Agent; and

**WHEREAS**, the Existing Borrowers have requested, and the Required Lenders have agreed, to amend and restated the Existing Credit Agreement in its entirety to, among other things, add SRG Waretown LLC, Hayden Gateway LLC, Pier Cove LLC, SRG 272 Main Street LLC, and SRG HI Park LLC (collectively, the "Additional Borrowers" and together with the Existing Borrowers, the "Borrowers" and each individually, a "Borrower"), as borrowers hereunder.

**NOW THEREFORE**, for and in consideration of the recitals made above and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    **DEFINITIONS AND CONSTRUCTION.**

    1.1    **Definitions**.

    Capitalized terms used and not otherwise defined in this Agreement shall have the meanings assigned to such terms below:

    "Acquisition" means the acquisition, directly or indirectly, by any Person of (a) a majority of the Stock of another Person or (b) all or substantially all of the assets of another Person, in each case (i) whether or not involving a merger or a consolidation with such other Person and (ii) whether in one transaction or a series of related transactions.

    "Additional Borrowers" has the meaning specified therefor in the recitals to this Agreement.

"Additional Collateral Property" means each Pennsylvania Collateral Property and the Waretown Property.

"Additional Documents" has the meaning specified therefor in Section 5.13.

"Additional Tranche B Loan" has the meaning specified therefor in Section 2.1(b)(ii).

"Adjusted EBITDA" means, with respect to any period,

(a)    EBITDA,

   *minus*

(b)    without duplication, the sum of the following amounts of the Borrowers and their Subsidiaries for such period to the extent included in determining combined net earnings (or loss) for such period:

   (i)    extraordinary non-recurring or unusual gains and income, and

   (ii)    non-cash items increasing combined net earnings for such period (excluding any such non-cash item to the extent it represents the reversal of an accrual or reserve for potential cash item in any prior period), and

   (iii)    interest income,

   *plus*

(c)    without duplication, the sum of the following amounts of the Borrowers and their Subsidiaries for such period to the extent included in determining combined net earnings (or loss) for such period:

   (i)    non-recurring non-cash charges, losses or expenses, including for goodwill write-offs and write downs; and

   (ii)    non-cash compensation expense, or other non-cash expenses or charges in each case arising from the granting of stock options, stock appreciation rights or similar arrangements;

*provided that,* any adjustments made pursuant to clauses (b) or (c) above shall be acceptable to Agent in its reasonable judgment.

"Affiliate" means, as applied to any Person, any other Person that controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise; *provided that*, for purposes of Section 6.12: (a) any Person which owns directly or indirectly twenty percent (20.00%) or more of the Stock having ordinary voting power for the election of directors or other members of the governing body of a Person or twenty percent (20.00%) or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such

- 2 -

Person; and *provided, further,* that in no event shall Agent, the Lenders or their respective Affiliates be deemed to be Affiliates of any Loan Party for any purpose whatsoever.

"<u>Agent</u>" has the meaning specified therefor in the preamble to this Agreement.

"<u>Agent Fee</u>" has the meaning specified therefor in <u>Section 2.6(b)</u>.

"<u>Agent-Related Persons</u>" means Agent, together with its Affiliates, officers, directors, employees, attorneys and agents.

"<u>Agent's Account</u>" means the Deposit Account of Agent identified on <u>Schedule A-1</u> (or such other Deposit Account of Agent that has been designated as such, in writing, by Agent to the Borrower and the Lenders).

"<u>Agent's Liens</u>" means the Liens granted by Parent and the Loan Parties, as applicable, to Agent under the Loan Documents securing or purporting to secure the Obligations for the benefit of the Lender Group.

"<u>Agreement</u>" has the meaning specified therefor in the preamble to this Agreement.

"<u>Amortization Trigger Date</u>" means the date that is the one (1) year anniversary of the Restatement Date.

"<u>Anti-Money Laundering Laws</u>" means all Applicable Laws that may be enforced by any Governmental Authority relating to anti-money laundering statutes, laws, regulations and rules, including, but not limited to the Bank Secrecy Act (31 U.S.C. §5311 et seq.; 12 U.S.C. §§1818(s) 1829(b), 1951-1959), as amended by the Patriot Act.

"<u>Applicable Law</u>" means any applicable United States or foreign federal, state, or local statute, law, ordinance, regulation, rule, code, order (whether executive, legislative, judicial or otherwise), judgment, injunction, notice, decree or other requirement or rule of law or legal process, or any other order of, or agreement issued, promulgated or entered into by any Governmental Authority, in each case related to the conduct and business of the applicable Person, including but not limited to any applicable Sanctions Laws, Anti-Money Laundering Laws or Environmental Laws; *provided, however,* that "<u>Applicable Law</u>" shall not mean any United States federal laws, rules, or regulations as they relate to cannabis.

"<u>Application Event</u>" means the occurrence of (a) a failure by the Borrowers to repay all of the Obligations (other than contingent obligations in respect of which no claim has been made) in full on the Maturity Date, (b) an Event of Default described in <u>Section 8.1(d)</u> or <u>Section 8.1(e)</u>, or (c) any other Event of Default, subject to the expiration of any applicable cure period, and the election by the Required Lenders to require that payments and proceeds of Collateral be applied pursuant to <u>Section 2.3(b)(ii)</u>.

"<u>Assignee</u>" has the meaning specified therefor in <u>Section 14.1(a)</u>.

"<u>Assignment and Acceptance</u>" means an Assignment and Acceptance Agreement substantially in the form of <u>Exhibit A</u> to this Agreement.

"<u>Auditor</u>" has the meaning specified therefor in <u>Section 5.1(a)</u>.

"Authorized Person" means any one of the individuals identified on Schedule A-2, as such schedule is updated from time to time by written notice from the Borrower Representative to Agent and the Lenders.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Benchmark Replacement" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by Agent and the Borrowers giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to LIBOR for U.S. Dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; *provided that*, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"Benchmark Replacement Adjustment" means, with respect to any replacement of LIBOR with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by Agent and the Borrowers giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement for U.S. Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Agent in a manner substantially consistent with market practice (or, if Agent decides that adoption of any portion of such market practice is not administratively feasible or if Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as Agent decides is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to LIBOR:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of LIBOR permanently or indefinitely ceases to provide LIBOR; and

- 4 -

(b)       in the case of clause (c) of the definition of "Benchmark Transition Event", the date of the public statement or publication of information referenced therein.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to LIBOR:

(a)       a public statement or publication of information by or on behalf of the administrator of LIBOR announcing that such administrator has ceased or will cease to provide LIBOR, permanently or indefinitely; *provided that*, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR;

(b)       a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for LIBOR, a resolution authority with jurisdiction over the administrator for LIBOR or a court or an entity with similar insolvency or resolution authority over the administrator for LIBOR, which states that the administrator of LIBOR has ceased or will cease to provide LIBOR permanently or indefinitely; *provided that*, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR; or

(c)       a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR announcing that LIBOR is no longer representative.

"Benchmark Transition Start Date" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication), and (b) in the case of an Early Opt-in Election, the date specified by Agent or the Required Lenders, as applicable, by notice to the Borrower Representative, Agent (in the case of such notice by the Required Lenders) and the Lenders (in the case of such notice by Agent).

"Benchmark Unavailability Period" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to LIBOR and solely to the extent that LIBOR has not been replaced with a Benchmark Replacement, the period (a) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced LIBOR for all purposes hereunder in accordance with Section 2.5(g) and (b) ending at the time that a Benchmark Replacement has replaced LIBOR for all purposes hereunder pursuant to Section 2.5(g).

"Benefit Plan" means (i) any "defined benefit plan" (as defined in Section 3(35) of ERISA) for which a Borrower or any of its Subsidiaries or ERISA Affiliates has been an "employer" (as defined in Section 3(5) of ERISA) within the past six (6) years and (ii) any Foreign Plan.

"Blocked Person" has the meaning specified therefor in Section 4.27(b).

"Board of Directors" means, as to any Person, the board of directors (or comparable governing body) of such Person or any committee thereof duly authorized to act on behalf of the board of directors (or comparable governing body).

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

- 5 -

"Board Resignation Letter" has the meaning specified therefor in Section 3.1.

"Borrower" or "Borrowers" has the meaning specified therefor in the recitals to this Agreement.

"Borrower Representative" means Jon Loevy, in his capacity as Borrower Representative pursuant to the provisions of Section 1.6, or any successor Borrower Representative selected by the Borrowers and approved by Agent pursuant to Section 1.6.

"Budget" has the meaning specified therefor in Schedule 3.7.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of Florida.

"Cannabis Law" means any applicable state, or local statute, law, ordinance, regulation, rule, code, order (whether executive, legislative, judicial or otherwise), judgment, injunction, notice, decree or other requirement or rule of law or legal process, or any other order of, or agreement issued, promulgated or entered into by any Governmental Authority, in each case related to the cultivation, manufacture, development, distribution, or sale of cannabis or products containing cannabis.

"Cannabis License" means all permits, licenses, registrations, variances, land-use rights, clearances, consents, commissions, franchises, exemptions, orders, authorizations, and approvals from Regulatory Authorities authorizing the recipient to conduct business in accordance with the Cannabis Laws of each applicable jurisdiction, including specifically applicable licenses required by (a) the State of New Jersey in accordance with the NJ Compassionate Use Medical Marijuana Act, and the rules, regulations, procedures and policies promulgated thereunder and (b) the Commonwealth of Pennsylvania in accordance with the Pennsylvania Medical Marijuana Act, and the rules, regulations, procedures and policies promulgated thereunder.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate amount of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one (1) year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one (1) year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than two hundred seventy (270) days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within one (1) year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having

- 6 -

at the date of acquisition thereof combined capital and surplus of not less than one hundred million dollars ($100,000,000), (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than five hundred million dollars ($500,000,000), having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Cash Management Services" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing house transfer (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system) and other customary cash management arrangements.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided that*, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means:

(a)     a transaction in which any "person" or "group" (within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange Act of 1934) other than the Permitted Holders becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of a sufficient number of shares of all classes of stock or other equity securities, as applicable, then outstanding of any Borrower ordinarily entitled to vote in the election of directors, empowering such "person" or "group" to elect a majority of the Board of Directors of any Borrower, who did not have such power before such transaction;

(b)     a transaction that results in the Permitted Holders, collectively, failing to own directly or indirectly, beneficially and of record on a fully diluted basis, a majority of the aggregate voting and aggregate economic interests in Parent and each Borrower;

(c)     any Borrower ceases to beneficially and of record own and control, directly or indirectly, free and clear of all Liens other than Permitted Liens arising by operation of law, one hundred percent (100.00%) of the issued and outstanding shares of each class of capital Stock of any wholly-owned Subsidiary or, in the case of less than wholly-owned Subsidiaries as of the Restatement Date, a lesser amount of the issued and outstanding shares of each class of capital Stock of any Subsidiary than on the Restatement Date; or

- 7 -

(d)     the occurrence of a change in control, change of control, or other similar provision, as defined in any document governing any Material Indebtedness triggering a default, mandatory prepayment or mandatory repurchase offer, which default, mandatory prepayment or requirement to make a mandatory repurchase offer has not been waived in writing.

"Closing Date" means April 29, 2021.

"Code" means the New York Uniform Commercial Code, as in effect from time to time; *provided, however*, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Agent's Liens on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

"Collateral" means all assets and interests in assets, except Excluded Assets, and proceeds thereof now owned or hereafter acquired by any Loan Party and any other Person who has granted a Lien to Agent or the Lenders under the Loan Documents, in or upon which a Lien is granted by such Person in favor of Agent or the Lenders under any of the Loan Documents.

"Collateral Assignment" means a collateral assignment of any Loan Party's rights under any Lease.

"Collateral Properties" means the Real Property specified in Schedule Z.

"combined" means, with respect to any financial statements or financial information relating to the Borrowers, a basis of presentation (a) combining each Borrower and its respective consolidated subsidiaries and (b) eliminating inter-Borrower transactions as though all of the foregoing entities were consolidated together.

"Commitment" and "Commitments" means the collective reference to the Tranche A Loan Commitment, the Tranche B Loan Commitment, and the Tranche C Loan Commitment and each one of them.

"Compliance Certificate" means a certificate substantially in the form of Exhibit B to this Agreement delivered, on behalf of the Borrowers, by the chief financial officer or chief executive officer of the Borrower Representative to Agent and the Lenders.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Construction Consultant" means a construction consultant satisfactory to Agent in its sole discretion, hired by Borrowers to provide project oversite and manage disbursements of the Term Loans in accordance with the terms of this Agreement.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  The terms "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any Deposit Account, Securities Account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance

- 8 -

reasonably satisfactory to Agent, among Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account or owning such entitlement or contract, effective to grant "control" (within the meaning of Articles 8 and 9 under the applicable UCC) over such account to Agent

"Combined Net Income" means, for any period, the combined net income (or loss) of the Borrowers and their Subsidiaries, determined on a combined basis in accordance with GAAP; *provided that*, there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of a Borrower or is merged into or combined with a Borrower or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary of any Borrower) in which a Borrowers or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by a Borrower or such Subsidiary in the form of dividends or similar distributions and (c) the undistributed earnings of any Subsidiary of a Borrower that is not a Loan Party to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Applicable Laws or the organizational documents or any contractual obligation (other than under any Loan Document) applicable to such Subsidiary.

"Cure Amount" has the meaning specified therefor in Section 8.2(a).

"Cure Right" has the meaning specified therefor in Section 8.2(a).

"Cure Right Deadline" has the meaning specified therefor in Section 8.2(a).

"Current Assets" means, as at any date of determination, the total assets of the Borrowers and their Subsidiaries (other than cash and Cash Equivalents) which may properly be classified as current assets on a combined balance sheet of the Borrowers and their Subsidiaries in accordance with GAAP.

"Current Liabilities" means, as at any date of determination, the total liabilities of the Borrowers and their Subsidiaries which may properly be classified as current liabilities (other than (i) the current portion of any Indebtedness, including the Loan and (ii) accrued interest that is not yet due and payable) on a combined balance sheet of the Borrowers and their Subsidiaries in accordance with GAAP.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Deposit Account" means any deposit account (as such term is defined in the Code).

"Designated Account" means the Deposit Account of the Borrower Representative identified on Schedule D-1 (or such other Deposit Account of the Borrower Representative located at Designated Account Bank that has been designated as such, in writing, by the Borrower Representative to Agent).

"Designated Account Bank" has the meaning specified therefor in Schedule D-1 (or such other bank that is located within the United States that has been designated as such, in writing, by the Borrower Representative to Agent).

"Disposition" has the meaning specified therefor in Section 6.4.

"Disqualified Stock" means any Stock that, by its terms (or by the terms of any security or other Stock into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise

- 9 -

(except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loan and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Stock that would constitute Disqualified Stock, in each case, prior to the date that is one hundred eighty (180) days after the Maturity Date.

"<u>Documentation Agent</u>" has the meaning specified therefor in the preamble to this Agreement.

"<u>Dollars</u>" or "<u>$</u>" means United States dollars.

"<u>Early Opt-in Election</u>" means the occurrence of (a) a determination by Agent or (b) a notification by the Required Lenders to Agent (with a copy to the Borrower Representative) that that the Required Lenders have determined, in each case, that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in <u>Section 2.5(g)</u> are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace LIBOR.

"<u>EBITDA</u>" means, with respect to the Borrowers and their Subsidiaries determined on a combined basis, for any period,

(a)     net earnings (or loss), excluding the earnings of any Subsidiary that is not a wholly-owned Subsidiary of a Borrower or entity that is not a Subsidiary in which a Borrower directly or indirectly owns any Stock, except to the extent such earnings are actually distributed in cash to a Borrower,

*plus*

(b)     without duplication, the sum of the following amounts of the Borrowers and their Subsidiaries for such period to the extent included in determining combined net earnings (or loss) for such period:

(i)     Interest Expense (and to the extent not reflected in Interest Expense, (x) bank and letter of credit fees and premiums in connection with financing activities and (y) amortization of deferred financing and loan fees,

(ii)     federal, state or local taxes and foreign taxes, in each case based upon income or earnings, and

(iii)     depreciation and amortization for such period, in each case, determined on a combined basis in accordance with GAAP.

"<u>EEA Financial Institution</u>" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

- 10 -

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority or any third party involving material violations of Environmental Laws, or Releases of Hazardous Materials (a) at or from any assets, properties, or businesses of a Borrower or any of its Subsidiaries, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) at or from any facilities which received Hazardous Materials generated by a Borrower or any of its Subsidiaries, or any of their predecessors in interest.

"Environmental Law" means any Applicable Law relating to worker health and safety, protection of the environment or natural resources, or the use, transportation, storage, disposal, Release or remediation of any Hazardous Material.

"Environmental Liabilities" means all material liabilities, monetary obligations, losses, damages, (including punitive damages, consequential damages and treble damages), costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equipment" means equipment (as that term is defined in the Code).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of a Borrower or its Subsidiaries under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of a Borrower or its Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which a Borrower or any of its Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with a Borrower or any of its Subsidiaries and whose employees are aggregated with the employees of the any Loan Party under IRC Section 414(o).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan, (b) a withdrawal by a Borrower or any of its Subsidiaries or ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA, (c) a complete or partial withdrawal by a Borrower or any of its Subsidiaries or ERISA Affiliates from a Multiemployer Plan or a Borrower's receipt of notification that a Multiemployer Plan is in reorganization, (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or, with respect to a Multiemployer Plan, a Borrower's receipt of notification of the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under

- 11 -

Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate such Multiemployer Plan, (e) the determination that any Pension Plan or, with respect to any Multiemployer Plan, a Borrower's receipt of notification, that such Pension Plan or Multiemployer Plan, as applicable, is considered an at risk plan or a plan in critical or endangered status under the IRC, ERISA or the Pension Protection Act of 2006; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or, with respect to any Multiemployer Plan, a Borrower's receipt of notification that an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer such Multiemployer Plan, or (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Borrower or any of its Subsidiaries or ERISA Affiliates.

"Erroneous Payment" has the meaning specified therefor in Section 16.13(a).

"Erroneous Payment Deficiency Assignment" has the meaning specified therefor in Section 16.13(d)(i).

"Erroneous Payment Impacted Class" has the meaning specified therefor in Section 16.13(d)(i).

"Erroneous Payment Return Deficiency" has the meaning specified therefor in Section 16.13(d)(i).

"Erroneous Payment Subrogation Rights" has the meaning specified therefor in Section 16.13(e).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar Reserve Percentage" means, for any day, the percentage which is in effect for such day as prescribed by the Federal Reserve Bank of New York for determining the maximum reserve requirement (including any basic, supplemental or emergency reserves) in respect of eurocurrency liabilities or any similar category of liabilities for a member bank of the Federal Reserve System in New York City.

"Event of Default" has the meaning specified therefor in Section 8.1.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time

"Excluded Assets" has the meaning specified therefor in the Security Agreement.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of a Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) a Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by a Borrower under Section 14.1(a)) or (ii) a Lender changes its lending office, except in each case to the extent that, pursuant to Section 16.11, amounts with respect to such Taxes were payable either to a Lender's

- 12 -

assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 16.11(f) and (d) any withholding Taxes imposed under FATCA.

"Existing Borrowers" has the meaning specified therefor in the recitals to this Agreement.

"Existing Credit Agreement" has the meaning specified therefor in the recitals to this Agreement.

"Exit Fee" has the meaning specified therefor in Section 2.6(a).

"Extraordinary Receipts" means any cash, proceeds, payments or consideration received by any Loan Party not in the ordinary course of business, including (a) foreign, United States, state or local tax refunds; (b) pension plan reversions, (c) proceeds of insurance (including key man life insurance and business interruption insurance, but excluding any casualty insurance), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, and (e) indemnity payments; *provided, however*, that after the first year anniversary of the Restatement Date, such sums shall not be deemed to be Extraordinary Receipts to the extent used (i) to satisfy any third party claims; (ii) to replace or repair any inventory, equipment, facilities, or other assets; or (iii) to finance approved working capital needs or general Borrower expenses, in each case to the extent consented to by Agent in its sole discretion.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the IRC and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the IRC.

"FF&E" means, furniture, fixtures and equipment.

"Fixed Charge Coverage Ratio" means, with respect to the Borrowers and their Subsidiaries determined on a consolidated basis, for the four fiscal quarter period then ended, the ratio of (a) (i) Adjusted EBITDA for such period *minus* (ii) Unfinanced Capital Expenditures made (to the extent not already incurred in a prior period) or incurred during such period, and (iii) management fees, advisory fees, director fees or the like, to the extent not already captured in the calculation of Adjusted EBITDA, to (b) Fixed Charges for such period.

"Fixed Charges" means, with respect to any period and with respect to the Borrowers and their Subsidiaries on a consolidated basis in accordance with GAAP, the sum, without duplication, of (a) Interest Expense accrued (other than interest paid-in-kind, amortization of financing fees, and other non-cash Interest Expense) during such period, (b) all principal payments in respect of Indebtedness that are paid during such period (including the principal portion of payments of Capital Lease Obligations), (c) all federal, state and local income taxes due and payable during such period, and (d) any distributions and dividends paid during such period.

"Foreign Plan" means any employee benefit plan or arrangement that would be considered a "defined benefit plan" (as defined in Section 3(35) of ERISA) if such plan was maintained in the United States and that is (a) maintained or contributed to by a Borrower or any of its Subsidiaries that is not subject to the laws of the United States; or (b) mandated by a government other than the United States for employees of a Borrower or any of its Subsidiaries.

- 13 -

"<u>Free Cash Flow</u>" means, with respect to the Borrowers and their Subsidiaries determined on a combined basis, for any period,

(a)    Adjusted EBITDA,

*minus*

(b)    without duplication, the sum of the following amounts of the Borrowers and their Subsidiaries for such period to the extent included in determining combined net earnings (or loss) for such period:

(i)    the cash portion of Unfinanced Capital Expenditures made during such period,

(ii)    any distributions and dividends paid during such period,

(iii)    management fees, advisory fees, director fees or the like, to the extent not already captured in the calculation of Adjusted EBITDA,

(iv)    Fixed Charges for such period,

(v)    one-time cash charges excluded from the calculation of Consolidated Net Income (excluding financed Capital Expenditures), and

(vi)    the Net Working Capital at the end of such period, minus the Net Working Capital at the beginning of such period (but zero, if the difference results in an amount less than zero).

"<u>GAAP</u>" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"<u>Governing Documents</u>" means, with respect to any Person, the certificate or articles of incorporation, certificates of designations pertaining to preferred securities, by-laws, or other organizational documents of such Person.

"<u>Governmental Authority</u>" means the government of the United States, any foreign country or any multinational authority, or any state, commonwealth, protectorate or political subdivision thereof, and any entity, body or authority exercising executive, legislative, judicial, tax, regulatory or administrative functions of or pertaining to government, including, without limitation, other administrative bodies or quasi-governmental entities established to perform the functions of any such agency or authority, and any agency, branch or other governmental body (federal or state) charged with the responsibility, or vested with the authority to administer or enforce, any Applicable Laws.

"<u>Hazardous Materials</u>" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any Applicable Laws or regulations as "<u>hazardous substances</u>," "<u>hazardous materials</u>," "<u>hazardous wastes</u>," "<u>toxic substances</u>," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity" (b) petroleum and petroleum products, and (c) per- and polyfluoroalkyl substances (PFAS).

"<u>Hedge Agreement</u>" means a "<u>swap agreement</u>" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code.

- 14 -

"Historical Financial Statements" has the meaning specified therefor in Section 4.8.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices that are less than ninety (90) days past due and, for the avoidance of doubt, other than royalty payments payable in the ordinary course of business in respect of non-exclusive licenses), (f) all monetary obligations of such Person owing under Hedge Agreements (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) any Disqualified Stock of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above.  For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation.

"Indemnified Liabilities" has the meaning specified therefor in Section 11.3.

"Indemnified Person" has the meaning specified therefor in Section 11.3.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of a Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Initial Tranche A Loan" has the meaning specified therefor in Section 2.1(a)(ii).

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intellectual Property" has the meaning specified therefor in the Security Agreement.

"Intellectual Property Security Agreement" means a collateral or security agreement pursuant to which the Loan Parties grant a security interest in its interests in certain Intellectual Property to Agent, as security for the Obligations.

"Interest Expense" means, for any period, the aggregate of the interest expense of the Borrowers and their Subsidiaries for such period, determined on a combined basis in accordance with GAAP.

"Interest Period" means one (1) month; *provided that*:

- 15 -

(a) the Interest Period shall commence on the date of advance of a Term Loan and, in the case of immediately successive Interest Periods, each successive Interest Period shall commence on the date on which the immediately preceding Interest Period expires;

(b) if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; *provided that*, if any Interest Period would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(c) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the relevant calendar month at the end of such Interest Period;

(d) no Interest Period shall extend beyond the applicable Maturity Date; and

(e) there shall be no more than six (6) Interest Periods in effect at any time.

"Interest Reserve Account" means a segregated non-interest bearing account established by Agent for the purposes described in Section 2.12(a).

"Inventory" means inventory (as that term is defined in the Code).

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, or capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business and consistent with past practice, and (b) *bona fide* accounts arising in the ordinary course of business consistent with past practice), purchase, or acquisitions of Indebtedness, Stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustment for increases or decreases in value, or write-ups, write-downs, or write-offs with respect to such Investment.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Key Employee" means each of Jon Loevy and Michael Kanovitz and any Person hired as a replacement of any of the foregoing.

"Late Fee" has the meaning specified therefor in Section 2.6(e).

"Lease" means, with respect to any Leasehold Property, the lease, sublease or other agreement under the terms of which any Loan Party has or acquires from any Person any right to occupy or use such Real Property, or any part thereof, or interest therein, and each existing or future guaranty of payment or performance thereunder, and all extensions, renewals, modifications and replacements of each such lease, sublease, agreement or guaranty.

"Leasehold Property" means any leasehold interest of any Loan Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by Agent in its sole discretion as not being required to be included in the Collateral.

- 16 -

"Lender" and "Lenders" have the meaning set forth in the preamble to this Agreement, and shall include any other Person made a party to this Agreement pursuant to the provisions of Section 14.1.

"Lender Designated Board Member" has the meaning specified therefor in Section 5.17(a).

"Lender Group" means each of the Lenders and Agent, or any one or more of them.

"Lender Group Expenses" means all of the following (without double-counting or duplication): (a) reasonable and documented out-of-pocket costs or expenses (excluding Taxes (which are addressed in Section 10) required to be paid by Parent or the Loan Parties under any of the Loan Documents that are paid, advanced, or incurred by the Lender Group), (b) documented, reasonable, out of pocket fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with Parent and the Loan Parties under any of the Loan Documents, including fees or charges for background checks and OFAC/PEP searches (in each case, solely to the extent contemplated by this Agreement), photocopying, notarization, couriers and messengers, telecommunication, third party digital automation services and compliance software, public record searches, filing fees, recording fees, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in this Agreement), real estate surveys (solely to the extent contemplated by this Agreement), real estate title policies and endorsements (solely to the extent contemplated by this Agreement), and environmental audits (solely to the extent contemplated by this Agreement), (c) Agent's customary and documented fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of any Loan Party or other members of the Lender Group (whether by wire transfer or otherwise) together with any reasonable and documented out-of-pocket costs and expenses incurred in connection therewith, (d) reasonable and documented charges paid, imposed or incurred by Agent and/or any Lender resulting from the dishonor of checks payable by or to any Loan Party, (e) reasonable documented out of pocket costs and expenses paid or incurred by the Lender Group to correct any Event of Default or enforce any provision of the Loan Documents, or, upon the occurrence and during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) solely to the extent contemplated by the terms of this Agreement, financial examination, appraisal, audit, and valuation reasonable and documented fees and reasonable and documented out-of-pocket expenses of Agent related to any inspections or financial examination, appraisal, audit, and valuation to the extent of the fees and charges (and up to the amount of any limitation) contained in this Agreement (including, without limitation, any such fees and expenses described in Section 2.10); *provided that*, such limits shall not apply during the continuance of an Event of Default, (g) Agent's reasonable and documented out of pocket costs and expenses (including reasonable and documented expenses of one primary counsel) relative to third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents or otherwise in connection with the transactions contemplated by the Loan Documents, Agent's Liens in and to the Collateral, or the Lender Group's relationship with Parent or any Loan Party, except with respect to such claims arising from the gross negligence of willful misconduct of Agent or any Lender as determined by the final and non-appealable judgment of a court of competent jurisdiction, (h) Agent's and each Lender's reasonable documented costs and expenses (including reasonable and documented attorney's fees and due diligence expenses of (i) external counsel to Agent and the Lenders, taken as a whole, (ii) local firm of counsel in each appropriate material jurisdiction (which may include a single special counsel acting in multiple jurisdictions), and (iii) any additional counsel if one or more actual or potential conflicts of interest arise for each class of similarly situated Persons) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), syndicating (including reasonable costs and expenses relative to the rating of the Loan, CUSIP, DXSyndicate, SyndTrak or other communication costs incurred in connection with a syndication of the

- 17 -

loan facilities), amending, waiving, or modifying the Loan Documents, and (i) Agent's and each Lender's documented costs and expenses (including documented attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning Parent or any Loan Party or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether a lawsuit or adverse proceeding is brought, or in taking any enforcement action or Remedial Action concerning the Collateral.

"Lender Group Representatives" has the meaning specified therefor in Section 17.7(a).

"Lender Observer" has the meaning specified therefor in Section 5.17(b).

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"LIBOR" means, subject to the implementation of a Benchmark Replacement in accordance with Section 2.5(g), the rate of interest per annum (rounded upwards, if necessary, to the nearest 1/100 of 1.00%) equal to the ICE Benchmark Administration Limited, a United Kingdom company, as published by Reuters (or a comparable or successor quoting service approved by Agent) at approximately 11:00 a.m. (London time) two (2) London Banking Days prior to the first day of the applicable Interest Period for a term comparable to the Interest Period. If, for any reason, such rate is not so published then "LIBOR" shall mean, the rate per annum at which, as determined by Agent in accordance with its customary practices, Dollars or such foreign currency in an amount comparable to the loans then requested are being offered to leading banks in at approximately 11:00 a.m. (London time) two (2) London Banking Days prior to the first day of the Interest Period for a period equal to such Interest Period.

"LIBOR Rate" means a rate per annum determined by Agent pursuant to the following formula:

$$\text{LIBOR Rate} = \frac{\text{LIBOR}}{1.00 - \text{Eurodollar Reserve Percentage}}$$

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan" means any Term Loan made hereunder, and "Loans" means all of them, collectively.

"Loan Account" has the meaning specified therefor in Section 2.9.

"Loan Documents" means this Agreement, the Parent Guaranty, any Subsidiary Guaranties, the Security Agreement, the Pledge Agreement, the Control Agreements, any Intellectual Property Security Agreements, the Mortgages, any Collateral Assignments, each Shareholder Guaranty, the Notes, and any other instrument or agreement entered into, now or in the future, by Parent or any Loan

OMM_US:80200477.9

Party or any shareholder of Parent or any Loan Party, and any member of the Lender Group in connection with this Agreement, in each case, as the same may be amended, supplemented or otherwise modified from time to time.

"Loan Party" means any Borrower or any Subsidiary Guarantor, and "Loan Parties" means all of them, collectively.

"London Banking Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank Eurodollar market.

"Margin Stock" has the meaning specified in Regulation U of the Board of Governors as in effect from time to time.

"Material Adverse Effect" means a material adverse effect on (i) the business, operations, results of operations, assets, liabilities or condition (financial or otherwise) of Parent or the Loan Parties (with respect to the Loan Parties only, taken as a whole), which causes a material impairment of their ability to perform their respective obligations under the Loan Documents; (ii) the legality, validity, or enforceability of the Loan Documents under Applicable Law; (iii) the Lender Group's ability to enforce the Obligations or realize upon the Collateral under Applicable Law or (iv) an impairment of the enforceability or priority of Agent's Liens with respect to the Collateral under Applicable Law.

"Material Contract" means, with respect to any Person, (i) each contract or agreement to which such Person is a party involving aggregate revenues payable to or consideration payable to or by such Person of three hundred fifty thousand dollars ($350,000) or more (other than purchase orders or customer agreements in the ordinary course of the business of such Person and other than contracts that by their terms may be terminated by such Person in the ordinary course of its business upon less than forty five (45) days' notice without penalty or premium), (ii) any Lease, and (iii) all other contracts or agreements, the loss of which could reasonably be expected to result in a Material Adverse Effect.

"Material Indebtedness" means any Indebtedness in excess of one hundred thousand dollars ($100,000) in aggregate outstanding principal amount.

"Maturity Date" means the first day of the month immediately following the five (5) year anniversary of the Closing Date.

"Moody's" has the meaning specified therefor in the definition of Cash Equivalents.

"Mortgage" means, individually and collectively, one or more mortgages, deeds of trust, or deeds to secure debt, executed and delivered by any Loan Party in favor of Agent, in form and substance reasonably satisfactory to Agent, that encumber the Real Property owned by any Loan Party.

"Mortgage Supporting Documents" means, with respect to each Mortgage for a parcel of Real Property, each the following:

(a) (i) evidence in form and substance reasonably satisfactory to Agent that the recording of counterparts of such Mortgage in the recording offices specified in such Mortgage will create a valid and enforceable first priority lien on property described therein in favor of Agent (or in favor of such other trustee as may be required or desired under local law) subject only to (A) Liens permitted hereunder and (B) such other Liens as Agent may reasonably approve and (ii) an opinion of counsel in each state in which any such Mortgage is to be recorded in form and substance and from counsel reasonably satisfactory to Agent;

- 19 -

(b)        a lender's Title Insurance Policy dated a date reasonably satisfactory to Agent, which shall (i) be in an amount not less than the appraised value (determined by reference to an appraisal) of such parcel of Real Property in form and substance satisfactory to Agent, (ii) insure that the Lien granted pursuant to the Mortgage insured thereby creates a valid first Lien on such parcel of Real Property free and clear of all defects and encumbrances, except for Liens permitted hereunder and for such defects and encumbrances as may be approved by Agent, (iii) name Agent as the insured thereunder, (iv) contain such endorsements as Agent deems reasonably necessary, and (v) be otherwise in form and substance reasonably satisfactory to Agent;

(c)        copies of a recent ALTA survey of such parcel of Real Property in form and substance satisfactory to Agent, but in any event allowing for the Title Insurance Policy to be issued without a standard survey exception (unless otherwise agreed by Agent) and with same as survey endorsement;

(d)        evidence in form and substance reasonably satisfactory to Agent that all premiums in respect of the lender's Title Insurance Policy, all recording fees and stamp, documentary, intangible or mortgage taxes, if any, in connection with the Mortgage have been paid;

(e)        concurrent with the delivery of any Mortgage of Real Property, (i) a completed standard "life of loan" flood hazard determination form, (ii) if the improvements to the applicable improved property is located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards (a "Flood Hazard Property"), a written notification to the Borrowers ("Borrower Notice"), (iii) the Borrower Representative's written acknowledgment of receipt of Borrower Notice as to the fact that such Real Property is a Flood Hazard Property and as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (iv) if the Borrower Notice is required to be given and flood insurance is available in the community in which the applicable Real Property is located, copies of the applicable Loan Party's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued and naming Agent as loss payee on behalf of the Lender Group; and

(f)        such other agreements, documents and instruments in form and substance reasonably satisfactory to Agent as Agent deems necessary or appropriate to create, register or otherwise perfect, maintain, evidence the existence, substance, form or validity of, or enforce a valid and enforceable first priority lien on such parcel of Real Property in favor of Agent (or in favor of such other trustee as may be required or desired under local law) subject only to (i) Liens permitted hereunder and (ii) such other Liens as Agent may reasonably approve.

