# EXHIBIT 3

*Execution Version*

## FORBEARANCE AGREEMENT

This FORBEARANCE AGREEMENT ("**Agreement**"), dated as of March 6, 2024 (the "**Forbearance Effective Date**"), is made by and among Bloc Dispensary LLC (f/k/a JG New Jersey LLC), SRG 1761 North Olden LLC, SRG 1474 Prospect LLC, SRG Waretown LLC, Hayden Gateway LLC, Pier Cove LLC, SRG 272 Main Street LLC, and SRG HI Park LLC (each, a "**Borrower**," and collectively, the "**Borrowers**"), JG Holdco LLC ("**Parent**"), solely for the purposes of Sections 2.4(c), 4.2, 5.1, 5.8, 5.9, 5.13, 7.2, 8, and 12.1 hereof, Jon Loevy ("**Loevy**") and Michael Kanovitz ("**Kanovitz**," and together with Lovey, the "**Shareholder Guarantors**," and collectively with the Borrowers and Parent, the "**Obligors**," and each, individually, an "**Obligor**"), the Lenders party hereto (the "**Forbearing Lenders**") and AFC Agent LLC, as administrative agent for the Lender Group (in such capacity, "**Agent**"). Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Credit Agreement (as defined below).

## RECITALS

**WHEREAS**, Borrowers, Parent, Agent (as successor in interest to AFC Management, LLC), and the Forbearing Lenders are parties to that certain Second Amended and Restated Credit Agreement, dated as of September 30, 2021, as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of June 30, 2022, Amendment No. 2 to Second Amended and Restated Credit Agreement, dated as of August 26, 2022, Amendment No. 3 to Second Amended and Restated Credit Agreement, effective as of December 31, 2022 and Amendment No. 4 to Second Amended and Restated Credit Agreement, effective as of April 26, 2023 (and as further amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**").

**WHEREAS**, as security for all of the indebtedness and obligations due to the Lenders under the Credit Agreement (collectively, the "**Obligations**"), (a) Borrowers executed and delivered to Agent that certain Second Amended and Restated Security Agreement, dated as of September 30, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Security Agreement**"), granting to Agent, for the benefit of the Lender Group, a security interest in the Collateral (as defined therein), (b) Parent, Jon Loevy, Michael Kanovitz and Vanessa Abbe Ferber Kruger executed and delivered to Agent that certain Second Amended and Restated Pledge Agreement dated as of September 30, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Pledge Agreement**"), granting to Agent, for the benefit of the Lender Group, a security interest in the Collateral (as defined therein), (c) Parent executed and delivered to Agent that certain Guaranty, dated as of April 5, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Parent Guaranty**"), pursuant to which Parent has unconditionally and irrevocably guaranteed the payment of any and all of the Guarantied Obligations (as defined therein) to Agent, for the benefit of the Lender Group, and (d) Loevy and Kanovitz executed and delivered to Agent that certain Shareholder Guaranty, dated as of April 5, 2021 (as amended, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Shareholder Guaranty**"), pursuant to which each Shareholder Guarantor has unconditionally

4858-6397-4309.13

and irrevocably guaranteed the payment of any and all of the Guarantied Obligations (as defined therein) to Agent, for the benefit of the Lender Group;

**WHEREAS**, on July 28, 2023, (a) Agent delivered to Borrowers a Notice of Events and Default and Reservation of Rights, pursuant to which Agent notified Borrowers of certain Events of Default continuing under the Credit Agreement and (b) Agent delivered to Parke Bank a Notice of Exclusive Control (the "**Notice of Exclusive Control**"), under the terms of that certain Account Control Agreement, dated as of October 22, 2021 (as amended, supplemented or otherwise modified from time to time, the "**DACA**"), by and among JG New Jersey LLC, Hayden Gateway LLC, AFC Agent LLC (as successor in interest to AFC Management, LLC) and Parke Bank, pursuant to which Agent obtained exclusive control of the bank accounts subject to the DACA (the "**Accounts**");

**WHEREAS**, Borrowers, Parent, the Forbearing Lenders, and Agent entered into a Forbearance Agreement, dated as of September 12, 2023 (the "**Existing Forbearance Agreement**"), pursuant to which the Forbearing Lenders agreed to forbear from exercising their rights and remedies under the Credit Agreement and the other Loan Documents with respect to certain Events of Default continuing under the Credit Agreement described therein.

**WHEREAS**, Borrowers are in default of the Existing Forbearance Agreement and the Credit Agreement by virtue of the certain Forbearance Defaults (as defined in the Existing Forbearance Agreement), Defaults and Events of Default set forth on Schedule I hereto (collectively, the "**Specified Defaults**"), each of which is currently, or Borrowers anticipate will become, a Forbearance Default (as defined in the Existing Forbearance Agreement) under the Existing Forbearance Agreement or an Event of Default under the Credit Agreement during the Forbearance Period;

**WHEREAS**, (a) the Termination Date (as defined in the Existing Forbearance Agreement) has occurred under the Existing Forbearance Agreement and the Forbearance Period (as defined in the Existing Forbearance Agreement) under the Existing Forbearance Agreement has ceased and (b) Agent, at the direction of the Required Lenders, may exercise any and all remedies available under the Loan Documents, the Existing Forbearance Agreement and applicable law;

**WHEREAS**, Borrowers and Parent have requested Agent and Lenders to forbear from exercising their rights and remedies under the Credit Agreement and the other Loan Documents with respect to the Specified Defaults;

**WHEREAS**, Agent and the Forbearing Lenders are willing to forbear from exercising such rights and remedies with respect to the Specified Defaults provided that the Obligors comply with the terms and conditions of this Agreement (excluding rights and remedies in connection with the Notice of Exclusive Control and as otherwise set forth in Section 2.3 hereof); and

-2-

CONFIDENTIAL                                                                                    AFC_PI_0114

**WHEREAS**, the Forbearing Lenders (which constitute Required Lenders) have authorized, instructed and directed Agent to enter into this Agreement and to take or not take all such actions, steps, deeds or other actions as provided herein or in connection herewith.

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Acknowledgments. Borrowers and Parent acknowledge and agree that:

    1.1   Recitals. The above recitals are true and correct.

    1.2   Specified Defaults. The occurrence of the Specified Defaults have resulted in, or shall result in, Forbearance Defaults (as defined in the Existing Forbearance Agreement) under the Existing Forbearance Agreement or Events of Default under the Credit Agreement.

    1.3   Obligations. The Obligations are not subject to any setoff, deduction, claim, counterclaim, or defenses of any kind or character whatsoever.

    1.4   Collateral. Agent, for the benefit of the Lender Group, has valid, enforceable, and perfected security interests in and liens on the Collateral, as to which there are no setoffs, deductions, claims, counterclaims, or defenses of any kind or character whatsoever.

    1.5   No Lending Obligation. As a result of the Specified Defaults, Agent and Lenders have no obligation to make Loans or otherwise extend credit to Borrowers.

    1.6   Right to Accelerate Obligations. As a result of the Specified Defaults, subject to the forbearance contemplated hereby, Lenders have the right to accelerate the maturity and demand immediate payment of the Obligations.

    1.7   No Waiver of Defaults. Neither this Agreement, nor any actions taken in accordance with this Agreement or the Loan Documents, including Agent's and Lenders' continued making of loans to Borrower, shall be construed as a waiver of or consent to the Specified Defaults or any other existing or future defaults under the Loan Documents, as to which Agent's and Lenders' rights shall remain reserved.

    1.8   Preservation of Rights and Remedies. Upon expiration of the Forbearance Period (as defined in Section 2.1), all of Agent's and Lenders' rights and remedies under the Loan Documents and at law and in equity shall be available without restriction or modification, as if the forbearance had not occurred (subject, however, to the terms of this Agreement).

    1.9   Lender Conduct. Agent and Lenders have fully and timely performed all of their obligations and duties in compliance with the Loan Documents and applicable law, and have acted reasonably, in good faith, and appropriately under the circumstances.

-3-

CONFIDENTIAL

    1.10   <u>Notice of Exclusive Control</u>.  Agent and Lenders have properly and validly delivered the Notice of Exclusive Control and asserted control over the Accounts under the Loan Documents, the DACA and applicable law.

    1.11   <u>Default Interest</u>.  The occurrence and continuation of the Specified Defaults permit the Required Lenders to charge the default rate of interest in excess of the interest rate otherwise applicable to the Obligations under the Credit Agreement (the "**Default Rate**") pursuant to Section 2.5(b) of the Credit Agreement and Section 2.4 of the Existing Forbearance Agreement with respect to all outstanding Obligations.

2.    <u>Lender Forbearance</u>.

    2.1   <u>Forbearance Period</u>. Subject to compliance by the Obligors with the terms and conditions of this Agreement, Agent and the Forbearing Lenders hereby agree to forbear from exercising their rights and remedies under the Loan Documents with respect to the Specified Defaults (other than as expressly set forth in <u>Section 2.3</u>) during the period (the "**Forbearance Period**") commencing on the Forbearance Effective Date and ending on the earlier to occur of (i) the Maturity Date and (ii) the date that any Forbearance Default (as defined in <u>Section 10</u>) occurs.  The Forbearing Lenders' forbearance, as provided herein, shall immediately and automatically cease without notice or further action on the earlier to occur of (i) or (ii) (the "**Termination Date**").  On and from the Termination Date, Agent, at the direction of the Required Lenders, may exercise any and all remedies available under the Loan Documents by reason of the occurrence of any Events of Default thereunder or the continuation of any Specified Default.

    2.2   <u>Extension of Forbearance Period</u>. In the sole discretion of the Forbearing Lenders and without obligation, they may renew or extend the Forbearance Period, or grant additional forbearance periods.

