**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ADVANCED FLOWER CAPITAL INC. and
AFC AGENT LLC,

        Plaintiffs,

        v.

MICHAEL KANOVITZ and JON LOEVY,

        Defendants.

Civil Action No. 1:25-cv-02996-PKC

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.    THE BORROWERS AND GUARANTORS REPEATEDLY BREACH THEIR
OBLIGATIONS UNDER THE APPLICABLE AGREEMENTS .................................... 3

    A.    AFC Provides Credit Facilities to the Borrower Entities ........................................ 3

    B.    The Guarantor Defendants and the Shareholder Guaranty.................................... 4

    C.    Despite Repeated and Ongoing Breaches of the Credit Agreement, AFC Enters into Four
Separate Amendments.......................................................................................... 4

    D.    AFC Further Agrees to Two Forbearance Agreements ........................................ 5

    E.    The Guarantors Conceal Numerous, Ongoing Breaches, Unauthorized Uses of Funds, and
Other Defaults Under the Credit Agreement ........................................................ 6

        1.    The Guarantors Secretly Transfer Tens of Millions in Loan Proceeds to or on Behalf of
Unauthorized Recipients .................................................................................. 6

        2.    The Guarantors Provide a False Perfection Certificate ................................... 6

        3.    The Guarantors Cause the Borrowers to Misrepresent Their Financial Status ............... 7

        4.    The Guarantors Submit Numerous False and Misleading Requests for Loan and Equity
Draw-Downs.................................................................................................... 7

        5.    The Guarantors and the Borrowers Repeatedly Breach the Credit Agreement by Failing
to Pay Taxes, Contractors, and Vendors ......................................................... 7

II.    PROCEDURAL BACKGROUND ................................................................................ 8

    A.    AFC Has Pursued Relief in Multiple Jurisdictions ............................................. 8

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT .................................................................................................................... 10

I.    THIS COURT HAS PERSONAL JURISDICTION OVER THE GUARANTORS ............ 10

    A.    The Forum Clause Was Reasonably Communicated to the Guarantors........................... 11

    B.    The Non-Exclusive Forum Selection Clause Binds the Guarantors ................................ 14

    C.    The Claims and Parties Are Subject to the Forum Clause.................................... 15

    D.    Defendants Do Not Attempt to Argue Enforceability ........................................ 15

II.    AFC PLEADS A CLAIM FOR MULTIPLE BREACHES OF THE SHAREHOLDER
GUARANTY (COUNT I)........................................................................................... 15

    A.    The Borrowers' Payment Status Is Not Relevant to the Guarantors' Obligations Under the
Shareholder Guaranty.......................................................................................... 16

    B.    AFC Has Pleaded Losses and Liabilities for Which the Guarantors Are Responsible
Under the Shareholder Guaranty ......................................................................... 16

III.  PLAINTIFFS STATE A CLAIM FOR TORTIOUS INTERFERENCE .............................18

IV.  PLAINTIFFS STATE CLAIMS FOR FRAUD ......................................................20

V.  PLAINTIFFS STATE A CLAIM FOR CONVERSION .......................................25

CONCLUSION ...................................................................................................................26

# TABLE OF AUTHORITIES

**Page**

### Cases

*Absolute Nev., LLC v. Grand Majestic Riverboat Co., LLC*,
   646 F. Supp. 3d 426 (S.D.N.Y. 2022) ............................................................................ 13

*Ademco Inc. v. TWS Tech. Ltd.*,
   2024 WL 3567417 (S.D.N.Y. July 29, 2024) ................................................................. 13

*AFC Agent LLC v. JG Holdco LLC*,
   No. 652644/2025 (N.Y. Cnty.) ........................................................................................ 8

*Aguas Lenders Recovery Grp. v. Suez, S.A.*,
   585 F.3d 696 (2d Cir. 2009) ........................................................................................... 14

*Argonaut P'ship, L.P. v. Bankers Tr. Co.*,
   1997 WL 45521 (S.D.N.Y. Feb. 4, 1997) ...................................................................... 18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................................ 10

*Asset Co IM Rest, LLC v. Katzoff*,
   2025 WL 919489 (S.D.N.Y. Mar. 26, 2025) .................................................................. 10

*Bank Leumi USA v. Ehrlich*,
   98 F. Supp. 3d 637 (S.D.N.Y. 2015) ......................................................................... 12, 14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................ 10

*Breach v. Loadsmart, Inc.*,
   2025 WL 753866 (S.D.N.Y. Mar. 10, 2025) ................................................................... 9

*Brookdale Univ. Hosp. & Med. Ctr. v. Health Ins. Plan of Greater N.Y.*,
   2009 WL 928718 (E.D.N.Y. Mar. 31, 2009) .................................................................. 23

*Cerco Bridge Loans 6 LLC v. Schenker*,
   768 F. Supp. 3d 559 (S.D.N.Y. 2025) ............................................................................ 16

*United States ex rel. Chorches v. Am. Med. Response, Inc.*,
   865 F.3d 71 (2d Cir. 2017) .............................................................................................. 20

*CP III Rincon Towers, Inc. v. Cohen*,
   666 F. App'x 46 (2d Cir. 2016) ...................................................................................... 18

*D.H. Blair & Co., Inc. v. Gottdiener*,
   462 F.3d 95 (2d Cir. 2006) ............................................................. 11

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
   722 F.3d 81 (2d Cir. 2013) ............................................................. 10

*Eades v. Kennedy, PC Law Offices*,
   799 F.3d 161 (2d Cir. 2015) ........................................................... 10

*Export-Import Bank of U.S. v. Hi-Films S.A. de C.V.*,
   2010 WL 3743826 (S.D.N.Y. Sept. 24, 2010) ................................. 13

*Exploration II, Inc. v. Biallas*,
   2009 WL 1066244 (S.D.N.Y. Apr. 21, 2009) .................................. 14

*In re: EZCorp, Inc. Sec. Litigations*,
   181 F. Supp. 3d 197 (S.D.N.Y. 2016) ............................................. 23

*Fasano v. Li*,
   47 F.4th 91 (2d Cir. 2022) ......................................................... 14, 15

*Feasby v. Industri-Matematik Intern. Corp.*,
   2000 WL 977673 (S.D.N.Y. 2000) ................................................. 21

*Flexborrow LLC v. TD Auto Fin. LLC*,
   255 F. Supp. 3d 406 (E.D.N.Y. 2017) ............................................. 23

*Freedom Holding, Inc. v. Haart*,
   172 N.Y.S.3d 873 (N.Y. Sup. Ct. 2022) ......................................... 25

*Friends of Wickers Creek Arch. Site, Inc. v. Landing on the Water at Dobbs Ferry*
   *Homeowners Ass'n, Inc.*,
   156 N.Y.S. 3d, 198 A.D.3d 726 (2d Dep't 2021) ............................ 15

*G3-Purves St., LLC v Thomson Purves, LLC*,
   953 N.Y.S.2d 109 (2d Dep't 2012) ................................................. 18

*Great N. Ins. Co. v. BMW of N. Am.*,
   2018 WL 1472513 (S.D.N.Y. Mar. 25, 2018) ................................. 11

*Hayden Gateway LLC & Bloc Dispensary LLC v. Advanced Flower Cap. Inc.*,
   No. 3:25-cv-02789 (D.N.J. Apr. 17, 2025) ....................................... 8

*Hayden Gateway LLC et al. v. Advanced Flower Cap. Inc.*,
   No. 25-2061, Dkt. 23-1 (3d Cir. July 1, 2025) ................................. 9

*Hayden Gateway LLC v. Advanced Flower Cap. Inc.*,
   2025 WL 1349266 (D.N.J, May 9, 2025) .......................................... 9