"Mortgaged Real Property" means each owned Collateral Properties listed on Schedule Z and any other owned Real Property of any Loan Party that becomes subject to a Mortgage.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Borrower or any of its Subsidiaries or any ERISA Affiliates makes or is obligated to make contributions, or during the preceding five (5) plan years, has made or been obligated to make contributions.

"Net Cash Proceeds" means, (a) with respect to any sale or disposition by a Borrower or any of its Subsidiaries of assets, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of a Borrower or any of its Subsidiaries, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than (A) Indebtedness owing to Agent or any Lender under this Agreement or the other Loan Documents and (B) Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such sale or

- 20 -

disposition, (ii) reasonable fees, commissions, and expenses related thereto and required to be paid by such Borrower or such Subsidiary in connection with such sale or disposition, (iii) taxes paid or payable to any taxing authorities by such Borrower or such Subsidiary in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are actually paid or payable to a Person that is not an Affiliate of such Borrower or such Subsidiaries and are properly attributable to such transaction; and (b) with respect to the issuance or incurrence of any Indebtedness by a Borrower or any of its Subsidiaries, or the issuance by a Borrower or any of its Subsidiaries of any Stock, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Borrower or such Subsidiary in connection with such issuance or incurrence, after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by such Borrower or such Subsidiary in connection with such issuance or incurrence and (ii) taxes paid or payable to any taxing authorities by such Loan Party in connection with such issuance or incurrence, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of such Loan Party, and are properly attributable to such transaction.

"Net Working Capital" means, as of any date of determination, Current Assets as of such date minus Current Liabilities as of such date.

"New Jersey Borrower" means each of JG New Jersey LLC, SRG 1761 North Olden LLC, SRG 1474 Prospect LLC and SRG Waretown LLC.

"New Jersey Collateral" means all Collateral now owned or hereafter acquired by any New Jersey Borrower (including, for the avoidance of doubt, any Pledged Interests (as defined in the Pledge Agreement) in any New Jersey Borrower and any Mortgaged Real Property of any New Jersey Borrower), in or upon which a Lien is granted by such Person in favor of Agent or the Lenders under any of the Loan Documents.

"NJ Termination" has the meaning set forth in Section 3.6(a).

"NJ Termination Condition" has the meaning set forth in Section 3.6(a).

"Note" means a promissory note issued by the Borrowers to a Lender in respect of a Loan made by such Lender under this Agreement, in each case, in form and substance satisfactory to such Lender.

"Obligations" means all loans (including the Loans), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), premiums, including any Exit Fee, Agent Fee, Unused Line Fee, Late Fee, liabilities (including all amounts charged to the Loan Account pursuant to this Agreement), Original Issue Discount, obligations (including indemnification obligations and obligations to pay, discharge and satisfy the Erroneous Payment Subrogation Rights), other fees, charges, costs, Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), guaranties, covenants, and duties of any kind and description owing by any Loan Party arising out of, under, pursuant to, in connection with, or evidenced by this Agreement or any other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all PIK Interest, interest not paid when due and all other expenses or other amounts that Parent or any Loan Parties are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents. Any reference in the Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or

- 21 -

alterations thereof, both prior and subsequent to any Insolvency Proceeding. Without limiting the generality of the foregoing, the Obligations of Loan Parties under the Loan Documents include the obligation to pay (i) the principal of the Loans (including PIK Interest), (ii) interest accrued on the Loans, (iii) Lender Group Expenses, (iv) fees payable under this Agreement or any of the other Loan Documents, and (v) indemnities and other amounts payable by any Loan Party under any Loan Document. Any reference in this Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Original Issue Discount" means an amount equal to four percent (4.0%) of the Term Loan Amount.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.11(b)).

"Outstanding Amount" means, at any time, the aggregate outstanding principal balance of the Loans at such time immediately prior to giving effect to any prepayment thereof, including, for the avoidance of doubt, the amount of any PIK Interest. "Outstanding Amount of Tranche A Loans," "Outstanding Amount of Tranche B Loans," or "Outstanding Amount of Tranche C Loans" shall mean the Outstanding Amount as calculated solely with respect to the applicable Tranche.

"PA Borrower" means each of Hayden Gateway LLC, Pier Cove LLC, SRG Main Street LLC, and SRG HI Park LLC.

"PA Collateral" means all Collateral now owned or hereafter acquired by any PA Borrower (including, for the avoidance of doubt, any Pledged Interests (as defined in the Pledge Agreement) in any PA Borrower and any Mortgaged Real Property of any PA Borrower), in or upon which a Lien is granted by such Person in favor of Agent or the Lenders under any of the Loan Documents.

"PA Termination" has the meaning set forth in Section 3.6(b).

"Parent" has the meaning specified therefor in the preamble to this Agreement.

"Parent Guaranty" means that certain guaranty agreement, dated as of April 5, 2021, executed and delivered by Parent to Agent on behalf of the Lender Group, as the same may be amended, supplemented or otherwise modified from time to time.

"Participant" has the meaning specified therefor in Section 14.1(b).

- 22 -

"Participant Register" has the meaning specified therefor in Section 14.1(b).

"Patriot Act" has the meaning specified therefor in Section 4.16.

"Payment Recipient" has the meaning specified therefor in Section 16.13(a).

"Payoff Reserve Amount" has the meaning specified therefor in Section 2.1(d)(i).

"Payoff Reserve Release Conditions" has the meaning specified therefor in Schedule 3.7.

"Payoff Reserve Release Deadline" has the meaning specified therefor in Schedule 3.7.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor agency.

"Pension Plan" means any "employee pension benefit plan" (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by a Borrower or any of its Subsidiaries or ERISA Affiliates or to which such Loan Party or ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the preceding five (5) plan years.

"Pennsylvania Collateral Properties" means the Real Property specified as such on Schedule Z.

"PEP" has the meaning specified therefor in Section 4.23.

"Perfection Certificate" means a certificate in form satisfactory to Agent that provides information with respect to the personal or mixed property of the Loan Parties.

"Permits" means, in respect of any Person, all licenses, permits, franchises, consents, rights, privileges, certificates, authorizations, approvals, registrations and similar consents granted or issued by any Governmental Authority to which or by which such Person is bound or as to which its assets are bound or which has regulatory authority over such Person's business and operations; *provided, however*, that "Permits" shall not mean any Cannabis License.

"Permitted Assignee" means: (a) Agent, any Lender or any of their direct or indirect Affiliates; and (b) any fund that is administered or managed by Agent or any Lender or an Affiliate of Agent or any Lender.

"Permitted Bank Debt" means Indebtedness incurred by the Borrowers within ninety (90) days following the Restatement Date in an amount not less than twelve million dollars ($12,000,000), but not to exceed twenty million dollars ($20,000,000), from a bank or other financial institution acceptable to the Required Lenders in their sole discretion (it being understood that Parke Bank is an acceptable bank).

"Permitted Bank Liens" means Liens securing Permitted Bank Debt, which Liens may have priority over Agent's Liens (which shall be second priority Liens); *provided that*, (a) such Liens shall not extend to any Collateral other than the Pennsylvania Collateral Properties and (b) the beneficiaries thereof (or an agent on their behalf) shall have entered into a customary intercreditor agreement with Agent acceptable to the Required Lenders in their sole discretion (it being understood that such intercreditor agreement shall provide for a par purchase right in favor of the Lenders upon customary terms).

- 23 -

"Permitted Dispositions" means:

(a)    any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(b)    any involuntary loss, damage or destruction of property;

(c)    sales, abandonment, or other dispositions of Equipment that is substantially worn, damaged, or obsolete or no longer used or useful in the ordinary course of business;

(d)    sales of Inventory, products or services to buyers in the ordinary course of business;

(e)    the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents;

(f)    the licensing, on a non-exclusive basis, of Intellectual Property in the ordinary course of business;

(g)    the sale, assignment, transfer, or disposition, in each case without recourse, of accounts receivable or any delinquent receivables, in each case arising in the ordinary course of business, and only in connection with the compromise, settlement or collection thereof;

(h)    the lapse or abandonment of registered patents, trademarks, copyrights and other intellectual property of a Borrower and its Subsidiaries to the extent not economically desirable in the conduct of their business;

(i)    to the extent constituting a Disposition, the making of Restricted Payments that are expressly permitted to be made pursuant to this Agreement;

(j)    to the extent constituting a Disposition, the making of Permitted Investments that are expressly permitted to be made pursuant to this Agreement;

(k)    intercompany dispositions of assets from a Loan Party to another Loan Party;

(l)    other issuances of Stock of the Borrowers to the extent not otherwise prohibited hereby;

(m)    (i) terminations of leases, subleases, licenses, sub-licenses and agreements in the ordinary course of business and (ii) the surrender or waiver of contractual rights or the settlement release or surrender of contract or tort claims in the ordinary course of business, in each case, to the extent not interfering in any material respect with the business of the Loan Parties;

(n)    subject to review and verification by Agent, Permitted Tax Payments; and

(o)    any other dispositions of property, with all such property disposed of pursuant to this clause (o) not to exceed a value of one hundred thousand dollars ($100,000) in any fiscal year, determined by the greater of (i) the aggregate fair market value or (ii) original purchase price or acquisition cost of such property.

"Permitted Holders" means each of the Persons listed on Schedule P-2.

- 24 -

"Permitted Indebtedness" means:

(a)    Indebtedness evidenced by this Agreement and the other Loan Documents;

(b)    endorsement of instruments or other payment items for deposit;

(c)    Indebtedness consisting of (i) unsecured guarantees incurred in the ordinary course of business with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, completion guarantees and similar obligations incurred in the ordinary course of business, and (ii) unsecured guarantees arising with respect to customary indemnification obligations to purchasers in connection with Permitted Dispositions;

(d)    Indebtedness owed to any Person providing property, casualty, liability, or other insurance to any Loan Party, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year;

(e)    Indebtedness incurred in the ordinary course of business in respect of Cash Management Services in an aggregate amount not to exceed one hundred thousand dollars ($100,000) at any time;

(f)    unsecured Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business;

(g)    Indebtedness in respect of unsecured intercompany loans and advances solely as between Loan Parties, subject to subordination agreements in form and substance satisfactory to the Required Lenders;

(h)    Permitted Purchase Money Indebtedness;

(i)    Indebtedness listed on Schedule 4.15 attached hereto, which, if requested by Agent, shall be subordinated to the Obligations upon terms satisfactory to Agent in its sole discretion;

(j)    Indebtedness comprising or arising from (i) Permitted Investments or (ii) Restricted Payments permitted pursuant to Section 6.8;

(k)    guaranties of other Permitted Indebtedness;

(l)    Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such person, in each case incurred in the ordinary course of business;

(m)    reasonable and customary indemnification obligations incurred in the ordinary course of business or pursuant to a transaction otherwise permitted under this Agreement, to the extent constituting Indebtedness;

(n)    deferred taxes to the extent constituting Indebtedness; and

(o)    Permitted Bank Debt.

"Permitted Investments" means:

- 25 -

(a)     Investments in cash and Cash Equivalents;

(b)     Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business and consistent with past practice;

(c)     advances (including to trade creditors) made in connection with purchases of goods or services in the ordinary course of business;

(d)     Stock or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to a Loan Party (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims;

(e)     deposits of cash made in the ordinary course of business to secure performance of operating leases by a Borrower that is lessee under such lease;

(f)     Investments made in the form of capital contributions or loans by a Loan Party to another Loan Party;

(g)     Investments existing on the Restatement Date in the Stock of direct or indirect Subsidiaries of a Borrower existing on the Restatement Date;

(h)     the maintenance of deposit accounts and securities accounts in the ordinary course of business and not in violation of this Agreement; and

(i)     other Investments not to exceed two hundred fifty thousand dollars ($250,000) in the aggregate at any time outstanding.

"Permitted Liens" means:

(j)     Agent's Liens;

(k)     Liens for unpaid Taxes that either (i) are not yet delinquent, or (ii) do not have priority over Agent's Liens and the underlying Taxes are the subject of Permitted Protests;

(l)     judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under Section 8.1 of the Agreement;

(m)     Liens set forth on Schedule P-1; *provided that*, to qualify as a Permitted Lien, any such Lien described on Schedule P-1 shall only secure the Indebtedness that it secures on the Restatement Date;

(n)     the interests of lessors under operating leases and UCC financing statements filed as a precautionary measure in connection with operating leases or consignment of goods;

(o)     easements, rights-of-way, zoning restrictions, minor defects or irregularities in title and other similar encumbrances, none of which interfere in any material respect with the ordinary course of business of the Loan Parties;

(p)     Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, repairmen, workmen or suppliers, or other statutory Liens, incurred in

- 26 -

the ordinary course of business and not in connection with the borrowing of money, and which Liens either are for sums not yet delinquent or are subject to Permitted Protest;

(q)    Liens on amounts pledged or deposited in connection with obtaining worker's compensation or other unemployment insurance;

(r)    Liens on amounts deposited to secure any Loan Party's obligations in connection with the making or entering into of bids, tenders, trade contracts (other than for borrowed money), government contracts, statutory obligations, leases and other obligations of a like nature, or leases in the ordinary course of business and not in connection with the borrowing of money;

(s)    Liens on amounts deposited to secure any Loan Party's obligations as security for surety, stay, custom, appeal performance and return of money bonds, and bonds of a like nature, in connection with obtaining such bonds in the ordinary course of business;

(t)    non-exclusive licenses of Intellectual Property in the ordinary course of business;

(u)    purchase money Liens or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness and so long as (i) such Lien attaches only to the asset purchased or acquired and improvements thereon and the proceeds thereof, and (ii) such Lien only secures the Indebtedness that was incurred to acquire the asset purchased or acquired (and improvements thereon);

(v)    Liens on deposit accounts granted or arising in the ordinary course of business in favor of depositary banks maintaining such deposit accounts solely to secure customary account fees and charges payable in respect of such deposit accounts and overdrafts not in violation of this Agreement; and

(w)    Permitted Bank Liens.

"Permitted Priority Liens" means Permitted Liens which are non-consensual.

"Permitted Protest" means the right of the Borrowers or any of their Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien) or rental payment; *provided that* (a) a reserve with respect to such obligation is established on such Borrower's or Subsidiary's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Borrower or such Subsidiary, as applicable, in good faith, and (c) the Required Lenders are reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Agent's Liens or result in a Material Adverse Effect.

"Permitted Purchase Money Indebtedness" means, as of any date of determination, Indebtedness (other than the Obligations, but including, for the avoidance of doubt, Capitalized Lease Obligations and other obligations in respect of Capital Leases), incurred after the Restatement Date and at the time of, or within ninety (90) days after, the acquisition of any fixed assets for the purpose of financing all or any part of the acquisition cost thereof; *provided that* (a) the outstanding principal amount of such Indebtedness at any one time does not exceed five hundred thousand dollars ($500,000) and (b) the interest rate on such Indebtedness does not exceed ten percent (10%) per annum.

"Permitted Tax Payments" means dividends or distributions paid by a Borrower or any Subsidiary of a Borrower to its direct or indirect owners to pay the tax liabilities of such direct or indirect owners arising as a result of such Person's equity in such Borrower or such Subsidiary of a Borrower.

- 27 -

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"PIK Interest" has the meaning specified therefor in Section 2.5(c).

"Plan" means any employee benefit plan (as defined in Section 3(3) of ERISA) established by a Borrower or any of its Subsidiaries or, with respect to any such plan that is subject to Section 412 of the IRC or Title IV of ERISA, an ERISA Affiliate.

"Pledge Agreement" means the Second Amended and Restated Pledge Agreement, effective as of the Restatement Date, executed and delivered by Parent, Jon Loevy and Michael Kanovitz to Agent on behalf of the Lender Group, as the same may be amended, supplemented or otherwise modified from time to time.

"Post-Closing Capital Contribution" has the meaning specified therefor in Schedule 3.7.

"Pro Rata Share" means, as of any date of determination, with respect to any Lender, the percentage obtained by dividing (a) the Term Loan Exposure of such Lender by (b) the aggregate Term Loan Exposure of all Lenders, which, as of the Restatement Date, is set forth on Schedule C-1 and which percentage may be adjusted from time to time by assignments permitted pursuant to Section 14.1. "Pro Rata Share of Tranche A Loans" shall be the Pro Rata Share calculated only with respect to the Tranche A Loans, "Pro Rata Share of Tranche B Loans" shall be the Pro Rata Share calculated only with respect to the Tranche B Loans, and "Pro Rata Share of Tranche C Loans" shall be the Pro Rata Share calculated only with respect to the Tranche C Loans.

"Processing Fee" has the meaning specified therefor in Section 2.6(d).

"Projections" means the Borrowers' and their Subsidiaries' forecasted (a) balance sheets, (b) profit and loss statements, and (c) cash flow statements, together with appropriate supporting details and a statement of underlying assumptions.

"Qualified Stock" means and refers to any Stock issued by any Borrower (and not by one or more of their Subsidiaries) that is not a Disqualified Stock.

"Ratchet Event" means, on or prior to the last day of the Tranche B Draw Period (a) receipt by the Borrowers of one or more cash equity contributions in an aggregate amount of not less than twenty five million dollars ($25,000,000) which has been invested in the Collateral Properties and (b) receipt by Agent or satisfactory evidence of such cash contributions and investments described in clause (a).

"Real Property" means any estates or interests in real property now owned or hereafter acquired by any Loan Party and the improvements thereto.

"Recipient" means (a) Agent, or (b) any Lender, as applicable.

"Register" has the meaning specified therefor in Section 14.1(a)(iii).

"Regulatory Authority" means every Person, political subdivision, agency, commission or similar authority authorized by any Governmental Authority with jurisdiction over any Borrower to regulate

- 28 -

the growth, processing, testing, or sale of cannabis or medical marijuana in any State in which any Borrower operates.

"Related Entity" means any Person that is directly (a) wholly-owned or majority-owned or (b) minority-owned (except with the written consent of the Required Lenders) by Parent or any Shareholder Guarantor, which is or will be engaged in the cultivation, processing or sale of cannabis in New Jersey (so long as the NJ Termination has not occurred) or Pennsylvania (so long as the Pennsylvania Termination has not occurred).

"Release" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the environment.

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Replacement Lender" has the meaning specified therefor in Section 2.11(b).

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Required Lenders" means, at any time, (a) Agent and (b) Lenders having or holding more than fifty percent (50.00%) of the Outstanding Amount.

"Restatement Date" means September 30, 2021.

"Restatement Date Loans" means the Restatement Date Tranche A Loan, Restatement Date Tranche B Loans and the Tranche C Loans.

"Restatement Date Tranche A Loan" has the meaning specified therefor in Section 2.1(a)(ii).

"Restatement Date Tranche B Loan" has the meaning specified therefor in Section 2.1(b)(i).

"Restricted Payment" means to (a) declare or pay any dividend or make any other payment or distribution, directly or indirectly, on account of Stock issued by any other Loan Party (including any payment in connection with any merger or consolidation involving any Loan Party) or to the direct or indirect holders of Stock issued by any Loan Party in their capacity as such (other than dividends or distributions payable in Qualified Stock issued by a Loan Party), or (b) purchase, redeem, make any sinking fund or similar payment, or otherwise acquire or retire for value (including in connection with any merger or consolidation involving any Loan Party) any Stock issued by any Loan Party, (c) make any payment to

- 29 -

retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Stock of any Loan Party now or hereafter outstanding, (d) make, or cause or suffer to permit any Loan Party to make, any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, any subordinated Indebtedness, and (e) make any payment with respect to (i) any earnout obligation or similar deferred or contingent obligation other than reasonable and customary bonuses, commissions, or similar payments to employees of the Loan Parties, (ii) management fees or advisory fees to any Affiliate of a Loan Party, including any allocation or sharing of overhead, selling, general or administrative expenses, taxes or other shared business expenses, or (iii) directors fees or the like.

"S&P" has the meaning specified therefor in the definition of Cash Equivalents.

"Sale Assets" has the meaning specified therefor in Section 9.3(a).

"Sale Notice" has the meaning specified therefor in Section 9.3.

"Sanctioned Jurisdiction" means, at any time, a country, territory or geographical region which is itself the target of comprehensive Sanctions Laws (currently, Cuba, Iran, North Korea, Sudan, Crimea and Syria).

"Sanctions Laws" means all Applicable Laws concerning or relating to economic or financial sanctions, requirements or trade embargoes imposed, administered or enforced from time to time by OFAC, including, but not limited to, the following (together with their implementing regulations, in each case, as amended from time to time): the International Security and Development Cooperation Act (ISDCA) (22 U.S.C. §23499aa-9 et seq.) and the Trading with the Enemy Act (TWEA) (50 U.S.C. §5 et seq.).

"Sanctioned Entity" means (a) a country, region or territory or a government of a country, region or territory, (b) an agency of the government of a country, region or territory, (c) an organization directly or indirectly controlled by a country, region or territory, or its government, (d) a Person resident in or determined to be resident in a country, region or territory, in each case, that is subject to a country, region or territory, as applicable, sanctions program administered and enforced by OFAC.

"Sanctioned Person" means any Person that is a designated target of Sanctions Laws or is otherwise a subject of Sanctions Laws, including as a result of being (i) owned, held or controlled by any Person which is a designated target of Sanctions Laws, (ii) located or resident in, a national of, or organized under the laws of, any country that is subject to general or country-wide Sanctions Laws, or (iii) a Person named on the list of Specially Designated Nationals maintained by OFAC, or any Person owned fifty percent (50.00%) or more by one or more of such Persons.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Securities Account" means a securities account (as that term is defined in the Code).

"Security Agreement" means the Second Amended and Restated Security Agreement, effective as of the Restatement Date, executed and delivered by the Loan Parties to Agent on behalf of the Lender Group, as the same may be amended, supplemented or otherwise modified from time to time.

"Shareholder Guarantor" means each of Jon Loevy and Michael Kanovitz and any other natural person that is required to provide a Shareholder Guaranty from time to time pursuant to Section 5.13.

- 30 -

"Shareholder Guaranty" means any "bad boy" guaranty agreement, dated as of April 5, 2021, and any other "bad boy" guaranty entered into at any time thereafter executed and delivered by any Shareholder Guarantor in favor of Agent on behalf of the Lender Group, as the same may be amended, supplemented or otherwise modified from time to time.

"SOFR" means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the Relevant Governmental Body at approximately 8:00 a.m. (New York City time) on the immediately succeeding Business Day.

"Solvent" means, with respect to any Person as of any date of determination, that (a) at fair valuations, the sum of such Person's debts (including contingent liabilities) is less than all of such Person's assets, (b) such Person is not engaged or about to engage in a business or transaction for which the remaining assets of such Person are unreasonably small in relation to the business or transaction or for which the property remaining with such Person is an unreasonably small capital, and (c) such Person has not incurred and does not intend to incur, or reasonably believe that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise), and (d) such Person is "solvent" or not "insolvent", as applicable within the meaning given those terms and similar terms under Applicable Laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Specified Quarter Period" means, (i) with respect to the fiscal quarter ending December 31, 2021, the last fiscal quarter then ended, (ii) with respect to the fiscal quarter ending March 31, 2022, the last two quarters then ended, (iii) with respect to the fiscal quarter ending June 30, 2022, the last three fiscal quarter then ended and (iv) for each fiscal quarter following thereafter, the four fiscal quarter then ended.

"Stock" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the Stock having ordinary voting power to elect a majority of the Board of Directors of such corporation, partnership, limited liability company, or other entity. Unless otherwise indicated, any use of the term Subsidiary shall mean a Subsidiary of a Borrower.

"Subsidiary Guarantor" means any Subsidiary of a Loan Party in existence as of the Closing Date, and any Subsidiary of a Loan Party formed or acquired after the Closing Date that becomes a guarantor of the Obligations pursuant to Section 5.11 of the Agreement.

"Subsidiary Guaranty" means any guaranty agreement entered into at any time on or after the Closing Date executed and delivered by any Subsidiary Guarantors to Agent on behalf of the Lender Group, as the same may be amended, supplemented or otherwise modified from time to time.

- 31 -

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), fees, assessments or other charges imposed by any Governmental Authority or Regulatory Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" and "Term Loans" means the collective reference to the Tranche A Loans, Tranche B Loans, Tranche C Loans, and each one of them.

"Term Loan Amount" means an amount equal to the sum of the Tranche A Loan Amount, the Tranche B Loan Amount, and the Tranche C Loan Amount.

"Term Loan Exposure" means, with respect to any Lender, as of any date of determination, the aggregate amount of (a) such Lender's Commitment (in respect of Term Loans that have not been funded) and (b) the outstanding principal amount of Term Loans held by such Lender at such time, including any PIK Interest.

"Term Loan Request Form" means the form delivered by Borrower Representative pursuant to Section 2.2(a) in substantially the form of Exhibit C attached hereto.

"Term SOFR" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Title Insurance Policy" means a mortgagee's loan policy, in form and substance satisfactory to Agent, together with all reasonable endorsements made from time to time thereto, issued to Agent by or on behalf of a title insurance company selected by or otherwise satisfactory to Agent, insuring the Lien created by a Mortgage in an amount and on terms and with such endorsements satisfactory to Agent, subject to Permitted Liens, delivered to Agent.

"Total Funded Indebtedness" means, as of any date of determination and without duplication, the sum of (i) the outstanding principal amount of the Loans (including any PIK Interest) hereunder and all other Indebtedness for borrowed money as of such date *plus* (ii) the attributable indebtedness in respect of all Capitalized Lease Obligations *plus* (iii) the outstanding principal amount of any revolving loans outstanding at such date (excluding any undrawn amounts under any such applicable revolving credit facilities), with respect to the Loan Parties and their Subsidiaries determined on a combined basis in accordance with GAAP.

"Total Leverage Ratio" means, as of any date of determination, the ratio of (i) the amount of Total Funded Indebtedness as of such date, to (ii) Adjusted EBITDA for the consecutive four (4) fiscal quarter period ended as of such date; *provided that*, for the fiscal quarters ending December 31, 2021, March 31, 2022, and June 30, 2022, Adjusted EBITDA shall be determined, in each case, as follows: (x) for the quarter ending December 31, 2021, the actual aggregate amount for such quarter multiplied by four (4); (y) for the quarter ending March 31, 2022, the actual aggregate amount for the two consecutive quarter period then ending multiplied by two (2); and (z) for the quarter ending June 30, 2022, the actual aggregate amount  for the three consecutive quarter period then ending multiplied by four thirds (4/3).

"Tranche" means either the Tranche A Loans, the Tranche B Loans, or the Tranche C Loans, as the context may require.

"Tranche A Loans" has the meaning specified therefor in Section 2.1(a)(ii).

"Tranche A Loan Amount" means twenty five million dollars ($25,000,000).

"Tranche A Loan Commitment" means, with respect to each Lender, its commitment to make the Tranche A Loans pursuant to the terms of this Agreement, and, with respect to all Lenders, their commitments to make the Tranche A Loans pursuant to the terms of this Agreement, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 to this Agreement or in the Assignment and Acceptance pursuant to which such Lender became a Lender under this Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 14.1.

"Tranche B Draw Period" means the period commencing on the Restatement Date, and ending on the date that is one (1) day prior to the one (1) year anniversary of the Restatement Date.

"Tranche B Loan" has the meaning specified therefor in Section 2.1(b)(ii).

"Tranche B Loan Amount" means forty million four hundred thousand dollars ($40,400,000).

"Tranche B Loan Commitment" means, with respect to each Lender, its commitment to make the Tranche B Loans pursuant to the terms of this Agreement, and, with respect to all Lenders, their commitments to make the Tranche B Loans pursuant to the terms of this Agreement, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 to this Agreement or in the Assignment and Acceptance pursuant to which such Lender became a Lender under this Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 14.1.

"Tranche B Payoff Reserve Amount" has the meaning specified therefor in Section 2.1(d)(i).

"Tranche C Loans" has the meaning specified therefor in Section 2.1(c).

"Tranche C Loan Amount" means ten million dollars ($10,000,000).

"Tranche C Loan Commitment" means, with respect to each Lender, its commitment to make the Tranche C Loans pursuant to the terms of this Agreement, and, with respect to all Lenders, their commitments to make the Tranche C Loans pursuant to the terms of this Agreement, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 to this Agreement or in the Assignment and Acceptance pursuant to which such Lender became a Lender under this Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 14.1.

"Tranche C Payoff Reserve Amount" has the meaning specified therefor in Section 2.1(d)(i).

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"Unfinanced Capital Expenditures" means, with respect to any Person for any period, Capital Expenditures by such Person and its Subsidiaries during such period that are not financed by Indebtedness, but will exclude Capital Expenditures financed by the proceeds available to and equity invested into the Borrowers, in the amount of fifty million dollars ($50,000,000). For the avoidance of doubt, any Capital Expenditures above fifty million dollars ($50,000,000), shall be considered Unfinanced Capital Expenditures.

- 33 -

"United States" means the United States of America.

"Unused Line Fee" has the meaning specified therefor in Section 2.6(c).

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the IRC.

"Voidable Transfer" has the meaning specified therefor in Section 17.6.

"Waretown Property" means the Collateral Property located at 501 U.S. Route 9, Unit 6 Township of Ocean, NJ.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2    **Accounting Terms**.    All accounting terms not specifically defined herein shall be construed in accordance with GAAP.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Borrower" or "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean the Borrowers and their Subsidiaries on a combined basis, unless the context clearly requires otherwise. Notwithstanding anything to the contrary contained herein, (a) all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (or any similar accounting principle or other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof or (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof and (b) the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that does not include any qualification or supplemental comment concerning the ability of the applicable Person to continue as a going concern or concerning the scope of the audit.

1.3    **Code**.  Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; *provided that* to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

1.4    **Construction**.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations,

- 34 -

amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties. Any reference herein or in any other Loan Document to the satisfaction, prepayment, repayment, or payment in full of the Obligations shall mean (a) the payment or repayment in full in immediately available funds of (i) the principal amount of, and interest accrued and unpaid with respect to, the outstanding Loans, together with the payment of any premium applicable to the repayment of the Loan, (ii) all Lender Group Expenses that have accrued and are unpaid (other than contingent obligations in respect of which no claim has been made), (iii) all fees or charges that have accrued hereunder or under any other Loan Document and are unpaid, (b) the receipt by Agent of cash collateral in order to secure any other contingent Obligations for which a claim or demand for payment has been made on or prior to such time or in respect of matters or circumstances known to Agent or a Lender at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorneys' fees and legal expenses), such cash collateral to be in such amount as Agent reasonably determines is appropriate to secure such contingent Obligations, and (c) the termination of all of the Commitments of the Lenders hereunder. Any reference herein to any Person shall be construed to include such Person's successors and permitted assigns.

      1.5     **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

      1.6     **Appointment of Borrower Representative.**

      (a)     Each Borrower hereby irrevocably appoints and constitutes Borrower Representative as its agent and attorney-in-fact to request and receive Term Loans in the name or on behalf of such Borrower and any other Borrowers, deliver all notices and certificates hereunder, give instructions with respect to the disbursement of the proceeds of the Term Loans, receive all notices and consents hereunder or under any of the other Loan Documents and take all other actions (including in respect of compliance with covenants) in the name or on behalf of such Borrower or any other Borrower pursuant to this Agreement and the other Loan Documents. Agent and the Lender may disburse the Term Loans to such bank account of Borrower Representative or a Borrower or otherwise make such Term Loans to a Borrower, in each case as Borrower Representative may designate or direct, without notice to any other Borrower.

      (b)     Borrower Representative hereby accepts the appointment by the Borrowers to act as the agent and attorney-in-fact of the Borrowers pursuant to this Section 1.6.

      (c)     Each Borrower hereby irrevocably appoints and constitutes Borrower Representative as its agent to receive statements on account and all other notices from Agent and the Lender with respect to the Obligations or otherwise under or in connection with this Agreement and the other Loan Documents.

      (d)     Any notice, election, representation, warranty, agreement or undertaking made or delivered by or on behalf of any Borrower by Borrower Representative shall be deemed for all purposes to have been made or delivered by such Borrower, as the case may be, and shall be binding upon and enforceable against such Borrower to the same extent as if made or delivered directly by such Borrower.

      (e)     No resignation by or termination of the appointment of Borrower Representative as agent and attorney-in-fact as aforesaid shall be effective, except after ten (10) Business Days' prior written notice to Agent. If the Borrower Representative resigns under this Agreement, the Borrowers shall be entitled to appoint a successor Borrower Representative (which shall be a Borrower and shall be reasonably acceptable to Agent as such successor). Upon the acceptance of its appointment as successor

Borrower Representative hereunder, such successor Borrower Representative shall succeed to all the rights, powers and duties of the retiring Borrower Representative and the term "Borrower Representative" shall mean such successor Borrower Representative for all purposes of this Agreement and the other Loan Documents, and the retiring or terminated Borrower Representative's appointment, powers and duties as Borrower Representative shall be thereupon terminated.

2.      **LOAN AND TERMS OF PAYMENT.**

2.1      **Term Loans**.

(a)      Tranche A Loans.

(i)      In connection with the Existing Credit Agreement, the Lenders made a term loan advance (the "Initial Tranche A Loan") to the Borrowers in an aggregate principal amount equal to twenty two million dollars ($22,000,000), in such Dollar amounts set forth beside such Lender's name under the applicable heading on Schedule C-1 to this Agreement.

(ii)      Subject to the terms and conditions of this Agreement, including the satisfaction (or waiver) of all conditions precedent specified in Section 3.2, and in reliance upon the representations and warranties of the Loan Parties contained herein, on the Restatement Date, each Lender agrees (severally, not jointly or jointly and severally) to make a single term loan advance (the "Restatement Date Tranche A Loan" and together with the Initial Tranche A Loan, the "Tranche A Loans") to the Borrowers in an aggregate principal amount equal to three million dollars ($3,000,000), less the amount deposited into the Interest Reserve Account pursuant to Section 2.12(a)(ii)(B), in such Dollar amounts set forth beside such Lender's name under the applicable heading on Schedule C-1 to this Agreement.

(b)      Tranche B Loans.

(i)      Subject to the terms and conditions of this Agreement, including the satisfaction (or waiver) of all conditions precedent specified in Section 3.2, and in reliance upon the representations and warranties of the Loan Parties contained herein, on the Restatement Date, each Lender agrees (severally, not jointly or jointly and severally) to make a single term loan advance (the "Restatement Date Tranche B Loan") to the Borrowers in an aggregate principal amount equal to twelve million four hundred thousand dollars ($12,400,000), less (A) the amount deposited into the Interest Reserve Account pursuant to Section 2.12(a)(ii)(B), and (B) the Tranche B Payoff Reserve Amount withheld pursuant to Section 2.1(d)(i), in each case, in such Dollar amounts set forth beside such Lender's name under the applicable heading on Schedule C-1 to this Agreement.