    2.3   <u>Scope of Forbearance</u>. During the Forbearance Period, Agent and Lenders will not (i) accelerate the maturity of the Obligations or initiate proceedings to collect the Obligations; (ii) initiate or join in filing any involuntary bankruptcy petition with respect to Borrowers or Parent under the Bankruptcy Code, or otherwise file or participate in any insolvency, reorganization, moratorium, receivership, or other similar proceedings against Borrowers or Parent under the laws of the U.S.; (iii) repossess or dispose of any of the Collateral, through judicial proceedings or otherwise; (iv) exercise or enforce any other rights and remedies under the Credit Agreement, the other Loan Documents or applicable law; (v) initiate proceedings to enforce the Parent Guaranty or the Shareholder Guaranty; or (vi) charge the Default Rate pursuant to Section 2.5(b) of the Credit Agreement with respect to the outstanding Obligations; <u>provided</u>, <u>that</u>, notwithstanding anything to the contrary set forth herein, the following actions shall be excluded from the forbearance granted hereunder: (a) any and all actions taken pursuant to the DACA and the Notice of Exclusive Control, including the continued exercise by Agent of exclusive control of the Accounts and any application of the amounts on deposit therein to the Obligations as determined by Agent in accordance with the Loan Documents; (b) judicial foreclosure with respect to the real

-4-

4858-6397-4309.13

property located at Site 35A, Humboldt Industrial Park, Hazleton, PA 18201 (also known as 5 Chestnut Hill, Hazle Township, PA 18201) (the "**PA Cultivation Property**"), the process of selling the PA Cultivation Property, the consummation of the foregoing and any application of the proceeds thereof to the Obligations in accordance with the Loan Documents (the "**PA Cultivation Foreclosure Proceeding**"); provided, that, notwithstanding the foregoing, Agent and Lenders shall not take any such actions with respect to the PA Cultivation Property before April 30, 2024, unless Mosaic Construction LLC takes any action to enforce the mechanic's lien it has asserted against the PA Cultivation Property; and (c) Agent's and Lenders' right to assert any claims or causes of action as a result of any fraud or intentional misconduct by Parent, Borrower or any Shareholder Guarantor, including with respect to undisclosed tax liabilities, proceeds from equipment loans used for other purposes, and potential improper distributions of cash. If Agent or Lenders assert any such claim or cause of action, then, notwithstanding anything contained in this Agreement or the other Loan Documents to the contrary, Parent, Borrower and each Shareholder Guarantor reserve the right to assert any defense or any counterclaim arising out of the same transaction or occurrence as Agent or Lenders' claim or cause of action.

2.4    Certain Acknowledgements.

(a)    Default Interest. Notwithstanding anything in this Agreement or elsewhere to the contrary, Borrowers acknowledge that nothing shall prohibit, limit, restrict or otherwise impact in any way any rights of Agent or any Lender from imposing, charging or collecting interest at the Default Rate set forth in and pursuant to Section 2.5(b) of the Credit Agreement at any time (i) on or after the Termination Date with respect to the Specified Defaults or (ii) on or after the occurrence of any other Event of Default (other than the Specified Defaults).

(b)    Unpaid Lease Expenses. Each of SRG 272 Main Street LLC, SRG HI Park LLC, SRG 1761 North Olden LLC, SRG Waretown LLC, and SRG 1474 Prospect LLC (each, a "**Landlord**") hereby waives and forgives any and all past due rent and any other expenses due and owing by Hayden Gateway LLC, Pier Cove LLC and JG New Jersey LLC (each, a "**Tenant**"), under each lease between any Landlord and any Tenant (the "**Related Party Leases**") as of the Forbearance Effective Date.

(c)    Unpaid Taxes. Each Shareholder Guarantor acknowledges and agrees that, pursuant to the Shareholder Guaranty, (i) all unpaid Taxes of Borrowers as of the Forbearance Effective Date (the "**Unpaid Taxes**") are a "Guaranteed Obligation" under the Shareholder Guaranty, including a portion of the Unpaid Taxes that is directly attributable to unpaid taxes on income generated by the PA Cultivation Facility (the "**PA Cultivation Unpaid Taxes**") and a portion of the Unpaid Taxes that is directly attributable to unpaid taxes related to the Pennsylvania dispensaries (the "**PA Dispensary Unpaid Taxes**") and (ii) such Shareholder Guarantor is jointly and severally liable for the payment of the Unpaid Taxes. For the avoidance of doubt, (x) in the event of a Forbearance Default or in the event of the PA Cultivation Foreclosure

-5-

4858-6397-4309.13

Proceeding, Agent and the Forbearing Lenders may assign their rights and interests under this Section 2.4(c) with respect to the PA Cultivation Unpaid Taxes, at any time without the consent of or notice to any Obligor, and this Section 2.4(c) shall inure to the benefit any such assignee and (y) in the event of a Forbearance Default and a foreclosure proceeding or receivership or other similar statutory or common proceeding with respect to Hayden Gateway LLC or the Pennsylvania dispensaries, Agent and the Forbearing Lenders may assign their rights and interests under this Section 2.4(c) with respect to the PA Dispensary Unpaid Taxes, at any time without the consent of or notice to any Obligor, and this Section 2.4(c) shall inure to the benefit any such assignee.

3.    Conditions Precedent. On or prior to the Forbearance Effective Date, each of the following conditions shall have been satisfied in Agent's sole discretion, unless waived in writing by Agent:

3.1    Diligence.  Agent shall have received the following:

(a)    [Reserved].

(b)    the final certificate of occupancy for each dispensary operated by Borrowers, other than the dispensary located at 1761 North Olden Avenue, Ewing, New Jersey;

(c)    the lease for the dispensary located at 501 U.S. Route 9, Unit 6, Township of Ocean, New Jersey.

3.2    Agreement.  Agent shall have received counterparts of this Agreement executed by each of the parties hereto, including the Lenders constituting Required Lenders.

3.3    Amendment to Shareholder Guaranty.  Agent shall have received counterparts of an amendment to the Shareholder Guaranty substantially in the form of Exhibit B attached hereto.

3.4    Representations and Warranties.  The representations and warranties set forth in Section 4 below shall be true and correct.

3.5    No Default or Event of Default.  No Default, Event of Default or Forbearance Default (as defined in the Existing Forbearance Agreement) shall have occurred and be continuing, other than the Specified Defaults.

4.    Representations and Warranties.

4.1    Each Borrower and Parent represents and warrants to Agent and the Forbearing Lenders as follows:

-6-

4858-6397-4309.13

(a)    No Default.  Other than the Specified Defaults, no Default, Event of Default or Forbearance Default (as defined in the Existing Forbearance Agreement) has occurred and is continuing.

(b)    No Defense.  Each Borrower and Parent have no grounds to and will not assert any defense to the enforcement of Agent's or the Lenders' rights and remedies under the Notice of Exclusive Control and in connection with the PA Cultivation Foreclosure Proceeding.

(c)    Incorporation of Representations and Warranties From Credit Agreement.  Except with respect to the Specified Defaults (and, to the extent not constituting a Specified Default, except (i) as otherwise previously disclosed by the Loan Parties to Agent with respect to the matters described in Section 3.7 of Amendment No. 2 and (ii) with respect to the representation and warranty set forth in Section 4.17 (Payment of Taxes) of the Credit Agreement), the representations and warranties contained in Section 4 of the Credit Agreement are and will be true, correct and complete in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof) on and as of the date hereof to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case they were true, correct and complete in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality or Material Adverse Effect in the text thereof) on and as of such earlier date.

(d)    Accuracy of Information. All information provided by Borrowers and Parent, or any of their respective agents, is true, correct, and complete in all material respects, as of the date provided and does not contain any untrue statements of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

4.2    Each Obligor represents and warrants to Agent and the Forbearing Lenders as follows:

(a)    Power and Authority.  Such Obligor has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations hereunder.

(b)    Authorization of Agreements.  The execution and delivery of this Agreement has been duly authorized by all necessary action on the part of such Obligor, as the case may be.

(c)    No Conflict.  The execution and delivery of this Agreement will not (a) violate any Laws, the organization documents of such Obligor (as applicable) or

-7-

CONFIDENTIAL                                                                                 AFC_PI_0119

any order, judgment or decree of any court or other agency of government binding on such Obligor, (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any contractual obligation of such Obligor, (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of such Obligor (other than the Liens created under the Security Agreement, any Mortgage or any other Loan Document), or (d) require any approval or consent of any Obligor under any contractual obligations of such Obligor.

(d)     <u>Governmental Consents</u>.  The execution and delivery by such Obligor of this Agreement does not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body.

(e)     <u>Binding Obligation</u>.  This Agreement has been duly executed and delivered by such Obligor and this Agreement and is the legally valid and binding obligations of such Obligor, enforceable against such Obligor in accordance with its terms.

(f)     <u>Advice of Counsel</u>.  Such Obligor has freely and voluntarily entered into this Agreement with the advice of legal counsel of their choosing, or have knowingly waived the right to do so.

(g)     <u>No Duress</u>.  This Agreement has been entered into without force or duress, of the free will of such Obligor.  Such Obligor's decision to enter into this Agreement is a fully informed decision and each is aware of all legal and other ramifications of such decision.

5.     <u>Covenants</u>. In order to induce Agent and the Forbearing Lenders to forbear from the exercise of their rights and remedies as set forth above, the Obligors covenant and agree as follows:

5.1     <u>Compliance with Loan Documents</u>. Each Obligor shall continue to perform and observe all applicable covenants, terms, and conditions, and other obligations contained in all of the Loan Documents (as expressly modified herein) and this Agreement, except with respect to the Specified Defaults.

5.2     <u>Sale of Pennsylvania Dispensary Real Estate</u>.

(a)     SRG 272 Main Street LLC ("**Main Street**") shall promptly, and in any event by March 27, 2024 (the "**PA Dispensary RE Sale Outside Date**"), sell the real property located at 256 Main Street, Dickson City, PA 18519 and 272 Main Street, Dickson City, PA 18519 (the "**PA Dispensary RE Sale**") for Net Cash Proceeds (as defined below) of not less than $750,000 in the aggregate, on terms and conditions satisfactory to Agent in its sole discretion.

-8-

CONFIDENTIAL

(b)  Main Street shall, not later than one (1) Business Day following the consummation of the PA Dispensary RE Sale, apply such Net Cash Proceeds, first, to the payment of any accrued but unpaid cash interest under the Credit Agreement, second, and then to the repayment of any capitalized interest or fees under the Credit Agreement and third, to the repayment of outstanding principal under the Credit Agreement.

(c)  In the event Main Street fails to consummate the PA Dispensary RE Sale by the PA Dispensary RE Sale Outside Date, in addition to any other rights and remedies available to Agent and Lenders under the Loan Documents, Agent shall automatically, without further action by any party, have the right, as agent and attorney-in-fact for Main Street, to consummate the PA Dispensary RE Sale, in its sole and absolute discretion, without any further consent or approval of Main Street.

5.3  Underline: New Jersey Construction; Minimum NJ Cash Balance.

(a)  Parent and Borrowers shall timely make, or cause to be made, all payments due and payable in connection with the construction of the extraction lab and kitchen at the cultivation facility at 1474 Prospect Street, Ewing, New Jersey 08638 (the "**NJ Construction**") and, if such payment is not made though Partner Engineering, shall promptly provide Agent with proof of each such payment (satisfactory to Agent in its sole discretion).  Borrowers shall obtain the final certificate of occupancy and close out documents related to the NJ Construction by no later than May 15, 2024.

(b)  In the event that Agent determines that the balance in the NJ Account (defined below) is less than the Minimum NJ Cash Balance (defined below) for a period of five consecutive Business Days, Agent shall promptly notify Borrowers of such determination, and Borrowers shall promptly, and in any event within fifteen (15) days of such notification, deposit into the NJ Account, the proceeds of additional cash equity capital contributions in an amount equal to or greater than the amount of such shortfall.