*Hecht v. Components Int'l, Inc.*,
    867 N.Y.S.2d 889 (N.Y. Sup. Ct. 2008) .................................................................. 25

*Horvath v. Banco Comercial Portugues, S.A.*,
    461 F. App'x 61 (2d Cir. 2012) ............................................................................ 12

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017) ................................................................... 23

*K.K.D. Imps., Inc. v. Karl Heinz Dietrich GmbH & Co. Int'l Spedition*,
    36 F. Supp. 2d 200 (S.D.N.Y. 1999) .................................................................... 13

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ................................................................................ 22

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006) ................................................................................ 18

*Knox v. Countrywide Bank*,
    4 F. Supp. 3d 499 (E.D.N.Y. 2014) ..................................................................... 24

*Lama Holding Co. v. Smith Barney Inc.*,
    88 N.Y.2d 413 (1996) .......................................................................................... 18

*Lechner v. Marco-Domo Internationales Interieur GmbH*,
    2005 WL 612814 (S.D.N.Y. Mar. 14, 2005) ........................................................ 19

*M/S Bremen v. Zapata Off–Shore Co.*,
    407 U.S. 1 (1972) ................................................................................................ 15

*Magi XXI, Inc. v. Stato della Citta del Vaticano*,
    714 F.3d 714 (2d Cir. 2013) ................................................................................ 10

*Maher v. Glob. Factors LLC*,
    2024 WL 3356985 (S.D.N.Y. July 8, 2024) ......................................................... 22

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*,
    553 F.2d 842 (2d Cir. 1977) ................................................................................ 13

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
    998 F. Supp. 2d 157 (S.D.N.Y. 2014), *aff'd*, 611 F. App'x 34 (2d Cir. 2015) ........ 24

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003) ................................................................... 21

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................................ 21

*Penn. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*,
    939 F. Supp. 2d 445 (S.D.N.Y. 2013) ...................................................................23

*Philippe Nyc I LLC v. Philippe W. Coast, LLC*,
    2016 WL 1183669 (S.D.N.Y. Mar. 24, 2016) .........................................................12

*Phillips v. Audio Active Ltd.*,
    494 F.3d 378 (2d Cir. 2007) ..........................................................................11, 14

*Pransky v. Eisner*,
    2011 WL 4753455 (E.D.N.Y. Sept. 14, 2011) ........................................................17

*Rabinowitz v. Kelman*,
    75 F.4th 73 (2d Cir. 2023) ...............................................................................14

*Ramiro Aviles v. S & P Glob., Inc.*,
    380 F. Supp. 3d 221 (S.D.N.Y. 2019) .................................................................20

*Remcoda, LLC v. Ridge Hill Trading (PTY) Ltd.*,
    2022 WL 603998 (S.D.N.Y. Mar. 1, 2022) ...........................................................22

*Republic of Haiti v. Duvalier*,
    626 N.Y.S.2d 472, 211 A.D.2d 379 (1st Dep't 1995) ..............................................25

*Richardson Greenshields Secs., Inc. v. Metz*,
    566 F. Supp. 131 (S.D.N.Y. 1983) .....................................................................13

*Rowett v. Proselect Ins. Co.*,
    2025 WL 1664018 (S.D.N.Y. June 12, 2025) ......................................................9, 10

*In re Rsrv. Fund Sec. & Derivative Litig.*,
    732 F. Supp. 2d 310 (S.D.N.Y. 2010) .................................................................22

*Sadowski v. Ng*,
    2022 WL 799636 (S.D.N.Y. Mar. 15, 2022) .........................................................19

*Signature Fin. LLC v. Neighbors Glob. Holdings, LLC*,
    281 F. Supp. 3d 438 (S.D.N.Y. 2017) .......................................................11, 14, 15

*Singh v. NYCTL 2009-A Tr.*,
    2016 WL 3962009 (S.D.N.Y. July 20, 2016) ........................................................24

*Starkey v. G Adventures, Inc.*,
    796 F.3d 193 (2d Cir. 2015) ............................................................................11

*U.S. Bank Nat'l Ass'n as Trustee v. Mattone*,
    769 F. Supp. 3d 298 (S.D.N.Y. 2025) .................................................................18

*VR Optics, LLC v. Peloton Interactive, Inc.*,
    2017 WL 3600427 (S.D.N.Y. Aug. 18, 2017) ........................................................................ 19

*Watts v. Jackson Hewitt Tax Serv. Inc.*,
    579 F. Supp. 2d 334 (E.D.N.Y. 2008) .......................................................................... 22

*Yuki v. Suzuki*,
    869 N.Y.S. 28 (1st Dep't 2008) ........................................................................ 22

## <u>Other Authorities</u>

Rule 9(b) ............................................................................................................. 2, 20, 21

Rule 12(b) ............................................................................................................... 10

Plaintiffs Advanced Flower Capital Inc. and AFC Agent LLC (together, "AFC") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Amended Complaint ("Mot.").

## PRELIMINARY STATEMENT

Defendants Jon Loevy and Michael Kanovitz (the "Guarantors") are sophisticated attorneys who obtained tens of millions of dollars in loaned funds from AFC to support their cannabis businesses.  To induce the loan, Loevy and Kanovitz agreed to personally guarantee, in a Shareholder Guaranty, certain obligations of each specific borrowing entity—all of which they own either directly or indirectly.  In particular, the Guarantors guaranteed, among other things, that the borrowers would pay taxes and refrain from making misrepresentations to AFC or from misappropriating loan funds for unauthorized recipients.  Unfortunately, as alleged in the Amended Complaint, the borrowers have failed to pay taxes, made numerous misrepresentations, and misappropriated funds, and the Guarantors have taken no steps required under the Shareholder Guaranty to remedy these breaches, harming AFC and its collateral.  For these and the reasons stated below, the Guarantors are liable to AFC.

*First*, at the threshold, the Guarantors are subject to suit in this Court.  They claim that, because the Shareholder Guaranty did not include a forum selection clause, there is no basis for jurisdiction.  But the Shareholder Guaranty incorporates by reference the forum selection clause found in the agreement that embodies the terms of the underlying loan—the Credit Agreement (defined below). The Guarantors undoubtedly understood that, and in any case, Loevy signed the Credit Agreement itself.  There is no plausible argument that the Guarantors can escape the reach of the forum clause.

*Second*, AFC has plausibly alleged a claim for breach of the Shareholder Guaranty against the Guarantors. Specifically, the Amended Complaint alleges the borrowers' breaches of the Credit Agreement, as well as their misrepresentations, misappropriations of loan funds, and failures to pay taxes. Yet the Amended Complaint alleges the Guarantors failed to take the steps required by the Shareholder Guaranty to address these issues. No more is required at this stage to allege a breach of contract.

*Third*, the Amended Complaint states a claim for tortious interference. The Amended Complaint alleges the Guarantors caused the borrowers to breach that contract through the unauthorized diversion of millions of dollars in loan proceeds to or on behalf of unauthorized recipients owned by the Guarantors themselves. These allegations show the Guarantors induced the borrowers to breach the Credit Agreement for personal benefit, which is sufficient.

*Fourth*, the Amended Complaint adequately pleads fraud claims. AFC alleges the Guarantors caused the borrowers to make dozens, if not more, of misrepresentations to AFC about the borrowers' financial status, use of funds, and whether the loan was in default (despite multiple concealed instances of misappropriation of funds). AFC's allegations far exceed the standard set by Rule 9(b), as the Amended Complaint not only identifies the Guarantors' alleged misstatements with specificity—including when and to whom they were made, under what circumstances, and why they were fraudulent—but also alleges the recipients and amounts of misappropriated funds down to the penny. Again, no more is required at this stage to plead fraud.