(ii)      Subject to the terms and conditions of this Agreement, including Section 2.2 and the satisfaction (or waiver) of all conditions precedent specified in Section 3.3, and in reliance upon the representations and warranties of the Loan Parties contained herein, each Lender agrees (severally, not jointly or jointly and severally) from time to time during the Tranche B Draw Period, to the extent approved by Agent, to made additional loans (each such loan, an "Additional Tranche B Loan" and collectively with the Restatement Date Tranche B Loans, the "Tranche B Loans") to the Borrowers in an aggregate amount up to the then unfunded portion of the Tranche B Loan Amount; *provided that*, (A) the Lenders shall not be obligated to make more than two (2) advances of Additional Tranche B Loans in any calendar month and (B) each such Additional Tranche B Loan shall be for no less than one hundred thousand dollars ($100,000).  Additional Tranche B Loans shall be allocated to the Lenders based on each Lender's Pro Rata Share of the Tranche B Loan Commitment.

- 36 -

(c)    Tranche C Loans.  Subject to the terms and conditions of this Agreement, including the satisfaction (or waiver) of all conditions precedent specified in Section 3.2, and in reliance upon the representations and warranties of the Loan Parties contained herein, on the Restatement Date, each Lender agrees (severally, not jointly or jointly and severally) to make a single term loan advance (the "Tranche C Loans") to the Borrowers in an aggregate principal amount equal to the Tranche C Loan Amount, less (A) the amount deposited into the Interest Reserve Account pursuant to Section 2.12(a)(ii)(B), and (B) the Tranche C Payoff Reserve Amount withheld pursuant to Section 2.1(d)(i), in each case, in such Dollar amounts set forth beside such Lender's name under the applicable heading on Schedule C-1.

(d)    Payoff Reserve Amounts.

(i)    On the Restatement Date, subject to the terms and conditions of this Agreement, Agent shall withhold from the proceeds of (A) the Restatement Date Tranche B Loan, an amount equal to one million seven hundred fifty thousand dollars ($1,750,000) (the "Tranche B Payoff Reserve Amount") and (B) the Tranche C Loans, an amount equal to ten million dollars ($10,000,000) (the "Tranche C Payoff Reserve Amount" and together with the Tranche B Payoff Reserve Amount, the "Payoff Reserve Amounts"), in each case, in such Dollar amounts set forth beside such Lender's name under the applicable heading on Schedule C-1 to this Agreement, and hold such Payoff Reserve Amounts for the benefit of the Lenders.

(ii)    The Payoff Reserve Amounts shall, as of the Restatement Date, (A) be deemed funded to the Borrowers as outstanding Tranche B Loans and Tranche C Loans hereunder, as applicable, (B) accrue interest pursuant to Section 2.5(a)(ii) and 2.5(a)(iii), as applicable, and (C) be withheld by Agent on behalf of the Lenders until satisfaction of the Payoff Reserve Release Conditions, at which time, Agent shall disburse the Payoff Reserve Amounts to, or at the direction of, the Borrowers.

(iii)    In the event the Payoff Reserve Release Conditions are not satisfied by the Payoff Reserve Release Deadline, Agent shall have no obligation to make the disbursements of the Payoff Reserve Amounts described in clause (ii) above and may apply such funds to the repayment of the corresponding outstanding principal amount of Tranche B Loans and Tranche C Loans, as applicable.  In the event Agent applies such funds in accordance with the foregoing sentence, the Borrowers shall promptly, and in any event within one (1) Business Day thereof, pay to Agent all accrued and unpaid interest, including any accrued PIK Interest, with respect to such repaid Loans.

(e)    Original Issue Discount.  Notwithstanding anything to the contrary set forth herein, the amount of the Original Issue Discount shall be withheld from the Loans, in such Dollar amounts set forth beside such Lender's name under the applicable heading on Schedule C-1 to this Agreement.

(f)    The outstanding principal balance of and all accrued and unpaid interest on the Term Loans, including, for the avoidance of doubt, PIK Interest, shall be due and payable on the earliest to occur of (i) the Maturity Date, (ii) a Change of Control, (iii) the sale or transfer of all or substantially all assets of the Collateral Properties and (iv) the date of the acceleration of the Term Loans in accordance with the terms hereof.

(g)    Any principal amount of the Term Loans (including any PIK Interest) that is repaid or prepaid may not be reborrowed.  All principal of, interest on, and other amounts payable in respect of the Term Loans, including, for the avoidance of doubt, PIK Interest, shall constitute Obligations.

2.2    **Borrowing Procedures**.

- 37 -

(a)    During the Tranche B Draw Period, if the Borrower desires an Additional Tranche B Loan, the Borrower shall notify Agent no later than 3:00 p.m. (Florida time), at least three (3) Business Days prior to the date such Additional Tranche B Loan is to be made, which notice may be given by telephone. Each such notification shall be confirmed promptly by delivery to Agent of a written and completed Term Loan Request Form in substantially the form of Exhibit C hereto, signed by an authorized officer of the Borrower Representative. Agent shall be entitled to rely on any notice given by a person who Agent reasonably believes to be an authorized officer of the Borrower Representative, and the Borrowers shall indemnify and hold Agent harmless for any damages or loss suffered by Agent as a result of such reliance.

(b)    Following receipt of a Term Loan Request Form, Agent shall promptly notify each Lender of the amount of the portion of the Additional Tranche B Loan to be funded by such Lender under Section 2.1(b)(ii). Upon satisfaction of the applicable conditions set forth in Section 3.3, Agent shall make all funds so received available to the Construction Consultant for distribution to contractors and subcontractors with respect to all work and services performed in connection with any construction at the Collateral Properties and in accordance with the Budget.

2.3    **Payments; Termination of Commitments; Prepayments**.

(a)    **Payments by the Borrowers.** Except as otherwise expressly provided herein, (i) all payments by the Borrowers due and payable to any Lender pursuant to this Agreement shall be made for the benefit of such Lender to Agent's Account (for subsequent distribution to each Lender) and shall be made in immediately available funds, no later than 5:00 p.m. (Florida time) on the date specified herein and (ii) all payments by the Borrowers due and payable to Agent pursuant to this Agreement shall be made to Agent at Agent's Account and shall be made in immediately available funds, no later than 5:00 p.m. (Florida time) on the date specified herein. Any payment received by Agent later than 5:00 p.m. (Florida time) shall be deemed to have been received (unless Agent or such applicable Lender, as applicable, in its sole discretion, elects to credit it on the date received) on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day; *provided that*, the failure of the Borrowers to make a payment to Agent's Account on or before 5:00 p.m. (Florida time) in accordance with the foregoing shall not constitute a Default or an Event of Default so long as such payment is received on the applicable due date provided herein.

(b)    **Apportionment and Application.**

(i)    So long as no Application Event has occurred and is continuing, all principal and interest payments made by the Borrowers shall be paid ratably to the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses made by the Borrowers (other than fees or expenses that are for Agent's separate account, which fees and expenses shall be paid to Agent) shall be paid ratably to each Lender according to such Lender's Pro Rata Share of the type of commitment or Obligation to which a particular fee or expense relates. Subject to any applicable regulatory requirements (including any licensing requirements promulgated by applicable Governmental Authorities or Regulatory Authorities), all proceeds of Collateral received by Agent, shall be applied, so long as no Application Event has occurred and is continuing, to be distributed to the Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under Applicable Law. If any Lender shall receive any amounts in respect of the Obligations at any time that an Application Event has occurred and is continuing, such Lender shall receive such amounts as trustee for Agent, and such Lender shall deliver any such amounts to Agent for application to the Obligations in accordance with Section 2.3(b)(ii).

- 38 -

(ii)     At any time that an Application Event has occurred and is continuing, all payments remitted to Agent or any Lender and all proceeds of Collateral received by Agent shall be applied as follows:

(A)     <u>first</u>, to pay the Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the Loan Documents until paid in full,

(B)     <u>second</u>, to pay any fees or premiums then due to Agent and ratably, to the Lenders under the Loan Documents until paid in full,

(C)     <u>third</u>, ratably, to pay the Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any Lender under the Loan Documents until paid in full,

(D)     <u>fourth</u>, to the extent not paid under clause (C) above, ratably, to pay any fees or premiums then due to any Lender under the Loan Documents until paid in full,

(E)     <u>fifth</u>, ratably, to pay interest (other than PIK Interest) accrued in respect of the Term Loans until paid in full,

(F)     <u>sixth</u>, ratably, to pay the outstanding principal balance of the Term Loans, including any PIK Interest (in the inverse order of the maturity of the installments due thereunder), until the Term Loans and all PIK Interest are paid in full,

(G)     <u>seventh</u>, to pay any other Obligations; and

(H)     <u>eighth</u>, to the Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under Applicable Law.

(iii)     Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from such Lender in writing, such funds as it may be entitled to receive.

(iv)     In each instance, so long as no Application Event has occurred and is continuing, <u>Section 2.3(b)(i)</u> shall not apply to any payment made by the Borrowers to Agent and specified by the Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document.

(v)     For purposes of <u>Section 2.3(b)(ii)</u>, "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any Insolvency Proceeding, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(vi)     In the event of a direct conflict between the priority provisions of this <u>Section 2.3</u> and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.

(c)     **Termination and Reduction of Commitments.**  The Commitment to make a Term Loan shall automatically terminate upon the making of such Term Loan.  Further, the Borrowers may terminate this Agreement and terminate the Commitments hereunder pursuant to <u>Section 3.6</u>.

- 39 -

(d)    **Amortization.**  Commencing on the Amortization Trigger Date, the Borrowers shall repay the Term Loans to each Lender in an amount equal to ten percent (10.00%) of such Lender's Pro Rata Share of the Outstanding Amount as of the day prior to the Amortization Trigger Date (including PIK Interest) on the first day of each month in equal installments; *provided that*, the final principal repayment installment of the Term Loans repaid on the Maturity Date shall be, in any event, in an amount equal to such Lender's Pro Rata share of the Outstanding Amount on such date (including PIK Interest).

(e)    **Optional Prepayments.**  After the Restatement Date, subject to Section 3.6 (if applicable), and any other applicable terms and conditions of this Agreement, the Borrowers may, upon at least five (5) Business Days' prior written notice to Agent and each Lender, prepay all or any part of the Outstanding Amount, in accordance with Section 2.3(h); *provided that* (i) the amount of such prepayment shall be no less than ten percent (10.00%) of the Outstanding Amount and (ii) such prepayments may not be made more than two (2) times in any calendar year.

(f)    **Mandatory Prepayments.**

(i)    **Dispositions.**  Within three (3) Business Days following the date of receipt by any Loan Party of the Net Cash Proceeds of any voluntary or involuntary sale or disposition by any Loan Party of property or assets (including Permitted Dispositions under clauses (a) and (b) of the definition of Permitted Dispositions, but excluding all other Permitted Dispositions), the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.3(h) in an amount equal to one hundred percent (100.00%) of such Net Cash Proceeds (including condemnation awards and payments in lieu thereof); *provided that*, so long as (A) no Default or Event of Default shall have occurred and is continuing or would result therefrom, (B) the Borrower Representative shall have given Agent and each Lender prior written notice of such Loan Party's intention to apply such monies to the costs of replacement of the properties or assets that are the subject of such sale or disposition with a similar or "like" asset or the cost of purchase or construction of any other assets useful in the business of the Loan Parties, (C) the monies are held in a Deposit Account subject to a Control Agreement in favor of Agent and in which Agent has a perfected first priority security interest, and (D) such Loan Party completes such replacement, purchase, or construction within one hundred eighty (180) days after the initial receipt of such monies (or, so long as such Loan Party has, within one hundred eighty (180) days following the initial receipt of such monies, entered into a binding commitment of purchase, construction, repair or restoration, within three hundred sixty five (365) days following the initial receipt of such monies), such Loan Party shall have the option to apply such monies to the costs of replacement of the properties or assets that are the subject of such sale or disposition or the costs of purchase or construction of other assets useful in the business of the Loan Parties unless and to the extent that such applicable period shall have expired without such replacement, purchase or construction being made or completed, in which case, any amounts not reinvested in accordance with the foregoing after expiration of the applicable period above shall be paid to Agent and the Lenders and applied in accordance with Section 2.3(h).  Nothing contained in this Section 2.3(f)(i) shall permit any Loan Party to sell or otherwise dispose of any assets other than in accordance with Section 6.4.

(ii)    **Extraordinary Receipts.**  Within three (3) Business Days of the date of receipt by any Loan Party of any Extraordinary Receipts, the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.3(h) in an amount equal to one hundred percent (100.00%) of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.

(iii)    **Indebtedness.**  Promptly, but in any event, within one (1) Business Day of the date of incurrence by any Loan Party of (A) Permitted Bank Debt or (B) any Indebtedness (other than Permitted Indebtedness), the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.3(h) in an amount equal to one hundred percent (100.00%) of the Net Cash

- 40 -

Proceeds received by such Person in connection with such incurrence. The provisions of this Section 2.3(f)(iii) shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms of this Agreement.

(iv)    **Cure Amount.**    No later than the Cure Right Deadline, the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.3(h) in an amount equal to the Cure Amount made pursuant to Section 8.2.

(g)    **[Reserved].**

(h)    **Application of Payments.**    Each prepayment made pursuant to Section 2.3(d), 2.3(e) or 2.3(f) shall be accompanied by the payment of accrued interest (not including any PIK Interest; *provided that*, any accrued PIK Interest on the amount prepaid shall be added to the Outstanding Amount as of such date (and prepaid, if such prepayment is a prepayment in full)) to the date of such payment on the amount prepaid. Any prepayment made pursuant to Section 2.3(d), 2.3(e) or 2.3(f) shall be allocated first, to the Tranche C Loans until paid in full, and second, ratably to the Tranche A Loans and Tranche B Loans until paid in full. Each such prepayment of the Term Loans shall be applied to the Outstanding Amount of such Tranche to reduce the remaining scheduled installments of principal in inverse order of maturity (for the avoidance of doubt, any amount that is due and payable on the Maturity Date shall constitute a scheduled installment). Each prepayment pursuant to Section 2.3(d), 2.3(e) or 2.3(f) shall (i) so long as no Application Event shall have occurred and be continuing, be applied, to the Outstanding Amount as set forth in Section 2.3(b)(i) until paid in full and (ii) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.3(b)(ii).

2.4    **Promise to Pay**.

The Borrowers agree to pay the Lender Group Expenses on the earlier of (a) the first day of the month following the date on which the applicable Lender Group Expenses were first incurred and (b) the date on which demand therefor is made by Agent or a Lender, as applicable. The Borrowers promise to pay all of the Obligations (including principal, interest, premiums, if any, fees, costs, and expenses (including Lender Group Expenses)) in full on the Maturity Date or, if earlier, on the date on which the Obligations become due and payable pursuant to the terms of this Agreement. The Borrowers agree that its obligations contained in the first sentence of this Section 2.4 shall survive payment or satisfaction in full of all other Obligations.

2.5    **Interest Rates, Payments and Calculations**.

(a)    **Interest Rates.**

(i)    For the period from the Closing Date to, but excluding, the Restatement Date, with respect to the Initial Tranche A Loan, the parties hereto acknowledge and agree that (A) the amount of accrued but unpaid interest outstanding is $233,553.71 and (B) the amount of PIK Interest is $374,073.67.

(ii)    Beginning on the Restatement Date, except as provided in Section 2.5(b) and 2.5(c), all Obligations that have been charged to the Loan Account pursuant to the terms hereof with respect to Tranche A Loans and the Tranche B Loans shall bear interest (A) payable in cash on the outstanding balance thereof at a rate per annum equal to (x) the greater of the LIBOR Rate and one percent (1.0%), *plus* (y) twelve percent (12.00%) and (B) payable in kind as provided in Section 2.5(c) on the outstanding balance thereof at a rate per annum equal to two percent (2.00%).

OMM_US:80200477.9

(iii)    Beginning on the Restatement Date, except as provided in <u>Section 2.5(b)</u>, all Obligations that have been charged to the Loan Account pursuant to the terms hereof with respect to Tranche C Loans shall bear interest payable in cash on the outstanding balance thereof at a rate per annum equal to nine percent (9%) per annum.

(b)    **Default Rate.**  Upon the occurrence and during the continuation of an Event of Default and at the written election of the Required Lenders (or automatically while any Event of Default under <u>Section 8.1(d)</u> or <u>(e)</u> exists), all outstanding Obligations shall bear interest from the date of the occurrence of such Event of Default at a per annum rate equal to five percent (5.00%) above the per annum rate otherwise applicable to such Obligation hereunder or under any other Loan Document (or, in the case of any amounts that do not otherwise bear interest, at a rate equal to five percent (5.00%) above the per annum interest rate otherwise payable hereunder), payable in cash.

(c)    **Payment.**  Except as expressly provided herein to the contrary, (i) all interest payable hereunder or under any of the other Loan Documents shall be due and payable in cash, in arrears, on the first day of each month following the Restatement Date (provided that two percent (2.00%) of all such interest with respect to Tranche A Loans and the Tranche B Loans shall be paid in kind monthly by increasing the Outstanding Amount in respect of which such interest is paid by an amount equal to such accrued interest, and the amount so added to principal shall be part of the Outstanding Amount, and treated as an outstanding Term Loan, for all purposes hereunder (such amount, the "<u>PIK Interest</u>")) and (ii) all costs and expenses payable hereunder or under any of the other Loan Documents, and all Lender Group Expenses shall be due and payable on the earlier of (x) the first day of the month following the date on which the applicable costs, expenses, or Lender Group Expenses were first incurred and (y) the date on which demand therefor is made by Agent or a Lender, as applicable.  The Borrowers hereby authorize Agent and the Lenders, from time to time to charge to the Loan Account (A) on the first day of each month, all interest accrued during the prior month on any Loan hereunder, (B) as and when incurred or accrued, all audit, appraisal, valuation, or other charges or fees payable pursuant to <u>Section 2.10</u>, (C) as and when due and payable, all other fees payable hereunder or under any of the other Loan Documents, (D) as and when due in accordance with <u>Section 2.5(c)(ii)</u>, all Lender Group Expenses, and (E) as and when due and payable all other payment obligations payable under any Loan Document.

(d)    All amounts (including interest, premiums, if any, fees, costs, expenses, Lender Group Expenses, or other amounts payable hereunder or under any other Loan Document) charged to the Loan Account shall thereupon constitute Obligations hereunder, and shall initially accrue interest at the rate then applicable to the Loans.

(e)    **Computation.**  All interest and applicable fees chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(f)    **Intent to Limit Charges to Maximum Lawful Rate.**  In no event shall the interest rate or rates payable under this Agreement or any other Loan Document, plus any other amounts paid in connection herewith or therewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  The Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; *provided that*, anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under Applicable Law, then, *ipso facto*, as of the date of the Closing Date, the Borrowers are and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from the Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

(g)    **Effect of Benchmark Transition Event.**

(i)    Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, Agent and the Borrowers may amend this Agreement to replace LIBOR with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (Florida time) on the fifth (5th) Business Day after Agent has posted such proposed amendment to the Lenders and the Borrowers so long as Agent has not received, by such time, written notice of objection to such amendment from the Required Lenders. Any such amendment with respect to an Early Opt-in Election will become effective on the date that the Required Lenders have delivered to Agent written notice that the Required Lenders accept such amendment. No replacement of LIBOR with a Benchmark Replacement pursuant to this Section 2.5(g) will occur prior to the applicable Benchmark Transition Start Date.

(ii)    Benchmark Replacement Conforming Changes.  In connection with the implementation of a Benchmark Replacement, Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(iii)    Notices; Standards for Decisions and Determinations.  Agent will promptly notify the Borrowers and the Lenders of (A) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (B) the implementation of any Benchmark Replacement, (C) the effectiveness of any Benchmark Replacement Conforming Changes and (D) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by Agent or the Required Lenders pursuant to this Section 2.5(g), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.5(g).

(iv)    Benchmark Unavailability Period.  Upon the Borrower Representative's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower Representative may revoke any request for a Term Loan to be made during any Benchmark Unavailability Period.

(h)    **Increased Costs.**  If, after the date hereof, any Change in Law:

(i)    shall subject any Recipient (or any of their respective lending offices) to any Taxes (other than (A) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, (B) Connection Income Taxes, and (C) Indemnified Taxes) with respect to any loan, loan principal, letter of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(ii)    shall impose, modify or deem applicable any reserve (including, without limitation, any imposed by the Board of Governors of the U.S. Federal Reserve System), special deposit, insurance or capital or similar requirement against assets of, deposits with or for the account of, or credit extended by any of the Lenders (or any of their respective lending offices) or shall impose on any of the Lenders (or any of their respective lending offices) or the foreign exchange and interbank markets any other condition affecting any Loan;

- 43 -

(iii)    and the result of any of the foregoing is to increase the costs to any of the Lenders of maintaining any Term Loan or to reduce the yield or amount of any sum received or receivable by any of the Lenders under this Agreement or under the Notes in respect of a Term Loan, then such Lender shall promptly notify Agent, and Agent shall promptly notify the Borrowers of such fact and demand compensation therefor and, promptly (but no later than the earlier of the next January 31 or the Maturity Date) after such notice by Agent, the Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender for such increased cost or reduction.  Agent will promptly notify the Borrowers of any event of which it has knowledge which will entitle any Lender to compensation pursuant to this Section 2.5(h); *provided that*, Agent shall incur no liability whatsoever to any Lender or the Borrowers in the event it fails to do so.  The amount of such compensation shall be determined, in each Lender's sole discretion, based upon the assumption that such Lender funded the Term Loans in the London interbank market and using any reasonable attribution or averaging methods which such Lender deems appropriate and practical.  A certificate of such Lender setting forth the basis for determining such amount or amounts necessary to compensate such Lender shall be forwarded to the Borrower Representative through Agent and shall be conclusively presumed to be correct save for manifest error.

(iv)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.5(h) shall not constitute a waiver of such Lender's right to demand such compensation; *provided that*, the Borrowers shall not be required to compensate such Lender pursuant to this clause (iv) for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefore (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

2.6    **Fees**.

(a)    **Exit Fee.**  An exit fee in the amount equal to ten percent (10.00%) of the Term Loan Amount; *provided that*, upon the occurrence of the Ratchet Event, such exit fee shall automatically convert to five percent (5.00%) (the "Exit Fee"), which, shall be fully earned as of the Restatement Date and the making of the Term Loans on such date, but paid by the Borrowers upon the earliest to occur of (i) the Maturity Date, (ii) any repayment in full of the Outstanding Amount for any reason (whether before or after an Event of Default, including any Change of Control, by reason of acceleration, optionally or mandatorily, or for any reason whatsoever, other than any prepayment under the Escrow Agreement), (iii) the occurrence of an Event of Default and the exercise by Agent of any rights or remedies, including without limitation, the acceleration of the Loans, and (iv) the occurrence of an Event of Default under Section 8.1(d) or Section 8.1(e) or an Insolvency Proceeding is filed by or against any Loan Party or Parent or all or any part of their properties.  For the avoidance of doubt, such Exit Fee shall not be paid at the time of any partial repayment of the Term Loans; provided, however, upon the occurrence of an NJ Termination, the Exit Fee with respect to the Tranche A Loans shall be paid on such date (and in the event that any part of the Tranche C Loans are repaid in connection with a NJ Termination, the Exit Fee with respect to the Tranche C Loans shall be paid on such date), and upon the occurrence of a PA Termination, the Exit Fee with respect to the Tranche B Loans and the Tranche C Loans shall be paid on such date.  All Exit Fees paid to Agent shall be distributed to each Lender on a pro rata basis based on the amount of the Loans (including any PIK Interest) then held by such Lenders.

(b)    **Agent Fee.**  On (i) the Restatement Date, the Borrowers shall pay an agent fee in an amount equal to one percent (1%) of the sum of the Tranche B Loan Amount and the Tranche C Loan Amount, and (ii) each yearly anniversary of the Restatement Date, the Borrowers shall pay an agent fee in an amount equal to one percent (1.00%) of the Term Loan Amount (collectively, the "Agent Fee"), which

- 44 -

shall be allocated as follows: (A) to Agent, 81.2734%, and (b) to Documentation Agent, 18.7266%.  In the event Agent receives any part of Documentation Agent's portion of the Agent Fee from the Borrowers, Agent shall distribute the same to or at the direction of the Documentation Agent.  The Agent Fee shall be fully earned as of the Restatement Date and the making of the Term Loans on such date and paid in advance on the Restatement Date and on each yearly anniversary of the Restatement Date thereafter.

(c)      **Unused Line Fee**. During the Tranche B Draw Period, the Borrowers shall pay to Agent an unused line fee (the "Unused Line Fee") in an amount equal to (i) five percent (5.00%) of (ii) the Tranche B Loan Amount, less the sum of the daily average Outstanding Amount of Tranche B Loans for the preceding month. The Unused Line Fee shall be paid by the Borrowers monthly in arrears on the first day of each month and distributed to each Lender on a pro rata basis.

(d)      **Processing Fee**. A processing fee of one thousand dollars ($1,000) (the "Processing Fee") shall be due and payable by the Borrowers to Agent upon each draw of any Term Loan.

(e)      **Late Fee.** A late fee shall be due and payable by the Borrowers in an amount equal to five percent (5.00%) of the amount of any payment hereunder more than five (5) days past due (the "Late Fee").

(f)      All fees due and payable on the Restatement Date shall be irrevocable when paid.

2.7      **Crediting Payments**.

The receipt of any payment item by Agent or any Lender shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then the Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly.

2.8      **Designated Account**.

Agent and each Lender are authorized to make the Loans under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person.  The Borrowers agree to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Loans.

2.9      **Maintenance of Loan Account; Statements of Obligations**.

Agent shall maintain an account on its books in the name of the Borrowers, (the "Loan Account") on which the Borrowers will be charged with the Term Loans, and with all other payment Obligations hereunder or under the other Loan Documents, including accrued interest, premiums, if any, fees and expenses, and Lender Group Expenses.  In accordance with Section 2.7, the Loan Account will be credited with all payments received by Agent or the Lenders from the Borrowers or for the Borrowers' account. Agent shall endeavor to provide statements regarding the Loan Account to the Borrower Representative, including principal, interest, fees, and including an itemization of all charges and expenses constituting Lender Group Expenses owing (but neither Agent nor any Lender shall have any liability if Agent shall fail to provide any such statement), and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between the Borrowers and the Lender Group unless, within thirty (30) days after Agent first makes such a statement available to the Borrower Representative (or such longer period as the Required Lenders may agree in their sole discretion), the

- 45 -

Borrower Representative shall deliver to Agent and the Lenders written objection thereto describing the error or errors contained in any such statements.

2.10    **Financial Examination and Other Fees**.

The Borrowers shall pay to Agent financial examination, audit, appraisal, and valuation fees and charges, as and when incurred or chargeable, as follows: (i) reasonable and documented out of pocket expenses for each financial examination or audit of any Loan Party performed by personnel employed by Agent, and (ii) the reasonable fees and charges paid or incurred by Agent (plus reasonable and documented out of pocket expenses (including travel, meals, and lodging)) if it elects to employ the services of one or more third party Persons to perform financial examinations, audits or quality of earnings analyses of the Loan Parties, to appraise the Collateral, or any portion thereof, or to assess the Loan Parties' business valuation (which, for the avoidance of doubt, may include the employment of CohnReznick, LLP (or any of its Affiliates) or any other mutually-approved accounting firm); *provided, that* so long as no Default or Event of Default has occurred and is continuing, Borrowers shall not be required to pay Agent for more than one such examination, audit, appraisal and/or valuation during any 12-month period.

2.11    **Capital Requirements**.

(a)    If, after the date hereof, any Lender determines in good faith that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital or reserve requirements for banks or bank holding companies, or any change in the interpretation, implementation, or application thereof by any Governmental Authority charged with the administration thereof, or (ii) compliance by such Lender or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy or liquidity (whether or not having the force of law), has the effect of reducing the return on such Lender's or such holding company's capital as a consequence of such Lender's Commitments hereunder to a level below that which such Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration such Lender's or such holding company's then existing policies with respect to capital adequacy and liquidity) by any amount deemed by such Lender to be material, then such Lender may notify the Borrower Representative and Agent thereof. Following receipt of such notice, the Borrowers agree to pay such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within thirty (30) days after presentation by such Lender of a statement in the amount and setting forth in reasonable detail such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, such Lender may use any reasonable averaging and attribution methods. Failure or delay on the part of such Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; *provided that*, the Borrowers shall not be required to compensate a Lender pursuant to this Section for any reductions in return incurred more than one hundred twenty (120) days prior to the date that such Lender notifies the Borrower Representative of such law, rule, regulation or guideline giving rise to such reductions and of such Lender's intention to claim compensation therefor; *provided, further,* that if such claim arises by reason of the adoption of or change in any law, rule, regulation or guideline that is retroactive, then the one hundred twenty (120)-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)    If such Lender requests additional or increased costs or amounts under Section 2.11(a), then such Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to Section 2.11(a), as applicable, and (ii) in the reasonable judgment of such Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not

- 46 -

otherwise be materially disadvantageous to it. If, after such reasonable efforts, such Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate the Borrowers' obligations to pay any future amounts to such Lender pursuant to Section 2.11(a), as applicable, then the Borrowers (without prejudice to any amounts then due to such Lender under Section 2.11(a), as applicable) may, unless prior to the effective date of any such assignment such Lender withdraws its request for such additional amounts under Section 2.11(a), as applicable, seek a substitute Lender reasonably acceptable to Agent (the consent of Agent not to be unreasonably withheld, conditioned or delayed) to purchase the Obligations owed to such Lender (a "Replacement Lender"), and if such Replacement Lender agrees to such purchase, such Lender shall assign to the Replacement Lender its Obligations, pursuant to an Assignment and Acceptance Agreement, and upon such purchase by the Replacement Lender, such Replacement Lender shall be deemed to be a "Lender" for purposes of this Agreement and such Lender shall cease to be a "Lender" for purposes of this Agreement.

(c)    Notwithstanding anything herein to the contrary, the protections of this Section 2.11 shall be available to a Lender regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, judicial ruling, judgment, guideline, treaty or other change or condition which shall have occurred or been imposed, so long as it shall be customary for lenders affected thereby to comply therewith.

(d)    Notwithstanding anything herein to the contrary, including subsections (a)-(c) of this Section 2.11, a Lender shall not be entitled to make a claim for compensation under this Section 2.11 unless such Lender shall be subject to the capital or reserve requirements or capital adequacy and liquidity laws, rules, guidelines, requests, or directives contemplated herein.

2.12    **Reserve Account.**

(a)    **Interest Reserve Account.**

(i)    Purpose of Interest Reserve Account. Amounts in the Interest Reserve Account shall be used to pay (or supplement Borrowers' payments of) accrued cash interest payable by the Borrowers pursuant to Section 2.5(a). The Interest Reserve Account shall be held until depleted.

(ii)    Deposits to Interest Reserve Account.

(A)    In connection with the Existing Credit Agreement, Agent deposited into the Interest Reserve Account, from the proceeds of the Initial Tranche A Loan, an amount equal to two million dollars ($2,000,000).

(B)    On the Restatement Date, subject to the terms and conditions of this Agreement, Agent shall deposit into the Interest Reserve Account, from the proceeds of the Restatement Date Tranche A Loan, the Restatement Date Tranche B Loan, the Tranche C Loans, an aggregate amount equal to two million dollars ($2,000,000), in such Dollar amounts set forth beside each Lender's name under the applicable heading on Schedule C-1 to this Agreement.

(iii)    Disbursements from Interest Reserve Account.

(A)    So long as no Default or Event of Default has occurred, Agent shall withdraw funds on deposit in the Interest Reserve Account and apply such funds toward the monthly payment of accrued cash interest in accordance with Section 2.5(c).

- 47 -

(B)     Notwithstanding anything to the contrary set forth herein, neither Agent's failure to disburse funds from the Interest Reserve Account nor the insufficiency of the balance remaining in the Interest Reserve Account shall relieve the Borrowers of its obligation to pay accrued cash interest in full as it becomes due in accordance with this Agreement.

(iv)     Disbursements from the Interest Reserve Account Following an Event of Default.  Upon the occurrence of an Event of Default, (A) Agent shall have no obligation to make the disbursements described in clause (iii) above from the Interest Reserve Account, and the Borrowers shall not be entitled to any disbursements from the Interest Reserve Account, unless and until such Event of Default is cured or waived by the Required Lenders, and (B) Agent may apply any funds in the Interest Reserve Account toward the repayment of the Obligations in accordance with Section 2.3(h), or in Agent's sole discretion, to finance construction and capital expenditures for the Collateral Properties.

(b)     **General**.

(i)     For the avoidance of doubt, (A) all amounts held in the Interest Reserve Account shall constitute proceeds of the Loans (and part of the Outstanding Amount) for all purposes hereunder and shall be available to the Borrowers as provided by this Section 2.12, and, notwithstanding that such proceeds of the Loans are held in the Interest Reserve Account, shall accrue interest in accordance with this Agreement and shall be subject to all other terms and provisions of this Agreement and the other Loan Documents, and (B) there shall be no conditions precedent to making any withdrawal from the Interest Reserve Account, other than as set forth in this Section 2.12.

(ii)     Amounts held in the Interest Reserve Account shall be at all times held in cash and uninvested.  The Borrowers shall not deposit any amounts in the Interest Reserve Account other than the proceeds of the Loans as described herein and the proceeds of any investments held in or credited to the Interest Reserve Account.

2.13     **Adjustments for Failure to Fund**.  In the event that a Lender fails to fund any Additional Tranche B Loans in accordance with Section 2.1(a)(iii) despite the satisfaction of all conditions precedent and all other applicable requirements hereunder, and such failure continues for more than thirty (30) days, the Exit Fee, the Agent Fee, the Original Issue Discount and the Unused Line Fee shall be re-calculated based on the Tranche B Loan Amount less the amount of any Additional Tranche B Loans subject to such failure to fund, and such Lender that failed to fund shall refund to the Borrowers, if applicable, any excess amounts previously received based on such re-calculation.

3.     **CONDITIONS; TERM OF AGREEMENT.**

3.1     **Conditions Precedent to the Extension of Credit on the Closing Date**.