5.4  Underline: Equity Contribution.

(a)  On or prior to each date set forth in the table below (each, an "**Equity Contribution Deadline**"), Borrowers shall deposit into escrow with Agent the proceeds of one or more cash equity capital contributions to Borrowers, in the aggregate amount set forth opposite such Equity Contribution Deadline  (each, an "**Equity Contribution**," and the amount of each Equity Contribution, the "**Equity Contribution Amount**"); provided that each such Equity Contribution (i) is upon terms and conditions satisfactory to Agent and (ii) constitute(s) Qualified Stock.

| Equity Contribution Deadline | Equity Contribution Amount |
| --- | --- |

-9-

4858-6397-4309.13

| March 8, 2024 | $1,000,000 |
|---|---|
| March 15, 2024 | $250,000 |
| March 31, 2024 | $750,000 |
| April 30, 2024 | $1,000,000 |

5.5     Sale of Ohio License.

        (a)     Borrowers, Parent and Michael Kanovitz acknowledge and agree that (i) Michael Kanovitz is the sole member (and has the power to direct the actions) of Cannavitz Ventures and a manager of Hayden Gateway LLC, which is the manager of each Borrower, (ii) Cannavitz Ventures is an Affiliate of Borrowers and part of a controlled group of companies with Borrowers, and (iii) the Loans and other financial accommodations provided to Borrowers under the Credit Agreement and the other Loan Documents and the forbearance and other accommodations granted by the Forbearing Lenders hereunder, directly and indirectly benefit Cannavitz Ventures.

        (b)     (i) Cannavitz Ventures shall use best efforts to consummate the sale and transfer of the Ohio License (the "**Ohio License Sale**") for Net Cash Proceeds (as defined below) at closing of not less than $1,000,000 in the aggregate (the "**Ohio License Net Cash Proceeds**"), on terms and conditions satisfactory to Agent in its sole discretion and (ii) Michael Kanovitz shall promptly, and in any event, not later than one (1) Business Day following the consummation of the Ohio License Sale, apply (or cause to be applied) the Ohio License Net Cash Proceeds, first, to any accrued but unpaid cash interest under the Credit Agreement, second, to the repayment of any capitalized interest or fees under the Credit Agreement, and third, to the repayment of outstanding principal under the Credit Agreement; provided, that any deferred purchase price (including any earnout or similar payments) with respect to the Ohio License Sale shall also be applied as set forth in this clause (b)(ii) within one (1) Business Day of receipt.

        (c)     Without limiting the foregoing, Cannavitz Ventures shall use good faith and best efforts, and shall fully cooperate with each applicable Ohio Governmental Authority, to promptly consummate the Ohio License Sale.

5.6     PA Management Services Agreement.

        (a)     Hayden Gateway LLC shall promptly, and in any event by March 20, 2024 enter into a management services agreement with Organic Remedies, Inc. (the "**Organic MSA**"), having terms consistent in all material respects with the terms set forth in the term sheet attached hereto as Annex I.

-10-

4858-6397-4309.13

(b)     In the event the Organic MSA is terminated for any reason prior to the end of the term specified therein, Hayden Gateway LLC shall promptly enter into a management services agreement on similar terms as the Organic MSA with a manager acceptable to Agent in its sole discretion.

(c)     Hayden Gateway LLC shall comply with the terms of the Organic MSA (or any replacement thereof) in all material respects and shall not interfere with or otherwise challenge the operational control of the Organic Remedies, Inc. under the Organic MSA.

5.7     <u>NJ Consulting Agreement</u>.

(a)     JG New Jersey LLC shall promptly, and in any event by March 20, 2024, enter into a consulting or similar agreement with SierraConstellation Partners LLC (the "**NJ Operations Manager**"), pursuant to which the NJ Operations Manager has full control to manage the operations of Borrowers in New Jersey until Agent is satisfied in its sole discretion that the cash flows from Borrowers' operations are adequate to support Borrowers' payment obligations under the Credit Agreement (as amended hereby) (the "**Specified End Date"),** which Borrowers acknowledge and agree may be an indefinite period of time (the "**NJ Consulting Agreement**").

(b)     In the event the NJ Consulting Agreement is terminated for any reason prior to the Specified End Date, JG New Jersey LLC shall promptly enter into a consulting or similar agreement on similar terms as the NJ Consulting Agreement with a consultant or operations manager acceptable to Agent in its sole discretion.

(c)     JG New Jersey LLC shall comply with the terms of the NJ Consulting Agreement (or any replacement thereof) in all material respects and shall not interfere with or otherwise challenge the operational control of the NJ Operations Manager.

5.8     <u>Unpaid Interest</u>.  Borrowers shall make a minimum payment with respect to accrued and unpaid interest for the month ending January 31, 2024 in an amount equal to $250,000 on or before March 20, 2024.  Agent acknowledges that a minimum payment with respect to accrued and unpaid interest for the month ending December 31, 2023 was made on February 26, 2024.  For the avoidance of doubt, the balance of accrued and unpaid interest for the months ending December 31, 2023 and January 31, 2024 shall be added to the Obligations.

5.9     <u>Excess Cash Flow Sweep</u>.

(a)     Borrowers shall cooperate fully with the ECF Sweep (defined below) as set forth in <u>Section 6.1</u>.

(b)     Prior to each ECF Sweep, Borrowers shall not use the funds in the NJ Account for any purpose other than (i) payroll, (ii) third party rent and related expenses pursuant to any triple net lease, (iii) amounts payable to service providers

-11-

CONFIDENTIAL

under current accounts payable for the current period (including pursuant to the NJ Consulting Agreement), (iv) expenses payable to vendors under current accounts payable for the current period, and (v) Estimated Tax Payments (as defined below), which, with respect to this clause (v), Borrowers shall deposit into escrow with Agent immediately prior to each ECF Sweep.

(c)     The Retained Cash Flow shall be applied only as follows: (i) first, for working capital purposes with respect to the Borrowers' operations in New Jersey, (ii) second, to management fees payable to Oakland Manager LLC in an amount not to exceed $40,000 per month, (iii) third, if the Borrowers are current and paying in cash all amounts due and payable under the Credit Agreement (as amended hereby) and past due accounts payable related to New Jersey operations are less than $100,000, to payment of accounts payable related to Pennsylvania operations which are past due as of the Forbearance Effective Date until the balance thereof is reduced to $250,000, and (iv) fourth, if the Borrowers are current and paying in cash all amounts due and payable under the Credit Agreement (as amended hereby), past due accounts payable related to New Jersey operations are less than $100,000 and past due accounts payable related to Pennsylvania operations are $250,000 or less, to payment of Unpaid Taxes. For the avoidance of doubt, Borrowers shall not use the Retained Cash Flow for payment of (A) any fees to Oakland Manager LLC (in excess of the amount set forth in clause (ii) above) or any other Affiliate, or (B) rent or other costs or expenses under the Related Party Leases.

5.10    PA Cultivation Foreclosure Proceeding.

(a)     Each Obligor shall participate and fully cooperate with Agent and the Lenders in all respects and on a consensual basis in the exercise of all rights and remedies under the Loan Documents, this Agreement and under Applicable Law, including in connection with the PA Cultivation Foreclosure Proceeding or any other foreclosure, receivership or other similar statutory or common proceeding with respect to the PA Cultivation Property, and the application of the proceeds thereof to the Obligations in accordance with the Loan Documents.

(b)     Without limiting the foregoing, in connection with the PA Cultivation Foreclosure Proceeding, each Obligor shall promptly take such further actions and execute and deliver such further instruments and documents that Agent may reasonably request, in order for Agent to foreclose on the PA Cultivation Property, including, without limitation, executing and delivering any board or shareholder consents or approvals as may be required or any documentation to evidence the agreements set forth in Section 2.5(c) and using best efforts to cooperate with any Governmental Authority in connection with the foregoing.

5.11    Access to Information and Reporting. Each Obligor, as applicable, shall deliver to Agent the following, in each case, in form and substance satisfactory to Agent in its sole discretion:

-12-

CONFIDENTIAL

(a)    on the first Business Day of each week, a consolidated accounts payable aging report as of the last Business Day of the immediately preceding week;

(b)    a schedule of all payroll expenses, not less than four days prior to disbursement;

(c)    copies of all invoices for services providers and vendor expenses related to the Pennsylvania and New Jersey operations, promptly upon receipt; and

(d)    the final certificate of occupancy for the dispensary located at 1761 N Olden Avenue, Ewing, New Jersey, promptly upon receipt.

(e)    any other information reasonably requested by Agent relating to the financial condition or operations of Parent, Borrowers and the Shareholder Guarantors or the Collateral, within three (3) Business Days of request thereof.

5.12    <u>Prohibited Transactions</u>.  Notwithstanding anything to the contrary set forth in the Credit Agreement, Parent and Borrowers shall not, without the express written consent of Agent, directly or indirectly (a) use the proceeds of any New Jersey operations or any cash held in any account of any Borrower with operations in New Jersey to pay any taxes, accounts payable or other expenses of any kind of any Borrower with operations in Pennsylvania or otherwise related to the Pennsylvania construction, business or operations (including in the form of any Investment or any Restricted Payment), or (b) comingle any assets of any Borrower operating in New Jersey with the assets of any Borrower operating in Pennsylvania.

5.13    <u>Control Agreement</u>.  Pursuant to the Notice of Exclusive Control, Parent and Borrowers shall not access, withdraw or transfer funds from the Accounts without the consent of Agent.

5.14    <u>Perfection of Lenders' Liens</u>. Borrowers and Parent shall execute and deliver, and shall cause each applicable Affiliate or other related party, as applicable, to execute and deliver to Agent, such documents and take such actions as Agent deems necessary or advisable to perfect or protect the security interests, mortgages, or liens granted to Agent for the benefit of the Lender Group.

5.15    <u>Agent Appointed Attorney-in-Fact</u>.  Without limiting any rights or remedies of Agent or the Lenders set forth in the Loan Documents or any power of attorney granted pursuant to or in connection with the Loan Documents, each Obligor hereby irrevocably appoints Agent its attorney-in-fact, with full authority in the place and stead of such Person and in the name of such Person or otherwise, in connection with the transactions contemplated hereunder, to take any action and to execute any instrument which Agent may reasonably deem necessary to accomplish the purposes of this Agreement.  To the extent permitted by law, each Obligor hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof.  This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated.

-13-

CONFIDENTIAL

5.16   <u>Perfection Certificate</u>.  Parent shall promptly, and in any event by March 20, 2024, deliver a completed Perfection Certificate, substantially in the form attached hereto as <u>Exhibit A</u>.