*Finally*, the Amended Complaint states a valid conversion claim. In particular, AFC alleges the Guarantors obtained millions in AFC funds under false pretenses and distributed the funds to their own entities. These allegations are sufficient to state a claim for conversion.

The Motion to Dismiss should be denied in its entirety.

## BACKGROUND

I.  **THE BORROWERS AND GUARANTORS REPEATEDLY BREACH THEIR OBLIGATIONS UNDER THE APPLICABLE AGREEMENTS**

A.  **AFC Provides Credit Facilities to the Borrower Entities**

This action arises from a credit facility (the "Loan") AFC made available to certain borrowers by means of a Credit Agreement dated April 5, 2021, and a Second Amended and Restated Credit Agreement dated September 30, 2021 (together with amendments, the "Credit Agreement"). The Credit Agreement made available a combined $75.4 million, which was later expanded to $83.5 million. AFC understood these funds were requested to finance construction and operations of cannabis facilities in New Jersey and Pennsylvania. Am. Compl. ¶¶ 34, 36.[1]

The borrowers comprise a group of eight entities within the business operated by Defendants Loevy and Kanovitz—known as "Justice Cannabis Co." or "Justice Grown"—a multi-state cannabis operator structured as a "network of subsidiaries that roll up to an entity called" JG HoldCo LLC ("JG HoldCo"). ¶ 3. The borrowing entities are: (i) Bloc Dispensary LLC, (ii) Pier Cove LLC, (iii) Hayden Gateway LLC, (iv) SRG Waretown LLC, (v) SRG 1761 North Olden LLC, (vi) SRG 1474 Prospect LLC, (vii) SRG 272 Main Street LLC, and (viii) SRG HI Park LLC (each a "Borrower," and together, the "Borrowers"). ¶¶ 20-22.

Loevy and Kanovitz control each Borrower in multiple ways. They hold: (i) nearly 90% of JG HoldCo, which holds (A) 87% of Bloc Dispensary and (B) 100% of Pier Cove and Hayden Gateway, ¶ 19; (ii) 100% of the remaining five Borrowers, ¶¶ 22-23; and (iii) 100% of Hayden Manager LLC, which manages all of the foregoing Borrowers, ¶¶ 20, 22-23

The Credit Agreement contains several Borrower representations, warranties, and covenants, including that the Borrowers will (i) comply with quarterly financial metrics for

---

[1] The Amended Complaint is cited herein as "¶ __."

adjusted EBITDA, free cash flow, cash balance, and net income, (ii) deliver quarterly compliance certificates, financial statements, and supporting calculations, (iii) certify on each request to draw down Loan funds that no default exists, and (vi) timely pay taxes and vendor obligations. It also provides that Borrowers will **not** (i) make misrepresentations to AFC, or (ii) make certain "Restricted Payments" (including to certain non-borrower entities). ¶¶ 37-41.

### B.    The Guarantor Defendants and the Shareholder Guaranty

Loevy and Kanovitz guaranteed, in the Shareholder Guaranty, certain "Guaranteed Obligations." These refer to "losses, expenses, charges, costs or liability" arising from, *inter alia* (i) "fraud, malfeasance or intentional misrepresentation" on the part of either or both Guarantors, or "knowingly" causing a Borrower to do so; (ii) a Borrower's failure to pay taxes; (iii) "intentional misapplication, misappropriation or conversion by" a Guarantor of revenues or income from the Borrowers' properties, or of "funds" designated for taxes, or (iv) any "material breach of any representation and warranty in the Credit Agreement." ¶ 44. Section 2 of the Shareholder Guaranty makes this obligation an "absolute, irrevocable, and unconditional guaranty of payment," Dkt. 30-1 § 2, and Section 5 makes clear the guaranty creates a "primary and original obligation," not "merely . . . a surety relationship." *Id.* § 5; ¶ 45. Where, as here, the Borrowers have failed to pay any of the Guaranteed Obligations, "the Guarantors immediately shall cause, as applicable, such payment in respect of the Guaranteed Obligations to be made." Dkt. 30-1 § 4.

### C.    Despite Repeated and Ongoing Breaches of the Credit Agreement, AFC Enters into Four Separate Amendments

In the span of just 10 months, between June 30, 2022, and April 26, 2023, AFC entered into four separate Amendments to the Credit Agreement, rather than simply exercising AFC's unfettered right to invoke various remedies, including accelerating the Loan repayment. The Amendments waived certain Borrower defaults, in exchange for which the Borrowers agreed that,

among other things: (i) the work at the New Jersey and Pennsylvania developments would meet certain "operational milestones"; (ii) Restricted Payments would include "payment of any kind" to Loevy or Kanovitz, and would be prohibited entirely where the Borrowers were not in "pro forma compliance with required financial covenants" or were in default under the Loan; and (iii) the Loan would increase to $83.5 million. ¶¶ 50-59.

Importantly, in each Amendment—which Loevy executed on behalf of the Borrowers—the Borrowers represented and warranted that, as of the date of execution, the Borrowers were not in default under the Credit Agreement. ¶¶ 52, 56, 58, 60. Each such representation turned out to have been knowingly false when made.

### D.    AFC Further Agrees to Two Forbearance Agreements

The Borrowers' situation continued to worsen into September 2023. *See* ¶ 61 (alleging additional defaults and breaches). On September 12, 2023, and again on March 6, 2024, AFC and the Borrowers entered into Forbearance Agreements (the "2023" and "2024 Forbearance Agreements," respectively). ¶¶ 61, 65. Under each, AFC agreed to forbear from enforcing contractual remedies as to certain *known* defaults, in exchange for, *inter alia*, the Guarantors' equity contributions to the New Jersey and Pennsylvania projects. *See id.* ¶¶ 61, 65-68. Notably, the 2024 Forbearance Agreement retained for AFC the right to "pursue claims based on fraud or intentional misconduct by [the Guarantors] or the borrowing entities without violating the forbearance terms." ¶ 68.

As in the Amendments, in each Forbearance Agreement—also executed by Loevy—the Borrowers again represented and warranted they were not in default under the Credit Agreement, apart from defaults listed in the agreements themselves. *See* ¶¶ 64, 66, nn.4-5 (Forbearance Agreements listed 37 total defaults). And, as with the Amendments, those representations were knowingly false when made.

### E.    The Guarantors Conceal Numerous, Ongoing Breaches, Unauthorized Uses of Funds, and Other Defaults Under the Credit Agreement

#### 1.    The Guarantors Secretly Transfer Tens of Millions in Loan Proceeds to or on Behalf of Unauthorized Recipients

While the Borrowers and AFC were entering into the above Amendments and Agreements, the Guarantors were using tens of millions in Loan proceeds as their personal slush fund.  Between September 2021 and July 2023, Loevy and Kanovitz caused the Borrowers to transfer nearly *$20 million* to or on behalf of unauthorized, non-borrower entities *also* owned by Loevy and Kanovitz. ¶ 75.  Close to $16 million of that sum went to Oakland Manager LLC, a wholly owned subsidiary of JG HoldCo (of which, again, Loevy and Kanovitz hold almost 90%).  *Id.*  In another instance, the Borrowers requested disbursement of close to $475,000—approximately $408,000 of which supposedly would go to pay an invoice for "extraction equipment" at the New Jersey development, but records indicate the money was used to pay expenses at Oakland Manager.  ¶¶ 79, 90-91.  And, remarkably, nearly $1 million of the total illicit transfers wound up paying off a debt incurred to a vendor by *Loevy's own law firm*.  ¶¶ 75, 78.  Each concealed payment is prohibited by, and an Event of Default under, the Credit Agreements.  ¶¶ 76-77, 80, 81.