The obligation of each Lender to make its extension of credit on the Closing Date under the Existing Credit Agreement was subject to the fulfillment, to the satisfaction of Agent, of each of the following conditions precedent:

(a)     Agent shall have received evidence that appropriate financing statements have been duly filed in such office or offices as may be necessary or, in the reasonable opinion of Agent, desirable to perfect Agent's Liens in and to the Collateral;

(b)     Agent shall have received each of the following documents, in form and substance reasonably satisfactory to Agent, duly executed and delivered, and each such document shall be in full force and effect:

OMM_US:80200477.9

(i)      this Agreement (as in effect prior to the Restatement Date);

(ii)     the Notes (as in effect prior to the Restatement Date);

(iii)    the Parent Guaranty;

(iv)     the Shareholder Guaranty;

(v)      the Security Agreement (as in effect prior to the Restatement Date);

(vi)     the Pledge Agreement (as in effect prior to the Restatement Date); and

(vii)    a completed Perfection Certificate;

(c)      Agent shall have received a certificate from an officer of Parent and each Loan Party (i) attesting to the resolutions of Parent or such Loan Party's board of directors (or equivalent governing body) authorizing its execution, delivery, and performance of the Loan Documents to which it is a party and authorizing specific officers of such Loan Party to execute the same, (ii) attesting to the incumbency and signatures of such specific officers of Parent or such Loan Party, (iii) certifying as to Parent's or such Loan Party's Governing Documents, as amended, modified, or supplemented to the Closing Date (and with respect to Governing Documents that are charter documents, certified as of a recent date (not more than thirty (30) days prior to the Closing Date) by the appropriate governmental official, (iv) attaching a certificate of status with respect to Parent or such Loan Party, dated not more than thirty (30) days prior to the Closing Date, issued by the appropriate officer of the jurisdiction of organization of Parent or such Loan Party, which certificate shall indicate that Parent or such Loan Party is in good standing (if applicable) in such jurisdiction;

(d)      Agent shall have received a certificate, in form and substance reasonably satisfactory to Agent, from the Chief Executive Officer, Chief Financial Officer or similar such officer of each Loan Party certifying that, after giving effect to the Term Loan and transactions hereunder, (i) the Loan Parties, on a combined basis, are Solvent, (ii) no Default or Event of Default exists, (iii) the representations and warranties set forth in Section 4 are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof), and (iv) each Loan Party has complied with all conditions to be satisfied by it under the Loan Documents except to the extent waived or permitted to be delivered pursuant to Section 3.7;

(e)      Agent shall have received a customary opinion of the Loan Parties' counsel in form and substance reasonably satisfactory to Agent;

(f)      Agent shall have received all documentation and other information for each Loan Party required by bank regulatory authorities under applicable "know your customer" procedures and Anti-Money Laundering Laws, including the Patriot Act and such documentation and information shall be reasonably satisfactory to Agent and each Lender;

(g)      Agent shall have completed its business, financial and legal due diligence of the Loan Parties, including but not limited to (i) review of material agreements, (ii) receipt of a satisfactory quality of earnings report, (iii) confirmation and review of any Cannabis Licenses and applications, (iv) receipt of UCC, tax lien and litigation searches, if applicable, and (v) review of the Loan Parties books and records, the results of which are satisfactory to Agent and each Lender;

- 49 -

(h)    Each Loan Party shall have received all other governmental and third party approvals (including shareholder approvals and other consents) necessary or, in the reasonable opinion of Agent, advisable in connection with this Agreement, the transactions contemplated by the Loan Documents, which shall all be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on this Agreement, the transactions contemplated by the Loan Documents;

(i)    Agent shall have received with respect to each Collateral Property, a satisfactory (i) Phase I Environmental Site Assessment and, if recommended by any Phase I Environmental Site Assessment, a satisfactory Phase II Environmental Site Assessment (unless otherwise agreed by Agent), (ii) a property condition or engineering report, and (iii) title report;

(j)    The representations and warranties of the Loan Parties contained in this Agreement and in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof) on and as of the Closing Date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof) or such earlier date;

(k)    No injunction, writ, restraining order, or other order of any nature prohibiting, directly or indirectly, the making of the Term Loan on the Closing Date shall have been issued and remain in force by any Governmental Authority against any Borrower, Agent, or any Lender;

(l)    [reserved];

(m)    Agent and each Lender shall have received all fees required to be paid, and all expenses required to be reimbursed (including the reasonable and documented fees and expenses of legal counsel); *provided that*, all such amounts may be paid with proceeds of the Term Loan made on the Closing Date; and

(n)    Agent shall have received executed (and, if applicable, recorded) copies of all other documents and legal matters in connection with the transactions contemplated by this Agreement in form and substance satisfactory to Agent.

3.2    **Conditions Precedent to the Extension of Credit on the Restatement Date**.

The obligation of each Lender to make its extension of credit on the Restatement Date provided for hereunder is subject to the fulfillment, to the satisfaction of Agent, of each of the following conditions precedent:

(a)    Agent shall have received evidence that appropriate financing statements have been duly filed in such office or offices as may be necessary or, in the reasonable opinion of Agent, desirable to perfect Agent's Liens in and to the Collateral with respect to the Additional Borrowers;

(b)    Agent shall have received each of the following documents, in form and substance reasonably satisfactory to Agent, duly executed and delivered, and each such document shall be in full force and effect:

(i)    this Agreement;

(ii)     the Notes;

(iii)    the Security Agreement;

(iv)     the Pledge Agreement;

(v)      [reserved]; and

(vi)     a completed Perfection Certificate with respect to the Additional Borrowers;

(c)      Agent shall have received a certificate from an officer of Parent and each Loan Party (i) attesting to the resolutions of Parent or such Loan Party's board of directors (or equivalent governing body) authorizing its execution, delivery, and performance of the Loan Documents to which it is a party and authorizing specific officers of such Loan Party to execute the same, (ii) attesting to the incumbency and signatures of such specific officers of Parent or such Loan Party, (iii) certifying as to Parent's or such Loan Party's Governing Documents, as amended, modified, or supplemented to the Restatement Date (and with respect to Governing Documents that are charter documents, certified as of a recent date (not more than thirty (30) days prior to the Restatement Date) by the appropriate governmental official, (iv) attaching a certificate of status with respect to Parent or such Loan Party, dated not more than thirty (30) days prior to the Restatement Date, issued by the appropriate officer of the jurisdiction of organization of Parent or such Loan Party, which certificate shall indicate that Parent or such Loan Party is in good standing (if applicable) in such jurisdiction;

(d)      Agent shall have received a certificate, in form and substance reasonably satisfactory to Agent, from the Chief Executive Officer, Chief Financial Officer or similar such officer of each Loan Party certifying that, after giving effect to the Restatement Date Loans and transactions hereunder, (i) the Loan Parties, on a combined basis, are Solvent, (ii) no Default or Event of Default exists, (iii) the representations and warranties set forth in Section 4 are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof), and (iv) each Loan Party has complied with all conditions to be satisfied by it under the Loan Documents except to the extent waived or permitted to be delivered pursuant to Section 3.7;

(e)      Agent shall have received a customary opinion of the Loan Parties' counsel in form and substance reasonably satisfactory to Agent;

(f)      Agent shall have received all documentation and other information for each Additional Borrower required by bank regulatory authorities under applicable "know your customer" procedures and Anti-Money Laundering Laws, including the Patriot Act and such documentation and information shall be reasonably satisfactory to Agent and each Lender;

(g)      Agent shall have completed its business, financial and legal due diligence of the Additional Borrowers, including but not limited to (i) review of material agreements, (ii) receipt of a satisfactory quality of earnings report, (iii) confirmation and review of any Cannabis Licenses and applications, (iv) receipt of UCC, tax lien and litigation searches, if applicable, and (v) review of the books and records of the Additional Borrowers, the results of which are satisfactory to Agent and each Lender;

(h)      Each Additional Borrower shall have received all other governmental and third party approvals (including shareholder approvals and other consents) necessary or, in the reasonable opinion of Agent, advisable in connection with this Agreement, the transactions contemplated by the Loan

- 51 -

Documents, which shall all be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on this Agreement, the transactions contemplated by the Loan Documents;

(i)      Agent shall have received with respect to each Additional Collateral Property, a satisfactory (i) Phase I Environmental Site Assessment and, if recommended by any Phase I Environmental Site Assessment, a satisfactory Phase II Environmental Site Assessment (unless otherwise agreed by Agent), (ii) a property condition or engineering report, and (iii) title report;

(j)      The representations and warranties of the Loan Parties contained in this Agreement and in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof) on and as of the Restatement Date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof) or such earlier date;

(k)      No Default or Event of Default shall have occurred and be continuing as of the Restatement Date, nor shall either result from the making of the Restatement Date Loans on the Restatement Date;

(l)      No material adverse change in the financial condition of Parent or the Loan Parties or in the quality, quantity or value of any Collateral shall have occurred since the Closing Date;

(m)      After giving effect to the Restatement Date Loans on the Restatement Date and the liabilities and obligations of each of the Loan Parties under the Loan Documents, the Loan Parties and their Subsidiaries, on a consolidated basis, shall be Solvent;

(n)      No injunction, writ, restraining order, or other order of any nature prohibiting, directly or indirectly, the making of the Restatement Date Loans shall have been issued and remain in force by any Governmental Authority against any Borrower, Agent, or any Lender;

(o)      Agent shall have received payoff letters and other customary release documents in form and substance satisfactory to Agent with respect to all existing Indebtedness other than Indebtedness set forth on Schedule 4.15;

(p)      Agent shall have received an accounts payable aging report with respect to each Borrower;

(q)      Agent shall have received in escrow signed resignation letters (each, a "Board Resignation Letter") from each member of the Board of Directors of each Borrower, which shall become effective solely upon the occurrence and continuation of an Event of Default and the commencement of exercise of remedies in accordance with Section 9.1;

(r)      Agent shall have received the combined financial statements of the Borrowers and their Subsidiaries for the fiscal year ended December 31, 202 audited by the Auditor and certified, without any qualifications (including any (i) "going concern" or like qualification or exception or (ii) qualification or exception as to the scope of such audit), by such Auditor to have been prepared in accordance with

- 52 -

GAAP, such audited financial statements to include a balance sheet, income statement, and statement of cash flow);

(s)    Agent and each Lender shall have received all fees required to be paid, and all expenses required to be reimbursed (including the reasonable and documented fees and expenses of legal counsel); *provided that*, all such amounts may be paid with proceeds of the Restatement Date Loans; and

(t)    Agent shall have received executed (and, if applicable, recorded) copies of all other documents and legal matters in connection with the transactions contemplated by this Agreement in form and substance satisfactory to Agent.

3.3    **Conditions Precedent to Additional Extensions of Credit**. The obligation of each Lender to make additional extensions of credit provided for hereunder is subject to the fulfillment, to the satisfaction of Agent and each Lender, of each of the following conditions precedent:

(a)    The Loan Parties shall be in pro forma compliance with each of the financial covenants set forth in Section 6.18 of this Agreement;

(b)    The representations and warranties of the Loan Parties contained in this Agreement and in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof) on and as of the date of the additional extension of credit (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof) or such earlier date;

(c)    Agent shall have received a certificate, in form and substance reasonably satisfactory to Agent, from the Chief Executive Officer, Chief Financial Officer or similar such officer of each Loan Party certifying that, after giving effect to the Additional Term Loan and transactions hereunder, (i) the Loan Parties and their Subsidiaries, on a combined basis, are Solvent, (ii) no Default or Event of Default exists, (iii) the representations and warranties set forth in Section 4 are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof), and (iv) each Loan Party has complied with all conditions to be satisfied by it under the Loan Documents except to the extent waived or permitted to be delivered pursuant to Section 4;

(d)    No injunction, writ, restraining order, or other order of any nature prohibiting, directly or indirectly, the making of the Additional Tranche B Loan on the date of the additional extension of credit shall have been issued and remain in force by any Governmental Authority against the Borrowers, Agent or any Lender;

(e)    No Default or Event of Default shall have occurred and be continuing as of the date of the additional extension of credit, nor shall either result from the making of the Additional Tranche B Loan as of the date of the additional extension of credit;

(f)    No material adverse change in the financial condition of Parent or the Loan Parties or in the quality, quantity or value of any Collateral shall have occurred since the Restatement Date;

- 53 -

(g)    After giving effect to the Additional Tranche B Loan as of the date of the additional extension of credit and the liabilities and obligations of each of the Loan Parties under the Loan Documents, the Loan Parties and their Subsidiaries, on a consolidated basis, shall be Solvent;

(h)    In the event that Permitted Bank Debt is outstanding, Agent shall have received satisfactory evidence that prior to or substantially concurrently with the funding of the Additional Tranche B Loan, the lender(s) of such Permitted Bank Debt have or will fund a pro rata amount thereunder;

(i)    Agent shall have received (i) confirmation from the Construction Consultant that construction and Capital Expenditures at the Collateral Properties are progressing substantially in accordance with the Budget and the Construction Consultant's standards and (ii) copies of satisfactory lien waivers or releases from all contractors and subcontractors with respect to all work and services performed in connection with any construction at the Collateral Properties;

(j)    Agent and each Lender shall have received all fees required to be paid, and all expenses required to be reimbursed (including the reasonable and documented fees and expenses of legal counsel); *provided that*, all such amounts may be paid with proceeds of the Additional Tranche B Loan; and

(k)    Agent shall have received executed (and, if applicable, recorded) copies of all other documents and legal matters in connection with the transactions contemplated by this Agreement in form and substance satisfactory to Agent.

3.4    **Term**.  Subject to Section 3.6, this Agreement shall continue in full force and effect for a term ending on the Maturity Date.  The foregoing notwithstanding, the Lender Group, upon the election of the Required Lenders, shall have the right to terminate its obligations under this Agreement immediately and without notice upon the occurrence and during the continuation of an Event of Default (other than any Event of Default described in Section 8.1(d) or (e), each of which shall automatically result in the termination of the Commitments and the acceleration of the Obligations as set forth in Section 9.1).**Effect of Maturity**.  On the Maturity Date, all of the Obligations immediately shall become due and payable without notice or demand and the Borrowers shall be required to repay all of the Obligations (other than contingent obligations in respect of which no claim has been made) in full.  No termination of the obligations of the Lender Group (other than payment in full of the Obligations and termination of the Commitments set forth in Schedule C-1) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and Agent's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations (other than contingent obligations in respect of which no claim has been made) have been paid in full.  When all of the Obligations (other than contingent obligations in respect of which no claim has been made) have been paid in full, Agent will, at the Borrowers' sole expense, execute and deliver any termination statements (or, alternatively, in Agent's sole discretion, at the Borrowers' sole expense, authorize the Loan Parties to file termination statements), lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary or requested by the Borrowers to release, as of record, Agent's Liens and all notices of security interests and liens previously filed by Agent with respect to the Obligations.

3.6    **Early Termination by the Borrowers**.

(a)    The New Jersey Borrowers have the option, at any time after April 29, 2022 and upon five (5) Business Days prior written notice to Agent and each Lender, to terminate this Agreement with respect to the Tranche A Loans by (i) paying to the Lenders, all of the Obligations with respect to the Tranche A Loans in full and (ii) (A) repaying not less than twenty million dollars ($20,000,000) of

- 54 -

outstanding principal with respect to, first, the Tranche C Loans (together with all of the Obligations with respect thereto, including, for the avoidance of doubt, all accrued interest and Exit Fee with respect to the Tranche C Loans) and thereafter, to the Tranche B Loans (together with all accrued but unpaid interest thereon, including any accrued PIK Interest with respect thereto) or (B) (I) repaying not less than five million dollars ($5,000,000) of outstanding principal with respect to, first, the Tranche C Loans (together with all of the Obligations with respect thereto, including, for the avoidance of doubt, all accrued interest and Exit Fee with respect to the Tranche C Loans) and thereafter, if any amounts remain, to the Tranche B Loans (together with all accrued but unpaid interest thereon, including any accrued PIK Interest with respect thereto) and (II) granting Agent, for the benefit of the Lender Group, a lien on and security interest in the cultivation license held by Pier Cove LLC and in connection therewith, executing and delivering to Agent, any and all security agreements, financing statements or amendments to financing statements, assignments, opinions of counsel, and all other documents that Agent may reasonably request in form and substance reasonably satisfactory to Agent to create and perfect Agent's Liens in such cultivation license (the actions to be taken pursuant to the foregoing clause (ii)(A) or clause (ii)(B), the "NJ Termination Condition").  If the Borrower Representative has sent a notice of termination pursuant to the provisions of this Section 3.6(a), then the Borrowers shall be obligated to repay the Obligations with respect to the Tranche A Loans (other than contingent obligations in respect of which no claim has been made) in full, and satisfy the NJ Termination Condition, on the date set forth as the date of termination of this Agreement with respect to the Tranche A Loans in such notice. Upon receipt of payment in full of the Obligations with respect to the Tranche A Loans and satisfaction of the NJ Termination Condition (an "NJ Termination") the Agent and each Lender shall release any Liens it may have on any New Jersey Collateral.  The foregoing notwithstanding, (x) the Borrower Representative may rescind termination notices relative to proposed payments in full of the Obligations with respect to the Tranche A Loans with the proceeds of third party Indebtedness or other transactions if the closing for such issuance, incurrence or other transaction does not happen on or before the date of the proposed termination (in which case, a new notice shall be required to be sent in connection with any subsequent termination), and (y) the Borrower Representative may extend the date of such termination at any time with the consent of Agent (which consent shall not be unreasonably withheld or delayed).

(b)    The PA Borrowers have the option, at any time after the first year anniversary of the Restatement Date and upon five (5) Business Days prior written notice to Agent and each Lender, to terminate this Agreement with respect to the Tranche B Loans and Tranche C Loans by paying to the Lenders, all of the Obligations with respect to the Tranche B Loans and Tranche C Loans in full.  If the Borrower Representative has sent a notice of termination pursuant to the provisions of this Section 3.6(b), then the Borrowers shall be obligated to repay the Obligations with respect to the Tranche B Loans and Tranche C Loans (other than contingent obligations in respect of which no claim has been made) in full on the date set forth as the date of termination of this Agreement with respect to the Tranche B Loans and the Tranche C Loans in such notice.  Upon receipt of payment in full of the Obligations with respect to the Tranche B Loans and Tranche C Loans (a "PA Termination"), the Agent and each Lender shall release any Liens it may have on any PA Collateral.  The foregoing notwithstanding, (a) the Borrower Representative may rescind termination notices relative to proposed payments in full of the Obligations with respect to the Tranche B Loans and Tranche C Loans with the proceeds of third party Indebtedness or other transactions if the closing for such issuance, incurrence or other transaction does not happen on or before the date of the proposed termination (in which case, a new notice shall be required to be sent in connection with any subsequent termination), and (b) the Borrower Representative may extend the date of such termination at any time with the consent of Agent (which consent shall not be unreasonably withheld or delayed).

3.7    **Conditions Subsequent**.  The obligation of the Lender Group (or any member thereof) to continue to extend the Loans (or otherwise make extensions of credit hereunder) is subject to the fulfillment,

- 55 -

on or before the date applicable thereto (as such date may be extended in the Required Lenders' sole discretion), of each of the conditions subsequent set forth on <u>Schedule 3.7</u>.

Notwithstanding anything to the contrary set forth herein, the failure by the Borrowers to so perform or cause to be performed the conditions subsequent in clause (9) on <u>Schedule 3.7</u> as and when required by the terms thereof (unless such date is extended in writing by the Required Lenders), shall constitute an immediate Event of Default.

4.    **REPRESENTATIONS AND WARRANTIES.**

In order to induce the Lender Group to enter into this Agreement, each Loan Party makes the following representations and warranties to the Lender Group; *provided, however*, to the extent applicable, such representations and warranties assume the consummation of all of the transactions set forth on <u>Schedule 3.7</u>:

4.1    **Title to Assets; No Encumbrances**.

Each of the Loan Parties has (a) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (b) good and marketable title to (in the case of all other real or personal property), all of their respective assets reflected in their most recent financial statements delivered pursuant to <u>Section 5.1</u>, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby. All of such assets are free and clear of Liens except for Permitted Liens.

4.2    **[Reserved]**.

4.3    **[Reserved]**.

4.4    **Due Organization and Qualification; Subsidiaries**.

(a)    Parent and each Loan Party (i) is duly formed or organized, validly existing and in good standing under the laws of the jurisdiction of its formation or organization, as applicable, (ii) is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect, and (iii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)    Set forth on <u>Schedule 4.4(b)</u> (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement), is a complete and accurate description of the authorized Stock of each Loan Party and each Subsidiary of each Loan Party, by class, and, as of the Restatement Date, a description of the number of shares of each such class that are issued and outstanding. Other than as described on <u>Schedule 4.4(b)</u>, there are no subscriptions, options, warrants, or calls relating to any shares of any Loan Party's Stock, including any right of conversion or exchange under any outstanding security or other instrument. No Loan Party is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its Stock or any security convertible into or exchangeable for any of its Stock. All of the outstanding Stock of each Loan Party (i) has been validly issued, is fully paid and non-assessable, to the extent applicable, (ii) was issued in compliance with all Applicable Law, and (iii) are free and clear of all Liens other than Permitted Liens.

(c)    Set forth on <u>Schedule 4.4(c)</u> is a complete and accurate list of (i) the jurisdiction of organization of Parent and each Loan Party, (ii) the chief executive office of Parent and each Loan Party, and (iii) the organizational identification number of Parent and each Loan Party (if any).

- 56 -

4.5    **Due Authorization; No Conflict**.

(a)    The execution, delivery, and performance by Parent and each Loan Party of the Loan Documents to which such Person is a party have been duly authorized by all necessary action on the part of such Person.

(b)    The execution, delivery, and performance by Parent or such Loan Party of the Loan Documents to which it is a party do not and will not (i) violate any material Applicable Law, the Governing Documents of such Person, or any order, judgment, or decree of any court or other Governmental Authority binding on such Person, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of such Person, except to the extent that the proceeds of this Agreement shall be used to satisfy in full or otherwise cancel such Material Contract, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of such Persony, other than Permitted Liens, or (iv) require any approval of any holder of Stock of such Person or any approval or consent of any Person under any Material Contract of such Person, except to the extent that (x) such consents or approvals have been obtained and are still in force and effect or (y) with respect to Material Contracts, such consents or approvals have not been obtained, but the proceeds of this Agreement shall be used to satisfy or otherwise cancel such Material Contracts, thereby rendering such approvals or consents unnecessary.

(c)    The execution, delivery, and performance by Parent and each Loan Party of the Loan Documents to which such Person is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or registrations, consents, approvals, notices, or other action with or by, any Governmental Authority, other than Permits, notices, or other actions that (i) have been obtained and that are still in force and effect, or (ii) the failure to obtain which would not reasonably be expected to become a Material Adverse Effect.  Notwithstanding the foregoing, any filings and recordings with respect to the Collateral of the Additional Borrowers shall be made, or otherwise delivered to Agent for filing or recordation, as of the Restatement Date.

(d)    Each Loan Document has been duly executed and delivered by Parent and each Loan Party that is a party thereto and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

(e)    Agent's Liens are validly created and perfected first priority Liens, subject only to Permitted Priority Liens.

4.6    **Litigation**.

(a)    There are no actions, suits, or proceedings pending or, to the knowledge of any Loan Party, threatened in writing against Parent or any Loan Party that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect or which in any manner draws into question the validity or enforceability of any of the Loan Documents.

(b)    Schedule 4.6(b) sets forth, as of the Restatement Date, to the knowledge of any Loan Party, a complete and accurate description with respect to each of the actions, suits, or proceedings with asserted liabilities in excess of, or that could reasonably be expected to result in liabilities in excess of, two hundred thousand dollars ($200,000) that, as of the Restatement Date, is pending or threatened in writing against Parent or any Loan Party, of (i) the parties to such actions, suits, or proceedings, (ii) the nature of the dispute that is the subject of such actions, suits, or proceedings, (iii) the procedural status, as

- 57 -

of the Restatement Date, with respect to such actions, suits, or proceedings, and (iv) whether any liability of such Person in connection with such actions, suits, or proceedings is covered by insurance. The estimate of costs with respect to such actions, suits, or proceedings set forth on Schedule 4.6(b) represents a reasonable estimate of such costs as of the Restatement Date, based on reasonable assumptions made in good faith.

4.7    **Compliance with Laws; Permits; Licenses**.

(a)    No Loan Party nor any of its Subsidiaries (i) is in violation of any Applicable Law in any material respect, or (ii) is subject to or in default with respect to any material final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

(b)    None of the Loan Parties has received any written notice from any Governmental Authority alleging that any of the Loan Parties is not in compliance in any material respect with, or may be subject to material liability under, any Applicable Law.

(c)    The Loan Parties have all the material Permits required pursuant to Applicable Laws for the Loan Parties to currently conduct its business, and all such Permits are in full force and effect . There are no such Permits held in the name of any Person (other than the Loan Parties) on behalf of any of the Loan Parties.

(d)    The Loan Parties have all Cannabis Licenses required to conduct their business as currently conducted, each of which are set forth on Schedule 4.7(d).

4.8    **Historical Financial Statements; No Material Adverse Effect**.  All historical financial information relating to the financial condition of the Loan Parties and their Subsidiaries that have been delivered by or on behalf of any Loan Party to Agent and each Lender (the "Historical Financial Statements") have been prepared in accordance with GAAP, except as otherwise expressly noted therein, and fairly present, in all material respects, the financial position, on a combined basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a combined basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments.  As of the applicable date of such Historical Financial Statements, none of the Loan Parties has any contingent liability or liability for taxes, long term lease or unusual forward or long term commitment that is not, in each case, reflected in the Historical Financial Statements or the notes thereto (to the extent required by GAAP) and which in any such case is material in relation to the business, operations, properties, assets, or financial condition of the Loan Parties or any of its Subsidiaries taken as a whole.  Since December 31, 2019, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Effect.

4.9    **Solvency**.

(a)    After giving effect to the Restatement Date Loans and the liabilities an obligations of each of the Loan Parties under the Loan Documents, the Loan Parties and their Subsidiaries, on a combined basis, are Solvent.

(b)    No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Loan Party.

4.10    **Employee Benefits**.  No Loan Party, its Subsidiaries nor any of their respective ERISA Affiliates has ever contributed to or maintained any Benefit Plan, or is liable for any obligations under any Benefit Plan.  No ERISA Event has ever occurred or is reasonably expected to occur.

4.11    **Environmental Condition**.  Except as set forth on Schedule 4.11, (a) to the knowledge of each Loan Party, none of the Real Property nor any other Loan Party's or any of its Subsidiaries' properties or assets has ever been used by a Loan Party, its Subsidiaries' or by previous owners or operators in the disposal of, or to produce, store, handle, treat, Release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, Release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) to the knowledge of each Borrower, after due inquiry, there has been no Release of any Hazardous Material, at, to or from any Real Property or any other property owned or leased by any Loan Party or any of its Subsidiaries, (c) no Loan Party nor any of its Subsidiaries has received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by a Loan Party, and (d) no Loan Party nor any of its Subsidiaries nor any of their respective facilities or operations is subject to any Environmental Action or any consent decree or settlement agreement with any Person relating to any Environmental Law or Environmental Liability.

4.12    **Real Property**.

(a)    Schedule 4.12(a) sets forth a correct and complete list as of the Restatement Date of the location, by state and street address, of all Real Property owned or leased by any Loan Party (including name of record owner), identifying which properties are owned and which are leased, together with the names and addresses of any landlords.

(b)    Each Loan Party has title, subject to matters of record disclosed in the title commitments referenced on Schedule 4.12(b), to, or valid leasehold interests in, all Real Property, in each case that is purported to be owned or leased by it, and none of the Real Property is subject to any Lien, except Permitted Liens.

(c)    Each Loan Party has paid all such material payments required to be made by it in respect of any Leasehold Property, and, to such Loan Party's knowledge, no landlord Lien has been filed, and to each Borrower's knowledge, no claim of delinquency is being asserted, with respect to any such payments, except as are subject to Permitted Protest.

(d)    Each Lease relating to the Leasehold Property listed on Schedule 4.12(a) is in full force and effect and is legal, valid, binding and enforceable in accordance with its terms.  To each such Loan Party's knowledge, there is not under any such Lease any existing breach, default, event of default or event or condition that, with or without notice or lapse of time or both, would constitute a breach, default or an event of default by any Loan Party or that, in any such case, could reasonably be expected to result in the commencement of proceedings or actions to terminate such Lease.

(e)    All Permits or Cannabis Licenses required to have been issued to enable all Real Property of any Loan Party to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are in full force and effect, other than those that, in the aggregate, would not have a Material Adverse Effect.

(f)    None of any Loan Party has received any notice, or has any knowledge, of any pending, threatened or contemplated condemnation proceeding affecting any Real Property of such Loan Party or any part thereof, except those that, in the aggregate, would not have a Material Adverse Effect.

- 59 -

(g)    No Loan Party owns or holds, or is obligated under or a party to, any lease, option, right of first refusal or other contractual right to purchase, acquire, sell, assign, dispose of or lease any Collateral Properties of such Loan Party except as set forth on Schedule 4.12(g).

4.13    **Broker Fees**.    Except as set forth on Schedule 4.13, no broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby.    The Borrowers shall be solely responsible for the payment of any and all broker's or finder's fees and commissions payable now and in the future in connection with this Agreement or any of the transactions contemplated hereby and shall indemnify upon demand the Lender Group and its directors, officers, employees and agents against any claim arising therefrom or in connection therewith.

4.14    **Complete Disclosure**.    All factual information taken as a whole (other than forward-looking statements and projections and information of a general economic nature and general information about the Loan Parties' industry) furnished by or on behalf of Parent or a Loan Party to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents is, and all other such factual information taken as a whole (other than forward-looking statements and projections and information of a general economic nature and general information about the Loan Parties' industry) hereafter furnished by or on behalf of Parent or a Loan Party to Agent or any Lender, will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole), not misleading in any material respect at such time in light of the circumstances under which such information was provided.    The Projections delivered to Agent and the Lenders immediately prior to the Restatement Date represent, and as of the date on which any other Projections are delivered to Agent or any Lender, such additional Projections represent, the good faith estimate of management of the Loan Parties, on the date such Projections were delivered, of the Loan Parties' future performance for the periods covered thereby based upon assumptions believed by the management of the Loan Parties to be reasonable at the time of the delivery thereof to Agent and the Lenders (it being recognized by Agent and the Lenders that such projected financial information is not to be viewed as fact and is subject to significant uncertainties and contingencies many of which are beyond the Loan Parties' control, that no assurance can be given that any particular financial projections will be realized, and that actual results may vary materially from such projected financial information).

4.15    **Indebtedness**.    Set forth on Schedule 4.15 is a true and complete list of all Indebtedness of each Loan Party outstanding immediately prior to the Restatement Date that is to remain outstanding after the Restatement Date and Schedule 4.15 accurately sets forth the aggregate principal amount of such Indebtedness as of the Restatement Date.

4.16    **Patriot Act; Foreign Corrupt Practices Act**.    Each Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act").    No part of the proceeds of the Loans made hereunder will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.17    **Payment of Taxes**.    Except as otherwise permitted under Section 5.6, all material tax returns of each Loan Party required to be filed by any of them have been timely filed, all such tax returns and reports are true, correct and complete in all material respects, and all taxes shown on such tax returns

- 60 -

to be due and payable and all assessments, fees and other similar governmental charges imposed by a tax authority upon a Loan Party and upon its assets, income, businesses and franchises that are due and payable have been paid when due and payable, other than taxes that are the subject of a Permitted Protest, and (ii) each Loan Party has made adequate provision in accordance with GAAP for all taxes not yet due and payable.  No Loan Party knows of any actual or proposed tax assessment or tax Lien against any Loan Party or any Subsidiary of a Loan Party or any of their respective assets or any Stock in respect of any such Person that is not subject to Permitted Protest.

4.18    **Margin Stock**.  No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to the Borrowers will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.

4.19    **Governmental Regulation**.  No Loan Party is subject to regulation under the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  No Loan Party is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.20    **Sanctions**.  No Loan Party nor any of its Subsidiaries is in violation of any Sanctions Laws, and each Borrower has implemented and maintain in effect and enforces necessary policies and procedures designed to ensure compliance therewith by the Loan Parties, their Subsidiaries and their respective directors, officers and employees.  None of the Loan Parties, nor any of its Subsidiaries (a) is a Sanctioned Person or a Sanctioned Entity, (b) has its assets located in Sanctioned Entities, or (c) directly or, to the knowledge of the Loan Parties, indirectly derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  No proceeds of any Loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

4.21    **Employee and Labor Matters**.  There is (i) no unfair labor practice complaint pending or, to the knowledge of any Loan Party, threatened against any Loan Party before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan which arises out of or under any collective bargaining agreement and that could reasonably be expected to result in a material liability, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened in writing against any Loan Party, or (iii) to each Borrower's knowledge, no union representation question existing with respect to the employees of any Loan Party and no union organizing activity taking place with respect to any of the employees of any Loan Party.  No Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains unpaid or unsatisfied.  The hours worked and payments made to employees of any Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements.  All material payments due from any Loan Party on account of wages and employee health and welfare insurance and other benefits (except for employee vacation benefits) have been paid or accrued as a liability on the books of the Borrowers and their Subsidiaries.

4.22    **Material Contracts**.  As of the Restatement Date, set forth on Schedule 4.22 is a description of the Material Contracts.  Each such Material Contract (a) is in full force and effect and is binding upon and enforceable against the applicable Loan Party and, to the knowledge of each Loan Party, each other Person that is a party thereto in accordance with its terms, (b) has not been otherwise amended or modified, and (c) is not in material default due to the action or inaction of the applicable Loan Party.  No

- 61 -

Loan Party, nor any of its Subsidiaries, is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Material Contracts, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.

4.23    **PEP**.  To the knowledge of each Loan Party, no Loan Party nor any of their respective Subsidiaries is acting on behalf of any corporation, business or other entity that has been formed by, or for the benefit of, a current or former senior foreign political figure, serving in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government owned corporation, or political figure (collectively, a "PEP").

4.24    **Location of Collateral**.  All of the Loan Parties' leased or owned locations which contain Collateral with a value in excess of one hundred thousand dollars ($100,000), as of the Restatement Date are listed on Schedule 4.24 hereto.  As of the Restatement Date, the office where each Loan Party keeps its records concerning the Collateral, and each of each Loan Party's principal place of business and chief executive office, are set forth on Schedule 4.24.

4.25    **EEA Financial Institutions**.  No Loan Party is an EEA Financial Institution.

4.26    **Intellectual Property**.  Each Loan Party owns, is licensed to use or otherwise has the right to use, all Intellectual Property that is material to the condition (financial or other), business or operations of such Loan Party.  All Intellectual Property owned by any Loan Party and existing as of the Restatement Date which is issued, registered or pending with any United States or foreign Governmental Authority (including, without limitation, any and all applications for the registration of any such Intellectual Property with any such United States or foreign Governmental Authority) and, to each Borrower's knowledge, all licenses under which any Loan Party is the exclusive licensee of any such registered Intellectual Property (or any such application for the registration of Intellectual Property) owned by another Person are set forth on Schedule 4.26.  Such Schedule 4.26 indicates in each case whether such registered Intellectual Property (or application therefor) is owned or exclusively licensed by such Loan Party.  Except as indicated on Schedule 4.26, to the best of each Loan Party's knowledge, the applicable Loan Party is the sole and exclusive owner of the entire and unencumbered right, title and interest in and to each such registered Intellectual Property (or application therefor) purported to be owned by such Loan Party, free and clear of any Liens and/or licenses in favor of third parties or agreements or covenants not to sue such third parties for infringement, other than non-exclusive licenses granted in the ordinary course of business. All registered Intellectual Property of each Loan Party is duly and properly registered, filed or issued in the appropriate office and jurisdictions for such registrations, filings or issuances.  No Loan Party is party to, nor bound by, any material license agreement with respect to which any Loan Party is the licensee that prohibits or otherwise restricts such Loan Party from granting a security interest in such Loan Party's interest in such license agreement.  Each Loan Party conducts its business without infringement or claim of infringement of any Intellectual Property rights of others and there is no infringement or claim of infringement by others of any Intellectual Property rights of any Loan Party.