For purposes of this Agreement, "**Net Cash Proceeds**" means the amount of cash proceeds received (directly or indirectly) by or on behalf of an Obligor as initial consideration (and not as deferred compensation), in connection a sale or disposition, after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by a such Obligor in connection with such sale or disposition and (ii) taxes paid or payable to any taxing authorities by such Obligor in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are actually paid or payable to a Person that is not an Affiliate of such Obligor and are properly attributable to such transaction (or are required to be paid in order to close the subject transaction).

6.   <u>Amendments to Credit Agreement</u>.  So long as the Obligors timely comply with each of the covenants set forth in <u>Section 5</u>, Agent and the Lenders agree that:

6.1   <u>Interest</u>.   Commencing with the month ending February 29, 2024, notwithstanding anything to the contrary set forth in the Credit Agreement, including Section 2.5 of the Credit Agreement, the all Obligations that have been charged to the Loan Account pursuant to the terms of the Credit Agreement and the other Loan Documents with respect to the Term Loans shall bear interest on the outstanding balance thereof at a rate per annum equal to twelve and one half percent (12.5%) (the "**Applicable Interest Rate**"); provided that (a) (i) commencing on March 15, 2024, and on every other Friday thereafter, Borrowers shall make the ECF Based Interest Payment (defined below) in cash in arrears (the "**ECF Sweep**"), which shall be withdrawn by Agent from the Account in the name of JG New Jersey LLC (the "**NJ Account**") and (ii) to the extent the ECF Based Interest Payment withdrawn from the NJ Account, plus the PA Excess Cash Flow, for any given month is less than the Fixed Interest Payment, Borrowers shall make a True Up Payment (defined below) from the Equity Contribution Amount in cash in arrears on the fifteenth day of the following month, (b) to the extent the Minimum Interest Payment (defined below) for any month is less than accrued interest at the Applicable Interest Rate for such month, such difference shall be paid in kind by increasing the Outstanding Amount in respect of which such interest is paid by an amount equal to such difference, and the amount so added to principal shall be part of the Outstanding Amount and treated as an outstanding Term Loan for all purposes hereunder, (c) to the extent the Minimum Interest Payment for any month is greater than accrued interest at the Applicable Interest Rate for such month, such excess shall be applied first, to any accrued and unpaid Lender Group Expenses, second, to any interest and fees under the Credit Agreement, and finally, to outstanding principal under the Credit Agreement, and (d) during the term of the NJ Consulting Agreement, monthly interest payable at the Applicable Rate shall be reduced by an amount equal to the lesser of (x) the amount of the consulting fee payable to the NJ Operations Manager (or any replacement thereof) for such month and (y) one hundred thousand dollars ($100,000).

For purposes of this <u>Agreement</u>:

-14-

4858-6397-4309.13

"**ECF Based Interest Payment**" means an amount equal to seventy-five percent (75%) of Excess Cash Flow.

"**Estimated Tax Payments**" means Taxes and other governmental charges incurred and payable by JG New Jersey LLC, SRG 1761 North Olden LLC, SRG Waretown LLC or SRG 1474 Prospect LLC from and after the Forbearance Effective Date in an amount not to exceed nine percent (9.0%) of net retail sales from the Borrowers' New Jersey operations.

"**Excess Cash Flow**" means the funds deposited into the NJ Account during the two-week period immediately prior to any ECF Sweep, in excess of the Minimum NJ Cash Balance.

"**Fixed Interest Payment**" means two hundred fifty thousand dollars ($250,000).

"**Minimum Interest Payment**" means the greater of (a) the Fixed Interest Payment and (b) the ECF Based Interest Payment.

"**Minimum NJ Cash Balance**" means an amount equal to three hundred thousand dollars ($300,000).

"**PA Excess Cash Flow**" means the excess cash flow payable to Agent, for the benefit of the Lenders, pursuant to the Organic MSA (or any replacement thereof).

"**Retained Cash Flow**" means an amount equal to twenty-five percent (25%) of Excess Cash Flow.

"**True Up Payment**" means an amount equal to the difference between the Fixed Interest Payment and the ECF Based Interest Payment for a given month.

6.2     <u>Amortization</u>.  Section 2.3(d) of the Credit Agreement is hereby deleted in its entirety.

6.3     <u>Excess Cash Flow Sweep</u>.

(a)     The definition of "Amortization Trigger Date" in Section 1.1 of the Credit Agreement is hereby deleted in its entirety.

(b)     The definition of "Excess Cash Flow" in Section 1.1 of the Credit Agreement is hereby deleted in its entirety.

(c)     Section 2.3(f)(v) of the Credit Agreement is hereby deleted in its entirety.

-15-

CONFIDENTIAL                                                                                          AFC_PI_0127

6.4     Financial Covenants.  Sections 7.1, 7.2, 7.3, 7.4, 7.5, and 7.6 of the Credit Agreement are hereby deleted in their entirety.

7.     Reaffirmation of Guaranties.

7.1     Parent hereby ratifies and reaffirms (i) the validity, legality, and enforceability of the Parent Guaranty; (ii) that its reaffirmation of the Parent Guaranty is a material inducement to Agent and the Forbearing Lenders to enter into this Agreement; and (iii) that its obligations under the Parent Guaranty shall remain in full force and effect until all the Obligations have been paid in full.

7.2     Each Shareholder Guarantor ratifies and reaffirms (i) the validity, legality, and enforceability of the Shareholder Guaranty; (ii) that its reaffirmation of the Shareholder Guaranty is a material inducement to Agent and the Forbearing Lenders to enter into this Agreement; and (iii) that its obligations under the Shareholder Guaranty shall remain in full force and effect until all the Obligations have been paid in full.

8.     Release; Covenant Not to Sue.

8.1     Each Obligor, on behalf of itself and its and their respective agents, representatives, officers, directors, advisors, subsidiaries, affiliates, successors and assigns (collectively, "**Releasors**"), hereby forever waives, releases and discharges, to the fullest extent permitted by law, each Releasee (as hereinafter defined) from any and all claims, demands or causes of action of any kind or nature (collectively, the "**Claims**"), that such Releasor now has, whether known or unknown, whether arising at law or in equity, against Agent or any Lender in any capacity and its respective affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and its respective successors and assigns and each and all of the officers, directors, agents, and other representatives of each of the foregoing (collectively, the "**Releasees**"), based in whole or in part on facts, whether or not now known, existing on or before the date hereof, that relate to or otherwise are in connection with the Obligations, the Credit Agreement and/or any other Loan Document, or the transactions contemplated thereby or any consulting or advisory services provided by Agent or any Lender relating to the operation of the business of Borrowers, including, without limitation, any claims relating to inequitable or wrongful conduct, breach of fiduciary duties, exercise of unreasonable control over Borrowers and their business, or similar claims; provided, however, such release shall not apply to any Claims that are determined in a non-appealable judgment by a court of competent jurisdiction to result from such Releasee's gross negligence or willful misconduct.  It is the intention of each Borrower and Parent in providing this release that the same shall be effective as a bar to each and every Claim specified, and in furtherance of this intention it waives and relinquishes all rights and benefits under any applicable law.  The provisions of this Section 8 shall survive the termination of this Agreement, the Credit Agreement, the other Loan Documents and payment in full of the Obligations.

8.2     Each Borrower, Parent and each Shareholder Guarantor, for itself and on behalf of the other Releasors, hereby absolutely, unconditionally and irrevocably, covenants

-16-

4858-6397-4309.13

and agrees with and in favor of each Releasee above that (a) none of the provisions of the above release shall be construed as or constitute an admission of any liability on the part of any Releasee, (b) it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by such Obligor pursuant to <u>Section 8.1</u>, and (c) any attempt to assert a Claim barred by the provisions of this <u>Section 8</u> shall subject it to the provisions of applicable law setting forth the remedies for the bringing of groundless, frivolous or baseless claims or causes of action.

8.3     No Obligor shall dispute the validity or enforceability of the Credit Agreement or any of the other Loan Documents or any of its obligations thereunder, or the validity, priority, enforceability or the extent of Agent's Lien on any item of Collateral under the Credit Agreement or the other Loan Documents.  If any Obligor or any Person acting for or on behalf of, or claiming through it, violate the foregoing covenant, such Obligor, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by such Releasee as a result of such violation.   In agreeing to the foregoing release, each Obligor expressly disclaims any reliance on any representations or warranties, acts or omissions by any of the Releasees and hereby agrees and acknowledges that the validity and effectiveness of the above release do not depend in any way on any such representations or warranties, acts or omissions or the accuracy, completeness or validity thereof.

8.4     The foregoing release is executed voluntarily and without any duress or undue influence on the part or behalf of Agent or Lenders.  The Obligors each acknowledge that they have read the foregoing release, that they understand the terms and consequences thereof, and that each has had the opportunity to consult with counsel and are fully aware of the legal and binding effect thereof.  In executing this Agreement, no Obligor is relying on any representations, either written or oral, express or implied, made to any Obligor by any other party hereto, Agent or Lenders.

9.     <u>Indemnification</u>. Borrowers hereby expressly acknowledge, agree, and reaffirm their indemnification obligations to the Indemnified Persons as set forth in Section 11.3 of the Credit Agreement. Borrowers further acknowledge, agree, and reaffirm that all such indemnification obligations set forth in Section 11.3 of the Credit Agreement shall survive the expiration of the Forbearance Period and the termination of this Agreement, the Credit Agreement, the other Loan Documents, and the payment in full of the Obligations.

10.     <u>Events of Default</u>. The occurrence of one or more of the following shall constitute a "**Forbearance Default**" under this Agreement:

10.1     Any Obligor shall fail to abide by or observe any term, condition, covenant (including, for the avoidance of doubt, any covenant set forth in <u>Section 5</u>), or other provision contained in this Agreement or any document related to or executed in connection with this Agreement.

10.2     A Default or Event of Default shall occur under the Credit Agreement (as amended hereby) (other than the Specified Defaults).

-17-

4858-6397-4309.13

10.3    (a) Any Borrower repudiates or asserts a defense to any obligations or liability under the Credit Agreement or any other Loan Document, (b) Parent revokes or terminates its liability under the Parent Guaranty, or challenges the validity or enforceability of the Parent Guaranty or denies any further liability or obligations thereunder, or (c) any Shareholder Guarantor revokes or terminates its liability under the Shareholder Guaranty, or challenges the validity or enforceability of the Shareholder Guaranty or denies any further liability or obligations thereunder.

10.4    As of immediately prior to the date and time that any Borrower or Parent files any petition or is subject to an involuntary petition seeking relief under Title 11 of the United States Code or any voluntary or involuntary proceeding is commenced with respect to any Borrower or Parent under any other federal or state bankruptcy, insolvency, receivership or similar law.

10.5    Any Obligor or any of their respective Affiliates commences a case, proceeding, or other action against Agent, any Lender or any Releasee (as defined below) relating to any of the Obligations, Collateral, Loan Documents, this Agreement, or any action or omission by Agent, Lender, or their agents in connection with any of the foregoing.