#### 2.    The Guarantors Provide a False Perfection Certificate

The 2024 Forbearance Agreement required the Borrowers to provide a "perfection certificate" that identified all the assets that might be used to collateralize the Loan.  ¶ 92.  On May 9, 2024, Loevy intentionally provided a perfection certificate that omitted significant assets, including four entities holding cannabis licenses and/or that had sold assets and obtained proceeds worth well over $20 million.  *See* ¶¶ 95-96, 98.  AFC was thus deprived of substantial collateral.

### 3.    The Guarantors Cause the Borrowers to Misrepresent Their Financial Status

At the Guarantors' direction, and under their control, the Borrowers misrepresented to AFC the state of their finances.  ¶ 102.  For instance, on February 11, 2022, the Borrowers provided AFC with unaudited financial statements and covenant compliance calculations for the fourth quarter of 2021. ¶ 103.  Each item concealed that the Borrowers had made more than $2.2 million in unauthorized payments during the same time period.  *Id.*  Further, the compliance certificates the Guarantors caused the Borrowers to deliver to AFC in October, November, and December 2022 misrepresented the Borrowers' free cash flows by concealing unauthorized payments of $5.2 million, $3.4 million, and $5.8 million in the first, second, and third quarters of 2022, respectively. ¶ 104.  Similarly, the compliance certificates, financial statements, and covenant compliance calculations the Borrowers delivered for the fourth quarter of 2022 and the first, second, and third quarters of 2023 concealed millions in illicit payments.  ¶ 105.

### 4.    The Guarantors Submit Numerous False and Misleading Requests for Loan and Equity Draw-Downs

The Guarantors were also required, on each and every request to draw down Loan or equity funds, to state that no Event of Default had occurred under the Credit Agreement.  Between September 30, 2021, and February 13, 2025, the Defendants/Borrowers submitted nearly 100 such requests to AFC, which AFC honored in reliance on the representations in those requests.  ¶ 107. Yet for the vast majority of these requests, the representation that there were no Events of Default was knowingly false, given, in particular, the illicit payments and falsehoods above.  ¶¶ 108-109.

### 5.    The Guarantors and the Borrowers Repeatedly Breach the Credit Agreement by Failing to Pay Taxes, Contractors, and Vendors

Finally, the Borrowers have repeatedly, over the course of years, failed to pay vendors, contractors, and taxes, in violation of, and in default under, the Credit Agreement.  ¶ 84.

Specifically, there were accounts payable of more than $5.4 million as of June 16, 2025, and unpaid taxes of more than $5.1 million through 2024.  ¶ 85.  Defendants never disclosed these additional Events of Default to AFC either.  ¶ 86.

## II.    PROCEDURAL BACKGROUND

### A.    AFC Has Pursued Relief in Multiple Jurisdictions

On April 9, 2025, after it became clear that the Borrowers' defaults and malfeasance had gone far beyond anything they had disclosed to AFC, AFC accelerated the Loan.  The following day, on April 10, 2025, AFC filed the instant action against the Guarantors, to enforce the Shareholder Guaranty.  *See* Dkt. 1.

On April 28, 2025, AFC filed a related action in New York County Supreme Court seeking similar relief against JG HoldCo.  *See AFC Agent LLC v. JG Holdco LLC*, No. 652644/2025 (N.Y. Cnty.).  JG HoldCo had executed a separate guaranty for the same Loan and, like the Guarantors, has refused to honor its obligations under the Guaranty.  JG HoldCo's motion to dismiss this action was fully briefed as of August 13, 2025.

On April 17, 2025—between the filing of AFC's two enforcement actions—Hayden Gateway and Bloc Dispensary sued AFC in the United States District Court for the District of New Jersey (JG HoldCo was later added as a plaintiff, and, together with Hayden Gateway and Bloc Dispensary, they are the "New Jersey Plaintiffs").  *See Hayden Gateway LLC & Bloc Dispensary LLC v. Advanced Flower Cap. Inc.*, No. 3:25-cv-02789 (D.N.J. Apr. 17, 2025) ("New Jersey Action").  The New Jersey Plaintiffs' suit seeks to prevent AFC from exercising its remedies under the Credit Agreement, including the right to accelerate the Loan and foreclose on collateral, on the grounds of a purported oral modification (even though both the Credit Agreement and 2024 Forbearance Agreement prohibit oral modifications).  *See generally id.* Dkt. No. 77.

On May 9, 2025, after a hearing, the District of New Jersey granted the New Jersey Plaintiffs' motion for a preliminary injunction prohibiting AFC from exercising its remedies under the 2024 Forbearance Agreement. *Hayden Gateway LLC v. Advanced Flower Cap. Inc.*, 2025 WL 1349266, at *19 (D.N.J, May 9, 2025). The court determined that, based on a purported oral waiver, the plaintiff borrowers were likely to succeed on claims that they had not defaulted under the 2024 Forbearance Agreement. *Id.* at *11-16.[2] The court found the purported waiver as to two breaches claimed by AFC (including the borrowers' failure to provide AFC with annual audited financials), but did not address the Shareholder Guaranty, misappropriation of funds, non-payment of taxes, or the Guarantors' false certifications and other misleading statements. *Id.*

The Motion's Background Section (Mot. 2-3) purports to draw facts from the New Jersey Action record on the basis of judicial notice. But "while '[a] court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings,' it may not do so 'for the truth of the matters asserted in the other litigation.'" *Breach v. Loadsmart, Inc.*, 2025 WL 753866, at *4 (S.D.N.Y. Mar. 10, 2025) (Castel, J.) (citation omitted). Moreover, the New Jersey proceedings involved only a preliminary injunction based on an incomplete record, not a final, merits determination. In any event, the Guarantors cannot import wholesale the record from another action in opposition to a 12(b)(6) motion. *See Rowett v. Proselect Ins. Co.*, 2025 WL 1664018, at *3 (S.D.N.Y. June 12, 2025) ("The Court's function on a motion to dismiss is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.") (citation omitted).

---

[2] AFC has appealed the Order. New Jersey Action, Dkt. 64 (Notice of Interlocutory Appeal); *Hayden Gateway LLC v. Advanced Flower Cap. Inc.*, No. 25-2061, Dkt. 23-1 at 28-41 (3d Cir. July 1, 2025).

Further, the Guarantors ask the Court to take as true their claims about AFC's finances, "predatory lend[ing]" practices, and attempts to obtain additional collateral (without even citing the record that supposedly supports their accusations). Mot. 2. AFC disputes the Guarantors' accusations (which will be addressed at the appropriate time), including but not limited to their claim that the court in the New Jersey Action "declared that the [L]oan was not in default at all," Mot. 3, which as noted above is false, *supra* Section I.E.

## LEGAL STANDARD

"In deciding a motion to dismiss [under Rule 12(b)(6)], courts must 'accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.'" *Asset Co IM Rest, LLC v. Katzoff*, 2025 WL 919489, at *5 (S.D.N.Y. Mar. 26, 2025) (citation omitted). The Court's role is "not to weigh the evidence" but to "determine whether the complaint itself is legally sufficient." *Rowett*, 2025 WL 1664018, at *3 (citation omitted). A complaint survives if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

## I.    THIS COURT HAS PERSONAL JURISDICTION OVER THE GUARANTORS

"[T]o survive a motion to dismiss for lack of personal jurisdiction [under Rule 12(b)(2)], a plaintiff must make a prima facie showing that jurisdiction exists." *Eades v. Kennedy, PC Law Offs.*, 799 F.3d 161, 167-68 (2d Cir. 2015) (citation omitted). Plaintiffs' factual allegations are taken as true, and "pleadings and affidavits [are construed] in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (citation omitted); *see also Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 721 (2d Cir. 2013) (courts "give substantial deference to the forum selected by the

parties, particularly where this choice was made in an arm's-length negotiation by experienced and sophisticated businessmen." (quotation marks and citation omitted)).