4.26    **Insurance**.  Each Loan Party is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which it is engaged.  No Loan Party (a) has received notice from any insurer or agent of such insurer that substantial capital improvements or other material expenditures will have to be made in order to continue such insurance or (b) has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers.

OMM_US:80200477.9

4.27    **Anti-Money Laundering Laws**

(a)    Neither the Borrowers nor any Subsidiary are in violation of any Anti-Money Laundering Laws or engage in or conspire to engage in any transaction that evades or avoids, or have the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Money Laundering Laws.

(b)    Neither the Borrowers nor any Subsidiary or their respective agents acting or benefiting in any capacity in connection with the loans or the other transactions hereunder, are any of the following (each a "Blocked Person"):

(i)    a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(iii)    a Person with which any Agent or Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Money Laundering Law;

(iv)    a Person that commits, threatens or conspires to commit or supports "terrorism" (as defined in Executive Order No. 13224); or

(v)    a Person that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or any replacement website or other replacement official publication of such list.

(c)    No Loan Party or, to the knowledge of any Loan Party, any of its agents acting in any capacity in connection with the Term Loan or the other transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224.

4.28    **Representations Not Waived**.    The representations and warranties of the Loan Parties contained herein will not be affected or deemed waived by reason of any investigation made by or on behalf of any Lender, Agent and/or any of their respective representatives or agents or by reason of the fact that any Lender, Agent and/or any of their respective representatives or agents knew or should have known that any such representation or warranty is or might be inaccurate in any respect; *provided that*, in the event that the Lenders and/or Agent receive written notice of any inaccuracy or breach of any representation, warranty, or covenant of any of the Loan Parties contained in this Agreement ("Specified Breach") on or prior to the date of funding of any Term Loan, and the Required Lenders waive such Specified Breach in writing and the Lenders proceed with funding such Term Loan, then the Lenders and Agent shall have waived and forever renounced any right to assert a claim for any such Specified Breach, or any other claim or cause of action under this Agreement (including, without limitation, declaring such inaccuracy or breach an Event of Default) or the other Loan Documents, whether at law or in equity, on account of any such Specified Breach.**AFFIRMATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until termination of the Commitments and payment in full of the Obligations (other than contingent obligations in respect of which no claim has been made), each Loan Party shall and shall cause each of its Subsidiaries to do all of the following:

5.1    **Financial Statements, Reports, Certificates**.    (a) Deliver to Agent and each Lender, each of the financial statements, reports, and other items set forth on Schedule 5.1 no later than the times specified therein, and in connection with the delivery of Borrowers' annual audited financial statements (as

- 63 -

required pursuant to Schedule 5.1), (i) the independent certified public accountant conducting such audit shall have been pre-approved by Agent prior to the Closing Date (the "Auditor"), (ii) provide Agent with regular progress reports regarding such audit, including at any time requested by Agent, and (iii) permit Agent, each Lender and their duly authorized representatives or agents to discuss such audit with the Auditor during regular business hours and at reasonable intervals, (b) agree that no Loan Party nor any of its Subsidiaries will have a fiscal year different from that of the Borrowers, (c) agree to maintain a system of accounting that enables the Loan Parties to produce financial statements in accordance with GAAP, and (d) agree that it will, and will cause each other Loan Party to, maintain its billing systems and practices substantially as in effect as of the Closing Date and shall only make material modifications thereto only with approval of Agent (not to be unreasonably withheld, conditioned or delayed).

5.2    **Collateral Reporting**.  Provide Agent and each Lender with each of the reports set forth on Schedule 5.2 at the times specified therein.

5.3    **Existence**.  At all times preserve and keep in full force and effect such Person's (i) valid existence and good standing in its jurisdiction of formation or organization and (ii) good standing with respect to all other jurisdictions in which it is qualified to do business and any Permits or Cannabis Licenses material to its businesses.

5.4    **Inspection; Appraisals**.

(a)    Permit Agent, each Lender and their duly authorized representatives or agents to (i) visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees and (ii) cause the Real Property to be appraised by an appraiser selected by Agent (*provided that* (A) an authorized representative of the Loan Parties shall be given an opportunity to be present and (B) so long as no Event of Default shall have occurred during a calendar year, Agent and the Lenders shall not conduct more than one (1) inspection per calendar year) at such reasonable times and intervals as Agent may designate and, so long as no Event of Default exists, with reasonable prior notice to the Borrower Representative and during regular business hours.  Each Loan Party will, and will cause each of its Subsidiaries to, permit Agent and each of its duly authorized representatives or agents to conduct appraisals and valuations at such reasonable times and intervals as Agent may designate. All such inspections and appraisals shall be at the Borrowers' expense.  In addition, the Borrowers shall pay Agent ten thousand dollars ($10,000) on an annual basis for unallocated diligence expenses.

(b)    Order and provide to Agent, or permit Agent or the Lender to order, at Agent's discretion, UCC, tax lien, litigation and title searches, as applicable, with respect to any of the Collateral (including the Collateral Properties) in form and substance reasonably satisfactory to Agent, in each case, at the expense of the Borrowers; *provided that*, so long as no Event of Default exists, the Borrowers shall only be required to pay for such searches up to two (2) times in any calendar year.

5.5    **Maintenance of Properties**.  Maintain and preserve all of its assets and properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear, tear, casualty and Permitted Dispositions excepted, and defend its title and Agent's Lien therein against all Persons claims and demands, except Permitted Liens.

(a)    Maintain, or obtain contractual commitments from relevant landlords to maintain, all rights of way, easements, grants, privileges, licenses, certificates, and permits necessary for the use of any Real Property (as used in the business of the Loan Parties), except to the extent a failure to do so would not reasonably be expected to cause a Material Adverse Effect.

- 64 -

(b)     Comply in all respects with the terms of each Lease and other material agreement relating to the Leasehold Properties so as not to permit any tenant default to exist thereunder beyond any applicable notice and cure periods (other than any matters being contested in good faith by appropriate proceedings), except to the extent a failure to do so would not reasonably be expected to cause a Material Adverse Effect.

5.6     **Taxes**.  Cause all Taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against the Loan Parties, their Subsidiaries or any of their respective assets to be paid in full when due in accordance with Applicable Law, except to the extent that the validity of such Tax shall be the subject of a Permitted Protest.

5.7     **Insurance**

(a)     Will, and will cause each of their Subsidiaries to, at the Borrowers' expense, maintain insurance respecting each of the Loan Parties' and their respective Subsidiaries' assets wherever located, in each case as are customarily insured against by other Persons engaged in same or similar businesses and similarly situated and located, including, but not limited to (i) commercial general liability insurance (as evidenced by Acord 25), including products/completed operations, motor vehicle liability, excess liability limits, workers compensation, products liability, broad form property damage, suppliers protective liability and broad form blanket contractual, advertising, and personal injury liability, (ii) business interruption insurance and/or loss of income reasonably satisfactory to Agent, (iii) casualty insurance, such public liability insurance, and third party property damage insurance with respect to liabilities, (iv) losses or damage in respect to assets (as evidenced by Acord 27), including, but not limited to, building, property, tenant improvements and betterments, equipment, equipment breakdown, indoor crop, marijuana inventory and stock, business personal property, (v) to the extent required by any vendor or customer of any Loan Party, cyber risk insurance, and (vi) regardless of any Real Properties' status in a flood area or higher risk zone, the Loan Parties will maintain insurance coverage for flood, earthquake, terrorism, and named storm and wind.

(b)     (i) Within ten (10) days of executing any agreement with any contractor or subcontractor for any improvements on the Collateral Properties and, in any event, prior to beginning any such construction, cause the contractors and subcontractors performing work on such improvements to maintain property (including "Builder's Risk" coverage), general liability, worker's compensation, automotive liability insurance policies, and professional liability or errors and omissions insurance, in types and amounts, typically held by contractors and subcontractors constructing and installing improvements similar in character to such improvements and (ii) without limiting the foregoing, require any general contractor to satisfy the additional insurance provisions set forth on Schedule 5.7.

(c)     Cause all such policies of insurance to be with financially sound and reputable insurance companies reasonably acceptable to Agent and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and, in any event, in amount, adequacy, and scope reasonably satisfactory to Agent. For the avoidance of doubt, financially sound and reputable insurance companies shall mean all insurance carriers must: (i) be licensed in New Jersey and Pennsylvania, and (ii) be rated at least A-IX in A.M Best's rating guide, or A- by S&P or A3 by Moodys.

(d)     Cause all property insurance policies covering the Collateral are to be made payable to Agent for the benefit of the Lender, as their interests may appear, in case of loss, pursuant to a lender loss payable endorsement with a standard noncontributory "lender" or "secured party" clause to the extent not otherwise payable to the Lender Group pursuant to the terms of such insurance policy and are to contain such other provisions as Agent may reasonably require to fully protect the Lender's interest in the

- 65 -

Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance are to be delivered to Agent, with the lender loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Agent and shall provide for (unless agreed to by Agent) not less than thirty (30) days (ten (10) days in the case of non-payment) prior written notice to the Lender Group of the exercise of any right of cancellation.  Once per calendar year, Agent shall have the right to request and the Loan Parties shall promptly deliver the current insurance policies of the Loan Parties for Agent's review of such policies for compliance with this Section 5.7.

(e)    Allow Agent to arrange for such insurance, if the Borrowers or any Subsidiary thereof fails to maintain such insurance, but at the Borrowers' expense and without any responsibility on Agent's and Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.

(f)    Give Agent and each Lender prompt notice of any loss exceeding fifty thousand dollars ($50,000) covered by any Loan Party's or its Subsidiaries' casualty or business interruption insurance.  So long as no Event of Default has occurred and is continuing, the Loan Parties shall have the exclusive right to adjust any losses payable under any such insurance policies.  Upon the occurrence and during the continuance of an Event of Default, Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

5.8    **Compliance with Laws**.  Comply with the requirements of all Applicable Laws, Permits, Cannabis Licenses, and orders of any Governmental Authority (including but not limited to, laws, rules, or regulations as they relate to cannabis) in all material respects.

5.9    **Environmental**.  Except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect:

(a)    Keep any property either owned or operated by any Loan Party or any Subsidiary of a Loan Party free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens,

(b)    Comply, in all material respects, with Environmental Laws and provide to Agent and each Lender documentation of such compliance which Agent or any Lender reasonably requests,

(c)    Promptly notify Agent and each Lender of any Release of which any Borrower has knowledge of a Hazardous Material in any reportable quantity at, from or onto the Real Property or any other property owned or operated by any Loan Party or its Subsidiaries including any Release identified in the course of any Phase II investigation conducted on behalf of any Borrower and take any Remedial Actions required to abate said Release or otherwise to come into compliance, in all material respects, with applicable Environmental Law, including any actions required to receive a "No Further Action" letter or similar confirmation from the relevant Governmental Authority evidencing completion of the remediation and compliance with Environmental Law, and provide Agent and each Lender with a copy of such No Further Action Letter or similar confirmation, and

(d)    Promptly, but in any event within five (5) Business Days of its receipt thereof, provide Agent with written notice of any of the following:  (i) notice that an Environmental Lien has been filed against any of the real or personal property of any Loan Party or its Subsidiaries, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Loan

- 66 -

Party or its Subsidiaries, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

5.10    **Disclosure Updates**.  Promptly upon obtaining knowledge thereof, notify Agent and each Lender if any written information, exhibit, or report furnished to the Lender Group contained, at the time it was furnished, any untrue statement of material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made.  The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules thereto.

5.11    **Formation or Acquisition of Subsidiaries**.  Upon the formation or acquisition (x) of any Related Entity or (y) by any Loan Party of any direct (a) wholly-owned or majority-owned Subsidiary or (b) minority-owned entity (except with the written consent of the Required Lenders) after the Restatement Date, within thirty (30) days of such formation or acquisition (or such later date as permitted by Agent in its sole discretion), the Loan Parties shall cause such new Related Entity or direct wholly-owned or majority-owned Subsidiary or minority-owned entity (except with the written consent of the Required Lenders) to (i) execute and deliver to Agent a joinder to the Credit Agreement or Subsidiary Guaranty, as applicable, in form and substance reasonably satisfactory to Agent, (ii) execute and deliver to Agent a joinder to the Security Agreement in the form contemplated thereby, together with such other security documents, as well as appropriate financing statements (and with respect to all owned Real Property subject to a Mortgage, fixture filings), all in form and substance reasonably satisfactory to Agent (including being sufficient to grant Agent a first priority Lien (subject to Permitted Priority Liens) in and to the applicable assets of such newly formed or acquired Related Entity or direct wholly-owned or majority-owned Subsidiary or minority-owned entity (except with the written consent of the Required Lenders)) which Lien is granted by such new Related Entity or direct wholly-owned or majority-owned Subsidiary or minority-owned entity (except with the written consent of the Required Lenders) in favor of Agent, on behalf of the Lender Group, under any of the Loan Documents (excluding all Excluded Assets, as defined in the Security Agreement), (iii) provide, or cause the applicable Loan Party to provide, to Agent a pledge agreement (or addendum to the Security Agreement) and appropriate certificates and powers or financing statements, as applicable pledging all of the direct or beneficial ownership interest in such new Related Entity or direct wholly-owned or majority-owned Subsidiary or minority-owned entity (except with the written consent of the Required Lenders), each in form and substance reasonably satisfactory to Agent, and (iv) provide to Agent all other customary documentation, including, to the extent reasonably requested by Agent, one or more opinions of counsel (to the extent requested by Agent) reasonably satisfactory to Agent which in its reasonable opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above.   Any document, agreement, or instrument executed or issued pursuant to this Section 5.11, Section 5.12 or Section 5.13 shall constitute a Loan Document.

5.12    **Additional Real Property**.  To the extent requested by Agent with respect to (a) any owned Real Property, including any owned Real Property acquired after the Restatement Date, in the aggregate with a fair market value in excess of two hundred fifty thousand dollars ($250,000), the applicable Loan Party owning any such Real Property shall, within thirty (30) days of Agent's request, take such actions and execute and deliver, or cause to be executed and delivered, all such Mortgages, instruments, agreements, opinions, certificates and all other Mortgage Supporting Documents with respect to such owned Real Property as reasonably requested by Agent to create in favor of Agent, a valid and perfected first priority security interest in such owned Real Property or to otherwise grant Agent rights with respect thereto consistent with the rights granted to Agent with respect to other owned Real Property subject to a Mortgage pursuant to the Loan Documents and (b) any leased Real Property, including any Lease entered into by any Loan Party after the Restatement Date, the applicable Loan Party shall, within thirty (30) days

of Agent's request, deliver a copy of any Lease and execute and deliver, or cause to be executed and delivered, a Collateral Assignment and such other agreements with respect to such Lease, and take such actions (including obtaining any landlord consents) as reasonably requested by Agent.

5.13    **Further Assurances**.  At any time upon the reasonable request of Agent, Parent and each Loan Party shall promptly execute or deliver to Agent, any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, Mortgages, deeds of trust, opinions of counsel, and all other documents that Agent may reasonably request in form and substance reasonably satisfactory to Agent (collectively, the "Additional Documents"), to create, perfect, and continue perfected Agent's Liens in all of the properties and assets of the Loan Parties, to create and perfect Liens in favor of Agent in the assets of Parent or such Loan Party required to be pledged pursuant to the Loan Documents, and in order to fully consummate all of the transactions contemplated hereby and under the Loan Documents.  To the maximum extent permitted by applicable law, Parent and each Loan Party authorizes Agent, after the occurrence and during the continuance of an Event of Default, to execute any such Additional Documents in the Parent's or applicable Loan Party's name and to file such executed Additional Documents in any appropriate filing office.  In furtherance of, and not in limitation of, the foregoing, Parent and each Loan Party shall take such actions as Agent may reasonably request from time to time to ensure that (a) the Obligations are guaranteed by Parent and any Subsidiary Guarantors and are secured by substantially all of the assets of the Borrowers and their Subsidiaries, including all of the outstanding capital Stock of the Borrowers and their Subsidiaries, excluding all Excluded Assets, as defined in the Security Agreement and (b) any natural person that becomes a direct shareholder of greater than twenty percent (20.00%) of the capital Stock of any Borrower from time to time pursuant to the terms hereof executes and delivers a Shareholder Guaranty; *provided that*, that in the case of any issuance or sale of Stock of any Borrower resulting in Jon Loevy, Danielle Loevy and Michael Kanovitz in the aggregate no longer holding at least fifty percent (50.00%) of the outstanding Stock of each Borrower, directly or indirectly, the Borrowers shall cause, in each case, any holder of at least twenty percent (20.00%) of the outstanding Stock of each Borrower to become party to execute and deliver a Shareholder Guaranty.

5.14    **Lender Meetings**.  The Loan Parties shall, within ninety (90) days after the close of each fiscal year of the Borrowers (or such later date as Agent may agree), at the request of Agent and upon reasonable prior notice, hold a meeting (at a mutually agreeable location and time or, at the option of Agent, by conference call) with the Lenders at which meeting shall be reviewed the financial results of the previous fiscal year and the financial condition of the Loan Parties and the projections presented for the current fiscal year of the Borrowers.

5.15    **Material Contracts**.  Each Loan Party shall, and shall cause each if its respective Subsidiaries to, observe and perform all of the covenants, terms, conditions and agreements contained in the Material Contracts to be observed or performed by it thereunder if failure to so is likely to have a Material Adverse Effect.  Each Loan Party will, and will cause each other Loan Party to, use commercially reasonable efforts to ensure that any Material Contract entered into after the Restatement Date (other than any renewals, amendments or extensions of Material Contracts in existence as of the Restatement Date) by any Loan Party (a) permits the grant of a security interest in such agreement (and all rights of such Loan Party thereunder) to such Loan Party's lenders or an agent for the Lenders (and any transferees of the Lenders or such agent, as applicable) and (b) does not contain any term or provision adverse in any material respect to the rights, interests or privileges of Agent or the Lenders.  No Loan Party shall release, or shall permit any of its Subsidiaries to release, the liability of any party under any Material Contract if such release is likely to have a Material Adverse Effect.

5.16    **Books and Records**.  Each Loan Party shall keep proper books of records and accounts in which full, true and correct entries in conformity with GAAP and all requirements of law, in each case, in all material respects, shall be made of all dealings and transactions in relation to its businesses and activities.

5.17    **Board Member; Board Observer Rights**.

(a)    Subject to Section 5.21, the Required Lenders shall have the right to designate (and replace from time to time) one (1) member of the Board of Directors of each Borrower (each, a "Lender Designated Board Member"), who shall be on each such Board of Directors in a nonvoting capacity until the occurrence and continuation of an Event of Default and the exercise of remedies in accordance with Section 9.1, upon which such Lender Designated Board Member shall become a voting member of each such Board of Directors.  Each Borrower shall enter into any and all documentation and perform all such corporate actions reasonably necessary in accordance with its organizational documents to effect the designation of the Lender Designated Board Member to such Board of Directors including without limitation, adding the Lender Designated Board Member to the Borrowers' director and officer liability insurance policies and entering into an indemnification agreement (in the form reasonably satisfactory to Agent) indemnifying and holding the Lender Designated Board Member harmless from and against any losses, claims, damages, liabilities and expenses in a manner no less favorable than any other member of the Board of Directors.  Each Borrower shall reimburse each Lender Designated Board Member for all reasonable out-of-pocket expenses incurred by such Lender Designated Board Member in connection with attendance at each meeting of such Board of Directors and any committee meetings related thereto and any such reimbursement shall be paid to the Lender Designated Board Member no later than comparable reimbursement is paid to the other members of such Board of Directors.  Each Lender Designated Board Member shall be reasonably acceptable to the Borrowers, it being understood that any of Jacob Levin and Edwin Gomez shall be deemed to be acceptable.  Each of the members of the Board of Directors of each Borrower (and any Person that becomes a member of the Board of Directors of each Borrower from time to time), other than each Lender Designated Board Member, shall deliver to Agent a Board Resignation Letter.

(b)    The Required Lenders shall have the right to designate (and replace from time to time), and Parent shall invite, one (1) representative (the "Lender Observer") to attend all meetings of Parent's Board of Directors (and any committees thereof) in a nonvoting observer capacity and, in this respect, Parent shall give the Lender Observer copies of all notices, minutes, consents and other material that Parent provides to its directors at the same time and in the same manner as provided to such directors.  As a condition to becoming the Lender Observer, the Lender Observer shall agree to hold in confidence and trust all information so provided; and provided further, that Parent reserves the right to withhold information and to exclude the Lender Observer from any meeting or portion thereof if the Board of Directors of Parent determines in good faith after due deliberation (and, with respect to attorney-client privilege and conflicts of interest, advice of counsel) that such exclusion is reasonably necessary (i) to preserve the attorney-client privilege or (ii) to avoid a potential conflict of interest.  The Lender Observer may participate in discussions of matters brought to the Board of Directors of Parent and, upon reasonable notice and at a scheduled meeting of such Board of Directors or such other time, if any, may address such Board of Directors with respect to the Lender Observer's concerns regarding significant business issues facing Parent.  Parent shall reimburse the Lender Observer for all reasonable out-of-pocket expenses incurred by the Lender Observer in connection with attendance at each meeting of such Board of Directors and any committee meetings related thereto and any such reimbursement shall be paid to the Lender Observer no later than comparable reimbursement is paid to the members of such Board of Directors.  Parent shall indemnify and hold the Lender Observer harmless from and against any losses, claims, damages, liabilities and expenses to which Lender Observer may become to the same extent and in the same manner to the same extent as if such Lender Observer were a director of Parent.

5.18    **Cooperation with REIT**.  The Borrowers and each of their Subsidiaries shall, to the extent commercially reasonable, cooperate with each Lender with respect to amending, supplementing or otherwise modifying any documents or instruments in connection with any actions or modifications not adverse to the Borrowers in any material respect necessary or advisable to maintain the status of any Lender in its capacity as a "real estate investment trust" within the meaning of Section 856 of the Internal Revenue Code.

5.19    **Board Meetings**.  The Board of Directors of Parent and each Borrower shall conduct a meeting (which may be telephonic, virtual or in-person) with quorum (and, with respect to such meetings of the Board of Directors of Parent, including the Lender Observer) no less than once a quarter.

5.20    **Management Agreement**.  The Borrowers and any applicable Subsidiary shall maintain each management agreement, or similar agreement for shared services, in full force and effect and, subject to any applicable regulatory requirements, timely perform all of the Borrowers' or such applicable Subsidiary's obligations thereunder and enforce performance of all obligations of the manager thereunder. The management fee and/or advisory fee payable under any such management agreement, including under any management agreement with Oakland Manager LLC, shall be reasonably consistent with that which would exist in an arms-length agreement between unrelated parties.  Similarly, the expenses and other amounts allocated to the Borrowers or their Subsidiaries for shared services under any such management agreement, including under any management agreement with Oakland Manager LLC, shall also be reasonably consistent with that which would exist in an arms-length agreement between unrelated parties. The Borrowers shall not, and shall not allow any Subsidiary to, enter into any new management agreement or similar agreement for shared services following the Restatement Date without Agent's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).

5.21    **Regulatory Approvals.**

(a)    Parent and the Borrowers shall use good faith and best efforts, and shall fully cooperate with the Lender Group and each applicable Pennsylvania or New Jersey Governmental Authority, to obtain any approvals as may be necessary or desirable under applicable Cannabis Laws with respect to registration of this Agreement (and/or the Loans provided hereunder), affiliation of the Lender Group, and/or the affiliation and appointment of any Lender Designated Board Member.

(b)    Parent and the Borrowers shall use good faith and best efforts, and shall fully cooperate with the Lender Group and each applicable Pennsylvania or New Jersey Governmental Authority, to obtain any pre-approvals or approvals as may be necessary or desirable under applicable Cannabis Laws to assign or transfer any Cannabis Licenses held by the Borrowers upon the occurrence and continuation of an Event of Default and the exercise of remedies in accordance with Section 9.1.

5.22    **Communications with Governmental Authorities**. Promptly, but in no event later than five (5) days after submission to any Governmental Authority, or receipt thereof, the Borrowers shall furnish to Agent all documents and information furnished to or received from such Governmental Authority in connection with any investigation of any Loan Party or inquiries by such Governmental Authority.

6.    **NEGATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations (other than contingent obligations in respect of which no claim has been made), no Loan Party will, and no Loan Party will permit any of its Subsidiaries to do any of the following:

- 70 -

6.1     **Indebtedness.**  Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2     **Liens.** Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3     **Restrictions on Fundamental Changes.**

(a)     Enter into any Acquisition, merger, consolidation, reorganization, or recapitalization, or reclassify its Stock (including pursuant to a "division" under Delaware law), except: (i) for any merger between Loan Parties; *provided that*, a Borrower must be the surviving entity of any such merger to which it is a party (except in the event of a roll up of such Borrower's equity interests to a parent company of such Borrower existing as of the Restatement Date and any Affiliate of such parent company as of the Restatement Date; *provided, further,* that such roll up does not affect Agent's Liens in the Collateral or the Obligations (in the reasonable judgement of the Required Lenders)); and (ii) for any merger between a Loan Party and a Subsidiary of such Loan Party that is not a Loan Party; *provided that*, the Loan Party is the surviving entity of any such merger to which is a party;

(b)     Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution); or

(c)     Suspend or cease operating a substantial portion of its or their business.

6.4     **Disposal of Assets**.  Other than Permitted Dispositions or transactions permitted by Section 6.3 and Section 6.11, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any of its or their assets (any such conveyance, sale, lease, license, assignment, transfer or other disposition, a "Disposition").

6.5     **Change Name.**  Change Parent's or any Loan Party's name, organizational identification number, state of organization or organizational identity; *provided, however*, that Parent or any Loan Party may change its name, organizational identification number, state of organization or organizational identity upon at least fifteen (15) days' prior written notice to Agent of such change and so long as at the time of such written notification, such Person provides any financing statements necessary to perfect and/or continue perfection of Agent's Liens.

6.6     **Nature of Business.**  Make any material change in the nature of its or their business as described in Schedule 6.6 or acquire any properties or assets that are not reasonably related to the conduct of such business activities.

6.7     **Prepayments and Amendments.**

(a)     Optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Loan Party, other than the Obligations in accordance with this Agreement;

(b)     make any payment on account of Indebtedness that has been contractually subordinated in right of payment to the Obligations if such payment is not permitted at such time under the subordination terms and conditions; or

(c)     directly or indirectly, amend, modify, alter, or change any of the terms or provisions of:

- 71 -

(i)     the Governing Documents of Parent or any Loan Party if the effect thereof, either individually or in the aggregate, could reasonably be expected to be adverse to the interests of the Lenders; or

(ii)     any Material Contract if the effect thereof, either individually or in the aggregate, could reasonably be expected to be adverse in any material respect to the rights, interests or privileges of Agent or the Lenders or any Borrower or their ability to enforce the same.

6.8     **Restricted Payments.**  Make Restricted Payments other than:

(a)     to the extent constituting Permitted Investments;

(b)     subject to review and verification by Agent, Permitted Tax Payments; and

(c)     until the last day of the fiscal quarter ended June 30, 2022, Restricted Payments not to exceed the cumulative amount of Free Cash Flow achieved during the period from April 1, 2021 until the date of such proposed Restricted Payment (less the amount of any Restricted Payments made in reliance on this Section 6.8(c)), if any, so long as (i) no Default or Event of Default has occurred and is continuing or would result from the making of such proposed Restricted Payment and (ii) the Borrowers are in pro forma compliance with the financial covenant set forth in Section 7.5, both before and after giving effect to such Restricted Payment; and

(d)     from and after the fiscal quarter ended June 30, 2022, other Restricted Payments, so long as (i) no Default or Event of Default has occurred and is continuing or would result from the making of such proposed Restricted Payment and (ii) the Borrowers are in pro forma compliance with the financial covenants set forth in Sections 7.1 through 7.6 (to the extent applicable), both before and after giving effect to such Restricted Payment.

Notwithstanding anything to the contrary set forth in this Section 6.8, Hayden Gateway LLC may make Restricted Payments at any time, so long as the Borrowers are in pro forma compliance with the financial covenants set forth in Sections 7.1 through 7.6 (to the extent applicable), both before and after giving effect to such Restricted Payment.

6.9     **Accounts.**  Subject to Section 3.7 and excluding any Deposit Account or Securities Account opened or acquired after the Restatement Date until sixty (60) days (or such longer period of time as consented to by Agent in its sole discretion) after such opening or acquisition, no Loan Party shall establish or maintain a Deposit Account or Securities Account that is not subject to a Control Agreement in favor of Agent and no Loan Party will deposit proceeds in a Deposit Account or Securities Account which is not subject to a Control Agreement in favor of Agent, except accounts used solely for payroll or tax payments and credit card processing or as otherwise agreed in writing by Agent.

6.10     **Accounting Methods.**  Modify or change its fiscal year end from December 31 or its method of accounting (other than as may be required to conform to GAAP) or enter into, modify, or terminate any agreement currently existing, or at any time hereafter entered into with any third party accounting firm or service bureau for the preparation or storage of the Loan Parties' accounting records without said accounting firm or service bureau agreeing to provide Agent information regarding the Loan Parties' financial condition.

6.11     **Investments.**  Except for Permitted Investments, directly or indirectly, make or acquire any Investment.

- 72 -

6.12    **Transactions with Affiliates.**  Directly or indirectly, enter into or permit to exist any transaction with any Affiliate of any Loan Party or any of its Subsidiaries (including the payment any of management, advisory, consulting fees or the like), except for:

(a)    transactions between a Loan Party, on the one hand, and any Affiliate of such Loan Party, on the other hand, so long as such transactions (i) are upon fair and reasonable terms, (ii) are fully disclosed to Agent if they involve one or more payments by such Loan Party in excess of ten thousand dollars ($10,000) per fiscal year for any single transaction or series of transactions, and (iii) are no less favorable to such Loan Party than would be obtained in an arm's length transaction with a non-Affiliate;

(b)    transactions permitted under Section 6.8;

(c)    so long as it has been approved by such Loan Party's Board of Directors (or comparable governing body) in accordance with Applicable Law, (i) the payment of reasonable and customary compensation, severance, or employee benefit arrangements to employees, officers, and outside directors of such Loan Party in the ordinary course of business and consistent with industry practice, and (ii) the payment of reasonable and customary indemnification obligations to employees, officers, and outside directors of such Loan Party in the ordinary course of business and consistent with industry practice; and

(d)    transactions exclusively among the Loan Parties.

6.13    **Use of Proceeds.**  Use the proceeds of:

(a)    the Tranche A Loans (including any PIK Interest) for any purpose other than to (i) finance future construction, FF&E and Capital Expenditures for the Collateral Properties of the New Jersey Borrowers, in each case, in accordance with the Budget, (ii) fund the Interest Reserve Account, and (iii) fund the purchase of additional Collateral Property in New Jersey, and (iv) pay transactional fees, costs, and expenses incurred in connection with this Agreement and the transactions contemplated hereby;

(b)    the Tranche B Loans (including any PIK Interest) for any purpose other than (i) to finance future construction, FF&E and Capital Expenditures for the Collateral Properties of the Pennsylvania Borrowers, in each case, in accordance with the Budget, (ii) following completion of construction and issuance of the certificate of occupancy at the Collateral Property located at 5 Chestnut Hill, Hazle Township, PA (Site 35A, Humboldt Industrial Park, Hazletown, PA), for working capital, in accordance with the Budget, (iii) to fund the Interest Reserve Account, (iv) pay accrued interest with respect to the Indebtedness described on Schedule 6.13, and (v) to pay transactional fees, costs, and expenses incurred in connection with this Agreement and the transactions contemplated hereby; or

(c)    the Tranche C Loans for any purpose other than to (i) repay the Indebtedness described on Schedule 6.13 and (ii) fund the Interest Reserve Account.

No proceeds of any loan made hereunder will be used by the Loan Parties or their Subsidiaries or their respective directors, officers and employees to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

6.14    **Benefit Plans.**  Maintain or contribute to any Benefit Plan or permit any ERISA Affiliate to maintain to contribute to any Benefit Plan.

- 73 -

6.15 **Limitation on Issuance of Stock.** Except for the issuance or sale of Qualified Stock by the Borrowers, issue or sell or enter into any agreement or arrangement for the issuance or sale of any of its Stock.

6.16 **Sale and Leaseback Transactions.** Enter into any arrangement, directly or indirectly, with any Person whereby any Borrower or any Subsidiary shall sell or transfer property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

6.17 **Key Employee Salaries.** For any calendar year, increase the cash compensation of any Key Employee more than three percent (3.00%) above such Key Employee's cash compensation for the prior year without the approval of the Board of Directors of the Borrowers (or a committee thereof).

6.18 **Cash Management**. Hold more than two hundred thousand dollars ($200,000) in cash at each dispensary at any one time.

6.19 **Construction Contracts.** Enter into any contract with respect to any construction or improvements at any Collateral Property prior to providing all Mortgage Supporting Documents with respect to such Collateral Property (including, for the avoidance of doubt, evidence that the Mortgage with respect to such Collateral Property has been recorded).

6.20 **Post-Closing Capital Contribution**.. Notwithstanding anything to the contrary set forth herein, transfer or make any Restricted Payment of, or enter into any agreement to transfer or make any Restricted Payment of, all or any portion of the proceeds of any capital contributions, including the Post-Closing Capital Contribution to Parent or any Affiliate of any of the Borrowers (other than the Borrowers).