10.6    Any representation or warranty of any Obligor made herein shall be false, misleading, or incorrect in any material respect when made.

10.7    Any Obligor or any of their respective Affiliates shall, or shall cooperate with any other Person to, challenge the validity or enforceability or otherwise seek to challenge, enjoin, avoid or unwind in any way the Notice of Exclusive Control or the PA Cultivation Foreclosure Proceeding.

Borrowers or Parent, as applicable, shall provide notice to Agent, as soon as possible but in any event within one (1) Business Day of the occurrence of any Forbearance Default, which notice shall state that such event occurred and set forth, in reasonable detail, the facts and circumstances that gave rise to such event.

11.    <u>Remedies</u>. Immediately upon the occurrence of a Forbearance Default:

11.1    The Forbearance Period shall immediately and automatically cease without notice or further action without notice to, or action by, any party.

11.2    Agent and Lenders shall be entitled to exercise any or all of their rights and remedies under the Loan Documents, this Agreement, or any stipulations or other documents executed in connection with or related to this Agreement or any of the Loan Documents, or applicable law, including, without limitation, the appointment of a receiver.

11.3    The accommodations set forth in <u>Section 6</u> shall automatically expire, terminate, and be of no further force and effect, and (a) interest shall accrue and shall be

-18-

CONFIDENTIAL

payable as set forth in Section 2.5 of the Credit Agreement (without giving effect to the amendment thereto set forth in <u>Section 6</u>), (b) amortization payments shall be due and payable as set forth in Section 2.3(d) of the Credit Agreement (without giving effect to the amendment thereto set forth in <u>Section 6</u>), and (c) the financial covenants set forth in Section 7 of the Credit Agreement shall be in full force and effect.

12.    <u>Miscellaneous</u>.

12.1    <u>Ratification of Liability</u>.    Each Obligor, as debtors, grantors, pledgors, guarantors, assignors, or in other similar capacities in which such parties grant liens or security interests in their properties or otherwise act as accommodation parties or guarantors, as the case may be, under the Credit Agreement and the other Loan Documents, hereby ratify and reaffirm all of their payment and performance obligations and obligations to indemnify, contingent or otherwise, under each of such Credit Agreement and other Loan Documents to which it is a party, and ratify and reaffirm their grants of liens on or security interests in their properties pursuant to such Credit Agreement and other Loan Documents to which they are a party, respectively, as security for the Obligations under or with respect to the Credit Agreement, and confirms and agrees that such liens and security interests hereafter secure all of the Obligations, including, without limitation, all additional Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Credit Agreement or any other Loan Document. Each Borrower, Parent and Shareholder Guarantor further agrees and reaffirms that the Loan Documents to which they are parties now apply to all Obligations as defined in the Credit Agreement (including, without limitation, all additional Obligations hereafter arising or incurred pursuant to or in connection with this Agreement, the Credit Agreement or any other Loan Document). Each such party (i) further acknowledges receipt of a copy of this Agreement and all other agreements, documents, and instruments executed and/or delivered in connection herewith, (ii) consents to the terms and conditions of same, and (iii) agrees and acknowledges that each of the Loan Documents remains in full force and effect and is hereby ratified and confirmed.

12.2    <u>References to and Effect on the Credit Agreement</u>.

(a)    Except as specifically set forth herein, all terms, conditions, covenants, representations and warranties contained in the Credit Agreement and other Loan Documents, and all rights of the Lender Group and all of the Obligations, shall remain in full force and effect. Borrowers and Parent hereby confirm that the Credit Agreement and the other Loan Documents are in full force and effect and that neither Borrowers nor Parent has any right of setoff, recoupment or other offset or any defense, claim or counterclaim with respect to any of the Obligations, the Credit Agreement or any other Loan Document.

(b)    Except as expressly set forth herein, the execution, delivery and effectiveness of this Agreement shall not directly or indirectly (i) constitute a consent or waiver of any past, present or future violations of any provisions of the Credit

-19-

4858-6397-4309.13

Agreement or any other Loan Documents nor constitute a novation of any of the Obligations under the Credit Agreement or other Loan Documents, (ii) amend, modify or operate as a waiver of any provision of the Credit Agreement or any other Loan Documents or any right, power or remedy of any member of the Lender Group, (iii) constitute a course of dealing or other basis for altering any Obligations or any other contract or instrument or (iv) create any obligation to make any further Loans or to continue to defer any enforcement action after the occurrence of any Default or Event of Default (including, without limitation, any Forbearance Default).  Except as expressly set forth herein, each member of the Lender Group reserves all of its rights, powers, and remedies under the Credit Agreement, the other Loan Documents and applicable law.

(c)     From and after the Forbearance Effective Date, the term "Loan Documents" in the Credit Agreement and the other Loan Documents shall include, without limitation, this Agreement and any agreements, instruments and other documents executed and/or delivered in connection herewith.

(d)     The Loan Parties acknowledge and agree that the Forbearing Lenders' agreement to forbear from exercising their default-related rights and remedies with respect to the Specified Defaults during the Forbearance Period as set forth herein does not in any manner whatsoever limit any member of the Lender Group's right to insist upon strict compliance by Borrower and Parent with the Credit Agreement, this Agreement or any other Loan Document during the Forbearance Period, except as expressly set forth herein.

(e)     No member of the Lender Group has waived (regardless of any delay in exercising such rights and remedies), any Default or Event of Default that may be continuing on the date hereof or any Event of Default that may occur after the date hereof (whether the same or similar to the Specified Defaults or otherwise), and no member of the Lender Group has agreed to forbear with respect to any of its rights or remedies concerning any Events of Default (other than, during the Forbearance Period, the Specified Defaults solely to the extent expressly set forth herein), that may have occurred or are continuing as of the date hereof, or that may occur after the date hereof.

(f)     This Agreement shall not be deemed or construed to be a satisfaction, reinstatement, novation or release of the Credit Agreement or any other Loan Document.

12.3   Fees and Expenses.  Each of Borrower and Parent acknowledges that, in accordance with the Credit Agreement, all Lender Group Expenses incurred by Agent, Lenders and their respective counsel with respect to this Agreement and the documents and transactions contemplated hereby shall be for the account of Borrowers and Parent.

-20-

CONFIDENTIAL

12.4    <u>Notices</u>. Any notices with respect to this Agreement shall be given in the manner provided for in Section 12 of the Credit Agreement, Section 31 of the Security Agreement and/or Section 20 of the Pledge Agreement, as applicable.

12.5    <u>Integration; Modification of Agreement</u>. This Agreement and the Loan Documents embody the entire understanding between the parties hereto and supersedes all prior agreements and understandings (whether written or oral) relating to the subject matter hereof and thereof.  The terms of this Agreement may not be waived, modified, altered, or amended except by agreement in writing signed by all the parties hereto. This Agreement shall not be construed against the drafter hereof.

12.6    <u>Severability of Provisions</u>. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

12.7    <u>Successors and Assigns</u>. This Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors, and assigns, provided that Borrowers' and Parent's rights under this Agreement are not assignable. Agent and the Forbearing Lenders may assign their rights and interests in this Agreement, the Loan Documents, and all documents executed in connection with or related to this Agreement or the Loan Documents, at any time without the consent of or notice to Borrowers or Parent.

12.8    <u>Cumulative Rights</u>. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

12.9    <u>Recommendation of Counsel</u>. Each Obligor acknowledges that Agent has recommended that they each consult with counsel prior to execution of this Agreement and represent that they either have done so or have knowingly waived the right to do so despite the express recommendation of Agent.

12.10    <u>Choice of Law and Venue; Jury Trial Waiver</u>.

(a)    THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK NOT INCLUDING CONFLICTS OF LAWS RULES.

(b)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO HEREBY WAIVES THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON

-21-

4858-6397-4309.13

OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH PARTY HERETO REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c)     EACH     OBLIGOR     HEREBY     IRREVOCABLY     AND UNCONDITIONALLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK, SITTING IN THE COUNTY OF WESTCHESTER OR NEW YORK, AT THE REQUIRED LENDERS' DISCRETION, AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY OBLIGOR OR ANY OF THEIR PROPERTIES IN THE COURTS OF ANY JURISDICTION.

12.11    Section Headings.    Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

12.12    Counterparts. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by electronic mail or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by electronic mail or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

4858-6397-4309.13

CONFIDENTIAL

AFC_PI_0134

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**BORROWERS:**    **BLOC DISPENSARY LLC (F/K/A JG NEW JERSEY LLC),**
**SRG 1761 NORTH OLDEN LLC,**
**SRG 1474 PROSPECT LLC,**
**SRG WARETOWN LLC,**
**HAYDEN GATEWAY LLC,**
**PIER COVE LLC,**
**SRG 272 MAIN STREET LLC,**
**SRG HI PARK LLC**

**By: Hayden Manager LLC, Manager**

By: _Jon Loevy_
Name: _Jon Loevy_
Title: _Manager_

**PARENT:**    **JG HOLDCO LLC**

By: _Jon Loevy_
Name: _Jon Loevy_
Title: _Manager_

*[Signature Page to Forbearance Agreement]*

CONFIDENTIAL

**SHAREHOLDER GUARANTORS**

**JON LOEVY (FOR PURPOSES OF
SECTIONS 2.4(c), 4.2, 5.1, 5.8, 5.9, 5.13, 7.2, 8, AND
12.1 ONLY)**

DocuSigned by:

*Jon Loevy*

1C8F8732A36A4D4

**MICHAEL KANOVITZ (FOR PURPOSES OF
SECTIONS 2.4(c), 4.2, 5.1, 5.8, 5.9, 5.13, 7.2, 8 AND
12.1 ONLY)**

DocuSigned by:

By: _____

D3D3859EDF5D46C

**CANNAVITZ VENTURES**

**CANNAVITZ VENTURES (FOR PURPOSES OF
SECTION 5.5 ONLY)**

**By: Michael Kanovitz, Sole Member**

DocuSigned by:

By: _____

D3D3859EDF5D46C

*[Signature Page to Forbearance Agreement]*

CONFIDENTIAL

**AGENT:**

**AFC AGENT LLC**

By: _Gabriel Katz_

Name:  Gabriel Katz

Title:  Authorized Signatory

**FORBEARING LENDERS:**

**AFC GAMMA, INC.**

By: _____

Name:  Dan Neville

Title:  Chief Executive Officer

**AFC INSTITUTIONAL FUND, LLC**

By: _Jeffrey Boccuzzi_

Name:  Jeffrey Boccuzzi

Title:  Authorized Signatory

*[Signature Page to Forbearance Agreement]*

CONFIDENTIAL

## SCHEDULE I

### Specified Defaults

1.      an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the Liens filed by, among others, Mosaic Construction LLC, Arc Electric Construction Co., Inc., Troy Mechanical, Inc. and C.E. Ankiewicz Construction & Excavation, Inc., against the assets of one or more of the Borrowers, in violation of Section 6.2 of the Credit Agreement;