Where, as here, the Court's jurisdiction is based on a forum clause, a "multi-factor test" is used to assess whether such clause is enforceable.  *See Signature Fin. LLC v. Neighbors Glob. Holdings, LLC*, 281 F. Supp. 3d 438, 451 (S.D.N.Y. 2017).  Specifically, courts examine whether (i) such clause was "reasonably communicated" to the opposing party, (ii) is "mandatory or permissive," and (iii) whether the "claims and parties involved in the suit are subject to the forum selection clause."  *Id.* (quoting *Starkey v. G Adventures, Inc.*, 796 F.3d 193, 196 (2d Cir. 2015)).  A clause that meets each factor is "presumptively enforceable," *Great N. Ins. Co. v. BMW of N. Am.*, 2018 WL 1472513, at *5 (S.D.N.Y. Mar. 25, 2018) (citation omitted), though the presumption can be rebutted where "enforcement would be unreasonable or unjust."  *Id.* (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007)); *see also D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) (setting out criteria).

The forum clause at issue is found at Section 13 of the Credit Agreement and incorporated through express language into Section 24(b) of the Shareholder Guaranty.  Specifically, Section 13(c) of the Credit Agreement provides that the parties "irrevocably and unconditionally submit[] to the non-exclusive jurisdiction of the state and federal courts located in the state of New York." ¶ 10.  And Section 24(b) of the Shareholder Guaranty provides that:  "[t]he provisions regarding choice of law and venue and jury trial waiver set forth in Section 13 of the Credit Agreement are applicable to each Guarantor fully as though such Guarantor were a party thereto, and such provisions are hereby incorporated herein by reference, *mutatis mutandis*."  *Id.*

### A.    The Forum Clause Was Reasonably Communicated to the Guarantors

The Guarantors make two arguments that the forum selection clause was not reasonably communicated to them:  (i) the clause is not in the Shareholder Guaranty, so "[t]here is nothing in

the record showing when and how AFC reasonably communicated that particular forum selection clause" to the Guarantors; and (ii) the Shareholder Guaranty, as pleaded, does not expressly incorporate the "jurisdiction" provision of the Credit Agreement, but only those relating to "choice of law" and "venue."  Mot. 8-9.  Neither of these arguments succeeds.

*First*, the Guarantors have no straight-faced argument that the forum clause was not "reasonably communicated" to them.  Loevy signed the Credit Agreement, which means the forum provision was actually—not just reasonably—communicated to him (and all but certainly to Kanovitz).  Dkt. 30-2 at 113; *see also Philippe Nyc I LLC v. Philippe W. Coast, LLC*, 2016 WL 1183669, at *7 (S.D.N.Y. Mar. 24, 2016) ("It is basic contract law that a person who signs a contract is presumed to know its terms . . . .").  Loevy also signed each Amendment and Forbearance Agreement, ¶ 137, and owns (along with Kanovitz) every Borrower that is a party to the Credit Agreement, ¶¶ 19-23.  It is also implausible that Loevy and Kanovitz were unfamiliar with any clause—much less a jurisdictional clause in ALL CAPS—contained in the Credit Agreement that embodies the terms under which their business borrowed more than $83 million. There is ample direct and inferential evidence that Loevy and Kanovitz were well aware of the forum clause (which, in any case, they do not actually deny).

Further, the Shareholder Guaranty incorporates the forum selection clause by reference, which binds the Guarantors absent "substantive unconscionability or fraud" not claimed here. *Horvath v. Banco Comercial Portugues, S.A.*, 461 F. App'x 61, 63 (2d Cir. 2012) (citation omitted); *see also Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 650 (S.D.N.Y. 2015) ("Even if the Terms were not provided to them at the time they signed,  . . . [Defendants] were put on express notice that the [forum-selection clause was] incorporated into their Agreement.").  And, of course, both Guarantors are sophisticated attorneys who undoubtedly understand these basic

12

contract principles, and any lack of awareness is "no one's fault but [Defendants'] own," and "[t]here is no reason to allow [them] to use [their] own inattention to defeat [AFC's] reasonable expectations." *K.K.D. Imps., Inc. v. Karl Heinz Dietrich GmbH & Co. Int'l Spedition*, 36 F. Supp. 2d 200, 203 (S.D.N.Y. 1999).

*Second*, the argument that the Shareholder Guaranty does not incorporate the jurisdiction provision of the Credit Agreement fails because the Guarantors concede that the Shareholder Guaranty incorporates the Credit Agreement's venue provisions, *see* Mot. 9,[3] and "[p]arties can consent to personal jurisdiction through forum-selection clauses," *Absolute Nev., LLC v. Grand Majestic Riverboat Co.*, 646 F. Supp. 3d 426, 438 (S.D.N.Y. 2022) (Castel, J.) (citation omitted); *see also Ademco Inc. v. TWS Tech. Ltd.*, 2024 WL 3567417, at *3 (S.D.N.Y. July 29, 2024) (a valid "forum selection clause amounts to consent to personal jurisdiction" (citation omitted)); *Exp.-Imp. Bank of U.S. v. Hi-Films S.A. de C.V.*, 2010 WL 3743826, at *4 (S.D.N.Y. Sept. 24, 2010) ("[S]o long as the forum selection clauses are found valid and enforceable, they are sufficient to establish this Court's personal jurisdiction over Luna."). The Guarantors' argument—that they agreed to be sued in this Court, but this Court cannot hear the case or enter judgment against them—has no support in the law. *See Richardson Greenshields Secs., Inc. v. Metz*, 566 F. Supp. 131, 133 (S.D.N.Y. 1983) (consent to venue is "meaningless" unless it also "contemplate[]s a . . . waiver of objection to personal jurisdiction"); *cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*, 553 F.2d 842, 844 (2d Cir. 1977) ("[T]he agreement to resolve disputes by arbitration in New York constituted consent to personal jurisdiction in New York.").

---

[3] The Motion concedes the Shareholder Guaranty incorporates "*some* portions of Section 13 of the Credit Agreement," Mot. 9, including "provisions regarding choice of law and venue and jury trial waiver." *Id.* (quoting Shareholder Guaranty ¶ 24(b)).

**B.**     **The Non-Exclusive Forum Selection Clause Binds the Guarantors**

Defendants argue that because the forum selection clause refers to "non-exclusive" jurisdiction of this Court, and use of this forum is at the "lender's discretion," the clause is permissive, rather than mandatory, and therefore unenforceable.  Mot. 10.

The Guarantors' argument relies upon ignoring that, under the forum selection clause, the Guarantors, at the very least, consent to venue by "irrevocably and unconditionally submit[ting]" to jurisdiction in this Court—the same venue clause the Guarantors concede is incorporated in the Shareholder Guaranty.  *See supra* Section I.A.  The Second Circuit has explained that a purportedly "permissive" (*i.e.*, non-exclusive) clause like this one "confers jurisdiction in the designated forum" without "deny[ing] plaintiff his choice of forum, if jurisdiction there is otherwise appropriate."  *Phillips*, 494 F.3d at 386.  In other words, the non-exclusivity does not release the Guarantors from their agreement to submit to this Court; it permits AFC to file suit in this Court without challenge to venue or jurisdiction, or to file suit in a different court that is "otherwise appropriate."  *Id.*; *Rabinowitz v. Kelman*, 75 F.4th 73, 83 (2d Cir. 2023) (permissive language "operates simply as mutual consent to personal jurisdiction in those [designated] courts"); *Signature Fin.*, 281 F. Supp. 3d at 448 (clause was not "'permissive . . . because it still requires [submission to] jurisdiction in" plaintiff's chosen forum); *Copenhagen Reins. Co. (UK) Ltd.*, 1998 WL 323489, at *3 (S.D.N.Y. June 17, 1998) ("non-exclusivity . . . does not lessen [the clause's] significance," particularly given "plaintiffs' decision to initiate this action in New York").[4]

---

[4] *See also Fasano v. Li*, 47 F.4th 91, 101 (2d Cir. 2022) ("[W]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient" (emphases omitted) (citation omitted)); *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009) ("[T]he combination" of the parties' preselection of the forum and waiver of convenience-based objections "amounts to a mandatory forum selection clause at least where the plaintiff chooses the designated forum."); *Exploration II, Inc. v. Biallas*, 2009 WL 1066244, at *3 (S.D.N.Y. Apr. 21, 2009) (Lynch, J.) (same); *Bank Leumi*, 98 F. Supp. 3d at 652 (same).