7. **FINANCIAL COVENANTS.**

The Loan Parties covenant and agree that, until termination of all of the Commitments and payment in full of the Obligations (other than contingent obligations in respect of which no claim has been made), the Loan Parties shall:

7.1 **Minimum Adjusted EBITDA.** Achieve Adjusted EBITDA, measured on a fiscal quarter-end basis, for the Specified Quarter Period, of at least the required amount set forth in the following table for the applicable period set forth opposite thereto:

| Applicable Amount | Fiscal Quarter Ending |
|---|---|
| $1,250,000 | December 31, 2021 |
| $3,000,000 | March 31, 2022 |
| $5,750,000 | June 30, 2022 |
| $9,750,000 | September 30, 2022 |
| $19,000,000 | December 31, 2022 |
| $37,500,000 | March 31, 2023 |
| $60,750,000 | June 30, 2023 |
| $84,500,000 | September 30, 2023 |
| $101,500,000 | December 31, 2023 and each fiscal quarter thereafter |

7.2    **Minimum Free Cash Flow.** Achieve Free Cash Flow, measured on a fiscal quarter-end basis, for the Specified Quarter Period, of at least the required amount set forth in the following table for the applicable period set forth opposite thereto:

| Applicable Amount | Fiscal Quarter Ending |
|---|---|
| ($450,000) | December 31, 2021 |
| ($800,000) | March 31, 2022 |
| ($450,000) | June 30, 2022 |
| $750,000 | September 30, 2022 |
| $4,750,000 | December 31, 2022 |
| $14,750,000 | March 31, 2023 |
| $28,000,000 | June 30, 2023 |
| $41,500,000 | September 30, 2023 |
| $52,250,000 | December 31, 2023 and each fiscal quarter thereafter |

- 75 -

7.3 **Maximum Total Leverage Ratio.** Have a Total Leverage Ratio, measured on a fiscal quarter-end basis, of not greater than the correlative ratio indicated in the following table:

| Applicable Ratio | Fiscal Quarter Ending |
|---|---|
| 11.50:1.00 | December 31, 2021 through March 31, 2022 |
| 9.00:1.00 | June 30, 2022 |
| 7.50:1.00 | September 30, 2022 |
| 4.00:1.00 | December 31, 2022 |
| 2.00:1.00 | March 31, 2023 and each fiscal quarter thereafter |

7.4 **Minimum Fixed Charge Coverage Ratio**. Have a Fixed Charge Coverage Ratio, measured as of the last day of each fiscal quarter, for the Specified Quarter Period, of not less than the correlative ratio indicated in the following table:

| Applicable Ratio | Fiscal Quarter Ending |
|---|---|
| 0.75:1.00 | December 31, 2021 through June 30, 2022 |
| 1.00:1.00 | September 30, 2022 |
| 1.25:1.00 | December 31, 2022 |
| 1.50:1.00 | March 31, 2023 and each fiscal quarter thereafter |

7.5 **Minimum Cash Balance.** Maintain a sum of unrestricted cash and Cash Equivalents of at least the required amount set forth in the following table, measured on the last day of the fiscal quarter(s) set forth opposite thereto:

| Applicable Amount | Fiscal Quarter Ending |
|---|---|
| $2,000,000 | December 31, 2021 through March 31, 2022 |
| $2,750,000 | June 30, 2022 |
| $4,000,000 | September 30, 2022 and the last day of each fiscal quarter thereafter |

7.6 **Minimum Net Income.** Maintain a sum of Combined Net Income of at least the required amount set forth in the following table, measured on a fiscal quarter-end basis, for the Specified Quarter Period, of at least the required amount set forth in the following table for the applicable period set forth opposite thereto:

- 76 -

OMM_US:80200477.9

| Applicable Amount | Fiscal Quarter Ending |
|---|---|
| ($1,250,000) | December 31, 2021 |
| ($2,750,000) | March 31, 2022 |
| ($3,500,000) | June 30, 2022 |
| ($4,000,000) | September 30, 2022 |
| $3,000,000 | December 31, 2022 |
| $14,250,000 | March 31, 2023 |
| $28,750,000 | June 30, 2023 |
| $44,000,000 | September 30, 2023 |
| $55,000,000 | December 31, 2023 and each fiscal quarter thereafter |

Notwithstanding anything to the contrary set forth herein, upon receipt of a partial termination notice under Section 3.6(a) or Section 3.6(b), the parties hereto shall negotiate in good faith to enter into an amendment to this Agreement to reset the financial covenants in this Section 7 to account for such partial termination, which amendment shall be a condition to, and effective immediately upon, such NJ Termination or PA Termination, as applicable.

8.     **EVENTS OF DEFAULT.**

    8.1     **Events of Default.**

        Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

        (a)     **Payments.**  If any Loan Party fails to pay when due and payable, or when declared due and payable, all or any portion of the Obligations consisting of principal (including any PIK Interest), interest, Exit Fee, other fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding) and such required payment is not made within three (3) Business Days of its due date; or**Covenants.**  If any Loan Party or any of its Subsidiaries:

        (i)     fails to perform or observe any covenant or other agreement contained in any of (i) Sections 3.7 (Conditions Subsequent), 5.1 (Financial Statements, Reports, Certificates), 5.2 (Collateral Reporting), 5.4 (Inspection; Appraisals), 5.7 (Insurance), 5.10 (Disclosure Updates), 5.11 (Formation or Acquisition of Subsidiaries), and 5.14 (Lender Meetings), (ii) Section 6 or (iii) Section 7, and, in each case, such failure continues for a period of ten (10) Business Days after the earlier of (A) the date on which such failure shall first become known to any officer of any Loan Party and (B) the date on which notice thereof is given to the Borrower Representative by Agent or any Lender;

- 77 -

(ii)    fails to perform or observe any covenant or other agreement contained in any of <u>Sections</u> 5.3 (Existence), <u>5.5</u> (Maintenance of Properties), <u>5.6</u> (Taxes), 5.8 (Compliance with Laws), <u>5.9</u> (Environmental), <u>5.12</u> (Additional Real Property), <u>5.13</u> (Further Assurances), and <u>5.15</u> (Material Contracts) of this Agreement and such failure continues for a period of fifteen (15) Business Days after the earlier of (i) the date on which such failure shall first become known to any officer of any Loan Party and (ii) the date on which notice thereof is given to the Borrower Representative by Agent or any Lender; or

(iii)    fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this <u>Section 8.1</u> (in which event such other provision of this <u>Section 8.1</u> shall govern), and such failure continues for a period of twenty (20) Business Days after the earlier of (i) the date on which such failure shall first become known to any officer of any Loan Party and (ii) the date on which notice thereof is given to the Borrower Representative by Agent; or

(c)    **Assets.**  If any material portion of any Loan Parties' or Parent's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person and the same is not discharged before the earlier of thirty (30) calendar days the date it first arises or five (5) calendar days prior to the date on which such property or asset is subject to forfeiture by such Loan Party or Parent, as applicable; or

(d)    **Voluntary Bankruptcy.**  If an Insolvency Proceeding is commenced by a Loan Party or Parent; or

(e)    **Involuntary Bankruptcy.**  If an Insolvency Proceeding is commenced against a Loan Party or any of its Subsidiaries or Parent and any of the following events occur: (a) such Person consents to the institution of such Insolvency Proceeding against it, (b) the petition commencing the Insolvency Proceeding is not timely controverted, (c) the petition commencing the Insolvency Proceeding is not dismissed within sixty (60) calendar days of the date of the filing thereof, (d) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, such Person, or (e) an order for relief shall have been issued or entered therein; or

(f)    **Business Affairs**.  If Parent or any Loan Party is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; or

(g)    **Judgments.**  If one or more judgments, orders, or awards for the payment of money involving an aggregate amount of four hundred thousand dollars ($400,000) or more (exclusive of amounts covered (other than to the extent of customary deductibles) by insurance) is entered or filed against Parent or any Loan Party, or with respect to any of their respective assets, and either (a) there is a period of thirty (30) consecutive days at any time after the entry of any such judgment, order, or award during which (x) the same is not discharged, satisfied, stayed, vacated, or bonded pending appeal, or (y) a stay of enforcement thereof is not in effect, or (b) enforcement proceedings are commenced upon such judgment, order, or award; or

(h)    **Default Under Other Agreements.**  If there is a default in one or more agreements to which a Loan Party or any of its Subsidiaries is a party with one or more third Persons relative to a Loan Party's or any of its Subsidiaries' Indebtedness involving an aggregate amount of four hundred thousand dollars ($400,000) or more, and such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of such Loan Party's obligations thereunder; or

- 78 -

(i)    **Representations, etc.**  If any warranty, representation, certificate or statement made herein or in any other Loan Document or delivered in writing to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof; or

(j)    **Guaranty.**  If the obligation of Parent under the Parent Guaranty, the obligation of any Subsidiary Guarantor under any Subsidiary Guaranty, or the obligation of any Shareholder Guarantor under its Shareholder Guaranty, is limited or terminated by operation of law or by the applicable guarantor; or

(k)    **Security Documents.**  If (i) the Security Agreement, any Mortgage or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected, and except to the extent of Permitted Priority Liens, first priority Lien on the Collateral covered thereby, subject to Permitted Priority Liens or (ii) any material portion of the Collateral (not fully covered by insurance as to which the relevant insurance company has not disputed coverage) shall be lost, stolen, materially damaged or destroyed; or

(l)    **Loan Documents.**  The validity or enforceability of any Loan Document shall at any time for any reason be declared to be null and void, or a proceeding shall be commenced by a Loan Party or its Subsidiaries, or by any Governmental Authority having jurisdiction over a Loan Party or its Subsidiaries, seeking to establish the invalidity or unenforceability thereof, or a Loan Party or its Subsidiaries shall deny that such Loan Party or its Subsidiaries has any liability or obligation purported to be created under any Loan Document; or

(m)    **Change of Control.**  A Change of Control shall occur, whether directly or indirectly; or

(n)    **Material Adverse Effect.**  A Material Adverse Effect shall be reasonably determined to have occurred; or

(o)    **ERISA Event.**  An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of any Loan Party to a Pension Plan, Multiemployer Plan or PBGC, or that constitutes grounds for appointment of a trustee for or termination by the PBGC of any Pension Plan or Multiemployer Plan; a Loan Party or ERISA Affiliate fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan; or any event similar to the foregoing occurs or exists with respect to a Foreign Plan.

8.2    **Equity Cure**.

(a)    In the event the Loan Parties fail to comply with any of the financial covenants set forth in <u>Section 7</u>, subject to the terms and conditions hereof, the Borrower**s** shall have the right (the "<u>Cure Right</u>") until the expiration of the ninetieth (90th) day after the last day of the applicable quarter during which such non-compliance occurred (the "<u>Cure Right Deadline</u>"), to issue Stock in the Borrower**s** for cash in an aggregate amount equal to, but not greater than, the amount necessary to cure the relevant financial covenant (the "<u>Cure Amount</u>"), provided that (i) such proceeds are actually received by the Borrowers on or prior to the Cure Right Deadline and (ii) such proceeds shall be applied to prepay the Loans in accordance with <u>Section 2.3(f)(iv)</u>.

- 79 -

(b)     Upon the actual receipt by the Borrower**s** of the cash proceeds thereof, the financial covenants shall then be recalculated giving effect to the following pro forma adjustments: (i) Adjusted EBITDA and/or Free Cash Flow, as applicable, shall be deemed increased by the Cure Amount for the applicable fiscal quarter and, without duplication, for the subsequent three (3) consecutive fiscal quarters, solely for the purpose of measuring the financial covenants and not for any other purpose under this Agreement, by an amount equal to the Cure Amount paid over to Agent for application to the Loan in accordance with Section 2.3(h) hereof (which amount shall in no event exceed the amount necessary to cure the relevant financial covenants), (ii) the prepayment made pursuant to Section 2.3(f)(iv) shall not be given effect for such purpose until the quarter in which such prepayment is made, and (iii) if, after giving effect to the foregoing recalculations, the Loan Parties shall then be in compliance with the requirements of all financial covenants, the Loan Parties shall be deemed to have been in compliance with such financial covenants as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or Event of Default of such financial covenants that had occurred shall be deemed not to have occurred for this purpose of the Agreement.

(c)     In the event that (i) no Event of Default exists other than that arising due to failure of the Loan Parties to comply with any of the financial covenants set forth in Section 7, and (ii) the Borrowers shall have delivered to Agent written notice of its intention to exercise the Cure Right (which notice shall be delivered no earlier than fifteen (15) calendar days prior to, and no later than five (5) days following, the date the applicable financial statements are required to be delivered pursuant to Section 5.1), which exercise if fully consummated would be sufficient in accordance with the terms hereof to cause the Loan Parties to be in compliance with the financial covenants as of the relevant date of determination, then from and following receipt by Agent of any such notice and until the date that is the earlier of (A) the Cure Right Deadline and (B) the date, if any, on which any Loan Party notifies Agent in writing that such Cure Right shall not be exercised, then Agent shall not exercise any remedies set forth in Section 9.1 hereof during such period with respect to the applicable financial covenant breach; provided that during such period, the Borrowers are acting diligently (in the reasonable discretion of Agent) to cure such non-compliance in accordance with the terms of this Section 8.2.

(d)     Notwithstanding anything to the contrary set forth herein, in no event shall the Borrowers be permitted to exercise the Cure Right hereunder more than four (4) times in the aggregate during the term of this Agreement or (ii) if an Event of Default (other than an Event of Default arising due to a breach of any of the financial covenants set forth in Section 7) shall have occurred and be continuing.

9.     **THE LENDER GROUP'S RIGHTS AND REMEDIES.**

9.1     **Rights and Remedies.**  Upon the occurrence and during the continuation of an Event of Default and in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by Applicable Law, Agent may and, at the direction of the Required Lenders, shall, do any one or more of the following:

(a)     declare all or any portion of the principal of, and any and all accrued and unpaid interest and fees in respect of, the Loan and all other Obligations, whether evidenced by this Agreement or by any of the other Loan Documents to be immediately due and payable, whereupon the same shall become and be immediately due and payable and the Borrowers shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by the Borrowers;

(b)     declare the Commitments terminated, whereupon the Commitments shall immediately be terminated;

- 80 -

(c)     terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of the Lender Group, but without affecting any of Agent's Liens in the Collateral and without affecting the Obligations; and

(d)     exercise all other rights and remedies available to Agent or the Lenders under the Loan Documents, under Applicable Law, or in equity.

The foregoing to the contrary notwithstanding, upon the occurrence of any Event of Default described in Section 8.1(d) or Section 8.1(e), in addition to the remedies set forth above, without any notice to the Borrowers or any other Person or any act by the Lender Group, the Commitment shall automatically terminate and the Obligations, inclusive of the principal of, and any and all accrued and unpaid interest and fees in respect of the Loans and all other Obligations, whether evidences by this Agreement or by any of the other Loan Documents, shall automatically become and be immediately due and payable and the Borrowers shall automatically be obligated to repay all of such Obligations in full, without presentment, demand, protest, or notice or other requirement of any kind, all of which are expressly waived by the Borrowers.

Agent shall not be required to take any action pursuant to this Section 9.1 unless so directed in writing by the Required Lenders and in Agent's good faith determination, taking such enforcement action is permitted under the terms of the Loan Documents and Applicable Law, and taking such enforcement action will not result in any liability of Agent to any Loan Party or any other Person for which Agent has not been indemnified for under the Loan Documents.

9.2     **Remedies Cumulative**.  The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative.  The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity.  No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver.  No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

9.3     **Sale of Licenses.**  Upon the occurrence and during the continuation of an Event of Default under Section 8.1(a) and written notice thereof to the Borrower Representative, without limiting any other right or remedy of Agent or Lenders hereunder or under any Loan Document, the Lender may require the following pursuant to its written election delivered to the Borrower Representative following: (i) Borrower's failure to cure such Event of Default within five (5) days of receipt of such notice (for the first two occurrences of an Event of Default under Section 8.1(a)) and (ii) thereafter, expiration of the grace period set forth in Section 8.1(a) (the "Sale Notice"):

(a)     Milestones.  By no later than thirty (30) days following the date of the Sale Notice, the Borrowers shall commence a full process to sell one or more Cannabis Licenses, as determined in the Borrowers' reasonable discretion (subject to clause (v) below), and related properties (including, without limitation, the Collateral Properties) and operations held by the Loan Parties (the "Sale Assets").  As part of such sale process:

(i)     By no later than sixty (60) days following the date of the Sale Notice, the Borrower Representative shall provide Agent with proposals from no less than three (3) investment banks or brokers for running the sale process, which investment banks or brokers shall be subject to Agent's approval in its reasonable discretion, and such proposals shall include detailed compensation information for each investment bank or broker;

- 81 -

(ii)        By no later than sixty-five (65) days following the date of the Sale Notice, the Borrower Representative shall indicate to Agent the investment bank or broker that it seeks to retain, provided that the retention of such investment bank or broker shall be subject to Agent's approval in its reasonable discretion;

(iii)        the Borrowers shall retain such investment bank or broker by no later than seventy (70) days following the date of the Sale Notice and provide a signed copy of the engagement letter between the Borrowers and the selected investment bank or broker to Agent by no later than eight-five (85) days following the date of the Sale Notice;

(iv)        the Borrowers shall cause the selected investment bank or broker to commence the marketing process by no later than ninety (90) days following the date of the Sale Notice, and shall cooperate with the investment bank or broker to facilitate such marketing process, including by providing (for access by potential bidders) all information reasonably requested by the investment bank or broker;

(v)        the Borrowers shall include in the sale process the Sale Assets expected (based on valuations by the investment bank or broker) to yield proceeds sufficient to repay all Obligations in full in cash (including any premiums, exit fees, penalties and/or default interest).  If the sale of all Sale Assets held by the Loan Parties would not be expected to yield sufficient proceeds to repay all Obligations in full in cash (including any premiums, exit fees, penalties and/or default interest), the sale process will be for all Sale Assets held by the Loan Parties.

(vi)        the Borrowers shall request initial letters of interest, along with each such potential buyer's qualifications, by no later than one hundred thirty (130) days following the date of the Sale Notice and signed letters of intent by no later than one hundred fifty (150) days following the date of the Sale Notice;

(vii)        the Borrowers shall have signed purchase agreement(s) for the sales of the Sale Assets by no later than one hundred sixty five (165) days following the date of the Sale Notice; and

(viii)        the Borrower shall close such sales by no later than two hundred twenty five (225) days following the date of the Sale Notice; *provided that*, such deadline shall be automatically extended in connection with any required regulatory filings or governmental approvals.

(b)        <u>Sale Process</u>.  The Borrowers shall cause the selected investment bank or broker to provide to the Lenders and Agent a detailed weekly report on the sale process including the number and identity of (i) potential bidders contacted, (ii) potential bidders negotiating non-disclosure agreements, (iii) potential bidders with signed non-disclosure agreements and (iv) potential bidders who have accessed the virtual data room, and the number of documents reviewed.  Such report shall also include (x) copies of all letters of intent received and (y) copies of all definitive bids received, together with such bidders' financial statements.  The selected investment bank or broker and the Lenders and/or their advisors shall also conduct update calls every week.  The Borrowers shall consult with the Lender and/or their advisors regarding all definitive bids received. The terms and conditions of any sale of any Sale Assets must be approved by the Required Lenders.

(c)        <u>Attorney-In-Fact</u>.  Each Loan Party hereby irrevocably appoints Agent its attorney-in-fact, with full authority in the place and stead of such Loan Party and in the name of such Loan Party or otherwise, at such time as an Event of Default has occurred and is continuing, to take any action and to execute any instrument which Agent may reasonably deem necessary to accomplish the purposes of this <u>Section 9.3</u>, including if the applicable Loan Parties have not complied, to ensure such compliance by giving

- 82 -

instructions or providing information to the investment bank, broker or other advisors so long as such instructions are commercially reasonable and given in good faith, and by executing and delivering necessary agreements and documents. To the fullest extent permitted by law, each Loan Party hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated.

(d)    Specific Performance.  The Loan Parties, Agent and the Lenders agree that irreparable damage would occur, and that Agent and the Lenders would not have an adequate remedy at law, in the event that any of the provisions of this Section 9.3 were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that Agent and the Lenders shall be entitled to an injunction or injunctions to prevent breaches or anticipated breaches of this Section 9.3 and to specifically enforce the terms and provisions of this Section 9.3, without proof of actual damages or otherwise, in addition to any other remedy to which Agent and the Lenders are entitled to at law or in equity. Each Loan Party agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. The Loan Parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy.

(e)    Governmental Approval.  Agent's exercise of any rights and remedies set forth in this Section 9.3 shall at all times be subject to compliance with applicable Cannabis Laws and obtaining any necessary written approvals or consents of any applicable Pennsylvania or New Jersey Regulatory Authority.

10.    **TAXES AND EXPENSES.**

Upon the occurrence and during the continuance of an Event of Default, to the extent that any Loan Party fails to pay any monies (whether Taxes, assessments, insurance premiums, or, in the case of leased properties or assets, rents or other amounts payable under such leases) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then, Agent, in its sole discretion and without prior notice to any Loan Party, may do any or all of the following:  (a) make payment of the same or any part thereof, or (b) in the case of the failure to comply with Section 5.7 hereof, obtain and maintain insurance policies of the type described in Section 5.7 and take any reasonable action with respect to such policies as Agent deems prudent. Any such amounts paid by Agent shall constitute Lender Group Expenses and any such payments shall not constitute an agreement by the Lender Group to make similar payments in the future or a waiver by the Lender Group of any Event of Default under this Agreement. Agent need not inquire as to, or contest the validity of, any such expense, Tax, or Lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

11.    **WAIVERS; INDEMNIFICATION.**

11.1    **Demand; Protest; etc.**  Parent and each Loan Party waives demand, protest, notice of protest, notice of default, acceleration or intent to accelerate, dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which Parent or any Loan Party may in any way be liable.

11.2    **The Lender Group's Liability for Collateral.**  Parent and each Loan Party hereby agrees that:  (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for:  (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the

OMM_US:80200477.9

value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Loan Parties.

      11.3    **Indemnification.**  Each Loan Party shall pay, indemnify, defend, and hold Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, brokers or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery incurred in advising, structuring, drafting, reviewing, administering, amending, waiving or otherwise modifying the Loan Documents, to the extent covered by the indemnification rights and obligations under this <u>Section 11.3</u>), enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Parent's and the Loan Parties' and its Subsidiaries' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by any Loan Party or any Environmental Actions, Environmental Liabilities and costs or Remedial Actions related in any way to any such assets or properties of any Loan Party or any of its Subsidiaries' (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, no Loan Party shall have any obligation to any Indemnified Person under this <u>Section 11.3</u> with respect to any Indemnified Liability that a court of competent jurisdiction determines pursuant to a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Loan Party was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Loan Parties with respect thereto.

12.    **NOTICES.**

      Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith). In the case of notices or demands to the Borrowers, Agent or any Lender, as the case may be, they shall be sent to the respective address set forth below:

- 84 -

| | |
|---|---|
| If to any Borrower: | Justice Grown<br>311 N. Aberdeen Street, Suite 420<br>Chicago, IL 60607<br>Attn: Jon Loevy<br>Email: jon@loevy.com |
| with copies to: | Taft Law<br>111 E. Wacker Drive, Suite 2800<br>Chicago, IL 60601<br>Attn: Jeremy Stonehill<br>Email: jstonehill@taftlaw.com |
| If to Agent or any<br>Lender: | 525 Okeechobee Blvd<br>Suite 1770<br>West Palm Beach, FL 33401<br>Attn: Thomas Geoffroy<br>Email: tom@advancedflowercapital.com |
| with copies to: | O'Melveny & Myers LLP<br>7 Times Square<br>New York, NY 10036<br>Attn: Sung Pak<br>Email: spak@omm.com |

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 12, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; *provided that* (a) notices sent by overnight courier service shall be deemed to have been given the next day and (b) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment).

13.     **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a)     THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK NOT INCLUDING CONFLICTS OF LAWS RULES.

(b)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, PARENT, EACH LOAN PARTY AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVES THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS

- 85 -

CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "CLAIM").  PARENT, EACH LOAN PARTY AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c)    PARENT AND EACH LOAN PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK, SITTING IN THE COUNTY OF WESTCHESTER OR NEW YORK, AT THE REQUIRED LENDER'S DISCRETION, AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST PARENT OR ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(d)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, PARENT, EACH LOAN PARTY AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVES ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION THEREWITH, AND PARENT, EACH LOAN PARTY AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

14.    **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.**

14.1    **Assignments and Participations.**

(a)    **Assignments**.  Any Lender may, with the consent of Agent and the Borrower Representative (*provided that*, the consent of the Borrower Representative (A) shall not be unreasonably withheld or delayed (*provided, further,* that if such consent is not granted, it shall not be considered unreasonably withheld if the proposed assignment is to a Person who is a direct competitor, or a lender to or an affiliate of a direct competitor, of any Loan Party) and (B) shall not be required if an Event of Default exists or such assignment is to a Permitted Assignee), at any time assign to one or more Persons (other than natural persons) (any such Person, an "Assignee") all or any portion of such Lender's Loan; *provided that*, notwithstanding the foregoing, other than upon the occurrence and during the continuance of an Event of Default, such assignment shall not be permitted if such assignment, when taken together with all previous assignments pursuant to this Section 14.1(a) and all sales of participating interests in the Term Loans pursuant to Section 14.1(b), would result in Agent, as a Lender (when aggregated with any of its direct or indirect Affiliate's interests in the Term Loans) not constituting the Required Lenders hereunder. Except as Agent may otherwise agree, any such assignment shall be in a minimum aggregate amount equal to five

- 86 -

hundred thousand dollars ($500,000) or, if less, the remaining Commitments and Loan held by the assigning Lender. The Loan Parties and Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Assignee until Agent shall have received and accepted an Assignment and Acceptance.

(i)    From and after the date on which the conditions described above have been met, and subject to acceptance and recording of the assignment pursuant to Section 14.1(a)(iii), (i) such Assignee shall be deemed automatically to have become a party hereto and, to the extent that rights and obligations hereunder have been assigned to such Assignee pursuant to such Assignment and Acceptance, shall have the rights and obligations of a Lender hereunder and (ii) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, shall be released from its rights (other than its indemnification rights) and obligations hereunder. Upon the request of the Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment and Acceptance, the Borrower Representative shall execute and deliver to Agent for delivery to the Assignee (and, as applicable, the assigning Lender) a Note or Notes setting forth such Lender's Loan (and, as applicable, a Note or Notes in the principal amount of the Loans retained by the assigning Lender). Each such Note shall be dated the effective date of such assignment. Upon receipt by Agent of such Note(s), the assigning Lender shall return to the Borrower Representative any prior Note held by it.

(ii)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; *provided that*, no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(iii)    Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of (and stated interest on) the Loans (including any PIK Interest) owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower Representative and the Lenders, at any reasonable time and from time to time upon reasonable prior notice.

(b)    Any Lender may, at any time sell to one or more Persons (other than natural persons) participating interests in its Term Loans or other interests hereunder (any such Person, a "Participant"); *provided that*, notwithstanding the foregoing, other than upon the occurrence and during the continuance of an Event of Default, such sale shall not be permitted if such sale, when taken together with all previous sales pursuant to this Section 14.1(b) and all assignments of Term pursuant to Section 14.1(a), would result in Agent, as a Lender (when aggregated with any of its direct or indirect Affiliate's interests in the Term Loans) not constituting the Required Lenders hereunder. In the event of a sale by a Lender of a participating interest to a Participant, (a) such Lender's obligations hereunder shall remain unchanged for all purposes, (b) the Borrowers and Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder and (c) all amounts payable by the Borrowers shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender. No Participant shall have any direct or indirect voting rights hereunder except with respect to any event described in Section 15.1 expressly requiring the vote of such Lender. Each Lender agrees to incorporate the requirements of the preceding sentence into each participation agreement which such

Lender enters into with any Participant. Each Lender shall, acting solely for this purpose as an agent of the Borrowers, maintain at one of its offices a register for the recordation of the names and addresses of each such Participant, and the Commitments of, and principal amount of and accrued interest on the Loans (including any PIK Interest) owing to, such Participant (the "Participant Register"); *provided that*, such Lender shall not have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loan, Commitments or its other obligations under any Loan Document) to any Person except to the extent that disclosure is required to establish that such a participation in a Loan or other obligation is held by a Participant who is a non-resident alien individual (within the meaning of Code Section 871) or a foreign corporation (within the meaning of Code Section 881) is in registered form (as described above). The entries in the Participant Register shall be conclusive absent manifest error, and the Lenders shall have the right to treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

14.2    **Successors.**  This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; *provided that*, no Loan Party may assign this Agreement or any rights or duties hereunder without the Required Lender's prior written consent and any prohibited assignment shall be absolutely void *ab initio*.  No consent to assignment by any Lender shall release any Loan Party from its Obligations.

15.    **AMENDMENTS; WAIVERS.**

15.1    **Amendments and Waivers.**

(a)    No amendment, waiver, or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Loan Party therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or, with respect to a Loan Document other than this Agreement, by Agent) and the Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given, *provided, however, that* no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders directly affected thereby and all of the Loan Parties that are party thereto do any of the following:

(i)    postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document,

(ii)    reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document (except (y) in connection with the waiver of applicability of Section 2.5(b) (which waiver shall be effective with the written consent of the Required Lenders) and (z) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or a reduction of fees for purposes of this clause (ii)),

(iii)    change the Pro Rata Share that is required to take any action hereunder,

(iv)    amend, modify, or eliminate this Section or any provision of this Agreement providing for consent or other action by all Lenders,

(v)    other than as permitted by Section 16.12, release Agent's Lien in and to all or substantially all of the Collateral,

- 88 -

(vi)    amend, modify, or eliminate the definitions of "Required Lenders" or "Pro Rata Share",

(vii)    contractually subordinate any of Agent's Liens,

(viii)    other than in connection with a merger, liquidation, dissolution or sale of such Person expressly permitted by the terms hereof or the other Loan Documents, release any Loan Party from any obligation for the payment of money or consent to the assignment or transfer by any Loan Party of any of its rights or duties under this Agreement or the other Loan Documents,

(ix)    amend, modify, or eliminate any of the provisions of <u>Section 2.3(b)(i)</u> or <u>(i)(ii)</u> or <u>Section 2.3(h)</u>, or

(x)    amend, modify, or eliminate any of the provisions of <u>Section 14.1</u> with respect to assignments to, or participations with, Persons who are a Loan Party or an Affiliate of a Loan Party.

(b)    No amendment, waiver, modification, or consent shall amend, modify, waive, or eliminate, any provision of <u>Section 16</u> pertaining to Agent, or any other rights or duties of Agent under this Agreement or the other Loan Documents, without the written consent of Agent, Loan Parties, and the Required Lenders.

15.2    **No Waivers; Cumulative Remedies.**  No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof.  No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Parent or the Loan Parties of any provision of this Agreement.  Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

16.    **AGENT; THE LENDER GROUP.**

16.1    <u>**Appointment and Authorization of Agent.**</u>

Each Lender hereby designates and appoints AFC Management, LLC as its agent under this Agreement and the other Loan Documents and such Lender hereby irrevocably authorizes Agent to execute and deliver each of the other Loan Documents on its behalf, and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Agent agrees to act as agent for and on behalf of each Lender on the conditions contained in this <u>Section 16.</u>  The provisions of this <u>Section 16</u> are solely for the benefit of Agent, and the Lenders, and neither Parent nor any Loan Party shall have any rights as a third party beneficiary of any of the provisions contained herein.  Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein or in any other Loan Document, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent. Without limiting the generality of the foregoing, the use of the term "<u>agent</u>" in this Agreement or the other Loan Documents with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under

- 89 -

agency doctrine of any Applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties. Each Lender hereby further authorizes Agent to act as the secured party under each of the Loan Documents that create a Lien on any item of Collateral. Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, each Lender agrees that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, the payments and proceeds of Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) exclusively receive, apply, and distribute the payments and proceeds of Collateral as provided in the Loan Documents, (d) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes, (e) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to Parent, any Loan Party, the Obligations, the Collateral, or otherwise related to any of same as provided in the Loan Documents, and (f) incur and pay the Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

16.2    **Delegation of Duties.**  Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence, bad faith or willful misconduct.

16.3    **Liability of Agent.**  None of Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct as determined by a court of competent jurisdiction pursuant to a final and nonappealable judgment), or (b) be responsible in any manner to any Lender for any recital, statement, representation or warranty made by any Loan Party, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of Parent or any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder (other than such filings and other actions as are necessary to perfect and maintain rights in the Collateral). No Agent-Related Person shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of any Loan Party or any of its Subsidiaries.

16.4    **Reliance by Agent.**  Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any of the Loan Parties or counsel to any Lender), independent accountants and other experts selected by Agent. Agent shall be fully

- 90 -

justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Required Lenders (or, to the extent required by Section 15.1(a), all Lenders). If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon the Lenders (except as otherwise required by Section 15.1(a)).

16.5    **Notice of Default or Event of Default.**  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or the Borrower Representative referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default." Agent promptly will notify such Lender of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge. If a Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify Agent of such Event of Default. Each Lender shall be solely responsible for giving any notices to its Participants, if any. Subject to Section 16.4, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with Section 9.1.

16.6    **Credit Decision.**  Each Lender acknowledges that none of Agent-Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of any Loan Party or its Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to such Lender. Each Lender represents to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such due diligence documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of each Loan Party or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrowers. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of each Loan Party or any other Person party to a Loan Document. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide the Lenders with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Loan Party or any other Person party to a Loan Document that may come into the possession of any of Agent-Related Persons. Each Lender acknowledges that Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender with any credit or other information with respect to any Loan Party, its Affiliates or any of their respective business, legal, financial or other affairs, and irrespective of whether such information came into Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement.

16.7    **Costs and Expenses; Indemnification.**  Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, reasonable

- 91 -

attorney's fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Loan Parties are obligated to reimburse Agent or the Lenders for such expenses pursuant to this Agreement or otherwise. Agent is authorized and directed to deduct and retain sufficient amounts from the payments or proceeds of the Collateral received by Agent to reimburse Agent for such reasonable and documented out-of-pocket costs and expenses prior to the distribution of any amounts to the Lenders.  In the event Agent is not reimbursed for such costs and expenses by any Loan Party, each Lender hereby agrees that it is and shall be obligated to pay for its Pro Rata Share of such costs and expenses.  Whether or not the transactions contemplated hereby are consummated, each Lender, on a ratable basis, shall indemnify and defend Agent-Related Persons (to the extent not reimbursed by or on behalf of Loan Parties and without limiting the obligation of Loan Parties to do so) from and against any and all Indemnified Liabilities; *provided that*, no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct as determined by a court of competent jurisdiction pursuant to a final and nonappealable judgment.  Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for its Pro Rata Share of Agent's costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, to the extent that Agent is not reimbursed for such expenses by or on behalf of Loan Parties.  The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

16.8    **Agent in Individual Capacity.**  AFC Management, LLC and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Stock in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Loan Party or its Affiliates and any other Person party to any Loan Documents as though AFC Management, LLC were not Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group. The other members of the Lender Group acknowledge that, pursuant to such activities, AFC Management, LLC or its Affiliates may receive information regarding the any Loan Party or its Affiliates or any other Person party to any Loan Document that is subject to confidentiality obligations in favor of Loan Parties or such other Person and that prohibit the disclosure of such information to the Lenders, and each Lender acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them.

16.9    **Successor Agent.**  Agent may resign as Agent upon thirty (30) days (ten (10) days if an Event of Default has occurred and is continuing) prior written notice to each Lender (unless such notice is waived by such Lender) and the Borrower Representative (unless such notice is waived by the Borrower Representative).  If Agent resigns under this Agreement, the Required Lenders shall be entitled to appoint a successor Agent for the Lenders.  If no successor Agent is appointed prior to the effective date of the resignation of Agent, the Required Lenders shall act as Agent until they appoint a successor Agent.  If Agent has materially breached or failed to perform any material provision of this Agreement or of Applicable Law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders; *provided that*, solely for purposes of this fourth sentence of <u>Section 16.9</u>. In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "<u>Agent</u>" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated.  After any retiring Agent's resignation hereunder as Agent, the provisions of this <u>Section 16</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this

OMM_US:80200477.9

Agreement. If no successor Agent has accepted appointment as Agent by the date which is thirty (30) days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Required Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Required Lender appoint a successor Agent as provided for above.