2.      an Event of Default under Section 8.1(b)(ii) of the Credit Agreement for the failure of the Loan Parties to observe and perform certain covenants, terms, conditions and agreements contained in certain Material Contracts, including under that certain Standard Form of Agreement Between Owner and Contractor (AIA Form A102 - 2017) dated as of October 25, 2021 by and between Mosaic Construction and SRG HI PARK, LLC , in each case, in violation of Section 5.15 of the Credit Agreement;

3.      an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure to provide the relevant documents to Agent and each Lender in connection with the filing of the Liens described in clause (i) above, within 3 Business Days after obtaining knowledge thereof, in violation of Section 5.2 of the Credit Agreement;

4.      an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure to provide the relevant documents to Agent and each Lender in connection with the violations of certain Material Contracts, as described in clause (ii) above, within 3 Business Days after obtaining knowledge thereof, in each case, in violation of Section 5.2 of the Credit Agreement;

5.      Events of Default under Section 8.1(a) of the Credit Agreement for the failure of the Loan Parties to make the cash interest payment due and owing for the months ending June 30, 2023, July 31, 2023 and January 31, 2024, in violation of Section 2.5(c) of the Credit Agreement;

6.      a Forbearance Default (as defined in the Existing Forbearance Agreement) under Section 10.1 of the Forbearance Agreement for the failure of the Loan Parties to make the cash interest payment due and owing for the month ending December 31, 2023 in violation of Section 6.2(a) of the Forbearance Agreement;

7.      an Event of Default under Section 8.1(a) of the Credit Agreement for the failure of the Loan Parties to make the principal payments due and owing on January 1, 2024 and February 1, 2024, in violation of Section 2.3(d) of the Credit Agreement and Section 6.2(b) of the Forbearance Agreement;

8.      an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure to provide notice of the Complaint to Enforce Mechanic's Lien Claim filed by Mosaic Construction, LLC, as plaintiff, against SRG HI PARK LLC (among others), as defendants, in the Court of Common Pleas, Luzerne County, which current liabilities or potential liability could reasonably be expected to exceed $250,000, within 3 Business

4858-6397-4309.11

Days after service of process with respect thereto, in violation of Section 5.1 of the Credit Agreement;

9.  an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure to provide notice of the Complaint filed by Arc Electric Construction Co., Inc., as plaintiff, against Mosaic Construction, LLC (among others), as defendants, in the United States District Court for the Middle District of Pennsylvania, which current liabilities or potential liability could reasonably be expected to exceed $250,000, within 3 Business Days after service of process with respect thereto, in violation of Section 5.1 of the Credit Agreement;

10. an Event of Default under Section 8.1(b)(i) for the failure by the Loan Parties to comply with the Minimum Cash Balance financial covenant for the fiscal quarter ending December 31, 2022, in violation of Section 7.5 of the Credit Agreement;

11. Events of Default under Section 8.1(b)(i) for the failure by the Loan Parties to comply with the Minimum Adjusted EBITDA, Minimum Free Cash Flow, Maximum Total Leverage Ratio, Minimum Fixed Charge Coverage Ratio, Minimum Cash Balance, and Minimum Net Income financial covenants for the fiscal quarter ending March 31, 2023, in violation of Sections 7.1, 7.2, 7.3, 7.4, 7.5, and 7.6 of the Credit Agreement, respectively;

12. an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure by the Loan Parties to deliver annual audited financial statements for the fiscal year ending December 31, 2022, in violation of Section 5.1 of the Credit Agreement;

13. an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure by the Loan Parties to deliver monthly financial statements for the months ending October 31, 2023 and November 30, 2023, in violation of Section 5.1 of the Credit Agreement;

14. an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure by the Loan Parties to provide prior notice to Agent regarding the name change of JG New Jersey LLC, in violation of Section 6.5 of the Credit Agreement;

15. an Event of Default under Section 8.1(b)(ii) of the Credit Agreement for the failure by the Loan Parties to defend their title and Agent's Lien on their assets and properties as described in clause (i) above, in violation of Section 5.5 of the Credit Agreement;

16. an Event of Default under Section 8.1(b)(ii) of the Credit Agreement for the failure by the Loan Parties to cause all Taxes to be paid in full when due, in violation of Section 5.6 of the Credit Agreement;

17. an Event of Default under Section 8.1(b)(iii) of the Credit Agreement for the failure by the Loan Parties to execute and deliver a first priority Mortgage with respect to the real property located at 6850 Hazelwood Ave, Hazelwood, MO 63134, securing and being insured for $3,100,000 and all Mortgage Supporting Documents with respect thereto, in violation of Section 5.1 of the Amendment No. 4;

CONFIDENTIAL

18.   an Event of Default under Section 8.1(n) of the Credit Agreement for the occurrence of a Material Adverse Effect;

19.   Events of Default under Section 8.1(b)(i) of the Credit Agreement for the failure to provide notice of each of the above events and conditions which constitute a Default or Event of Default and a statement of the curative action that the Loan Parties proposed to take with respect thereto, in each case, in violation of Section 5.1 of the Credit Agreement;

20.   an Event of Default under Section 8.1(b)(i) of the Credit Agreement for the failure by the Loan Parties to comply with Section 6.15 of the Credit Agreement with respect to a draw request made in November 2022 for $408,814 for extraction equipment from Precision (in reference to Precision invoice no. S26402 dated November 9, 2022), which funds were advanced by Agent on November 11, 2022, but were not used to purchase the equipment identified on the referenced invoice; and

21.   a Forbearance Default (as defined in the Existing Forbearance Agreements) under Section 10.1 of the Forbearance Agreement for the failure of the Loan Parties to consummate the Ohio License Sale by the Ohio License Sale Outside Date (as defined in the Forbearance Agreement), in violation of Section 5.5(b) of the Forbearance Agreement.

4858-6397-4309.11

**Exhibit A**

**Form of Perfection Certificate**

- 1 -

4858-6397-4309.11

CONFIDENTIAL

AFC_PI_0141

## PERFECTION CERTIFICATE

[DATE]

Reference is hereby made to (a) that certain Second Amended and Restated Credit Agreement, dated as of September 30, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among **BLOC DISPENSARY LLC** (f/k/a JG NEW JERSEY LLC), **HAYDEN GATEWAY LLC**, **PIER COVE LLC**, **SRG 272 MAIN STREET LLC**, **SRG 1761 NORTH OLDEN LLC**, **SRG 1474 PROSPECT LLC**, and **SRG HI PARK LLC** (each, a "Borrower" and collectively, the "Borrowers"), the other Loan Parties party thereto from time to time, JG Holdco LLC ("Holdco"), the Lenders party thereto from time to time, and AFC AGENT LLC, a Delaware limited liability company, as the agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "Agent") and (b) that certain Forbearance Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Forbearance Agreement"), by and among the Borrowers, Holdco, the other parties thereto, the Lenders party thereto, and Agent.

All initially capitalized terms used herein without definition shall have the meanings ascribed thereto in the Credit Agreement. Any terms (whether capitalized or lower case) used in this Perfection Certificate that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein or in the Credit Agreement; provided, that to the extent that the Code is used to define any term used herein and if such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern. As used herein, the term "Specified Persons" means (i) Holdco and its Subsidiaries and (ii) any Affiliate or other Person, including any present or former officer, employee, director, member of management or consultant (or their respective estates, executors, administrators, heirs, family members, legatees, distributees, spouses, former spouses, domestic partners and former domestic partners) of the Persons set forth in clause (i), which owns any cannabis assets, including any cannabis licenses or permits, and with respect to which Holdco or any of its Subsidiaries provides or provided any financing in connection with the acquisition of such assets or provides or provided any guaranty or other credit support in connection with the development, operation or maintenance of such cannabis assets.

The undersigned, an Officer of Holdco, hereby certifies (in his or her capacity as Officer of Holdco, and not in his or her individual capacity), to Agent and each Lender as follows as of the date hereof:

1.  Names.

The exact legal name of each Specified Person, as such name appears in its certified certificate of incorporation, articles of incorporation, certificate of formation, or any other applicable organizational document, is set forth on below. Each Specified Person is (i) the type of entity disclosed next to its name below and (ii) a registered organization except to the extent disclosed below. Also set forth below is the organizational identification number, if any, of each Specified Person that is a registered organization, the U.S. Federal Taxpayer Identification Number of each Specified Person, and the jurisdiction of formation of each Specified Person. Each Specified Person has qualified to do business in the states listed below.

- 2 -

4858-6397-4309.11

| Legal Name | Jurisdiction of Formation | States in Which Qualified to do Business | Tax ID# | Organizational No. | Type of Entity |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Set forth below is a list of any other legal names each Specified Person has had in the past five years, together with the date of the relevant name change.

| Current Legal Name of Specified Person | Former Legal Name | Date of Change |
|---|---|---|
|  |  |  |

Set forth below is a list of all other names used by each Specified Person in connection with any business or organization to which such Specified Person became the successor by merger, consolidation, acquisition, change in form, nature or jurisdiction of organization or otherwise or on any filings with the Internal Revenue Service, in each case, at any time in the past five years. Except as set forth below, no Specified Person has changed its jurisdiction of organization at any time during the past four months.

/●/

2.  Chief Executive Offices; Books and Records; Other Property.  The chief executive office of each Specified Person is located at the address set forth below, and except as otherwise listed, such chief executive office has not been located at any other address during the past five years.  Set forth below is all of the locations where each Specified Person maintains (or within the past four months has maintained) its books and records and any equipment, inventory or other tangible personal property.

| Specified Person | Chief Executive Office Address | Location of Books and Records | Location of Equipment, Inventory or Other Tangible Personal Property |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

- 3 -

4858-6397-4309.11

3.  <u>Officers and Directors</u>.  The officers of each Specified Person and their respective titles are set forth below.  The members of the board of directors, board of managers or similar governing body of each Specified Person (or, if such party is a limited partnership, the general partner or, if such party is a limited liability company, the managers) are set forth below.

| Specified Person | Officer Names and Titles | Board of Directors / Managers / Other Governing Body |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

4.  <u>Real Property</u>.