### C.    The Claims and Parties Are Subject to the Forum Clause

The Guarantors' only argument as to the last criterion—that the claims and parties must be subject to the clause—is that the Guarantors are not parties to the Credit Agreement and the Shareholder Guaranty "never refers to jurisdiction." Mot. 10. This argument is addressed above: the Guarantors concede that the Shareholder Guaranty incorporates, at the very least, the Credit Agreement's venue provision, which, under well-established case law from this Circuit, requires the Guarantors to submit to jurisdiction in this Court. *See supra* Section I.A-B; *see also Fasano*, 47 F.4th at 93 ("[T]he fact that a party is a non-signatory to an agreement is insufficient . . . to preclude enforcement of a forum selection clause.") (citation omitted).

### D.    Defendants Do Not Attempt to Argue Enforceability

The forum selection clause in the Credit Agreement is presumptively enforceable against the Guarantors because it meets the criteria stated above. *See Signature Fin.*, 281 F. Supp. 3d at 451. And Defendants do not attempt to rebut the presumption by arguing that enforcement "would be unreasonable or unjust." *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 15 (1972). The forum selection clause is therefore valid and enforceable against the Guarantors.

## II.    AFC PLEADS A CLAIM FOR MULTIPLE BREACHES OF THE SHAREHOLDER GUARANTY (COUNT I)

The elements of a breach of contract under New York law are (i) a contract, (ii) plaintiff's performance, (iii) defendants' breach of the contract, and (iv) damages. *Friends of Wickers Creek Arch. Site, Inc. v. Landing on the Water at Dobbs Ferry Homeowners Ass'n, Inc.*, 156 N.Y.S. 3d, 198 A.D.3d 726, 728 (2d Dep't 2021) (citation omitted). The Guarantors claim AFC has failed to plead a breach of the Shareholder Guaranty because (i) the Borrowers are current on their Loan payments and (ii) AFC does not allege losses the Guarantors must remedy. These arguments fail.

### A. The Borrowers' Payment Status Is Not Relevant to the Guarantors' Obligations Under the Shareholder Guaranty

AFC has pleaded that the Borrowers and Guarantors made multiple misrepresentations to AFC, including dozens of false and misleading requests to draw down more of AFC's money, as well as misrepresentations that the Loan was not in default, despite undisclosed payments of nearly $20 million of AFC's funds to or on behalf of unauthorized recipients, and failures to pay at least $10 million in taxes and vendor costs. *Supra* Background, Section I.E. AFC therefore pleads (i) the Borrowers' failure to meet the Guaranteed Obligations in the Shareholder Guaranty, and (ii) the Guarantors failure to address those obligations, which is a breach or the Shareholder Guaranty.

The Guarantors respond that the Borrowers are not in default of any payment obligations under the 2024 Forbearance Agreement, so "Defendants' shareholder guaranty obligations are not actionable." Mot. 12. Putting aside the merits of Defendants' allegation, the Shareholder Guaranty does not guarantee payment of principal and interest; it guarantees that, during the time the Borrowers (and thus the Guarantors) are holding AFC's money, the Guarantors will pay or otherwise guarantee the Guaranteed Obligations where the Borrowers do not. *See supra* Background, Section I.B. Indeed, the Guarantors concede the Shareholder Guaranty is a "bad boy guaranty," Mot. 11, which typically "requires defendants to compensate the lenders in the event they or the [b]orrower engage in certain acts that could harm the lenders' interest in the collateral or the lenders' ability to enforce their rights under the loan agreement." *Cerco Bridge Loans 6 LLC v. Schenker*, 768 F. Supp. 3d 559, 575 (S.D.N.Y. 2025) (citation omitted). This argument is therefore irrelevant.

### B. AFC Has Pleaded Losses and Liabilities for Which the Guarantors Are Responsible Under the Shareholder Guaranty

The Guarantors argue also that they are not liable for the Guaranteed Obligations because AFC has not incurred "losses, expenses, charges, costs, or liability" arising from the Borrowers'

failure to fulfill those Obligations.  Mot. 12.  The Guarantors illustrate this by arguing that their alleged unpaid vendor and tax bills—totaling approximately $10 million—would constitute loss to AFC only in the event of a hypothetical, future foreclosure.  *Id.* at 12-13.

This argument ignores multiple allegations that AFC has incurred "losses" and "liabilities" that trigger the Guarantors' obligations under the Shareholder Guaranty.  Perhaps most glaringly, AFC alleges in detail that the Borrowers, at the direction of the Guarantors, made numerous, repeated misrepresentations concerning the Borrowers' financial status and covenant compliance, as well as representations that the Loan was not in default despite millions in undisclosed, unauthorized payments, to induce AFC to permit the draw-down of millions in Loan funds.  Those funds that AFC would not have released, and should still possess, are thus "losses" and "liabilities" for which the Guarantors are immediately responsible.  *Supra* Background, Section I.B.

Similarly, the Borrowers, again at the Guarantors' direction, made unauthorized payments of close to $20 million in AFC funds—including to cover expenses of their own law firm—in breach of the "Restricted Payments" requirements in the Credit and Forbearance Agreements. *Supra* Background, Section I.E.  Those illicit draw-downs and distributions "constitute a breach of the agreement, and the plaintiffs have sustained damages by the loss of the funds."  *Pransky v. Eisner*, 2011 WL 4753455, at *2 (E.D.N.Y. Sept. 14, 2011) (finding breach of contract pled where defendants breached agreement to invest funds and instead used funds for defendant's own purposes), *report and recommendation adopted*, 2011 WL 4753452 (E.D.N.Y. Oct. 7, 2011).  The Guarantors' failure to pay for these obligations is sufficient to plead a breach of the Shareholder Agreement.

The Borrowers' $10 million in unpaid taxes and other obligations also triggers the Guarantors' obligations under the Shareholder Guaranty.  A key purpose of this and most other

"bad boy" guarantees is to preserve collateral and prevent its impairment. *CP III Rincon Towers, Inc. v. Cohen*, 666 F. App'x 46, 49 n.1 (2d Cir. 2016) ("Bad boy guarantees are frequently required by lenders . . . to permit the lender to pursue the individual controlling the special purpose borrower for actions that undermine the value of the lender's collateral."); *U.S. Bank Nat'l Ass'n as Trustee v. Mattone*, 769 F. Supp. 3d 298, 307 n.3 (S.D.N.Y. 2025) (a "bad boy guarantee . . . requires defendants to compensate the lenders in the event they or the Borrower engage in certain acts that could harm the lenders' interest in the collateral" (citation omitted)). The Borrowers unpaid tax bills create potential competing claims against the assets securing AFC's Loan, reducing the assets securing the Loan and impairing AFC's collateral. *See* ¶ 87. The Guarantors' view that the guarantee covers only realized losses (which AFC has pleaded) undermines the basic collateral-preserving function of the Shareholder Guaranty. *See also Argonaut P'ship, L.P. v. Bankers Tr. Co.*, 1997 WL 45521, at *7 (S.D.N.Y. Feb. 4, 1997) (matter was ripe for adjudication and immediate suit where plaintiff alleged impairment to collateral underlying debt instruments); *G3-Purves St., LLC v Thomson Purves, LLC*, 953 N.Y.S.2d 109, 112-14 (2d Dep't 2012) (borrowers' failure to pay taxes "affected the value of the collateral that secured the loan, as [loan and guaranty agreements] afforded the lender the protection required by causing the borrower and the guarantors to be personally liable."