16.10    **Lender in Individual Capacity.**  Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Stock in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Loan Party or its Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge that, pursuant to such activities, a Lender and its respective Affiliates may receive information regarding any Loan Party or its Affiliates and any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Loan Parties or such other Person and that prohibit the disclosure of such information to such Lender, and such Lender acknowledges that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

16.11    **Withholding Taxes.**

(a)    **Payments Free of Taxes.**  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by such Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    **Payment of Other Taxes by Borrowers.**  The Borrowers shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of Agent timely reimburse it for the payment of, any Other Taxes.

(c)    **Indemnification by Borrowers.**  Each Loan Party shall, jointly and severally, indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to such Loan Party by a Lender (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    **Indemnification by the Lenders.**  Each Lender shall severally indemnify Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that a Loan Party has not already indemnified Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 14.1(b) relating to the maintenance of a Participant Register

- 93 -

and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to such Lender by Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Agent to such Lender from any other source against any amount due to Agent under this paragraph (d).

(e)    **Evidence of Payments.**  As soon as practicable after any payment of Taxes by a Loan Party to a Governmental Authority pursuant to this Section, the Borrower Representative shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(f)    **Status of Lenders.**  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower Representative and Agent, at the time or times reasonably requested by the Borrower Representative or Agent, such properly completed and executed documentation reasonably requested by the Borrower Representative or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, such Lender, if reasonably requested by the Borrower Representative or Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower Representative or Agent as will enable the Borrower Representative or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (f)(ii)(A), (ii)(B) and (ii)(D) of this Section) shall not be required if in such Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)    Without limiting the generality of the foregoing, in the event that each Borrower is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower Representative and Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower Representative and Agent in writing of its legal inability to do so.

(g)    **Treatment of Certain Refunds.**  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the

- 94 -

request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    **Survival.**  Each party's obligations under this Section shall survive the resignation or replacement of Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

16.12    **Collateral Matters.**

(a)    The Lenders hereby irrevocably authorize Agent to release any Lien on any Collateral (i) upon the Commitments and payment and satisfaction in full by the Loan Parties of all of the Obligations (other than contingent obligations in respect of which no claim has been made), (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if the Loan Parties certify to Agent and each Lender that the sale or disposition is permitted under Section 16.4 (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which the Loan Parties did not own any interest at the time Agent's Lien was granted nor at any time thereafter, (iv) constituting property leased or licensed to any Loan Party under a lease or license that has expired or is terminated in a transaction permitted under this Agreement, or (v) in connection with a credit bid or purchase authorized under this Section 16.12.  The Loan Parties and the Lenders hereby irrevocably authorize Agent, upon the instruction of the Required Lenders, to (a) consent to the sale of, credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the Code, or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any other sale or foreclosure conducted or consented to by Agent and the Required Lenders in accordance with Applicable Law in any judicial action or proceeding or by the exercise of any legal or equitable remedy.  In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the Collateral that is the subject of such credit bid or purchase) and the Lenders whose obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the Stock of the any entities that are used to consummate such credit bid or purchase), and (ii) Agent, upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by such any entities used to consummate such credit bid or purchase and in connection

- 95 -

therewith Agent may reduce the Obligations owed to the Lenders (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration. Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of the Required Lenders. Upon request by Agent or the Loan Parties at any time, each Lender will confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 16.12; *provided that* (1) anything to the contrary contained in any of the Loan Documents notwithstanding, Agent shall not be required to execute any document or take any action necessary to evidence such release on terms that, in Agent's opinion, could expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly released) upon (or obligations of the Loan Parties in respect of) any and all interests retained by any Loan Party, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b) Agent shall have no obligation whatsoever to any Lender (i) to verify or assure that the Collateral exists or is owned by any Loan Party or is cared for, protected, or insured or has been encumbered, (ii) to verify or assure that Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, (iii) to impose, maintain, increase, reduce, implement, or eliminate any particular reserve hereunder or to determine whether the amount of any reserve is appropriate or not, or (iv) to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as a Lender and that Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise expressly provided herein.

16.13 **Erroneous Payment.**

(a) If Agent (x) notifies the Lenders, any member of the Lender Group or any Person who has received funds on behalf of the Lenders or the Lender Group (any such Lender, member of the Lender Group or other recipient (and each of their respective successors and assigns), a "Payment Recipient") that Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from Agent) received by such Payment Recipient from Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, member of the Lender Group or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of Agent pending its return or repayment as contemplated below in this Section 16.13 and held in trust for the benefit of Agent, and the Lenders or member of the Lender Group shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter (or such later date as Agent may, in its sole discretion, specify in writing), return to Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received). A notice of Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b) Without limiting immediately preceding clause (a), the Lenders, any member of the Lender Group or any Person who has received funds on behalf of the Lenders or any member of the

OMM_US:80200477.9

Lender Group (and each of their respective successors and assigns), agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by Agent (or any of its Affiliates), or (z) that the Lenders, any member of the Lender Group or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

> (i)     it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

> (ii)    the Lenders and any member of the Lender Group shall use commercially reasonable efforts to (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one (1) Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying Agent pursuant to this <u>Section 16.13(b)</u>.

> For the avoidance of doubt, the failure to deliver a notice to Agent pursuant to this <u>Section 16.13(b)</u> shall not have any effect on a Payment Recipient's obligations pursuant to <u>Section 16.13(a)</u> or on whether or not an Erroneous Payment has been made.

> (c)     The Lenders and any member of the Lender Group hereby authorizes Agent to set off, net and apply any and all amounts at any time owing to the Lenders or member of the Lender Group under any Loan Document, or otherwise payable or distributable by Agent to the Lenders or member of the Lender Group under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that Agent has demanded to be returned under immediately preceding clause (a).

> (d)     (i) In the event that an Erroneous Payment (or portion thereof) is not recovered by for any reason, after demand therefor in accordance with immediately preceding clause (a), from a Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "<u>Erroneous Payment Return Deficiency</u>"), upon Agent's notice to such Lender at any time, then effective immediately (with the consideration therefor being acknowledged by the parties hereto), (A) such Lender shall be deemed to have assigned its Loans (but not its Commitments ) with respect to which such Erroneous Payment was made (the "<u>Erroneous Payment Impacted Class</u>") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "<u>Erroneous Payment Deficiency Assignment</u>") (on a cashless basis and such amount calculated at par plus any accrued and unpaid interest (with the assignment fee to be waived by Agent in such instance)), and is hereby (together with the Borrowers) deemed to execute and deliver an Assignment and Assumption (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference as to which Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to the Borrowers or Agent (but the failure of such Person to deliver any such Notes shall not affect the effectiveness of the foregoing assignment), (B) Agent as the assignee Lender shall be deemed to have acquired the Erroneous Payment Deficiency Assignment, (C) upon

- 97 -

such deemed acquisition, Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender, (D) Agent and the Borrowers shall each be deemed to have waived any consents required under this Agreement to any such Erroneous Payment Deficiency Assignment, and (E) Agent will reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of such Lender and such Commitments shall remain available in accordance with the terms of this Agreement.

(ii)    Subject to <u>Section 14.1</u> (but excluding, in all events, any assignment consent or approval requirements (whether from the Borrowers or otherwise)), Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). In addition, an Erroneous Payment Return Deficiency owing by a Lender (x) shall be reduced by the proceeds of prepayments or repayments of principal and interest, or other distribution in respect of principal and interest, received by Agent on or with respect to any such Loans acquired from such Lender pursuant to an Erroneous Payment Deficiency Assignment (to the extent that any such Loans are then owned by Agent) and (y) may, in the sole discretion of Agent, be reduced by any amount specified by Agent in writing to the applicable Lender from time to time.

(e)    The parties hereto agree that (x) irrespective of whether Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of the Lenders or any member of the Lender Group, to the rights and interests of the Lenders or such member of the Lender Group, as the case may be) under the Loan Documents with respect to such amount (the "<u>Erroneous Payment Subrogation Rights</u>") (provided that the Loan Parties' Obligations under the Loan Documents in respect of the Erroneous Payment Subrogation Rights shall not be duplicative of such Obligations in respect of Loans that have been assigned to the Administrative Agent under an Erroneous Payment Deficiency Assignment) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party; provided that this <u>Section 16.13</u> shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrowers relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by Agent; provided, further, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by Agent from the Borrower for the purpose of making such Erroneous Payment.

(f)    To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

- 98 -

(g)    Each party's obligations, agreements and waivers under this Section 16.13 shall survive the resignation or replacement of Agent, any transfer of rights or obligations by, or the replacement of, the Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

16.14    **Agency for Perfection.**    Agent hereby appoints the each Lender as its agent (and such Lender hereby accepts such appointment) for the purpose of perfecting Agent's Liens in assets which, in accordance with Article 08 or Article 8.29, as applicable, of the Code can be perfected by possession or control.  Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

16.15    **Payments by Agent to the Lenders.**    All payments to be made by Agent to any Lender shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent.  Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

16.16    **Concerning the Collateral and Related Loan Documents.**    Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan Documents.  Each member of the Lender Group agrees that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

16.17    **Several Obligations; No Liability**.  Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of the Lenders to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective portion of the Commitment, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount at such time of their respective portion of the Commitment. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose. Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender. Nothing contained herein or in any other Loan Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity. Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender. Except as provided in Section 16.7, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group. No Lender shall be responsible to Parent, any Loan Party or any other Person for any failure by any other Lender to fulfill its obligations to make credit available hereunder, nor to advance for it or on its behalf, nor to take any other action on its behalf hereunder or in connection with the financing contemplated herein.

16.18    **Documentation Agent**.    Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document, the Documentation Agent shall have no duties or responsibilities and such Persons shall not have or be deemed to have any fiduciary relationship with any

- 99 -

Lender, and no implied responsibilities, duties or obligations of the Documentation Agents shall be construed to exist in this Agreement or any other Loan Document.

17.     **GENERAL PROVISIONS.**

17.1     **Effectiveness.**  This Agreement shall be binding and deemed effective when executed by Parent, the Loan Parties, Agent, and each Lender whose signature is provided for on the signature pages hereof.

17.2     **Section Headings.**  Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

17.3     **Interpretation.**  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or any Loan Party, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

17.4     **Severability of Provisions.**  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

17.5     **Counterparts; Electronic Execution.**  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by electronic mail or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by electronic mail or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

17.6     **Revival and Reinstatement of Obligations; Certain Waivers.**  If any member of the Lender Group repays, refunds, restores, or returns in whole or in part, any payment or property (including any proceeds of Collateral) previously paid or transferred to such member of the Lender Group in full or partial satisfaction of any Obligation or on account of any other obligation of any Loan Party under any Loan Document, because the payment, transfer, or the incurrence of the obligation so satisfied is asserted or declared to be void, voidable, or otherwise recoverable under any law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent transfers, preferences, or other voidable or recoverable obligations or transfers (each, a "Voidable Transfer"), or because such member of the Lender Group elects to do so on the reasonable advice of its counsel in connection with a claim that the payment, transfer, or incurrence is or may be a Voidable Transfer, then, as to any such Voidable Transfer, or the amount thereof that such member of the Lender Group elects to repay, restore, or return (including pursuant to a settlement of any claim in respect thereof), and as to all reasonable costs, expenses, and attorneys' fees of such member of the Lender Group related thereto, (i) the liability of the Loan Parties with respect to the amount or property paid, refunded, restored, or returned will automatically and immediately be revived, reinstated, and restored and will exist and (ii) Agent's Liens securing such liability shall be effective, revived, and remain in full force and effect, in each case, as fully as if such Voidable Transfer had never been made. If, prior to any of the foregoing, (A) Agent's Liens shall have been released or

- 100 -

terminated or (B) any provision of this Agreement shall have been terminated or cancelled, Agent's Liens, or such provision of this Agreement, shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligation of any Loan Party in respect of such liability or any Collateral securing such liability.

     17.7   **Confidentiality.**

     (a)    Agent and each Lender each individually (and not jointly or jointly and severally) agree that material, non-public information regarding the Loan Parties, their operations, assets, and existing and contemplated business plans shall be treated by Agent and such Lender in a confidential manner, and shall not be disclosed by Agent or such Lender to Persons who are not parties to this Agreement, except: (i) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group and to employees, directors and officers of any member of the Lender Group (the "Lender Group Representatives") on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and on a confidential basis, (ii) to Subsidiaries and Affiliates of any member of the Lender Group and *provided that*, any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 17.7, (iii) as may be required by regulatory authorities so long as such authorities are informed of the confidential nature of such information, (iv) as may be required by statute, decision, or judicial or administrative order, rule or regulation, (v) as may be agreed to in advance in writing by any Loan Party, (vi) as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, (vii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or any Lender or the Lender Group Representative), (viii) in connection with any assignment, participation or pledge of a Lender's interest under this Agreement; *provided that*, such party is subject to confidentiality obligations no less protective of the Borrowers as those contained herein in connection therewith, (ix) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents, and (x) in connection with the exercise of any secured creditor remedy under this Agreement or any other Loan Documents.

     (b)    Anything in this Agreement to the contrary notwithstanding, Agent may disclose information concerning the terms and conditions of this Agreement and the other Loan Documents to loan syndication and pricing reporting services or in its marketing or promotional materials, with such information to consist of deal terms and other information customarily found in such publications or marketing or promotional materials and may otherwise use the name, logos, and other insignia of the Borrowers or the other Loan Parties and the Loans provided hereunder in any "tombstone" or other advertisements, on its website or in other marketing materials of Agent.

     17.8   **Debtor-Creditor Relationship.**  The relationship between the Lenders and Agent, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor.  No member of the Lender Group has (or shall be deemed to have) any fiduciary relationship or duty to Parent or any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the members of the Lender Group, on the one hand, and Parent or the Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

     17.9   **Public Disclosure.**  Each party hereto agrees that it will not disclose any non-public information regarding any other party hereto or issue any press release or other public disclosure using the name of any other party hereto or any of their respective Affiliates or referring to this Agreement or any other Loan Document or any of the terms or provisions hereof or thereof without the prior written consent of Agent and Borrower Representative, except (i) to the extent that a party hereto is required to do so under

- 101 -

Applicable Law (in which event, such party will consult with Agent or Borrower Representative, as applicable before issuing such press release or other public disclosure to the extent permitted by Applicable Law), (ii) to attorneys for and other advisors, accountants, auditors, and consultants to any member of such party and to employees, directors and officers of any member of such party on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and on a confidential basis, (iii) to Subsidiaries and Affiliates of any party hereto and *provided that*, any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this <u>Section 17.9</u>, (iv) as may be required by regulatory authorities so long as such authorities are informed of the confidential nature of such information, (v) as may be required by statute, decision, or judicial or administrative order, rule or regulation, (vi) as may be agreed to in advance in writing by Agent and the Borrower Representative, (vii) as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, (viii) as to any such information that is or becomes generally available to the public (other than as a result of any disclosure prohibited by this section) and (ix) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents.

17.10    **Survival.**    All representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee or any other amount payable under this Agreement is outstanding or unpaid (other than contingent obligations in respect of which no claim has been made) and so long as the Commitments have not expired or been terminated.

17.11    **PATRIOT Act**.    Each Lender that is subject to the requirements of the Patriot Act hereby notifies Loan Parties that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies Loan Parties, which information includes the name and address of Loan Parties and other information that will allow such Lender to identify Loan Parties in accordance with the Patriot Act.

17.12    **Integration.**    This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

17.13    **Joint and Several.**    The obligations of the Loan Parties hereunder and under the other Loan Documents are joint and several.

17.14    **<u>Acknowledgment and Consent to Bail-In of EEA Financial Institutions.</u>** Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

- 102 -

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

17.15    **Schedules.**  Information furnished in any particular schedule attached hereto or any subsection thereof shall be deemed to have been disclosed with respect to every other schedule attached hereto or any subsection thereof to the extent the relevance of such information to other schedules or subsections thereof is readily apparent regardless of whether a specific cross-reference is indicated.

17.16    **Amendment and Restatement; Joinder.**(a)      This Agreement shall, except as otherwise expressly set forth herein, supersede the Existing Credit Agreement from and after the Restatement Date with respect to the transactions hereunder.  The parties hereto acknowledge and agree, however, that (i) this Agreement and all other Loan Documents executed and delivered herewith do not constitute a novation, payment and reborrowing or termination of the Obligations under the Existing Credit Agreement and the other Loan Documents as in effect immediately prior to the Restatement Date, (ii) such Obligations are in all respects continuing with the terms thereof, being modified only as provided in this Agreement and the other Loan Documents, (iii) the liens and security interests in favor of Agent for the benefit of the Lender Group securing payment of such Obligations are in all respects continuing and in full force and effect with respect to all Obligations, being modified only as provided in this Agreement and the other Loan Documents, and (iv) all references in the other Loan Documents to this Agreement shall be deemed to refer, without further amendment, to this Agreement.

(b)      For the avoidance of doubt, by its execution of this Agreement, each Additional Borrower hereby (a) agrees that from and after the Restatement, it shall be a party to this Agreement as a "Borrower" and shall be bound by all of the terms, conditions, covenants, agreements and obligations set forth herein, (b) accepts joint and several liability for the Obligations pursuant to the terms of this Agreement and the other Loan Documents, and (c) confirms that the representations and warranties contained in Section 4 of this Agreement are true and correct in all material respects as they relate to such Additional Borrower as of the date of this Agreement.  Each Additional Borrower hereby agrees that each reference to a "Borrower" or the "Borrowers" in this Agreement and the other Loan Documents shall include such Additional Borrower.  Each Additional Borrower acknowledges that it has received a copy of this Agreement and the other Loan Documents and that it has read and understands the terms thereof.

[Signature pages to follow.]

- 103 -

       **IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**BORROWERS**:

           **JG NEW JERSEY LLC,**
           **SRG 1761 NORTH OLDEN LLC,**
           **SRG 1474 PROSPECT LLC,**
           **SRG WARETOWN LLC,**
           **HAYDEN GATEWAY LLC,**
           **PIER COVE LLC,**
           **SRG 272 MAIN STREET LLC,**
           **SRG HI PARK LLC**

           **By: Hayden Manager LLC, Manager**

                 DocuSigned by:

By:      *Jon Loevy*
               —1C8F8732A36A4D4...
Name:   Jon Loevy
Title:    Manager

**AGENT:**

**AFC MANAGEMENT, LLC**, a Delaware limited liability
company, as Agent

By: _____
Name:   THOMAS  GEOFFREY
Title:      CFO

**DOCUMENTATION AGENT:**

**A BDC WAREHOUSE, LLC**, a Delaware limited liability
company, as Documentation Agent

By: _____
Name:   LEONARD TANNENBAUM
Title:   CEO

**LENDERS:**

**AFC GAMMA, INC.,** a Maryland corporation, as a Lender

By: _____
Name:  Brett Kaufman
Title:  CFO

**A BDC WAREHOUSE, LLC**, a Delaware limited liability
company, as a Lender

By: _____
Name:  LEONARD TANNENBAUM
Title:  CEO

*[Signature Page to Credit Agreement]*

## EXHIBIT A

## [FORM OF] ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (the "Assignment and Acceptance") is dated as of the Effective Date set forth below and is entered into by and between [the][each] Assignor identified in item 1 below ([the][each, an] "Assignor") and [the][each] Assignee identified in item 2 below ([the][each, an] "Assignee"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees] hereunder are several and not joint.] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, supplemented or otherwise modified, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignee], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations [in its capacity as a Lender][in their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below (including without limitation any letters of credit, guarantees, and swingline loans included in such facilities), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "Assigned Interest"). [Each such][Such] sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by [the][any] Assignor.

1. Assignor[s]: _____

2. Assignee[s]: _____

   [Assignee is an Affiliate of [*identify Lender*]]

3. Borrowers: JG New Jersey LLC, SRG 1761 North Olden LLC, and SRG 1474 Prospect LLC, SRG Waretown LLC, Hayden Gateway LLC, Pier Cove LLC, SRG 272 Main Street LLC, SRG HI Park LLC

4. Agent: AFC Management, LLC, as the agent under the Credit Agreement

5.      Credit Agreement:        That certain Second Amended and Restated Credit Agreement, dated as of September 30, 2021, by and among JG New Jersey LLC, SRG 1761 North Olden LLC, SRG 1474 Prospect LLC, SRG Waretown LLC, Hayden Gateway LLC, Pier Cove LLC, SRG 272 Main Street LLC, and SRG HI Park LLC, as the Borrowers, the other Loan Parties party thereto from time to time, JG Holdco LLC, as Parent, the Lenders party thereto from time to time, AFC Management, LLC, as Agent, and A BDC Warehouse, LLC, as Documentation Agent, as the same may be amended, supplemented or otherwise modified from time to time

6.      Assigned Interest[s]:

| Assignor[s] | Assignee[s] | Aggregate Amount of Commitment/ Loans for all Lenders | Amount of Commitment/ Loans Assigned | Percentage Assigned of Commitment/ Loans[1] | CUSIP Number |
|---|---|---|---|---|---|
| | | $ | $ | % | |
| | | $ | $ | % | |
| | | $ | $ | % | |

7.      Notice and Wire Instructions:

**[NAME OF ASSIGNOR]**                          **[NAME OF ASSIGNEE]**

Notices:                                        Notices:

_____                     _____
_____                     _____
_____                     _____
Attention:                                      Attention:
Email:                                          Email:

with a copy to:                                 with a copy to:

_____                     _____
_____                     _____
_____                     _____
Attention:                                      Attention:
Email:                                          Email:

Wire Instructions:                              Wire Instructions:

---

[1] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

A-2

[*Signature page follows.*]

A-3

Effective Date:  _____ ___, 20___  [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Acceptance are hereby agreed to:

**ASSIGNOR[S]**
**[NAME OF ASSIGNOR]**


By:_____
  Name:
  Title:

**ASSIGNEE[S]**
**[NAME OF ASSIGNEE]**


By:_____
  Name:
  Title:


**Consented to and Accepted:**

**AFC MANAGEMENT, LLC**, as
Agent

By: _____
  Name:
  Title:

**[Consented to:**

**[_____],** as the Borrower Representative


By: _____
  Name:
  Title:  ]²

---

² NTD: If applicable.

A-4

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ACCEPTANCE

1.      Representations and Warranties.

1.1      Assignor[s].  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.      Assignee[s].  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 14.1 of the Credit Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 7 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned Interest, and (vii) if it is a Lender organized under the laws of a jurisdiction other than the United States, attached to the Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance on the Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      Payments.  From and after the Effective Date, the Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to [the][the relevant] Assignee.

A-5

       3.    <u>General Provisions</u>.  This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.  This Assignment and Acceptance shall be governed by, and construed in accordance with, the law of the State of New York without regard to conflict of laws principles thereof.

A-6

<u>**EXHIBIT B**</u>

**[FORM OF ]COMPLIANCE CERTIFICATE**

[on Borrower letterhead]

To:    AFC MANAGEMENT, LLC
           525 Okeechobee Blvd
           Suite 1770
           West Palm Beach, FL 33401
           Attention: Thomas Geoffroy
           Email: PM@advancedflowercapital.com

          Re:     Compliance Certificate, dated [    ], 20[  ]

Ladies and Gentlemen:

         Reference is made to that certain Second Amended and Restated Credit Agreement, dated as of September 30, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among, by and among **JG NEW JERSEY LLC, SRG 1761 NORTH OLDEN LLC, SRG 1474 PROSPECT LLC, SRG WARETOWN LLC, HAYDEN GATEWAY LLC, PIER COVE LLC, SRG 272 MAIN STREET LLC,** and **SRG HI PARK LLC** (each, a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"), the other Loan Parties party thereto from time to time, **JG HOLDCO LLC**, as Parent, the Lenders party thereto from time to time, **AFC MANAGEMENT, LLC,** a Delaware limited liability company, as the agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "<u>Agent</u>"), and **A BDC WAREHOUSE, LLC**, a Delaware limited liability company, in its capacity as Documentation Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

         Pursuant to <u>Section 5.1</u> of the Credit Agreement, the undersigned officer of the Borrower Representative hereby certifies (in such officer's capacity as an officer of the Borrower Representative and not in such person's individual capacity) as of the date hereof that:

         1.      The financial information of the Borrowers and their Subsidiaries furnished in <u>Schedule 1</u> attached hereto has been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for year-end audit adjustments and the lack of footnotes), and fairly presents in all material respects the financial condition of the Borrowers and their Subsidiaries as of the date set forth therein.

         2.      Such officer has reviewed the terms of the Credit Agreement and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and financial condition of the Borrowers and their Subsidiaries during the accounting period covered by the financial statements delivered pursuant to <u>Section 5.1</u> of the Credit Agreement.

         3.      Such review has not disclosed the existence on and as of the date hereof, and the undersigned does not have knowledge of the existence as of the date hereof, of any event or condition that constitutes a Default or Event of Default, except for such conditions or events listed on <u>Schedule 2</u> attached

B-1

hereto, in each case specifying the nature and period of existence thereof and what action the Borrowers or their Subsidiaries have taken, are taking, or propose to take with respect thereto.

4.      Except as set forth on <u>Schedule 3</u> attached hereto, the representations and warranties of the Borrowers and their Subsidiaries set forth in the Credit Agreement and the other Loan Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date hereof (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date).

5.      As of the date hereof, the Borrowers and their Subsidiaries are in compliance with the applicable covenants contained in <u>Section 7</u> of the Credit Agreement as demonstrated on <u>Schedule 4</u> hereto.

*[Signature Page Follows.]*

**IN WITNESS WHEREOF**, this Compliance Certificate is executed by the undersigned this [  ] day of [    ], 20[  ].

**[_____]**, as the Borrower Representative

By:_____

Name:_____

Title: _____

*[Signature Page to Compliance Certificate]*

**<u>SCHEDULE 1 to Compliance Certificate</u>**

**Financial Information**

**SCHEDULE 2 to Compliance Certificate**

**Default Or Event Of Default**

Schedule to Compliance Certificate

## <u>SCHEDULE 3 to Compliance Certificate</u>

### Representations And Warranties

OMM_US:80200477.9

## <u>SCHEDULE 4 to Compliance Certificate</u>

### Financial Covenants

1.      **<u>Minimum Adjusted EBITDA</u>**.

       The Adjusted EBITDA for the fiscal quarter ending on [     ], 20[  ], for the Specified Quarter Period, is $[  ], which amount **[is/is not]** at least equal to the amount set forth in <u>Section 7.1</u> of the Credit Agreement for the corresponding period.

2.      **<u>Minimum Free Cash Flow</u>.**

       The Free Cash Flow for the fiscal quarter ending on [     ], 20[  ] for the Specified Quarter Period, is $[  ], which amount **[is/is not]** at least equal to the minimum amount set forth in <u>Section 7.2</u> of the Credit Agreement for the corresponding period.

3.      **<u>Maximum Total Leverage Ratio.</u>**

       The Total Leverage Ratio for the fiscal quarter ending on [__], 202[  ], is [  ]:[  ], which ratio **[is/is not]** greater than or equal to the maximum ratio set forth in <u>Section 7.3</u> of the Credit Agreement for the corresponding period.

4.      **<u>Minimum Fixed Charge Coverage Ratio.</u>**

       The Fixed Charge Coverage Ratio measured as of the last day of the fiscal quarter ending on [     ], 20[  ], is [  ]:[  ], which ratio **[is/is not]** less than the minimum ratio set forth in <u>Section 7.4</u> of the Credit Agreement for the corresponding period.

5.      **<u>Minimum Cash Balance</u>.**

       The sum of unrestricted cash and Cash Equivalents as of the date hereof is equal to $[     ], which amount **[is/is not]** at least equal to the required amount set forth in <u>Section 7.5</u> of the Credit Agreement for the corresponding period.

6.      **<u>Minimum Net Income.</u>**

       The sum of Combined Net Income as of the date hereof is equal to $[     ], which amount **[is/is not]** at least equal to the required amount set forth in <u>Section 7.6</u> of the Credit Agreement for the corresponding period.

Schedule to Compliance Certificate

<u>EXHIBIT C</u>

**[FORM OF ]TERM LOAN REQUEST**

AFC MANAGEMENT, LLC                                     Date: _____[3]

Ladies and Gentlemen:

      Reference is made to that certain Second Amended and Restated Credit Agreement, dated as of September 30, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among, by and among **JG NEW JERSEY LLC, SRG 1761 NORTH OLDEN LLC, SRG 1474 PROSPECT LLC, SRG WARETOWN LLC, HAYDEN GATEWAY LLC, PIER COVE LLC, SRG 272 MAIN STREET LLC,** and **SRG HI PARK LLC** (each, a "<u>Borrower</u>" and collectively, the "<u>Borrowers</u>"), the other Loan Parties party thereto from time to time, **JG HOLDCO LLC**, as Parent, the Lenders party thereto from time to time, **AFC MANAGEMENT, LLC,** a Delaware limited liability company, as the agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "<u>Agent</u>"), and **A BDC WAREHOUSE, LLC**, a Delaware limited liability company, in its capacity as Documentation Agent.  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

    (A)    The Borrowers irrevocably request the making of a Term Loan as follows:

        (1)    Funding Date:            _____

        (2)    Working Capital Amount of Term Loan[4]    $_____

        (3)    Capex Amount of Term Loan:    $_____

        (4)    Amount of Term Loan    $_____

    (B)    The Borrowers irrevocably instruct and authorize Agent to disburse the proceeds of the Term Loan requested in clause (A)(2) above in the manner set forth in Section 2.2(b) of the Credit Agreement and incorporated herein by reference, in accordance with the terms and provisions of the Credit Agreement.

    (C)    The Borrowers represent and warrant to Agent:

        (1)    No Default or Event of Default has occurred and is continuing on the date hereof or will result from the making of the Term Loan requested hereby.

        (2)    No material adverse change in the financial condition of the Loan Parties or in the quality, quantity or value of any Collateral has occurred since the [Closing Date][5][Restatement Date][6].

---

[3] To be delivered at least 3 Business Days prior to proposed funding date.

[4] Only applicable following completion of construction and issuance of the certificate of occupancy at the Collateral Property located at 5 Chestnut Hill, Hazle Township, PA (Site 35A, Humboldt Industrial Park, Hazleton, PA).

[5] To be used for Restatement Date Loans.

[6] To be used for any additional extension of credit.

(3)      The conditions precedent set forth in Section [3.2]⁷[3.3]⁸ of the Credit Agreement have been or will be satisfied on and as of the date of the Term Loan requested hereby.

[*Signature page follows*.]

---

⁷ To be used for Restatement Date Loans.
⁸ To be used for any additional extension of credit.

Very truly yours,

[_____], as the Borrower Representative

By: _____
Name: _____
Title: __

**SCHEDULES TO SECOND AMENDED AND RESTATED CREDIT AGREEMENT**

**dated as of September 30, 2021**

**by and among**

**JG NEW JERSEY LLC,**
**SRG 1761 NORTH OLDEN LLC,**
**SRG 1474 PROSPECT LLC,**
**SRG WARETOWN LLC,**
**HAYDEN GATEWAY LLC,**
**PIER COVE LLC,**
**SRG 272 MAIN STREET LLC,**
**and**
**SRG HI PARK LLC**
**as Borrowers,**

**JG HOLDCO LLC,**
**as Parent,**

**THE OTHER LOAN PARTIES THAT ARE PARTY HERETO,**

**THE LENDERS THAT ARE PARTY HERETO,**
**as Lenders,**

**AFC MANAGEMENT, LLC,**
**as Agent,**

**and**

**A BDC WAREHOUSE, LLC,**
**as Documentation Agent**

| | |
|---|---|
| Schedule A-1 | Agent's Account |
| Schedule A-2 | Authorized Persons |
| Schedule C-1 | Commitments |
| Schedule D-1 | Designated Account |
| Schedule P-1 | Permitted Liens |
| Schedule P-2 | Permitted Holders |
| Schedule Z | Collateral Properties |
| | |
| Schedule 3.7 | Conditions Subsequent |
| Schedule 4.4(b) | Capitalization of Loan Parties |
| Schedule 4.4(c) | Jurisdictions of Organization of Loan Parties |
| Schedule 4.6(b) | Litigation |
| Schedule 4.7(d) | Cannabis Licenses |
| Schedule 4.11 | Environmental Matters |
| Schedule 4.12(a) | Real Property |
| Schedule 4.12(b) | Title Commitments |
| Schedule 4.12(g) | Collateral Property Matters |
| Schedule 4.13 | Broker Fees |
| Schedule 4.15 | Existing Indebtedness |
| Schedule 4.22 | Material Contracts |
| Schedule 4.24 | Collateral Locations |
| Schedule 4.26 | Intellectual Property |
| Schedule 5.1 | Financial Statements, Reports, Certificates |
| Schedule 5.2 | Collateral Reporting |
| Schedule 5.7 | General Contractor Additional Insurance Provisions |
| Schedule 6.6 | Nature of Business |
| Schedule 6.13 | Payoff Debt |

**<u>Schedule A-1</u>**

**<u>Agent's Account</u>**

**<u>Agent Account</u>**:

AFC MANAGEMENT, LLC
**Bank Name**: Signature Bank
**Bank Address:** 75 Holly Hill Lane, Greenwich, CT 06830
**ABA**: 026013576
**Account Name**: AFC Management, LLC
**Account Address:** 525 Okeechobee Blvd., Suite 1770, West Palm Beach, FL 33401
**Account Number**: 1503820958

**Schedule A-2**

**Authorized Persons**

Jon Loevy, manager of Hayden Manager LLC and manager of JG Holdco LLC

Michael Kanovitz, manager of Hayden Manager LLC and manager of JG Holdco LLC

**Schedule C-1**

**Commitments**

**Tranche A Loans**

| Lender | Pro Rata Share | Initial Tranche A Loan Commitment | Initial Tranche A Loan Outstanding as of the Restatement Date | PIK Interest Outstanding as of the Restatement Date | Original Issue Discount | Interest Reserve |
|---|---|---|---|---|---|---|
| AFC Gamma, Inc. | 100% | $22,000,000 | $22,000,000 | $374,073.67 | $880,000 | $2,000,000 |

| Lender | Pro Rata Share | Restatement Date Tranche A Loan Commitment | Restatement Date Tranche A Loan Outstanding as of the Restatement Date | Original Issue Discount | Interest Reserve |
|---|---|---|---|---|---|
| AFC Gamma, Inc. | 81.2734% | $2,438,202.25 | $2,438,202.25 | $97,528.09 | $91,318.44 |
| A BDC Warehouse, LLC | 18.7266% | $561,797.75 | $561,797.75 | $22,471.91 | $21,041.11 |
| TOTAL | 100% | $3,000,000 | $3,000,000 | $120,000 | $112,359.55 |

**Tranche B Loans**

| Lender | Pro Rata Share | Tranche B Loan Commitment | Tranche B Loan Outstanding as of the Restatement Date | Original Issue Discount | Interest Reserve | Tranche B Payoff Reserve Amount |
|---|---|---|---|---|---|---|
| AFC Gamma, Inc. | 81.2734% | $32,834,456.93 | $10,077,903.62 | $1,313,378.28 | $1,229,754.94 | $1,422,284.64 |
| A BDC Warehouse, LLC | 18.7266% | $7,565,543.07 | $2,322,097.38 | $302,621.72 | $283,353.67 | $327,715.36 |
| TOTAL | 100% | $40,400,000 | $12,400,000 | $1,616,000 | $1,513,108.61 | $1,750,000 |

**Tranche C Loans**

| Lender | Pro Rata Share | Tranche C Loan Commitment | Tranche C Loan Outstanding as of the Restatement Date | Original Issue Discount | Interest Reserve | Tranche C Payoff Reserve Amount |
|---|---|---|---|---|---|---|
| AFC Gamma, Inc. | 81.2734% | $8,127,340.82 | $8,127,340,82 | $325,093.63 | $304,394.79 | $8,127,340.82 |
| A BDC Warehouse, LLC | 18.7266% | $1,872,659.18 | $1,872,659.18 | $74,906.37 | $70,137.05 | $1,872,659.18 |
| TOTAL | 100% | $10,000,000 | $10,000,000 | $400,000 | $347,531.84 | $10,000,000 |

**Schedule D-1**

**Designated Account**

JON LOEVY

**For NJ:**

For wire transfers and ACH:
Bank Name: Parke Bank
Bank Address: 567 Egg Harbor Rd, Sewell, NJ 08080
Recipient Name: JG New Jersey LLC
Recipient's Address: 311 N Aberdeen St, Ste 200A, Chicago, IL 60607
Account # 9000724994
Routing # 031207814
Email:  tmehs@oaklandmanager.com
Recipient's phone number: 720-939-1433

**For PA:**

For wire transfers:
Bank Name: Parke Bank
Bank Address: 567 Egg Harbor Rd, Sewell, NJ 08080
Recipient: Hayden Gateway LLC
Recipient's Address: 311 N Aberdeen St, Ste 200A, Chicago, IL 60607
Account # 9000684109
Routing # 031207814
Email:  tmehs@oaklandmanager.com
Recipient's phone number: 720-939-1433

OMM_US:80200477.9

**Schedule P-1**

**Permitted Liens**

None.