Set forth below is a list of all (i) Real Property (as defined in the Security Agreement) of each Specified Person, (ii)  mortgages encumbering any such owned Real Property or to encumber, any such owned Real Property as of the Restatement Date, including filing offices, (iii) common names, addresses and uses of each parcel of such Real Property (stating improvements located on any owned Real Property), (iv) names of entity owning any Real Property, and (v) other information relating thereto.  Except as described below:  (A) no Specified Person has entered into any leases, subleases, tenancies, franchise agreements, licenses or other occupancy arrangements as owner, lessor, sublessor, licensor, franchisor or grantor with respect to any of the Real Property described below and (B) no Specified Person has any leases, subleases, tenancies, franchise agreements, licenses or other occupancy agreements which require the consent of the landlord, tenant or other party thereto to the transactions contemplated by the Loan Documents.

| Specified Person | Common Address | County/ State | Owned/ Leased | Landlord (as applicable) | Use(s) | Improvements |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

- 4 -

4858-6397-4309.11

Set forth below is a list of all third parties ("Bailees") with possession of any assets (including inventory and equipment) of any Specified Person , including the name and address of such Bailee, a description of the inventory and equipment in such Bailee's possession and the location of such inventory and equipment (if none please so state).

[●]

5.    Extraordinary Transactions.    Except for those purchases, mergers, acquisitions, consolidations, and other transactions described below, all assets of each Specified Person has been originated by such Specified Person in the ordinary course of business or consists of goods which have been acquired by such Specified Person in the ordinary course of business from a person in the business of selling goods of that kind.

[●]

6.    Lien Search Summary.    Set forth below is a summary of each financing statement or other filing filed against any Specified Person in the Uniform Commercial Code filing office or offices in each jurisdiction identified in item 1 with respect to such Specified Person.  Holdco has no knowledge of any other financing statement or other filing under the Uniform Commercial Code having been made in the name of any Specified Person.  True and correct copies of all filings listed below have been delivered to the Lender.

| Specified Person | Filing Jurisdiction | Secured Party | Lien Number | Collateral |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

7.    Stock, Ownership and Other Equity Interests.    Set forth below is a true and correct list of each of all of the authorized, and the issued and outstanding, Stock of each Specified Person and the record and beneficial owners of such Stock.  Also set forth below is each equity investment of each Specified Person that represents 50% or less of the equity of the entity in which such investment was made.  Except as set forth below, (a) no Specified Person has issued any securities convertible into, or options or warrants for, any common or preferred equity securities thereof, and (b) there are no agreements, voting trusts or understandings binding upon any Specified Person with respect to the voting securities of any Subsidiary thereof or affecting in any manner the sale, pledge, assignment or other disposition thereof, including any right of first refusal, option, redemption, call or other right with respect thereto, whether similar or dissimilar to any of the foregoing.  Attached hereto as **Schedule 1** is a true and correct organizational chart of the Specified Persons.

| Specified Person | Beneficial Owner | Issued and Outstanding |
|---|---|---|

- 5 -

4858-6397-4309.11

AFC_PI_0145

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

8.  <u>Instruments and Chattel Paper</u>.  Set forth below is a true and correct list of all promissory notes, instruments (other than checks to be deposited in the ordinary course of business), tangible chattel paper, electronic chattel paper and other evidence of Indebtedness held by any Specified Person as of the date hereof having an aggregate value or face amount in excess of $50,000, including all intercompany notes among any Specified Persons.

*[●]*

9.  <u>Intellectual Property</u>.

Set forth below is a complete and correct list of all registered Copyrights (as defined in the Security Agreement) owned by any Specified Person, all applications for registration of Copyrights owned by any Specified Person, and all other Copyrights owned by any Specified Person and material to the conduct of the business of any Specified Person.  Set forth below is a complete and correct list of all Patents (as defined in the Security Agreement) owned by any Specified Person and all applications for Patents owned by any Specified Person.  Set forth below is a complete and correct list of all registered Trademarks (as defined in the Security Agreement) owned by any Specified Person, all applications for registration of Trademarks owned by any Specified Person, and all other Trademarks owned by any Specified Person and material to the conduct of the business of such Specified Person.

*[●]*

Set forth below is a complete and correct list of all Intellectual Property Licenses (as defined in the Security Agreement) entered into by any Specified Person pursuant to which (i) any Specified Person has provided any license or other rights in Intellectual Property (as defined in the Security Agreement) owned or controlled by such Specified Person to any other Person (other than non-exclusive software licenses granted in the ordinary course of business) or (ii) any Person has granted to

- 6 -

4858-6397-4309.11

CONFIDENTIAL

any Specified Person any license or other rights in Intellectual Property owned or controlled by such Person that is material to the business of such Specified Person, including any Intellectual Property that is incorporated in any Inventory, software, or other product marketed, sold, licensed, or distributed by such Specified Person.

[●]

10. <u>Commercial Tort Claims</u>. Set forth below is a true and correct list of all commercial tort claims that exceed $50,000 held by any Specified Person, including a brief description thereof.

[●]

11. <u>Deposit Accounts and Securities Accounts</u>. Set forth below is a true and complete list of all Deposit Accounts and Securities Accounts (each as defined in the Security Agreement) maintained by any Specified Person, including the name of each institution where each such account is held, the name of each such account and the name of each banking or other entity that holds each account.

| Specified Person | Institution | Account # | Type (E.g., Operating, Payroll, Withholding Tax, Fiduciary, etc.) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

12. <u>Letter-of-Credit Rights</u>. Set forth below is a true and correct list of all letters of credit issued in favor of any Specified Person, as beneficiary thereunder, having an aggregate value or face amount in excess of $50,000.

[●]

13. <u>Motor Vehicles</u>. Set forth below is a complete list of all motor vehicles owned by each Specified Person (describe each vehicle by make, model, and year and indicate for each the state in which registered and the state in which based) with fair market value in excess of $50,000.

[●]

14. <u>Other Titled Collateral</u>. Set forth below is a complete list of all aircraft, vessels and all other inventory, equipment and other goods of each Specified Person which are subject to any certificate of title or other registration statute of the United States, any state or any other jurisdiction with a fair market value in excess of $50,000 (provide description of covered goods and indicate registration system and jurisdiction), in each case other than any motor vehicles described immediately above.

[●]

15. <u>Litigation</u>.

- 7 -

4858-6397-4309.11

(a)     Set forth below is a complete list of any litigation or proceeding against any Specified Person in which the amount of damages sought from such Specified Person exceeds $50,000.

*[●]*

(b)     Set forth below are the only claims which any Specified Person has against others (other than claims on accounts receivable), which such Specified Person is asserting or intends to assert, and in which the potential recovery exceeds $50,000.

*[●]*

[*Signature Page Follows.*]

- 8 -

4858-6397-4309.11

**IN WITNESS WHEREOF**, the undersigned has caused this Perfection Certificate to be executed and delivered as of the date first written above.

**JG HOLDCO LLC**

By: _____
Name:
Title:

*[Signature Page to Perfection Certificate (Holdco)]*

4858-6397-4309.11

CONFIDENTIAL

AFC_PI_0149

**Schedule 1**

**Organizational Chart**

4858-6397-4309.11

CONFIDENTIAL                                                                                 AFC_PI_0150

**<u>Exhibit B</u>**

**Form of Amendment to Shareholder Guaranty**

CONFIDENTIAL

AFC_PI_0151

*Execution Version*

# AMENDMENT NO. 1 TO SHAREHOLDER GUARANTY

This **AMENDMENT NO. 1 TO SHAREHOLDER GUARANTY** (this "**Amendment**") is effective as of March 6, 2024 (the "**Effective Date**"), by and among **JON LOEVY** and **MICHAEL KANOVITZ** (the "**Shareholder Guarantors**") and **AFC AGENT LLC**, a Delaware limited liability company, as agent for the Lender Group (in such capacity, together with its successors and assigns, if any, in such capacity, "**Agent**"). Capitalized terms used herein without definition shall have the same meanings herein as set forth in the Credit Agreement (as defined below).

## PRELIMINARY STATEMENTS:

**WHEREAS**, reference is made to that certain Second Amended and Restated Credit Agreement, dated as of September 30, 2021, as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of June 30, 2022, Amendment No. 2 to Second Amended and Restated Credit Agreement, dated as of August 26, 2022, Amendment No. 3 to Second Amended and Restated Credit Agreement, effective as of December 31, 2022, and Amendment No. 4 to Second Amended and Restated Credit Agreement, effective as of April 26, 2023 (and as further amended, supplemented, restated or otherwise modified from time to time, the "**Credit Agreement**"), by and among the Borrowers, the other Loan Parties from time to time party thereto, Parent, the Lenders party thereto from time to time, Agent and Documentation Agent; and

**WHEREAS**, as security for all of the indebtedness and obligations due to the Lenders under the Credit Agreement, the Shareholder Guarantors entered into that certain Shareholder Guaranty, dated as of April 5, 2021 (as amended, supplemented, restated or otherwise modified from time to time, the "**Shareholder Guaranty**"), pursuant to which the Shareholder Guarantors agreed to unconditionally and irrevocably guarantee the payment of any and all of the Guaranteed Obligations (as defined in the Shareholder Guaranty) to Agent, for the benefit of the Lender Group; and

**WHEREAS**, in connection with that certain Forbearance Agreement, dated as of the date hereof, by and among the Borrowers, Parent, the Shareholder Guarantors, the Forbearing Lenders (as defined therein), and Agent, the Shareholder Guarantors have requested, and the Agent and the Required Lenders have agreed, to amend certain terms of the Shareholder Guaranty, subject to the terms and conditions set forth herein and in the Forbearance Agreement.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## 1.    AMENDMENTS TO SHAREHOLDER GUARANTY

1.1    **Amendments To Shareholder Guaranty.** Subject to the conditions set forth in Section 2 below, in accordance with Section 21 of the Shareholder Guaranty, the Shareholder Guaranty is hereby amended as follows:

1.2    **Guaranteed Obligations**. The definition of "Guaranteed Obligations" in Section 1 of the Shareholder Guaranty is hereby amended by deleting: "any Taxes or other governmental charges or" from clause (a)(vii).

## 2.    CONDITIONS TO EFFECTIVENESS

2.1    In addition, it shall be conditions precedent to the effectiveness of this Amendment and the amendments set forth herein that:

4877-5425-4507.1

2.2    No Default or Event of Default shall have occurred or be continuing (other than the Specified Defaults (as defined in the Forbearance Agreement)); and

2.3    Agent shall have received, in form and substance satisfactory to Agent, the following:

(a)    this Amendment, duly executed by the Shareholder Guarantors and Agent; and

(b)    such other documents, and completion of such other matters, as Agent may reasonably deem necessary or appropriate in connection with the foregoing.

## 3.    MISCELLANEOUS

3.1    Reference to and Effect on the Credit Agreement and the Other Loan Documents.

(a)    On and after the date hereof, each reference in the Shareholder Guaranty to "this Guaranty", "hereunder", "hereof", "herein" or words of like import referring to the Shareholder Guaranty, and each reference in the other Loan Documents to the "Shareholder Guaranty", "thereunder", "thereof" or words of like import referring to the Shareholder Guaranty shall mean and be a reference to the Shareholder Guaranty as amended by this Amendment.