## III.    PLAINTIFFS STATE A CLAIM FOR TORTIOUS INTERFERENCE

To plead tortious interference with contract, a plaintiff must allege (i) a contract between plaintiff and a third party, (ii) defendant's knowledge of the contract, (iii) defendant's intentional and unjustified procurement of the third party's breach; and (iv) damages. *See, e.g., Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (quotation marks and citation omitted); *see also Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) (describing elements).

AFC pleads each element. AFC alleges the existence, and Guarantors' awareness, of the Credit Agreement; that the Guarantors caused the Borrowers to "misappropriat[e] and diver[t] funds from the . . . Borrowers" to other entities owned and controlled by the Guarantors (including to pay a debt owed by the Guarantors' own law firm), ¶¶ 75, 125; and that these acts caused the Borrowers to default on Loan payments and breach other covenants, which in turn harmed AFC's ability to recoup the Loan and harmed its business. ¶¶ 122-128.

The Guarantors offer two brief responses. *First*, they claim the Court in the New Jersey Action already held that the Borrowers did not breach the Credit Agreement. Mot. 13-14. As detailed above, that preliminary ruling—made under the legal standard applicable to preliminary injunctions—addressed only certain narrow breach allegations on an incomplete record and does not account for the numerous breaches alleged here (nor even address the Shareholder Guaranty). *See supra* Procedural Background II.A.

*Second*, the Guarantors argue they cannot be liable because corporate officers, acting in their "official capacity," cannot be liable for tortious interference by causing their entity to breach a contract. Mot. 14. In fact, it is well-settled that "corporate officers can be held liable for the infringing acts of their corporations if they personally participated in the acts constituting infringement." *Sadowski v. Ng*, 2022 WL 799636, at *6 (S.D.N.Y. Mar. 15, 2022) (quoting *Lechner v. Marco-Domo Internationales Interieur GmbH*, 2005 WL 612814, at *6 (S.D.N.Y. Mar. 14, 2005) (collecting cases)). This is also true if "the acts of the defendant corporate officers . . . were beyond the scope of their employment or, if not, were motivated by their personal gain, as distinguished from gain for the corporation." *VR Optics, LLC v. Peloton Interactive, Inc.*, 2017 WL 3600427, at *6 (S.D.N.Y. Aug. 18, 2017) (citation omitted).

AFC has pleaded that the Guarantors personally participated in, and benefited from, the acts constituting the Borrowers' breaches.  In particular, in breach of the Credit Agreement's Restricted Payment provisions, they misappropriated Loan proceeds by directing the funds to their own entities, *see, e.g.*, ¶¶ 20, 75, 78, 125, which is self-evidently for personal gain—particularly where the funds were used to pay down a debt owed by their own law firm.  ¶¶ 75, 78.  This is not a case where corporate officers determined it was in the best interest of a corporation to breach a contract, but where a corporate officers determined it was in *their* best interest to have a corporation breach a contract.  These allegations are sufficient to plead tortious interference.

## IV.    PLAINTIFFS STATE CLAIMS FOR FRAUD

Rule 9(b) applies a heightened pleading standard to fraud claims, but does not "elevate the standard of certainty that a pleading must attain beyond the ordinary level of plausibility required of civil complaints."  *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 256–57 (S.D.N.Y. 2019) (citation omitted).  Rule 9(b) requires only that a plaintiff "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (citation omitted).

The Amended Complaint meets this standard with room to spare.  AFC alleges, among other misrepresentations and omissions:  (i) that Loevy deliberately misrepresented the property available to collateralize the Loan by submitting an incomplete perfection certificate, ¶¶ 92-100; (ii) the Guarantors knowingly caused the Borrowers to misrepresent their financial status by omitting from multiple documents their extensive misappropriation and diversion of nearly $20 million in funds—more than 25% of the total Loan, ¶¶ 102-105; and (iii) the Guarantors knowingly caused the Borrowers to make dozens of requests that misstated the default status of the Loan, including because they concealed illicit diversion of Loan funds, ¶¶ 108-109.

In the face of these detailed allegations, Defendants argue that (i) the allegations are insufficiently particularized, Mot. 17-19, (ii) AFC fails to plead scienter, Mot. 19-21, (iii) AFC improperly relies on a legal conclusion as a fraudulent misstatement, Mot. 21-22, and (iv) the perfection certificate fails to support a claim, *id.* at 22-23.  Each of these fails as a matter of law.

*First*, the claim that AFC fails to specify each instance of illicit fund diversion cannot defeat the fraud claim.  AFC pleaded numerous misrepresentations of fact, noted above, specifying the statements at issue, speakers, specific circumstances of the statements (such as date or time period and manner of transmission), and the reason each was false.  This exceeds Rule 9(b)'s plausibility bar.  *See Feasby v. Industri-Matematik Intern. Corp.*, 2000 WL 977673, at *6 (S.D.N.Y. 2000) ("Rule 9(b) does not require that plaintiffs plead with particularity every single fact upon which they base their beliefs. . . plaintiffs must plead with particularity *some* facts *sufficient* to support those beliefs (citing *Novak v. Kasaks*, 216 F.3d 300, at *13 (2d Cir. 2000))).

Regardless, to the extent AFC's allegations rely on the Borrowers' failure to disclose illicit diversion of funds—including affirmative representations about the Borrowers' financial status and the absence of Events of Default—AFC has pleaded those illicit diversions.  AFC specifies, to the penny, the total illicitly transferred to or on behalf of each unauthorized entity, and the time period during which each amount was transferred.  ¶ 75.  That is sufficient, at this stage, to plead falsity under Rule 9(b).  The Guarantors demand for additional details—for instance, their claim that the allegations about the illicit transfer of Loan funds to pay a debt of Loevy's law firm "lacks factual support" and that AFC fails to plead the precise number of illicit transfers ("dozens? hundreds? thousands?" Mot. 17)—are really demands for evidence and proof, neither of which is required at this early stage of the case without the benefit of discovery.  *See In re Nortel Networks*

*Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003) ("A pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage." (citation omitted)).

*Second*, AFC sufficiently pleads that the Guarantors knowingly and intentionally made, or caused the Borrowers to make, the numerous misrepresentations cited above—*i.e.* acted with scienter. The Guarantors argue largely that their mere positions at the Borrowing entities do not amount to scienter, and that there are no allegations the Guarantors were aware of the illicit payments or that "various employees were signing compliance certificates or draw requests." Mot. 20. In fact, AFC has alleged, among other things, that Loevy himself executed the Credit Agreement Amendments, which AFC was induced to sign based on misrepresentations that the Loan was not in default. ¶¶ 52, 56, 58, 60, 95-96. Further, the illicit transfers were made to or on behalf of entities wholly owned, directly or indirectly, by the Guarantors, and at least one was made to pay a debt of the law firm that bears Loevy's name. These allegations are sufficient to support a plausible inference that the Guarantors were aware of the illicit payments and related misrepresentations concerning the Borrowers' financial status. *See Maher v. Glob. Factors LLC*, 2024 WL 3356985, at *13 (S.D.N.Y. July 8, 2024) ("Proof of scienter 'can be and customarily is presented through circumstantial evidence.'" (citation omitted)).