**Schedule P-2**

**Permitted Holders**

Jon Loevy
Danielle Lovey
Michael Kanovitz

**Schedule Z**

**Collateral Properties**

**New Jersey Collateral Properties:**

| Loan Party | Common Address | County/State | Owned/Leased | Landlord (as applicable) |
|---|---|---|---|---|
| SRG 1761 North Olden LLC | 1761 North Olden Avenue, Ewing, NJ 08638 | Mercer, NJ | Owned | N/A |
| JG New Jersey LLC | 1761 North Olden Avenue, Ewing, NJ 08638 | Mercer, NJ | Leased | SRG 1761 North Olden LLC |
| SRG 1474 Prospect LLC | 1474 Prospect St, Ewing, NJ 08638 | Mercer, NJ | Owned | N/A |
| SRG Waretown LLC | 501 U.S. Route 9, Unit 6 Township of Ocean, NJ | Ocean, NJ | Owned | N/A |

**Pennsylvania Collateral Properties:**

| Loan Party | Common Address | County/State | Owned/Leased | Landlord (as applicable) |
|---|---|---|---|---|
| SRG 272 Main Street LLC | 272 Main Street, Dickson City, PA 18519-1618 | Lackawanna, PA | Owned | N/A |
| SRG 272 Main Street LLC | 256 Main Street, Dickson City, PA 18519-1618 | Lackawanna, PA | Owned | N/A |
| Hayden Gateway LLC | 272 Main Street, Dickson City, PA 18519-1618 | Lackawanna, PA | Leased | SRG 272 Main Street LLC |
| Hayden Gateway LLC | 3650 Nazareth Pike, Bethlehem, PA 18020 | Leigh, PA | Leased | 303-305 West Main Street LLC |
| Hayden Gateway LLC | 7B Gateway Shopping Centre, Edwardsville, PA 18704 | Luzerne, PA | Leased | Joe Amato Ventures, LP |
| Pier Cove LLC | Site 35A, Humboldt Industrial Park Hazletown, PA 18201 (5 Chestnut Hill, Hazle Township, PA 18201) | Luzerne, PA | Leased | SRG HI Park LLC |
| SRG HI Park LLC | Site 35A, Humboldt Industrial Park Hazletown, PA 18201 (5 Chestnut Hill, Hazle Township, PA 18201) | Luzerne, PA | Owned | N/A |

**Schedule 3.7**

**Conditions Subsequent**

As promptly as practicable, but in any event not later than:

1.  (a) October 15, 2021 (or such later date as Agent may agree in its sole discretion), reviewed unaudited balance sheet and statement of cash flow and income statement covering Parent's operations for the fiscal quarters ending March 31, 2021 and June 30, 2021 and (b) October 31, 2021 (or such later date as Agent may agree in its sole discretion), unaudited balance sheet and statement of cash flow and income statement covering Parent's operations for the fiscal quarter ending September 30, 2021.

2.  (a) November 26, 2021 (or such later date as Agent may agree in its sole discretion), Agent shall have received evidence in form and substance reasonably satisfactory to Agent that one or more cash capital contributions have been made to Parent, and subsequently contributed to the Borrowers, in an aggregate amount of not less than five million dollars ($5,000,000), and (b) February 28, 2022 (or such later as Agent may agree in its sole discretion), Agent shall have received evidence in form and substance reasonably satisfactory to Agent that one or more cash capital contributions have been made to Parent, and subsequently contributed to the Borrowers, in an aggregate additional amount of not less than five million dollars ($5,000,000) (collectively, the "Post-Closing Capital Contribution").

3.  ten (10) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), the Borrowers shall execute and deliver a Mortgage, dated effective as of the date hereof, and all Mortgage Supporting Documents in connection therewith with respect to each Additional Collateral Property; provided, that (a) in the case of the Collateral Property held by SRG HI Park LLC, the Borrowers shall execute and deliver two Mortgages, dated effective as of the date hereof, securing and being insured for, in the aggregate, $40,000,000.00, and all Mortgage Supporting Documents and (b) in the case of the Collateral Property held by SRG Waretown LLC, the Borrower shall have twenty eight (28) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), to deliver the ALTA Survey and lender's Title Insurance Policy with respect thereto.

4.  ten (10) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), with respect to the Collateral Property held by SRG 1474 Prospect LLC, the Borrowers shall execute and deliver a Mortgage, dated effective as of the date hereof, and securing and being insured for $8,000,000, and all Mortgage Supporting Documents.

5.  ten (10) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), with respect to the Collateral Property held by SRG 1761 North Olden LLC, the Borrowers shall execute and deliver an amendment to Mortgage, dated effective as of the date hereof, and all Mortgage Supporting Documents.

6.  thirty (30) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), the Borrowers shall use best efforts to deliver an executed counterpart signature page to the Pledge Agreement from Vanessa Abbe Ferber Kruger.

7.  ten (10) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), the Borrowers shall deliver copies of bank statements for each account set forth on Schedule 10 to the Security Agreement for the three (3) months prior to the Restatement Date.

8.  fifteen (15) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), the Borrowers shall execute and deliver to Agent, Control Agreements as required by Section 6.9.

9. twenty one (21) days after the Restatement Date (or such later date as Agent may agree in its sole discretion) (the "Payoff Reserve Release Deadline"), the Borrowers shall (a) execute and deliver to Agent payoff letters in form and substance reasonably satisfactory to Agent with respect to the Indebtedness set forth on Schedule 6.13 and (b) file or cause to be filed any and all terminations and releases with respect to the liens and security interests associated with the Indebtedness set forth on Schedule 6.13 (and provide Agent with satisfactory evidence of the same) (collectively, the "Payoff Reserve Release Conditions").

10. thirty (30) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), Agent shall have received (a) certificates from the Borrowers' insurance broker or other evidence satisfactory to Agent that all insurance required to be maintained pursuant to Section 5.7 is in full force and effect, together with endorsements naming Agent as additional insured, loss payee and mortgagee thereunder and (b) with respect to any general contractor, proof of insurance that satisfies the additional insurance requirements set forth on Schedule 5.7.

11. thirty (30) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), Agent shall have received a final construction budget ("Budget") with respect to planned construction at the Collateral Properties.

12. thirty (30) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), Agent shall have received invoices and quotes with respect to FF&E for the Collateral Properties.

13. thirty (30) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), Agent shall have received a Collateral Assignment with respect to each leased Real Property as of the Restatement Date.

14. thirty (30) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), Agent shall have received a subordination agreement in form and substance reasonably acceptable to Agent executed by the general contractor and each other contractor performing work or services at the Collateral Property located at 1474 Prospect St., Ewing, NJ.

15. sixty (60) days following the Restatement Date (or such later date as Agent may agree in its sole discretion), Agent shall have received a duly executed copy of each "Guaranteed Maximum Price" construction contract for each Additional Collateral Property, which shall have been reviewed by the Construction Consultant and in form and substance reasonably satisfactory to Agent.

16. seventy-five (75) days after the Restatement Date (or such later date as Agent may agree in its sole discretion), Agent shall have received (a) evidence of review by the Construction Consultant of the Budget, (b) the contractor evaluation and (c) quality of earnings roll-forward.

17. thirty (30) days following the earlier of (a) the "Rent Commencement Date" under that certain Ground Lease, effective as of August 30, 2021 (as amended, supplemented or otherwise modified from time to time, including any replacement or alternative lease, the "Somerset Ground Lease"), by and between Sohum Enterprises LLC and SRG Real Estate Holdings LLC and (b) the formation of an entity to which SRG Real Estate Holdings LLC assigns or will assign its obligations under the Somerset Ground Lease (the "Somerset RE Entity"), Agent shall have received (i) a copy of the Somerset Ground Lease (and any amendments or modifications thereof) and copies of any related assignments, leases or subleases, (ii) an executed Collateral Assignment with respect to the Somerset Ground Lease, (iii) formation and organizational documents with respect to the Somerset RE Entity, and (iv) such other information and documents as required pursuant to Sections 5.11 and 5.12 of the Credit Agreement, in each case, in form and substance reasonably satisfactory to Agent.

**Schedule 4.4(b)**

**Capitalization of Loan Parties**

| Loan Party | Beneficial Owner | Issued and Outstanding |
|---|---|---|
| SRG 1761 North Olden LLC | Mike Kanovitz | 50%* |
| | Jon Loevy | 50%* |
| SRG 1474 Prospect LLC | Mike Kanovitz | 50%* |
| | Jon Loevy | 50%* |
| JG New Jersey LLC | JG HoldCo LLC | 87%* |
| | NJ JG Investment I, LLC | 3.333% |
| | Double-up LLC | 3.333% |
| | Rookie Deal LLC | 3.333% |
| | Andrew Kofsky | 1.00% |
| | Robert W. Mauriella, Jr. | 1.00% |
| | Robert A. Magnanini | 1.00% |
| SRG Waretown LLC | Mike Kanovitz | 50%* |
| | Jon Loevy | 50%* |
| SRG 272 Main Street LLC | Mike Kanovitz | 50%* |
| | Jon Loevy | 50%* |
| SRG HI Park LLC | Mike Kanovitz | 50%* |
| | Jon Loevy | 50%* |
| Pier Cove LLC | JG HoldCo LLC | 100%* |
| Hayden Gateway LLC | JG HoldCo LLC | 100% Class A Shares* |
| | JG HoldCo LLC | 71.43% Class B Shares* |
| | Vanessa Abbe Ferber Kruger | 28.57% Class B Shares* |

**\*Signifies the Stock pledged pursuant to a Pledge Agreement**

**Schedule 4.4(c)**

**Jurisdictions of Organization of Parent and Loan Parties**

| Legal Name | Jurisdiction of Formation | States in Which Qualified to do Business | Tax ID# | Organizational No. | Type of Entity |
|---|---|---|---|---|---|
| JG Holdco LLC | Delaware | Delaware | 85-0702564 | 7345050 | LLC |
| SRG 1761 North Olden LLC | Delaware | New Jersey; Delaware | 84-3445949 | 7747183 | LLC |
| JG New Jersey LLC | New Jersey | New Jersey | 83-1681674 | 450297806 | LLC |
| SRG 1474 Prospect LLC | Delaware | New Jersey; Delaware | 85-1260759 | 7997923 | LLC |
| SRG Waretown LLC | New Jersey | New Jersey | 87-2142641 | 450688679 | LLC |
| Hayden Gateway LLC | Pennsylvania | Pennsylvania | 82-0837551 | 6526369 | LLC |
| SRG 272 Main Street LLC | Pennsylvania | Pennsylvania | 83-2470889 | 6748216 | LLC |
| Pier Cove LLC | Pennsylvania | Pennsylvania | 83-0567988 | 6714893 | LLC |
| SRG HI Park LLC | Pennsylvania | Pennsylvania | 84-3030915 | 6809441 | LLC |

| Legal Name | Chief Executive Office Address | County/State |
|---|---|---|
| JG Holdco LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| SRG 1761 North Olden LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| JG New Jersey LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| SRG 1474 Prospect LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| SRG Waretown LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| Hayden Gateway LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| SRG 272 Main Street LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| Pier Cove LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| SRG HI Park LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |

**Schedule 4.6(b)**

**Litigation**

1. Construction dispute with Vivo Partners involving JG New Jersey LLC, which the Lender has held back certain Loan funds for.

2. Construction dispute with Pulaski Brothers Construction involving JG New Jersey LLC, which the Lender has held back certain Loan funds for.

3. On September 21, 2021, SRG HI Park LLC received a letter Twin City Builders, Inc. regarding an alleged construction dispute.

**Schedule 4.7(d)**

**Cannabis Licenses**

**New Jersey**

| Entity: | JG New Jersey LLC |
|---|---|
| Date Applied: | August 2018 |
| Licensing Agency: | New Jersey Department of Health |
| License Type: | Alternative Treatment Center (a fully vertical license which allows for cultivation, processing, manufacturing, and dispensing of marijuana) |
| License Number: | TBD |
| Current Status: | Application Approved. Actual license will soon be awarded |

**Pennsylvania**

Justice Grown Pennsylvania Permit to operate a Medical Marijuana Dispensary Facility at 3650 Nazareth Pike, Bethlehem, PA – Permit No. D-2013-17 effective 6-29-21 to 6-29-22

Justice Grown Pennsylvania Permit to operate a Medical Marijuana Dispensary Facility at 7B Gateway Shopping Center, Edwardsville, PA – Permit No. D-2013-17 effective 6-29-21 to 6-29-22

Justice Grown Pennsylvania Permit to operate a Medical Marijuana Dispensary Facility at 272 Main Street, Dickson City, PA – Permit No. D-2013-17 effective 6-29-21 to 6-29-22

**Schedule 4.11**

**Environmental Matters**

None.

**Schedule 4.12(a)**

**Real Property**

| Loan Party | Common Address | County/ State | Owned/ Leased | Landlord (as applicable) |
|---|---|---|---|---|
| SRG 1761 North Olden LLC | 1761 North Olden Avenue, Ewing, NJ 08638 | Mercer County, NJ | Owned | N/A |
| JG New Jersey LLC | 1761 North Olden Avenue, Ewing, NJ 08638 | Mercer County, NJ | Leased | SRG 1761 North Olden LLC 1761 North Olden Avenue, Ewing, NJ 08638 |
| SRG 1474 Prospect LLC | 1474 Prospect St, Ewing, NJ 08638 | Mercer County, NJ | Owned | N/A |
| SRG Waretown LLC | 501 U.S. Route 9, Unit 6 Township of Ocean, NJ | Ocean County, NJ | Owned | N/A |
| SRG 272 Main Street LLC | 272 Main Street, Dickson City, PA 18519-1618 | Lackawanna, PA | Owned | N/A |
| SRG 272 Main Street LLC | 256 Main Street, Dickson City, PA 18519-1618 | Lackawanna, PA | Owned | N/A |
| Hayden Gateway LLC | 272 Main Street, Dickson City, PA 18519-1618 | Lackawanna, PA | Leased | SRG 272 Main Street LLC 272 Main Street, Dickson City, PA 18519-1618 |
| Hayden Gateway LLC | 3650 Nazareth Pike, Bethlehem, PA 18020 | Leigh, PA | Leased | 303-305 West Main Street LLC 2337 Philmont Ave Suite 210 Huntington Valley PA 19006 |
| Hayden Gateway LLC | 7B Gateway Shopping Centre, Edwardsville, PA 18704 | Luzerne, PA | Leased | Joe Amato Ventures, LP One Amato Drive, Moosic, PA 18507 |
| Pier Cove LLC | Site 35A, Humboldt Industrial Park Hazletown, PA 18201 (5 Chestnut Hill, Hazle Township, PA 18201) | Luzerne, PA | Leased | SRG HI Park LLC 5 Chestnut Hill, Hazle Township, PA 18201 |
| SRG HI Park LLC | Site 35A, Humboldt Industrial Park Hazletown, PA 18201 (5 Chestnut Hill, Hazle Township, PA 18201) | Luzerne, PA | Owned | N/A |

**Schedule 4.12(b)**

**Title Commitments**

| Loan Party | Common Address | County/ State | Owned/ Leased |
|---|---|---|---|
| SRG 1761 North Olden LLC | 1761 North Olden Avenue, Ewing, NJ 08638 | Mercer County, NJ | Owned |
| SRG 1474 Prospect LLC | 1474 Prospect St, Ewing, NJ 08638 | Mercer County, NJ | Owned |
| SRG Waretown LLC | 501 U.S. Route 9, Unit 6 Township of Ocean, NJ | Ocean / NJ | Owned |
| SRG 272 Main Street LLC | 272 Main Street, Dickson City, PA 18519-1618 | Lackawanna, PA | Owned |
| SRG 272 Main Street LLC | 256 Main Street, Dickson City, PA 18519-1618 | Lackawanna, PA | Owned |
| SRG HI PARK LLC | Site 35A, Humboldt Industrial Park Hazletown, PA 18201 (5 Chestnut Hill, Hazle Township, PA 18201) | Luzerne, PA | Owned |

**Schedule 4.12(g)**

**Collateral Property Matters**

The leases listed on Schedule 4.12(a) are incorporated herein by reference.

**Schedule 4.13**

**Broker Fees**

Sai Raman – Northern Lights Partners Inc.

Beneficiary Name: NORTHERN LIGHTS PARTNERS INC
Address: 333 Bay Street Suite 1700 Toronto ON M5H2R2
Transit Number : 0002
Institution number : 001
Bank Account Number: 4607682
BMO Swift: BOFMCAM2

Beneficiary Institution Information:
BMO Bank of Montreal
100 King Street West
Toronto, Ontario M5X1A3

USD correspondent bank information:
Pay through: Wells Fargo Bank (FKA Wachovia Bank)
S.W.I.F.T BIC Code: PNBPUS3NNYC
AND - Fedwire ABA: 026005092
OR - CHIPS UID: 0509

**Schedule 4.15**

**Existing Indebtedness**

None.

**Schedule 4.22**

**Material Contracts**

- That certain Lease dated as of January 1, 2020 by and between SRG 1761 North Olden LLC and JG New Jersey LLC.

- That certain Real Estate Lease Agreement dated as of March 20, 2017, by and between Joe Amato Ventures, LP and Hayden Gateway LLC (f/k/a Justice Grown Pennsylvania LLC).

- That certain Real Estate Lease Agreement dated as of January 11, 2019, by and between Bethlehem Village Associates and Hayden Gateway LLC.

- That certain Lease dated as of June 1, 2019 by and between SRG 272 Main Street LLC and Hayden Gateway LLC.

- That certain Lease dated as of June 1, 2019 by and between SRG HI Park LLC and Pier Cove LLC.

**Schedule 4.24**

**Collateral Locations**

| Legal Name | Jurisdiction of Formation | States in Which Qualified to do Business | Tax ID# | Organizational No. | Type of Entity |
|---|---|---|---|---|---|
| JG Holdco LLC | Delaware | Delaware | 85-0702564 | 7345050 | LLC |
| SRG 1761 North Olden LLC | Delaware | New Jersey; Delaware | 84-3445949 | 7747183 | LLC |
| JG New Jersey LLC | New Jersey | New Jersey | 83-1681674 | 450297806 | LLC |
| SRG 1474 Prospect LLC | Delaware | New Jersey; Delaware | 85-1260759 | 7997923 | LLC |
| SRG Waretown LLC | New Jersey | New Jersey | 87-2142641 | 450688679 | LLC |
| Hayden Gateway LLC | Pennsylvania | Pennsylvania | 82-0837551 | 6526369 | LLC |
| SRG 272 Main Street LLC | Pennsylvania | Pennsylvania | 83-2470889 | 6748216 | LLC |
| Pier Cove LLC | Pennsylvania | Pennsylvania | 83-0567988 | 6714893 | LLC |
| SRG HI Park LLC | Pennsylvania | Pennsylvania | 84-3030915 | 6809441 | LLC |

| Legal Name | Chief Executive Office Address | County/State |
|---|---|---|
| JG Holdco LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| SRG 1761 North Olden LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| JG New Jersey LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| SRG 1474 Prospect LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| SRG Waretown LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| Hayden Gateway LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| SRG 272 Main Street LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| Pier Cove LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |
| SRG HI Park LLC | 311 N. Aberdeen Street, Suite 200A, Chicago 60607 | Cook County, IL |

**Schedule 4.26**

**Intellectual Property**

None.

**Schedule 5.1**

**Financial Statements, Reports, Certificates**

Deliver to Agent and each Lender each of the financial statements, reports, or other items set forth below at the following times in form satisfactory to such Lender:

| | |
|---|---|
| as soon as available, but in any event within thirty (30) days after the end of each month during the Borrowers' fiscal year | monthly financial statements in the form customarily prepared by management consistent with Borrower's accounting methods;<br><br>a report detailing all Capital Expenditures in reasonable detail, including detailed Capital Expenditure draws requested (as appropriate); |
| as soon as available, but in any event within thirty (30) days after the end of each fiscal quarter during the Borrowers' fiscal year | (a) an unaudited balance sheet and statement of cash flow and income statement covering Parent's operations during such period and (b) an unaudited combined balance sheet and statement of cash flow and combined income statement covering the Borrowers and their Subsidiaries' operations during such period;<br><br>a Compliance Certificate along with the underlying calculations, including the calculations to arrive at Total Leverage Ratio, the Fixed Charge Coverage Ratio, Free Cash Flow, Combined Net Income, and Adjusted EBITDA, to the extent applicable; |
| as soon as available, but in any event within seventy-five (75) days after the Borrowers' fiscal year | (a) financial statements of Parent for each such fiscal year and (b) combined financial statements the Borrowers and their Subsidiaries for each such fiscal year, in each case, audited by the Auditor and certified, without any qualifications (including any (i) "going concern" or like qualification or exception or (ii) qualification or exception as to the scope of such audit), by such Auditor to have been prepared in accordance with GAAP, such audited financial statements to include a balance sheet, income statement, and statement of cash flow);<br><br>a Compliance Certificate along with the underlying calculations, including the calculations to arrive at Total Leverage Ratio, the Fixed Charge Coverage Ratio, Free Cash Flow, Combined Net Income, and Adjusted EBITDA, to the extent applicable; |
| as soon as available, but in any event ten (10) days prior to the start of the Borrowers' fiscal year | copies of Borrowers' Projections, in form and substance (including as to scope and underlying assumptions) reasonably satisfactory to Agent, for the forthcoming fiscal year, month by month, certified by the Chief Financial Officer or Chief Executive Officer of the Borrowers as being such officer's good faith estimate of the financial performance of Borrowers and their Subsidiaries during the period covered thereby; |
| promptly, but in any event within three (3) Business Days after Loan Parties have knowledge of any event or condition that constitutes a | notice of such event or condition and a statement of the curative action that Loan Parties propose to take with respect thereto; |

| Default or an Event of Default | |
|---|---|
| promptly after the commencement thereof, but in any event within three (3) Business Days after the service of process with respect thereto on any Loan Party or any of its Subsidiaries | notice of all actions, suits, or proceedings brought by or against the Borrowers or any of their Subsidiaries in which the current liabilities or potential liability could be reasonably expected to exceed two hundred fifty thousand dollars ($250,000); notices of all actions, suits or proceedings relating to any Cannabis License, and copies of all correspondence to or from any Regulatory Authority relating to any Cannabis License; notice of any infringement or claim of infringement by any other Person with respect to any Intellectual Property rights of any Loan Party, or if there is any claim by any other Person that any Loan Party in the conduct of its business is infringing on the Intellectual Property rights of others; |
| within a reasonable period of time following the reasonable request of Agent | any other information reasonably requested relating to the financial condition (including but not limited to any sales or cost information) of the Loan Parties; |
| promptly after the same becomes available | copies of all periodic and other notices, minutes, consents, reports, statements and other materials distributed to the Board of Directors of any Loan Party or to any of their respective shareholders generally, as the case may be; |
| with delivery of the financial statements for each fiscal quarter | Copies of any long-term employment agreement with any officer or Person with similar duties of a Loan Party or any material amendment thereto; Copies of any new Material Contracts or Cannabis Licenses, and All board packages provided to the members of such Board of Directors during such fiscal quarter, with such redactions as the Borrowers may reasonably make to the extent sharing such information (i) would reasonably be expected to jeopardize an attorney-client privilege, (ii) would reasonably be expected to result in a breach by any Loan Party of its obligations under any law, regulation, contract or agreement, (iii) would reasonably be expected to materially and adversely impact the discharge of the director's fiduciary duties to the Borrowers, (iv) includes information relating to any transactions with Agent or any Lender, or their affiliates or such information relates to the Loan Documents, or (v) includes information relating to confidential labor matters. |

**Schedule 5.2**

**Collateral Reporting**

Provide Agent and each Lender with each of the documents set forth below at the following times in form satisfactory to such Lender:

| within three (3) Business Days after any Loan Party obtains knowledge thereof | any acquisition or disposition of Real Property, the filing or creation of any Lien or claim relating to any Real Property and any violation of any Applicable Law or any Material Contract relating to any Real Property; and |
|---|---|
| within a reasonable period of time following request by Agent | such reports as to the Collateral or the financial condition of the Borrowers and their Subsidiaries as Agent may reasonably request. |

**Schedule 5.7**

**General Contractor Additional Insurance Provisions**

INDEMNIFICATION:

To the fullest extent permitted by law, the General Contractor shall agree to indemnify, defend and hold harmless the Borrower and the parties listed at the end of this paragraph as additional indemnities, if any, their officers, directors agents, employees and partners (hereafter for this Schedule 5.7, collectively, the "Indemnitees") from any and all claims, suits, damages, liabilities professional fees, including attorneys' fees, costs, expenses and disbursements related to death, personal injuries or property damage( including loss of use thereof) brought or assumed against any of the Indemnitees by any person or firm, arising out of or in connection with or as a result of or consequence of the performance of the Project of the General Contractor, as well as any additional work, extra work or add-on work, whether or not caused in whole or in part by the General Contractor or any person or entity employed, either directly or indirectly, by the General Contractor including any Contractors thereof and their er In its sole discretion. under this paragraph shall operate whether or not Contractor has placed and maintained the insurance specified below. Attorneys' fees, court costs, expenses and disbursements shall be defined those fees, costs, etc. incurred in defending the underlying claim and those fees, costs, etc., incurred in connection with the enforcement of this indemnity agreement. Parties to hold harmless include, but are not limited to, the Borrowers, Lenders, and the Agent.

SAFETY:

The General Contractor shall expressly agree and understand that it is primarily and solely responsible for the safety conditions of the work areas. The General Contractor shall agree that it is fully responsible for the compliance with all current and hereinafter enacted requirements and provisions under the Occupational Safety and Health Act of 1970 (OSHA), and/or any special standards and/or requirements promulgated by the Borrower and applicable to its Project, work areas, workmen, and those of its contractors and subcontractors, and agrees to hold and save harmless the Borrower from any claim, cost, loss, damage, expense or liability, including legal fees, which it might incur by reason of any action, law suit or proceeding arising out of a failure to work in accordance with any requirement or provision of OSHA, and from any costs, fines, penalties levied by any governmental authority, and the legal expenses incurred in connection therewith, which the indemnitees may suffer by reason of the Indemnitor's er In its sole discretion. under this paragraph shall operate whether or not Contractor has placed and maintained the insurance.

INSURANCE:

The General Contractor shall procure and maintain insurance as follows. The limits of liability shown for each type of insurance coverage to be provided by the General Contractor shall not be deemed to constitute a limitation of the General Contractor's or Subcontractors of every tier's liability for claims hereunder or otherwise. All policies shall contain a waiver of subrogation in favor of the Borrower and Additional Insureds and all others as required by contract.

If the General Contractor fails to purchase or fails to continue in force until completion of the Work, insurance in the amounts indicated above, Borrower or Agent may purchase such insurance and the cost thereof shall be borne by the party that failed to provide such insurance and may be deducted from any amounts owed by Borrower or Agent to that entity.

1. Workers Compensation and Employers Liability

(a) Workers' Compensation - Statutory Limits; Employer's Liability
(b) Employer Liability Limits:
    (i) Bodily Injury each Accident: $1,000,000
    (ii) Bodily Injury by Disease -Policy Limit: $1,000,000
    (iii) Bodily Injury by Disease -Each Employee: $1,000,000
(c) Waiver of Subrogation in favor of all parties, including, but not limited to, the Borrowers, Lenders, and the Agent.

## 2. Commercial General Liability ("CGL")

General Liability insurance with a combined single limit for Bodily Injury, Personal Injury and Property Damage of at least $1,000,000 per occurrence and $2,000,000 aggregate. The general aggregate limit shall apply on a per project basis. The limit may be provided through a combination of primary and umbrella/excess liability policies.

Coverage must provide and encompass at least the following:

(a) X, C and U hazards, (explosion, collapse, underground) where applicable;
(b) Blanket Contractual Liability covering all Indemnity Agreements;
(c) Products Liability and Completed Operations, with the provision that coverage shall extend for a period of at least six years from project completion;
(d) CGL coverage written on an occurrence form;
(e) Broad Form Property Damage Liability Insurance;
(f) ISO Endorsements CG 20 10 04 13 and CG 20 37 04 13, naming the following as Additional Insureds;
    • Property Owner
    • Borrower
    • Lender & Agent and their respective parent companies, subsidiaries, affiliate companies, directors, officers, employees and agents.

## 3. Commercial Automobile Liability

Commercial Automobile Liability (including all owned, leased, hired and non-owned automobiles) with a combined single limit for Bodily Injury and Property Damage of at least $1,000,000 per occurrence.

Such coverage shall be listed as primary coverage on the Umbrella Liability or Excess Liability required in Section 4 below.

The parties referenced in Section 2 above shall be covered as Additional Insureds.

## 4. Umbrella and/or Excess Liability

$5,000,000 Umbrella and/or excess liability policies, which may be used to comply with CGL, Auto Liability and Employers Liability limits shown above.

## 5. General Contractor's Pollution Liability:

General Contractor shall purchase a policy covering third-party injury and property damage claims, including cleanup costs, as a result of pollution conditions arising from Contractor's operations and completed operations. Completed operations coverage will remain in effect for no less than 3 years after

Final Completion. Borrower and other Additional Insureds pursuant to Section 2 above shall be named as Additional Insureds and the policy will have a retroactive date before the start of the Project.

The limits of coverage will not be less than $1,000,000 per occurrence and $2,000,000 in the aggregate, and shall include the following Coverage Extensions:

(a) Bodily injury, sickness, disease, mental anguish or shock sustained by any person, or death.
(b) Property damage, including physical injury to or destruction or tangible property, including the resulting loss of use thereof, clean-up costs and the loss of use of tangible property that has not been physically damaged or destroyed.
(c) Defense, including costs, charges and expenses incurred in the investigation, adjustment or defense of claims for damages.

6. Professional Liability

Where the General Contractor or any of the General Contractor's Subcontractors employs any licensed professional in connection with the Project, any such licensed professional shall carry professional liability insurance with coverage in the amount of $2,000,000 per claim and in the aggregate. Each such professional shall be maintained in effect for an additional 3 years following Final Completion of the Project.

7. Proof of Insurance

Prior to commencing any work, General Contractor shall furnish a certificate of insurance evidencing the above required coverages; provided, however, upon request from Lender and/or the Construction Consultant, the General Contractor shall furnish copies of the insurance policies required hereunder. The General Contractor shall keep the policies in full force and effect for a period of six (6) years following Substantial Completion of the Project.

All insurance carriers must: (i) be licensed in PA and NJ, and (ii) be rated at least A-IX in A.M. Best's rating guide, or A- by S&P or A3 By Moodys.

**Schedule 6.6**

**Nature of Business**

<u>JG New Jersey LLC</u>:  Is a licensed cultivator, processor and retail operator in the State of New Jersey in the Central Zone.  The license JG New Jersey LLC holds, is arguably the most valuable license in the country and industry. As there are currently only twelve (12) license holders in the State, and the license allows for three (3) dispensaries, cultivation and processing in a high populated state. JG New Jersey LLC  will earn revenue through the sales of medical cannabis products to medical cannabis patients within the State of New Jersey. Along with earning revenue through its wholesale sales of flower and manufactured products to other medically licensed dispensaries in the state.

<u>SRG 1761 North Olden LLC</u>: The landlord and property owner for JG New Jersey LLC's dispensary in 1761 North Olden, NJ.

<u>SRG 1474 Prospect LLC</u>: The landlord and property owner for JG New Jersey LLC's manufacturing and cultivation location.

<u>SRG Waretown LLC</u>: The landlord and property owner for JG New Jersey LLC's dispensary at 501 U.S. Route 9, Unit 6. Township of Ocean, NJ.

<u>Pier Cove LLC</u>:  Is a licensed processor and cultivator of cannabis in the Commonwealth of Pennsylvania in the North East Zone (Hazle Township). Along with Illinois, and New Jersey, it is also one of the most coveted and valuable licenses in the country due to the limited amount of licenses that exist, population size and a robust medical cannabis market. The license allows Pier Cove LLC to grow and process cannabis in the Commonwealth of Pennsylvania. Pier Cove LLC is not currently operational, but will earn revenue through its wholesale sales of flower and manufactured products to other dispensaries in the Commonwealth.

<u>Hayden Gateway LLC</u>: Is a licensed medical cannabis retail operator in the Commonwealth of Pennsylvania. The license allows Hayden Gateway to operate three medical cannabis dispensaries in the North East Zone of Pennsylvania. Hayden Gateway earns revenue through the sales of medical cannabis products to medical cannabis patients within the Commonwealth of Pennsylvania. Hayden Gateway currently has three dispensaries operational in Edwardsville, Dickson City, and Bethlehem.

<u>SRG HI Park LLC</u>: The landlord and property owner for Pier Cove LLC cultivation and processing.

<u>SRG 272 Main Street LLC</u>: The landlord and property owner for Hayden Gateway LLC's Dickson City dispensary location.

**Schedule 6.13**

**Payoff Debt**

Convertible Promissory Note dated August 12, 2019, issued by JG Holdco LLC in favor of Boka Capital LLC in an original principal amount of $5,000,000.

Secured Promissory Note dated August 8, 2019, issued by JG Holdco LLC in favor of Thirty-Ninth Street LLC in an original principal amount of $5,000,000.