(b)    Except as specifically amended by this Amendment, the Shareholder Guaranty and the other Loan Documents shall remain in full force.

(c)    Each Shareholder Guarantor hereby ratifies and confirms, as of the date hereof, (i) the covenants and agreements contained in each Loan Document to which it is a party, including, in each case, as such covenants and agreements may be modified by this Amendment and the transactions contemplated hereby and (ii) the Guaranteed Obligations (as amended hereby) under the Shareholder Guaranty.

(d)    The execution, delivery and performance of this Amendment shall not, except as expressly provided herein, constitute a waiver of any provision of, or operate as a waiver of any right, power or remedy of Agent or the Lenders under, the Credit Agreement, the Shareholder Guaranty or any of the other Loan Documents.

(e)    This Amendment is a Loan Document.

3.2    **Fees and Expenses**.  The Borrowers acknowledges that all costs, fees and expenses incurred with respect to this Amendment and the documents and transactions contemplated hereby shall be provided for as described in the Credit Agreement.

3.3    **Effectiveness**. This Amendment shall be binding and deemed effective when executed by the Shareholder Guarantors, Agent and the Lenders.

3.4    **Section Headings**.  Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Amendment.

3.5    **Severability of Provisions**. Each provision of this Amendment shall be severable from every other provision of this Amendment for the purpose of determining the legal enforceability of any specific provision.

2

4877-5425-4507.1

CONFIDENTIAL

3.6     **Choice of Law and Venue; Jury Trial Waiver.**  The provisions regarding choice of law and venue and jury trial waiver set forth in Section 13 of the Credit Agreement are hereby incorporated herein by reference, *mutatis mutandis*.  Without limiting the foregoing, THE PARTIES HERBY CONFIRM THAT CHOICE OF LAW AND VENUE AND WAIVER OF JURY TRIAL PROVISIONS OF SECTION 13 OF THE CREDIT AGREEMENT ARE APPLICABLE TO THIS AMENDMENT.

3.7     **Counterparts; Effectiveness**.  This Amendment may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Amendment.  Delivery of an executed counterpart of this Amendment by electronic mail or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Amendment.  Any party delivering an executed counterpart of this Amendment by electronic mail or other electronic method of transmission also shall deliver an original executed counterpart of this Amendment but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Amendment.

[Remainder of page intentionally left blank]

4877-5425-4507.1

CONFIDENTIAL

AFC_PI_0154

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**GUARANTORS:**

Jon Loevy

Michael Kanovitz

*[Signature Page to Amendment No. 1 to Shareholder Guaranty]*

4877-5425-4507.1

CONFIDENTIAL

**AGENT:**

**AFC AGENT LLC**, a Delaware limited liability company

By: _____
*Gabriel Katz*
9550F86F34214498
Name: Gabriel Katz
Title:  Authorized Signatory

CONFIDENTIAL

**<u>Annex I</u>**

**Term Sheet**

- 12 -

## NON-BINDING SUMMARY OF TERMS AND CONDITIONS

*This Non-Binding Summary of Terms and Conditions (this "**Term Sheet**") sets forth certain terms between the parties for the provision of services, subject in all respects to the definitive documentation to be entered into. This Term Sheet is intended to outline certain basic points of business understanding around which the transaction could be structured. Except for the section of this Term Sheet entitled "Confidentiality," which is binding on the parties and shall survive the termination of this Term Sheet, this Term Sheet shall be non-binding upon the parties.*

| | |
|---|---|
| **Parties:** | Organic Remedies, Inc. ("**Organic**") |
| | Hayden Gateway LLC ("**Justice**") |
| **Agreement/Effective Date:** | The parties shall negotiate in good faith in an attempt to arrive at a final agreement ("Agreement") which shall set forth the terms of which Organic shall manage the Dispensaries. The Effective Date shall be defined in the Agreement. Either party may terminate this Term Sheet by providing the other party written notice. |
| **Services:** | Justice shall transfer to Organic the exclusive right and obligation to manage and operate Justice's dispensaries in Pennsylvania located at (i) 7B Gateway Shopping Center, Edwardsville, (ii) 272 Main Street, Dickson City and (iii) 3650 Nazareth Pike, Bethlehem Township (collectively, the "**Dispensaries**"), in each case in accordance with applicable law. |
| **Management Rights:** | Organic shall manage, operate and control, without limitation, the following services ("Services") for each Dispensary: |

    (i) hiring, terminating, training, and monitoring performance of personnel;

    (ii) depositing gross revenue and paying operating expenses and any other expenses contemplated in the Agreement;

    (iii) purchasing inventory and supplies, including inventory from Organic;

    (iv) orderly management, operation and maintenance of the facilities;

    (v) arranging for support services from personnel and third-party contractors, including billing services, payroll, human resources, legal, accounting, housekeeping, information technology, and such other services as Organic deems reasonably necessary. Organic will consult with Justice prior to making any material change to a service existing as of the Effective Date;

    (vi) Organics shall work with Justice's accounting team to ensure that Justice is able to maintain accurate books and records regarding the financial operations of the Dispensaries; and

    (vii) all such other services necessary for the successful and efficient operation of the Dispensaries.

Organic shall have an exclusive power of attorney to submit bills in Justice's name, collect deposits on Justice's behalf, and otherwise manage the cash and funds of the Dispensaries on Justice's behalf. The individuals

working in the Dispensaries shall continue to be employees of Justice unless Organic determines otherwise.

| | |
|---|---|
| **Management Fee:** | In exchange for the Services, Organic shall be paid a monthly fee equal to Four Percent (4.0%) of net revenue for each month. The parties shall define "net revenue" in the Agreement, and the payment shall be made the following month unless otherwise determined by Organic. Justice shall have the right to review Organic's calculation regarding the monthly management fee. |
| **Costs and Expenses:** | Organic shall be entitled to reimbursement for all reasonable costs expended by Organic in the performance of the Services, including total cost for all personnel that Organic engages to provide the Services and any out of pocket expenses incurred by Organic; provided, however, that no rent or other payments shall be made to SRG 272 Main Street LLC, Oakland Manager LLC or other Justice affiliates. Any expense in excess of $10,000 at a single dispensary (other than Product [as defined below], rent, Organic's Management Fee, employee compensation (to include wages and any benefits) and any payments from Excess Cash Flow shall be approved by Justice prior to Organic incurring such expense. If Justice does not respond within two (2) business days of Organic's request, said expenditure shall be deemed approved. |
| **Product Pricing:** | Organic shall sell cannabis inventory ("Product") to Justice to be sold at the Dispensaries. Organic shall sell its Product to Justice at a discounted rate of 20% below Organic's average wholesale prices to third parties. Justice shall pay Organic for all Product delivered to the Dispensaries net fifteen (15) days from the date of delivery. For the avoidance of doubt, payments shall occur by ACH or another electronic payment system and shall occur no more frequently than once a week. Any Product Organic sells to Justice after the effective date of the Agreement (just like any Product purchased after said effective date) shall not be subject to repayment through the use of free cash flow as defined below; instead, all such Product shall be paid for from revenues derived from the Dispensaries. |
| **Working Capital:** | Justice shall deposit at least $375,000.00 into the Dispensaries' working capital account on or before the effective date of the final agreement to be used by Organic for the operation of the Dispensaries, and Justice shall deposit an additional $375,000 into the Dispensaries' working capital account upon the earlier of (a) the date the Dickson City property (which is owned by Justice's affiliate) is sold to a third party or (b) 30 days after the effective date of the Agreement, with such funds to also be used for the operation of the Dispensaries. Justice shall not withdraw any funds from the Dispensaries' working capital account(s) without the prior written approval of Organic. |
| **Free Cash Flow:** | Up to 25% of the Dispensaries' excess cash flow (as described below) may pay down an agreed-upon list of past-due accounts payable on a monthly basis, with up to half of such paydowns made against Organic's past due balances. |

Excess cash flow will be defined as Net Revenue (gross sales less discounts (to be determined by Organics) or returns), *less* (i) costs of goods sold (i.e., current accounts payable); (ii) operating expenses (e.g., payroll, rent, utilities, services and other ordinary course expenses); (iii) reasonable capital expenditures for maintenance of the Dispensaries and improvements to be agreed upon by Justice, Organic and applicable lenders (iv) estimated state and federal taxes attributable to the Dispensaries; and (v) the Management Fee, *plus* depreciation and all non-cash expenses.

**Minimum Gross Margin:**   Organic shall strive to maintain a minimum gross margin of 35% at each Dispensary. Organic shall not guarantee the success or any particular rate of return of the Dispensaries, or of any particular dispensary governed by the Agreement. Gross Margin shall be defined by Net Revenue *less* Cost of Goods Sold.

**Term and Termination:**   The term of the Agreement shall commence on the Effective Date of the Agreement, and remain in effect for twenty-four (24) months. The agreement shall automatically renew for an additional twelve (12) months unless either Party provides written notice at least sixty (60) days prior to the end of the Term or the renewal period ("Extension Period").

Following the nine-month anniversary of the Effective Date of the Agreement, Justice shall have the right to terminate the agreement upon thirty (30) days' notice to Organic if the Dispensaries do not collectively generate Net Revenue of at least $15 million on an annual run rate over any consecutive three (3) month period not counting the initial nine-month period of the Agreement.

If Justice sells or enters into an agreement or letter of intent to sell a majority of its dispensary assets in Pennsylvania, or if Justice's shareholders or members sell or enter into an agreement or letter of intent to sell a majority of the ownership interests during the Term of this Agreement, including any renewal Term, Justice shall pay to Organic the lump sum payment of $1,000,000.

Following the nine-month anniversary of the Effective Date of the Agreement, Organic shall have the right to terminate the Agreement upon thirty (30) days' notice to Justice.

**Indemnification:**   Each Party shall indemnify and hold harmless the other Party and its agents and representatives from and against all claims, losses, judgments, damages and liabilities that arise as a result the indemnifying Party's negligent acts or omission in performing its obligations under the agreement. Nothing in this Term Sheet or subsequent Agreement shall render Organic liable for any debts of Justice.

**Confidentiality:**   This Term Sheet is confidential and may not be disclosed by either Party to any person or entity other than such Party's respective officers, directors, lenders and professional advisors, without prior written consent of the other

CONFIDENTIAL

Party. Such confidentiality obligations shall survive any expiration, termination or any other nullification of this Term Sheet for one year.

*(Signature page follows.)*

CONFIDENTIAL

**AGREED AND ACCEPTED THIS 13th OF FEBRUARY, 2024:**

ORGANIC REMEDIES, INC.

By: _____
Name: _____
Title: _____

HAYDEN GATEWAY, LLC

By:  Hayden Manager LLC, its manager

By: _____
Jon Loevy (Feb 13, 2024 11:48 CST)

Jon Loevy, its manager

CONFIDENTIAL