Further, far from a "generalized profit motive," AFC has alleged the Guarantors obtained "concrete benefits" that can plead motive to commit fraud. *Watts v. Jackson Hewitt Tax Serv. Inc.*, 579 F. Supp. 2d 334, 352-53 (E.D.N.Y. 2008) (citing *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)). The Guarantors obtained concrete, personal benefits by diverting funds to or for their own entities. *See Remcoda, LLC v. Ridge Hill Trading (PTY) Ltd.*, 2022 WL 603998, at *13 (S.D.N.Y. Mar. 1, 2022) (five-percent fee sufficient to plead motive on the part of individual defendant); *In re Rsrv. Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 320-21 (S.D.N.Y. 2010) (fraudulent

motive pled based on "direct, personal financial stake in the Fund and in these entities and a motive to maximize not only their personal financial investment but also their entities' management fees."); *Yuki v. Suzuki*, 869 N.Y.S. 28, 30 (1st Dep't 2008) (fraud allegations sufficient where defendant, *inter alia*, "diverted funds . . . to satisfy personal obligations," including settlement of a fraudulent conveyance claim).

These are manifest: AFC alleges that the Guarantors used the illicit funds to pay down unrelated debts—including one incurred by their own law firm—and made misrepresentations to stave off Loan acceleration and potential business failure. By contrast, the Guarantors' authority refers to the unremarkable and well-worn proposition that an executive's motive to increase their company profits or financial standing is insufficient to plead fraud, since every executive is motivated to increase a company's financial standing. Mot. 19; *see also Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 423 (E.D.N.Y. 2017) (failing to plead motive on the basis that defendant company and employees "profited" from certain transactions); *Brookdale Univ. Hosp. & Med. Ctr. v. Health Ins. Plan of Greater N.Y.*, 2009 WL 928718, at *6 (E.D.N.Y. Mar. 31, 2009) (failure to plead motive by alleging company improperly denied insurance claims based on "generalized profit motive").

*Third*, the Guarantors argument that they could not have made misrepresentations concerning a legal conclusion must fail. Mot. 21-22. Many of the misrepresentations above concerned the Borrowers' financial status, which is a statement of fact. *See supra* Background, Section I.E.3. Regardless, courts regularly find claims of fraud can be premised on misrepresentations of compliance with legal requirements. *See, e.g.*, *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 612 (S.D.N.Y. 2017) (adequately alleging statement about compliance with regulation was "false or misleading"); *In re: EZCorp, Inc. Sec. Litigs.*, 181 F.

Supp. 3d 197, 213-14 (S.D.N.Y. 2016) (misrepresentations of compliance with lending regulations sufficient to plead falsity); *Penn. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 939 F. Supp. 2d 445, 452 (S.D.N.Y. 2013) ("Violating GAAP and SEC regulations may not amount to a material misrepresentation. But falsely certifying compliance with those same regulations certainly can."). Further, by contrast to the Guarantors' authority, AFC alleges these sophisticated attorneys misrepresented and concealed the making of payments prohibited by provisions in a contract Loevy signed (Credit Agreement) and presumably negotiated on behalf of the Borrowers. The Guarantors cannot now claim they did not sufficiently understand those same straightforward provisions such that those representations could not have been false.[5]

*Finally*, the Guarantors claim AFC cannot allege the perfection certificate was fraudulent because (i) evidence in the New Jersey Action proves otherwise and (ii) any misrepresentation was not "material" because AFC does not allege it would have not have acted differently had it known the truth about the additional collateral. Mot. 22-23. Setting aside the Guarantors' uncited reference to facts in the New Jersey Action that are outside the pleadings, AFC alleges that Loevy's concealment of additional collateral enabled him to "orchestrate the sale of their assets without pledging the proceeds as material collateral for the Credit Agreement." ¶ 97. In other words, AFC accepted less collateral than it was entitled to—amounting to millions in value—based on the false perfection certificate. AFC has therefore alleged it absolutely would have negotiated a different deal—with more security for AFC—had AFC known the truth.

---

[5] Nor does the Guarantors' authority stand for the novel proposition that a defendant can never be liable for misrepresenting compliance with a contract. *See Singh v. NYCTL 2009-A Tr.*, 2016 WL 3962009, at *7 (S.D.N.Y. July 20, 2016) (no liability under RICO where potential litigation adversary allegedly misrepresented state of the law); *Knox v. Countrywide Bank*, 4 F. Supp. 3d 499, 508 (E.D.N.Y. 2014) (allegation that "rests on [a] legal conclusion" concerning defendant's status as noteholder was not entitled to "presumption of truth" for pleading purposes).

## V.    PLAINTIFFS STATE A CLAIM FOR CONVERSION

Finally, "[a] claim for conversion lies when funds given to a party for one purpose" are "used for another purpose." *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 184 (S.D.N.Y. 2014), (citation omitted) *aff'd*, 611 F. App'x 34 (2d Cir. 2015). The Guarantors argue the claim is insufficient because (i) converted funds must be "specifically identifiable and segregated," and (ii) AFC has no "possessory right" in its own Loan funds. Mot. 24.

Although a claim for conversion of money must allege funds were "in escrow or similarly, that the transferred money is specifically identifiable," *Freedom Holding, Inc. v. Haart*, 172 N.Y.S.3d 873, 884 (N.Y. Sup. Ct. 2022) (cleaned up) (citation omitted), funds maintained in a specific account meet this criterion. *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 384 (1st Dep't 1995). Further, "[w]hen funds are provided for a particular purpose, the use of those funds for an unauthorized purpose constitutes conversion." *Hecht v. Components Int'l, Inc.*, 867 N.Y.S.2d 889, 897 (N.Y. Sup. Ct. 2008); *see also Freedom Holding*, 172 N.Y.S.3d at 884 (similar).

Both criteria apply here. Justice Grown maintains one bank account for its Pennsylvania development, and one for New Jersey. Dkt. 27 at 9. AFC can therefore point to where the funds obtained through misrepresentations ended up. And it goes without saying that funds withdrawn from these accounts to be used illicitly in breach of the Restricted Payment provisions of the Credit Agreement were designated for one purpose but used for another. *See supra* Section I.E.1.

The notion that AFC does not have a "possessory right" in its own Loan funds, and that conversion does not lie for contract damages, is untenable. The Guarantors are not parties to the Credit Agreement, and AFC does not bring suit under that contract. AFC brings suit against the Guarantors for making misleading statements to obtain funds and then using those funds in ways that are contrary to AFC's ownership interest. Thus, at this stage, conversion will lie.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied in its entirety.


DATED:    New York, New York                QUINN EMANUEL URQUHART &
          August 29, 2025                         SULLIVAN, LLP


                                          By: */s/ Kevin S. Reed*
                                              Kevin S. Reed
                                              Alex Zuckerman
                                              295 Fifth Avenue, 9th Floor
                                              New York, NY 10016
                                              (212) 849-7000
                                              kevinreed@quinnemanuel.com
                                              alexzuckerman@quinnemanuel.com

                                              Jason D. Sternberg
                                              2601 South Bayshore Drive, Suite 1550
                                              Miami, FL 33133
                                              (305) 402-4880
                                              jasonsternberg@quinnemanuel.com


                                              *Attorneys for Plaintiffs Advanced Flower
                                              Capital, Inc. and AFC Agent LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum of law complies with the length limit requirements of Local Rule 7.1(c) because it contains 8,049 words (based on the Microsoft Word word count function) excluding the parts exempted by the Local Rules.

Dated: August 29, 2025

*/s/ Kevin S. Reed*

Kevin S. Reed
