UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
ADVANCED FLOWER CAPITAL INC. and
AFC AGENT LLC,

                 Plaintiffs,

                                           25-cv-2996 (PKC)

       -against-                        OPINION AND ORDER

MICHAEL KANOVITZ and JON LOEVY,

                 Defendants.
----------------------------------------------------------x

CASTEL, U.S.D.J.

       Plaintiff Advanced Flower Capital Inc. ("Advanced Flower") provides financing to companies that sell cannabis products. Defendants Michael Kanovitz and Jon Loevy are two attorneys who co-own and manage a network of cannabis companies. Some of these companies borrowed from Advanced Flower to fund construction projects in New Jersey and Pennsylvania pursuant to a Credit Agreement, under which plaintiff AFC Agent LLC is the administrative agent. As part of the lending arrangement, defendants signed a Shareholder Guaranty that imposed liability on defendants under specified circumstances.

       Plaintiffs, collectively "AFC," bring this action alleging that defendants breached the Shareholder Guaranty, tortiously interfered with the underlying Credit Agreement, and converted the funds disbursed under the Credit Agreement. Plaintiffs also allege that defendant Loevy committed fraud by issuing false certifications to AFC, and that defendant Kanovitz aided and abetted that fraud. Defendants seek transfer of the action to the District of New Jersey, or, in the alternative, dismissal for lack of personal jurisdiction and failure to state a claim.

For reasons to be explained, the Court will deny the motion to transfer and grant the motion to dismiss in part and deny it in part.

BACKGROUND.

As noted, defendants Kanovitz and Loevy co-own and manage a network of cannabis companies. (Amended Complaint (the "Complaint") ¶¶ 1, 18.) The network is made up of several entities that are relevant to this suit. First, defendants each own 44.7% of JG HoldCo LLC ("JG HoldCo"). (Id. ¶ 19.) JG HoldCo is the parent company of several subsidiary companies, of which it holds an ownership stake of between 86% and 100%. (Id.) Defendants manage the various subsidiaries of JG HoldCo through Hayden Manager LLC ("Hayden Manager"). (Id. ¶¶ 3, 20.) Kanovitz and Loevy each possess a 50% ownership interest in Hayden Manager and are its only members. (Id. ¶ 20.) Kanovitz and Loevy also directly co-own several other entities engaged in the cannabis industry, some of which are managed by Hayden Manager but are not subsidiaries of JG HoldCo. (Id. ¶¶ 22–24, 33.)

AFC is a publicly-traded institutional lender to the commercial real estate sector and specializes in providing funding to companies that operate in the cannabis industry. (Id. ¶¶ 2, 14.)

On April 5, 2021, AFC, JG HoldCo and a number of other entities owned by defendants, either directly or through JG HoldCo, entered into a credit agreement (the "Credit Agreement"), through which AFC would provide lending of up to $46,150,000. (Id. ¶¶ 4, 34.) Three of the recipients of the loan proceeds were JG HoldCo subsidiaries. (Id. ¶ 21.) Other borrowing entities included three New Jersey and two Pennsylvania limited liability companies, each of which were managed by Hayden Manager and were directly owned by Kanovitz and

Loevy. (Id. ¶¶ 22–23.) The Complaint refers to the borrowing entities collectively as the "JG Borrowers." Defendants are not parties to the Credit Agreement, i.e., they are not among the JG Borrowers.

The initial purpose of this lending arrangement was to finance the construction of a cannabis cultivation and manufacturing facility and three cannabis dispensaries in New Jersey (the "New Jersey Project"). (Id. ¶ 34.) The parties later amended the Credit Agreement to increase the funds directed to the New Jersey Project and to fund three retail medical dispensaries and a cannabis cultivation facility in Pennsylvania (the "Pennsylvania Project"). (Id. ¶ 36.)

The Credit Agreement contained several provisions relevant here. First, the Credit Agreement required the JG Borrowers to comply with certain financial covenants. (Id. ¶ 38.) The Credit Agreement also prohibited the JG Borrowers from making "Restricted Payments" of loan proceeds to affiliated entities. (Id. ¶ 39.) The Credit Agreement further required that the JG Borrowers deliver quarterly compliance certificates and financial statements to AFC and to certify with each draw request under the loan that no defined defaults existed. (Id. ¶ 40.) The Credit Agreement also mandated timely payment of taxes and vendor obligations. (Id. ¶ 41.) Failure by the JG Borrowers to comply with the Restricted Payments and financial covenant provisions would be considered an event of default under the Credit Agreement. (Id. ¶ 42.)

As part of the financing transaction, Kanovitz and Loevy executed a Shareholder Guaranty with AFC. (Id. ¶ 35.). The Shareholder Guaranty, which the parties describe as a "bad

boy" guaranty,[1] made defendants personally liable for certain "Guaranteed Obligations." (Id. ¶ 35.) Such Guaranteed Obligations include losses to AFC from, among other things, "material breach of any representation and warranty in the Credit Agreement," "any failure by a JG Borrower . . . to pay any Taxes or other governmental charges or charges for labor and materials," "fraud, malfeasance or intentional misrepresentation by Guarantors," and "misappropriation or conversion" of income from operation of the JG Borrowers' properties. (Id. ¶¶ 4, 35, 44–45 (internal quotation marks omitted).)

The loan had a troubled history. Construction proceeded behind schedule and suffered cost overruns. (Id. ¶ 48.) Starting in June 2022, the parties agreed to amend the Credit Agreement on four separate occasions (the "Amendments"). (Id. ¶¶ 47–60.) Under the Amendments, AFC agreed to waive certain defaults under the Credit Agreement. (Id. ¶¶ 50–59.) Each of the Amendments also contained a representation and warranty from the JG Borrowers that no default or event of default under the Credit Agreement that had not been waived by AFC existed at the time of signing. (Id. ¶¶ 52, 56, 58, 60.) In September 2023, after the JG Borrowers failed to make interest payments in June and July 2023, the parties then entered into a forbearance agreement (the "September 2023 Forbearance Agreement"), under which AFC agreed to forbear from exercising its remedies under the Credit Agreement. (Id. ¶ 61.) The parties agreed to a second forbearance agreement in March 2024 (the "March 2024 Forbearance Agreement") after several more missed interest payments. (Id. ¶¶ 62–63, 65.) In both the

---

[1] "Bad boy guarantees are frequently required by lenders providing financing to special purpose entities, often in real estate transactions, to permit the lender to pursue the individual controlling the special purpose borrower for actions that undermine the value of the lender's collateral." CP III Rincon Towers, Inc. v. Cohen, 666 F. App'x 46, 49 n.1 (2d Cir. 2016). This shorthand explanation does not control the meaning or intent of the Shareholder Guaranty at issue.

forbearance agreements, the JG Borrowers represented that there was no default or event of default other than those specified in the agreements. (Id. ¶¶ 64, 66.)

AFC alleges that, during the period in which AFC and the JG Borrowers were negotiating the Amendments and forbearance agreements, the JG Borrowers failed to disclose certain other events of default under the Credit Agreement. These purported events of default included (1) that the JG Borrowers made certain Restricted Payments that funneled approximately $20 million in loan proceeds and cash collateral to other entities owned and controlled by defendants; (2) that the JG Borrowers accrued approximately $10 million in accounts payable and unpaid taxes; (3) that the JG Borrowers submitted a fabricated invoice to AFC; (4) the JG Borrowers submitted an incomplete perfection certificate that failed to detail certain assets that could serve as collateral for the loan; (5) that the JG Borrowers submitted to AFC false and misleading financial statements in quarterly compliance certificates that concealed the Restricted Payments; and (6) that the JG Borrowers submitted false draw requests that AFC relied on in disbursing loan proceeds. (Id. ¶¶ 74–111.) The Complaint alleges that these actions were taken at defendants' direction and under their control.

On April 10, 2025, AFC initiated this action. (ECF 1.) AFC's Complaint brings claims of breach of contract, tortious interference with contract, and conversion against Loevy and Kanovitz, a claim of fraud against Loevy, and a claim of aiding and abetting fraud against Kanovitz. The Complaint seeks damages and injunctive relief. (Compl't at 38–39.) Defendants have moved to transfer the action to the District of New Jersey and alternatively for dismissal on the basis of lack of personal jurisdiction and failure to state a claim.

DISCUSSION

I.   Motion to Transfer.

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ."  In deciding a motion to transfer under section 1404(a), the district court has "broad discretion in making determinations of convenience . . . and notions of convenience and fairness are considered on a case-by-case basis."  D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 106 (2d Cir. 2006).  "[T]he party requesting transfer carries the 'burden of making out a strong case for transfer'" and it is "appropriate" for the district court to apply a "clear and convincing evidence standard in determining whether to exercise discretion to grant a transfer motion."  New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 114 (2d Cir. 2010) (quoting Filmline (Cross–Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 521 (2d Cir. 1989)).

Defendants argue that this action should be transferred to the United States District Court for the District of New Jersey because, among other reasons, the Credit Agreement was intended to finance the construction of facilities in New Jersey, some of the borrowing entities under the Credit Agreement are New Jersey companies, and Judge Quraishi of the District of New Jersey is presiding over a related matter.  The Court declines to exercise its discretion to transfer this action.

As AFC notes, section 24(b) of the Shareholder Guaranty states that "[t]he provisions regarding choice of law and venue and jury trial waiver set forth in Section 13 of the Credit Agreement are applicable to each Guarantor fully as though such Guarantor were a party thereto, and such providers are hereby incorporated herein by reference, *mutatis mutandis*."

(ECF 30-1 at 13.)  Section 13 of the Credit Agreement in turn states that the borrowing entities

consent to non-exclusive jurisdiction in the Southern District of New York:

> PARENT AND EACH LOAN PARTY HEREBY IRREVOCABLY AND
> UNCONDITIONALLY SUBMITS TO THE NON-EXCLUSIVE
> JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN
> THE STATE OF NEW YORK, SITTING IN THE COUNTY OF
> WESTCHESTER OR NEW YORK, AT THE REQUIRED LENDER'S
> DISCRETION, AND THE UNITED STATES DISTRICT COURT FOR THE
> SOUTHERN DISTRICT OF NEW YORK IN ANY ACTION OR
> PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN
> DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY
> JUDGMENT.

(ECF 30-2 at 95.)[2]

"[A] proper application of § 1404(a) requires that a forum-selection clause be

given controlling weight in all but the most exceptional cases." Atlantic Marine Const. Co. v.

U.S. Dist. Ct. for W. Dist. of Texas, 571 U.S. 49, 59–60 (2013) (internal quotation marks

omitted).  In determining whether a forum selection clause is enforceable, a district court must

consider "whether (1) the clause was reasonably communicated to the party resisting its

enforcement; (2) the clause is mandatory or permissive; and (3) the claims and parties to the

dispute are subject to the clause." Fasano v. Yu Yu, 921 F.3d 333, 335 (2d Cir. 2019) (per

curiam) (citing Magi XXI, Inc. v. Stato della Citta del Vaticano, 714 F.3d 714, 721 (2d Cir.

2013)).  Furthermore, a district court applying a forum selection clause must consider whether

"enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as

fraud or overreaching." Id. (quoting Magi, 714 F.3d at 721).

---

[2] The Second Amended and Restated Credit Agreement, dated September 30, 2021, is the only version of the Credit Agreement supplied to the Court by the parties.  (ECF 30-2.)  The Complaint alleges that Section 13(c) in each version of the Credit Agreement contained the language that each loan party "irrevocably and unconditionally submits to the non-exclusive jurisdiction of the state and federal courts located in the state of New York . . . ." (Compl't ¶ 10.)

The forum selection clause was reasonably communicated to Loevy and Kanovitz because they signed the Shareholder Guaranty, which expressly incorporated the forum selection clause contained in section 13 of the Credit Agreement.  (ECF 30-1 at 15.)  See Horvath v. Banco Comercial Portugues, S.A., 461 F. App'x 61, 63 (2d Cir. 2012) (summary order) (forum selection clause contained in document expressly incorporated by reference into contract was reasonably communicated to party because "parties are charged with knowing and understanding the contents of documents they knowingly sign").

The forum selection clause in the Credit Agreement also has mandatory effect, despite the language that the parties to the agreement submit to "non-exclusive" jurisdiction of New York courts.  When a forum selection clause contains a waiver of objections to venue, the provision is deemed to be "a mandatory forum selection clause at least where the plaintiff chooses the designated forum . . . ." Aguas Lenders Recovery Grp. v. Suez, S.A., 585 F.3d 696, 700 (2d Cir. 2009); see also Bank Leumi USA v. Ehrlich, 98 F. Supp. 3d 637, 652 (S.D.N.Y. 2015) (Nathan, J.).  Defendants, by signing the Shareholder Guaranty, "irrevocably and unconditionally submit[ted] to the non-exclusive jurisdiction of . . . the United States District Court for the Southern District of New York," waiving any objections to venue in this forum in any suit brought against them.  (ECF 30-2 at 95.)

Finally, AFC's claims are subject to the forum selection clause in the Credit Agreement.  The forum selection clause covers "any action or proceeding arising out of or relating to any Loan Documents."  (Id.)  Per the Complaint, a "Loan Document" was defined in the April 2021 version of the Credit Agreement as any "instrument or agreement entered into, now or in the future, by Parent or any Loan Party or any shareholder of Parent or any Loan Party, and any member of the Lender Group in connection with this Agreement."  (Compl't ¶ 37 n.3.)

Defendants are shareholders of "Parent," JG HoldCo, and the Shareholder Guaranty was entered into in connection with the Credit Agreement. (See ECF 30-1 at 2; ECF 30-2 at 10.) The forum selection clause thus embraces all of AFC's claims. See Magi, 714 F.3d at 724–25 ("[C]ontract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties." (internal quotation marks omitted) (quoting Lambert v. Kysar, 983 F.2d 1110, 1121–22 (1st Cir. 1993))).

Defendants do not argue that enforcement of the forum selection clause would be "unreasonable or unjust" or that it is otherwise unenforceable due to fraud or overreaching. The forum selection clause thus controls. Atlantic Marine, 571 U.S. at 59–60. The Court will deny the motion to transfer.

II.   Motion to Dismiss for Lack of Personal Jurisdiction.

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 34–35 (2d Cir. 2010) (quoting Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir. 2006)). This showing includes factual allegations that, if credited, establish jurisdiction over the defendant. Id. at 35. The Complaint alleges that defendants are subject to personal jurisdiction in New York because they assented to the Shareholder Guaranty, which expressly incorporated the forum selection clause in the Credit Agreement. (Compl't ¶¶ 10–12.)

"Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. UPS Supply Chain Sols., Inc., 74 F.4th 66, 76 (2d Cir. 2023) (quoting D.H. Blair, 462 F.3d at 103). Indeed, courts in this district routinely hold that "[a]n enforceable forum selection clause amounts to consent to personal jurisdiction." Ademco Inc. v. TWS Tech. Ltd., 23-cv-8383 (AS), 2024 WL 3567417, at

*3 (S.D.N.Y. July 29, 2024) (Subramanian, J.) (quoting NuMSP, LLC v. St. Etienne, 462 F. Supp. 3d 330, 342 (S.D.N.Y. 2020) (Abrams, J.)); see also Am. S.S. Owners Mut. Prot. & Indemnity Ass'n, Inc. v. Am. Boat Co., LLC, 11-cv-6804 (PAE), 2012 WL 527209, at *2 (S.D.N.Y. Feb. 17, 2012) (Engelmayer, J.) ("When a forum selection clause is found valid and enforceable, 'it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process.'" (quoting Export–Import Bank of the U.S. v. Hi–Films S.A. de C. V., 09-cv-3573, 2010 WL 3743826, at *4 (S.D.N.Y. Sept. 24, 2010) (Gardephe, J.))).

Section 24(b) of the Shareholder Guaranty states that "[t]he provisions regarding choice of law and venue and jury trial waiver set forth in Section 13 of the Credit Agreement are applicable to each Guarantor fully as though such Guarantor were a party thereto, and such providers [sic] are hereby incorporated herein by reference, *mutatis mutandis*." (ECF 30-1 at 13.) Defendants argue that because section 24(b) does not refer to jurisdiction, it does not incorporate the submission to the non-exclusive jurisdiction of the state and federal courts in New York. Defendants are wrong as a matter of contract interpretation. Section 13 does not use the word "venue" anywhere in its text. The reference to venue in section 24(b) is presumed to have an intended meaning, and it does. Subdivision (c) of section 13 addresses the place, location or venue of where an action may be brought and speaks in very specific terms:

> PARENT AND EACH LOAN PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK, SITTING IN THE COUNTY OF WESTCHESTER OR NEW YORK, AT THE REQUIRED LENDER'S DISCRETION, AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS . . . .

(ECF 30-2 at 95.)

This provision selects the forum, i.e., the place, location or venue, where a suit may be brought and operates, by its express terms and by operation of the case law cited above, as a consent to jurisdiction in that forum, place, location or venue. The Court concludes that it is subdivision (c) of section 13 that section 24(b) refers to when it uses the word "venue."

By reason of section 24(b) of the Shareholder Guaranty, the terms of section 13 of the Credit Agreement are enforceable against Loevy and Kanovitz. AFC has made a prima facie showing that there is personal jurisdiction over defendants, and defendants' motion to dismiss for lack of personal jurisdiction will be denied.

III. Motion to Dismiss for Failure to State a Claim.

    A. Rule 12(b)(6) Standard.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth. Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Michael Grecco Products, Inc. v. RADesign, Inc., 112 F.4th 144, 150 (2d Cir. 2024) (quoting Sewell v. Bernardin, 795 F.3d 337, 339 (2d Cir. 2015)).

The Court is limited to consideration of the allegations of the complaint but it "is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (citations omitted) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

B.    The Breach of Contract Claim.

To plead a breach of contract claim under New York law, a plaintiff must allege that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." 34-06 73, LLC v. Seneca Ins. Co., 39 N.Y.3d 44, 52 (2022) (citations omitted).[3]

The Complaint alleges that Loevy and Kanovitz breached the Shareholder Guaranty "by failing to pay for losses and liabilities to AFC" caused by the JG Borrowers' breaches of the Credit Agreement's representations and warranties, conversion of funds, failure to pay taxes and charges for labor and materials, and fraud.  (Compl't ¶¶ 115–120.)  The Complaint alleges that such losses and liabilities include, among other things, diminution in value of collateral under the Credit Agreement, loan advances that otherwise would not have been made, and costs and expenses incurred in managing the loan and investigating defendants' conduct.  (Id. ¶ 120.)  Defendants argue that AFC has failed to plausibly allege a breach of the Shareholder Guaranty because certain conditions precedent to their obligation to make payments under the contract have not been satisfied.

---

[3] The parties cite to cases applying New York law as to all of AFC's claims throughout their briefing on the motion to dismiss.  "[S]uch implied consent . . . is sufficient to establish choice of law."  Chau v. Lewis, 771 F.3d 118, 126 (2d Cir. 2014) (quoting Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000)).

Defendants' obligations to pay certain "Guaranteed Obligations" are set out in section 2 of the Shareholder Guaranty. In full, section 2 states that:

> Each Guarantor hereby irrevocably and unconditionally guaranties to Agent, for the benefit of the Lender Group, as and for such Guarantor's own debt, until the final payment in full thereof, in cash, has been made, the due payment of the Guaranteed Obligations, <u>when and as the same shall become due and payable, whether at maturity, pursuant to a mandatory prepayment requirement, by acceleration, or otherwise, and after the expiration of any applicable grace and notice period under the Credit Agreement or any of the other Loan Documents</u>; it being the intent of each Guarantor that the guaranty set forth herein shall be a guaranty of payment and not a guaranty of collection. Each of the Guarantors hereby agrees that this Guaranty is an absolute, irrevocable and unconditional guaranty of payment and is not a guaranty of collection.

(ECF 30-1 at 5 (emphasis added).)[4]

Section 1(a) of the Shareholder Guaranty defines "Guaranteed Obligations" as, among other things:

> [A]ny losses, expenses, charges, costs or liability to any member of the Lender Group arising from: (a) (i) fraud, malfeasance or intentional misrepresentation by Guarantors (or either of them) or if Guarantors (or either of them) direct, or otherwise knowingly cause, any Loan Party or any other Person directly Controlled by such Guarantor to commit fraud or malfeasance or to make an intentional misrepresentation[;] . . . (ii) the intentional misapplication, misappropriation or conversion . . . of any [] income, revenue or other collections or other amounts derived from the operation of the Collateral Properties in each case due to be paid or delivered to Agent under the Loan Documents, including, if applicable, in connection with a failure to deposit such amounts into any Reserve Account if so required pursuant to the Loan Documents[;] . . . (v) any material breach of any representation and warranty in the Credit Agreement or any other Loan Document; [and] (vi) the failure by a Loan Party to pay any Taxes or other governmental charges or charges for labor and materials . . . .

(ECF 30-1 at 3.)

---

[4] The Shareholder Guaranty is not attached to the Complaint but is fairly considered to be incorporated by reference. See, e.g., Wilkov v. Ameriprise Fin. Servs., Inc., 753 F. App'x 44, 46 (2d Cir. 2018) (summary order) (contract incorporated by reference when "referenced throughout the . . . complaint and its terms served as the basis for [plaintiff's] breach-of-contract claim").

Plaintiffs have plausibly alleged actions taken by Loevy and Kanovitz that may be characterized as "fraud," "misappropriation or conversion," "breach[es] of . . . representation[s] and warrant[ies] in the Credit Agreement" and "failure . . . to pay any Taxes . . . or charges for labor and materials." (Id.) But even assuming that these actions caused "losses . . . or liability" to AFC, the Complaint fails to allege that the conditions precedent contained in section 2 have been satisfied, and thus fails to allege that Loevy and Kanovitz's payment obligations under the Shareholder Guaranty have been triggered.

Specifically, section 2 requires payment of the Guaranteed Obligations only when they "become due and payable, whether at maturity, pursuant to a mandatory prepayment requirement, by acceleration, or otherwise" and "after the expiration of any applicable grace and notice period under the Credit Agreement or any of the other Loan Documents." (ECF 30-1 at 5.) The Complaint contains no allegations that these conditions have been satisfied. There are no allegations in the Complaint that the Guaranteed Obligations are "due and payable" pursuant to "maturity" or "by acceleration." Nor are there any allegations that any grace period or notice period under the Credit Agreement or any of the other Loan Documents had expired. Thus, AFC has not plausibly alleged that Loevy and Kanovitz have a present duty to pay the Guaranteed Obligations. See Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc., 821 F.3d 297, 305 (2d Cir. 2016) ("Under New York law . . . a condition precedent . . . must occur before a duty to perform a promise in the agreement arises.") (internal quotations omitted) (quoting Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 690 (1995))); Spencer-Smith v. Ehrlich, 347 F.R.D. 606, 620 (S.D.N.Y. 2024) (Liman, J.) (collecting cases and concluding that "where the plaintiff must have satisfied a condition precedent before any duty of

the defendant to perform arises, the plaintiff must plead satisfaction of the condition precedent because otherwise the plaintiff will have failed to allege any breach by defendant . . . .").

AFC attempts to paper over this fatal flaw by arguing that the Shareholder Guaranty does not require that Loevy and Kanovitz pay the interest and principal due under the Credit Agreement were the JG Borrowers to default. AFC further characterizes the Shareholder Guaranty as a "bad boy" guaranty aimed at holding Loevy and Kanovitz liable for any bad acts that harmed the collateral under the Credit Agreement. But these arguments do nothing to address the Complaint's failure to plausibly allege that the "due and payable" and notice period expiration conditions have been satisfied.

AFC also points to section 4 of the Shareholder Guaranty. That section, entitled "Performance Under this Guaranty," states in full that "[i]n the event that the Borrowers fail to make any payment of any Guaranteed Obligations, on or prior to the due date thereof, the Guarantors immediately shall cause, as applicable, such payment in respect of the Guaranteed Obligations to be made." (ECF 30-1 at 5.) But nowhere in the Complaint does AFC allege that the Borrowers failed to make any payment of any "Guaranteed Obligations, on or prior to the due date thereof." "Guaranteed Obligations" are a defined term in the Shareholder Guaranty. Because defendants are not "Borrowers" and the "Borrowers" are not parties to the Shareholder Guaranty, the obligation of the "Borrowers" to pay "Guaranteed Obligations" would have to come from another contractual source such as the Credit Agreement. AFC cites to no such provision in any contractual document. In any event, it suffices to note that AFC's Complaint does not allege that the Borrowers failed to make any payment of any "Guaranteed Obligations, on or prior to the due date thereof." More to the point, section 2 unambiguously states when the Guarantors are obligated to pay, which is "after the expiration of any applicable grace and notice

period under the Credit Agreement or any of the other Loan Documents" and the Complaint does not plausibly allege that this has occurred.

The Court reiterates that the Complaint plausibly alleges that Loevy and Kanovitz engaged in acts that may eventually require them to pay for Guaranteed Obligations under the Shareholder Guaranty. (See, e.g., Compl't ¶¶ 74–111.) But, at least based on the factual allegations contained in the four corners of the Complaint, we are not there yet. The Court deems the breach of contract claim to be premature for failure to allege satisfaction of conditions precedent, and will dismiss that claim accordingly.

C.    The Tortious Interference with Contract Claim.

To plead a claim of tortious interference with contract under New York law, a plaintiff must allege "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996).

The Complaint alleges that Loevy and Kanovitz "intentionally, willfully, and without justification interfered with the Credit Agreement by overseeing or directing the misappropriation and diversion of funds from the JG Borrowers to the Non-Borrower JG Entities, which they have substantial interests in . . . ." (Compl't ¶ 125.) Per the Complaint, these transfers "contributed to and exacerbated the JG Borrowers' repeated failures to comply with the financial covenants" in the Credit Agreement, which were events of default. (Id.) Furthermore, the Complaint alleges that these transfers and were themselves events of default of the Credit Agreement as "Restricted Payments." (Id.)

"As a general rule, tortious interference claims that are duplicative of contract claims are precluded." Horowitz v. Nat'l Gas & Elec., LLC, 17-cv-7742 (JPO), 2018 WL 4572244, at *7 (S.D.N.Y. Sept. 24, 2018) (Oetken, J.) (quoting Choquette v. Motor Info. Sys., Inc., 15-cv-9338 (VEC), 2017 WL 3309730, at *6 (S.D.N.Y. Aug. 2, 2017) (Caproni, J.)). This rule "logically appl[ies] where a plaintiff seeks to assert a tortious-interference claim against the same party that has allegedly breached its contract, and where the plaintiff's tort allegations are based on the same conduct as that which gave rise to the alleged contract breach." Lavazza Premium Coffees Corp. v. Prime Line Distributors Inc., 575 F. Supp. 3d 445, 471 (S.D.N.Y. 2021) (Failla, J.) (quotation marks omitted); see also Maricultura Del Norte, S. de R.L. de C.V. v. Umami Sustainable Seafood, Inc., 769 F. App'x 44, 55 (2d Cir. 2019) (affirming dismissal of tortious interference with contract claim that was premised on the same conduct as a breach of contract claim). A tortious interference claim may survive, however, when it is premised on a duty that "springs from circumstances extraneous to, and not constituting elements of, the parties' contract." Lavazza, 575 F. Supp. 3d at 471 (quoting Horowitz, 2018 WL 4572244, at *7).

AFC's tortious interference with contract claim is premised on precisely the same conduct that underlies the breach of contract claim: Loevy and Kanovitz's alleged diversion of funds from the JG Borrowers to non-borrowing entities in which they had an ownership stake. AFC repeatedly alleges that this purported misconduct is governed by the Shareholder Guaranty, which holds Loevy and Kanovitz liable for Guaranteed Obligations caused by "the intentional misapplication, misappropriation or conversion" of any "income, revenue or other collections or other amounts derived from the operation of the Collateral Properties, in each case due to be paid

or delivered to Agent under the Loan Documents . . . ." (ECF 30-1 at 3; see Compl't ¶¶ 115, 118–119.)

The Court thus dismisses the tortious interference with contract claim as duplicative of the breach of contract claim. See Generation Next Fashions Ltd. v. JP Morgan Chase Bank, NA., 698 F. Supp. 3d 663, 684 (S.D.N.Y. 2023) (Liman, J.) (dismissing breach of contract claim and tortious interference claim that was premised on conduct that "was governed by [the] contractual relationship between the parties"); Allerand, LLC v. 233 E. 18th St. Co., 19 A.D.3d 275, 277–78 (1st Dep't 2005) (dismissing tortious interference claim when "[t]he parties' rights and obligations respecting the matter in dispute are governed by their contract and the purported claim for tortious interference with contract does no more than restate plaintiffs' claim for the contract's breach").

D. The Fraud Claims.

The Complaint brings a claim of fraud against Loevy and a claim of aiding and abetting fraud against Kanovitz. The Court considers each claim in turn.

1. Fraud Claim Against Defendant Loevy.

To plead a claim of fraud under New York law, a plaintiff must allege "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 170 (2d Cir. 2015) (citing Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559 (2009)). Pursuant to Rule 9(b), Fed. R. Civ. P., a party alleging fraud "must state with particularity the circumstances constituting fraud."

AFC's fraud claim against Loevy is premised on two sets of conduct. First, the Complaint alleges that, in connection with the March 2024 Forbearance Agreement, Loevy provided a false perfection certificate that omitted certain affiliates of JG HoldCo holding substantial assets. (Compl't ¶ 131.) AFC claims that this omission was intended to induce AFC to enter into the March 2024 Forbearance Agreement "by concealing the full scope of JG HoldCo's assets and preventing AFC from expanding its collateral package to include [affiliate] TC Applico or TC Applico's assets." (Id. ¶ 133.) Second, AFC alleges that Loevy certified or directed others to certify that there were no undisclosed events of default or Restricted Payments in the amendments to the Credit Agreement, the forbearance agreements, compliance certificates and draw requests. (Id. ¶ 137.) AFC claims that Loevy "intended for AFC to rely on these misrepresentations in order to obtain or retain the financing provided by AFC under the Credit Agreement and to avoid the consequences of the JG Borrowers' breaches and defaults." (Id. ¶ 139.) AFC claims that it suffered "the loss of interest and principal payments, the loss of collateral and security, and the loss of opportunity to exercise its rights and remedies" under the Credit Agreement as a result. (Id. ¶ 141.)

Defendants first argue that the fraud claim is duplicative of AFC's breach of contract claim. The Court disagrees.

"[W]here a fraud claim is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie." Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (quoting McKernin v. Fanny Farmer Candy Shops, Inc., 176 A.D.2d 233, 234 (2d Dep't 1991)). However, "parallel fraud and contract claims may be brought if the plaintiff (1) demonstrates a

legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 183 (2d Cir. 2007) (citing Bridgestone/Firestone, 98 F.3d at 20). Importantly, New York courts distinguish between "a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement." Id. at 184; see also Nielsen Consumer LLC v. Circana Grp., L.P., 22-cv-3235 (JPO), 2026 WL 380810, at *5 (S.D.N.Y. Feb. 11, 2026) (Oetken, J.) ("[B]oth New York and federal courts have repeatedly held that misrepresentations of present facts made post-contract formation are collateral or extraneous to the contract and are actionable in fraud." (brackets and internal quotation marks omitted)).

Applying these principles, the allegations that Loevy supplied a false perfection certificate that concealed some of JG HoldCo's assets in order to induce AFC to enter the March 2024 Forbearance Agreement raise misrepresentations of present facts and are thus collateral to Loevy's obligations under the Shareholder Guaranty. The allegations concerning the false certifications regarding events of default are also collateral to the contract for the same reason. See Merrill Lynch, 500 F.3d at 184 (a fraud claim premised on "breach of . . . contractual warranties" is not duplicative of a contract claim); U.S. Bank Nat'l Ass'n v. BFPRU I, LLC, 230 F. Supp. 3d 253, 261 (S.D.N.Y. 2017) (Koeltl, J.) (alleged false certifications provided to lender after contract formation were collateral to loan agreement). The fraud claim is thus collateral to the breach of contract claim and will not be dismissed as duplicative.

Defendants next argue that fraud premised on the false certifications contained in the Credit Agreement amendments, forbearance agreements, compliance certificates and draw requests is not alleged with sufficient particularity.  To satisfy the particularity requirement set out in Rule 9(b), a complaint alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 25 (2d Cir. 2016) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

Again, AFC's second fraud theory relies on four sets of statements made by Loevy to AFC.  The Court will consider each set of false statements in turn.

Amendments to the Credit Agreement and Forbearance Agreements.  The Complaint alleges that Loevy "falsely certif[ied] that no Event of Default had occurred or was continuing in each of the amendments to the Credit Agreement and the Forbearance Agreements . . . ." (Compl't ¶ 137.)  As to each of the four amendments to the Credit Agreement and the two forbearance agreements, the Complaint alleges that "Loevy, in his capacity as manager of Hayden Manager, provided [a] representation and warranty on behalf of the JG Borrowers" that as of signing "no Default or Event of Default existed under the Credit Agreement." (Compl't ¶ 52; see also id. ¶¶ 56, 58, 60, 64, 66.)  Furthermore, the Complaint explicates why the representations that there was "no Default or Event of Default" were false when made.  For instance, as to the first amendment to the Credit Agreement, the Complaint explains that the JG Borrowers had made "over $10 million in undisclosed Restricted Payments in breach of the Credit Agreement, including a debt payoff of $966,762.00 to Law Finance Group, $8,667,519.32 in transfers to Oakland Manager, and $871,345.07 in transfers to JG IL LLC," which the

Complaint alleges were events of default under the Credit Agreement.  (Compl't ¶ 49; see also id. ¶ 75 (detailing alleged amounts of undisclosed restricted payments to affiliated entities).)  The Complaint further alleges that none of these transfers were waived in the amendments or forbearance agreements.  (Id. ¶ 83.)  The Complaint thus alleges with sufficient particularity why the certifications contained in the Credit Agreement amendments and forbearance agreements were fraudulent.

Compliance Certificates.  The Complaint also alleges that Loevy "caused to be submitted" false compliance certificates that stated that "there had been no Event of Default under the Credit Agreement," stated that "there had been no Restricted Payments" and falsely reported the JG Borrowers' free cash flow.  (Id. ¶ 137.)  The Complaint alleges that these certificates were fraudulent because they failed to disclose restricted payments.  (Id. ¶¶ 103–05.)  The Complaint specifies the dollar value of the concealed Restricted Payments.  (Id.)  Although the Complaint alleges that such statements were submitted quarterly (see id. ¶¶ 40, 101), the Complaint specifically refers to certificates that were submitted on February 11, 2022; in October, November and December 2022; on April 3, 2023; and in May, July and November 2023.  (Id. ¶¶ 103–05.)  As to these specific certificates, the Complaint has alleged that the statements were fraudulent with the requisite particularity.  To the extent there are other compliance certificates that contained allegedly fraudulent statements about the JG Borrowers' free cash flow or there being no events of default, the Complaint has not alleged them with particularity.

Perfection Certificate.  The Complaint further alleges that Loevy signed a perfection certificate as required under the March 2024 Forbearance Agreement that "falsely represent[ed] that the Perfection Certificate was complete and accurate despite omitting" certain

- 22 -

affiliated companies that could serve as collateral under the Credit Agreement. (Id. ¶ 137.) The Complaint further alleges that the perfection certificate was submitted to AFC on May 9, 2024 and was signed by Loevy. (Id. ¶ 95.) The Complaint explains that it was false because it required the submission of information about assets belonging to JG HoldCo's affiliates but did not include assets from purported affiliates TC Applico, Healing Through Cannabis, Botavi Wellness LLC and Growing Jobs Missouri LLC. (Id. ¶ 96.) The Complaint thus alleges with sufficient particularity that the May 9, 2024 perfection certification was fraudulent.

Draw Requests. Finally, the Complaint alleges that Loevy caused "others [to] falsely certify that no Event of Default had occurred or was continuing in each of the draw requests sent to AFC." (Id. ¶ 137.) The Complaint specifically lists the dates of the draw requests, and alleges they were signed by two officers of defendants' company at Loevy's direction. (Id. ¶¶ 108–09, 137–38.) Per the Complaint, the draw requests represented that "[n]o Default or Event of Default has occurred and is continuing." (Id. ¶¶ 108–09.) These representations allegedly were false because of the restricted payments. These allegations plead fraud with particularity as to the draw requests made on the dates identified in the Complaint. (Id.) To the extent there are other draw requests on which the fraud claim is premised, they have not been alleged with sufficient particularity.

Accordingly, the Court rejects defendants' arguments that the fraud claim has not been alleged with sufficient particularity.

Next, defendants argue that the Complaint fails to plead that Loevy acted with scienter. Rule 9(b) states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," but the Second Circuit has emphasized that plaintiffs must nonetheless "allege facts that give rise to a strong inference of fraudulent intent." Lerner v. Fleet

Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995)).  A strong inference of scienter "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Id. at 290–91 (quoting Shields, 25 F.3d at 1128).  "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  Loreley Fin., 797 F.3d at 176–77 (quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 324 (2007)).  "[M]otive for scienter can be shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements" and "opportunity could be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged."  Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 309 (2d Cir. 2015) (internal quotation marks omitted).

The Complaint has adequately alleged Loevy had a motive and opportunity to commit fraud as to the theory of fraud based on the perfection certificate submitted in connection with the March 2024 Forbearance Agreement.  The Complaint alleges that Loevy had a financial interest in the affiliated entities that were omitted from the perfection certificate.  (Compl't ¶¶ 33, 96.)  Loevy is alleged to have known about the affiliates, because they were affiliates of the cannabis company network that he owned and managed.  (Id. ¶¶ 93, 96.)  The perfection certificate was signed after a long series of defaults and missed interest payments by the JG Borrowers.  (Id. ¶¶ 62–63.)  And as a result of the omission from the perfection certificate, those affiliate companies—which held millions of dollars in assets—would remain out of reach of

AFC in the increasingly likely event that AFC accelerated the loan and seized collateral.[5]  (Id. ¶¶ 95–100.)

The Complaint has also adequately alleged scienter as to the second theory of fraud premised on the false certifications contained in the Credit Agreement amendments, forbearance agreements, compliance certificates and draw requests.  Loevy is alleged to have signed or directed the signature of the certifications, and he is alleged to have been aware of the restricted payments because the funds moved between firms that Loevy owned and managed. (Id. ¶¶ 18–20, 75, 137).  By certifying that there were no undisclosed restricted payments, Loevy preserved his struggling companies' access to AFC lending and may have prevented AFC from declaring an event of default and seeking to enforce the Shareholder Guaranty against Loevy personally.  (Id. ¶ 139.)

Finally, the defendants attempt to characterize Loevy's purported misrepresentations regarding the false certifications as legal opinions that the JG Borrowers were not in default of the Credit Agreement.  Defendants argue such legal opinions cannot serve as the basis for a fraud claim.  The Court disagrees.  The assertion that the JG Borrowers were not in default of the Credit Agreement, despite payments to affiliated companies that were barred by the restricted payments provisions of the agreement, is one of fact.

The Court thus declines to dismiss the fraud claim against Loevy.

---

[5] For similar reasons, AFC has adequately alleged that the false statements contained in the perfection certificate were material.  Based on the Complaint, the Court is unable to conclude that these statements were "so obviously unimportant to a reasonable party that reasonable minds could not differ on the question of their importance."  GEM Advisors, Inc. v. Corporacion Sidenor, S.A., 667 F. Supp. 2d 308, 332 (S.D.N.Y. 2009) (Sullivan, J.) (brackets omitted) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)).  The Court also notes that defendants have not raised whether AFC's alleged prospective loss of collateral is sufficient to plead the element of damages.

2.    Aiding and Abetting Fraud Claim Against Defendant Kanovitz.

"To establish liability for aiding and abetting fraud, the plaintiffs must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Lerner, 459 F.3d at 292 (brackets and internal quotation marks omitted) (quoting JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) (Lynch, J.)).

Defendants argue that the Complaint has failed to adequately allege that Kanovitz had knowledge of Loevy's purported fraud. "[A]ctual knowledge is required to impose liability on an aider and abettor under New York law." Krys v. Pigott, 749 F.3d 117, 127 (2d Cir. 2014) (quoting Lerner, 459 F.3d at 292). Actual knowledge must be alleged with particularity pursuant to Rule 9(b), and conclusory allegations of actual knowledge are insufficient. Lerner, 459 F.3d at 292–93. Furthermore, "while constructive knowledge alone cannot support a claim for aiding and abetting fraud, circumstantial evidence can be sufficient to support a finding of actual knowledge." Silvercreek Mgmt., Inc. v. Citigroup, Inc., 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018) (Oetken, J.).

The Complaint offers two allegations regarding Kanovitz's knowledge of the fraud alleged to have been conducted by Loevy. First, the Complaint alleges that "Kanovitz had actual knowledge of Loevy's fraud, as he served as an even larger owner of JG HoldCo and a co-manager of Hayden Manager." (Compl't ¶ 146.) Second, the Complaint states that, "[o]n information and belief, Kanovitz also had access to and control over the information and assets of the JG Borrowers and their Affiliates, including the Non-Borrower JG Entities, TC Applico, Healing Through Cannabis, Botavi Wellness, and Growing Jobs Missouri." (Id.) Despite the Complaint's characterization to the contrary, these are allegations of constructive knowledge, not

actual knowledge, which cannot sustain an aiding and abetting claim. See Krys, 749 F.3d at 127 ("[C]onstructive knowledge . . . is [k]nowledge that one using reasonable care or diligence *should* have, and therefore that is attributed by law to a given person."). Furthermore, the Complaint does not allege that Kanovitz signed or participated in the preparation of the perfection certificate or that Kanovitz specifically directed the submission of the false certifications upon which the fraud claim is premised. Because the Complaint has "fail[ed] to allege sufficient facts to support the inference that the alleged aider and abettor had actual knowledge of the fraudulent scheme," dismissal of the aiding and abetting claim is warranted. Id.

The Court will thus dismiss the aiding and abetting claim against Kanovitz.

### E. The Conversion Claim.

Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 49–50 (2006). "To state a claim of conversion, the plaintiff must allege that (1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another, (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." V&A Collection, LLC v. Guzzini Props. Ltd., 46 F.4th 127, 133 (2d Cir. 2022). "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Id. (quoting Colavito, 8 N.Y.3d at 49–50).

The Complaint alleges that defendants, "through their control and direction of the JG Borrowers, exercised unauthorized dominion over the [loan] funds, interfering with AFC's rights, by misappropriating and diverting the funds to the Non-Borrower JG Entities, by failing to pay the invoice for [certain] extraction equipment and using the funds for some other purpose, and by failing to pay taxes, trade vendors, and contractors, resulting in liens and liabilities that diminished AFC's collateral." (Compl't ¶ 152.)

"A claim of conversion under New York law 'cannot be predicated on a mere breach of contract.'" Rynasko v. New York Univ., 63 F.4th 186, 196 (2d Cir. 2023) (quoting Jeffers v. Am. Univ. of Antigua, 125 A.D.3d 440, 443 (1st Dep't 2015)). Indeed, "[a] conversion claim may only succeed . . . if a plaintiff alleges wrongs and damages distinct from those predicated on a breach of contract." Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 204 (S.D.N.Y. 2011) (Sullivan, J.). Accordingly, when courts analyze whether a claim of conversion is duplicative of that for a breach of contract, they "look both to the material facts upon which each claim is based and to the alleged injuries for which damages are sought." Id. (quoting Physicians Mut. Ins. Co. v. Greystone Servicing Corp., 07-cv-10490 (NRB), 2009 WL 855648, at *10 (S.D.N.Y. Mar. 25, 2009) (Buchwald, J.)); see also IKB Int'l, S.A. v. Wells Fargo Bank, N.A., 40 N.Y.3d 277, 290–91 (2023) ("In determining whether [tort] claims are duplicative [of contract claims], we evaluate the nature of the injury, how the injury occurred and the harm it caused." (brackets and internal quotation marks omitted)). "[C]onversion claims that are based on 'the same facts underlying a contract claim' must be dismissed as duplicative." Vekaria v. Mthree Corp. Consulting, Ltd., 22-cv-3197 (JPC), 2024 WL 4337542, at *16 (S.D.N.Y. Sept. 27, 2024) (Cronan, J.) (quoting Reade v. SL Green Operating P'ship, LP, 30 A.D.3d 189, 190 (1st Dep't 2006)).

AFC relies on the same set of facts for its breach of contract claim and its conversion claim. Both claims are premised on allegations that Loevy and Kanovitz directed the JG Borrowers to divert loan proceeds to non-borrowing entities they controlled and caused the JG Borrowers to accumulate unpaid taxes and accounts payable. (See Compl't ¶¶ 79, 117, 119, 152.) Indeed, AFC has asserted a breach of contract claim against defendants premised on the Shareholder Guaranty's express provision imposing liability for "intentional misapplication, misappropriation or conversion" of loan funds. (ECF 30-1 at 3; see Compl't ¶¶ 115, 119.) Moreover, both the breach of contract claim and the conversion claim seek damages for loss and diminution in value of collateral because of this conduct. (Id. ¶¶ 120–21, 152, 156.) AFC's conclusory allegation that the defendants' conduct affected "rights beyond those due under the Credit Agreement or Shareholder Guaranty" does not alter these conclusions. (Id. ¶ 153.) Therefore, the Court will dismiss the conversion claim as duplicative. See Caplan v. Dollinger, 803 F. Supp. 3d 219, 238 (S.D.N.Y. 2025) (Furman, J.) (dismissing conversion claim when "[p]laintiffs' conversion claims rely on the same facts underlying their breach claims . . . and assert no distinct conversion damages").

Defendants' motion to dismiss the conversion claim will be granted.

CONCLUSION.

Defendants' motion to transfer is DENIED. Defendants' motion to dismiss is GRANTED as to Counts One, Two, Four and Five, and is otherwise DENIED. The Clerk is respectfully directed to terminate the motions at ECF 29 & 31.

- 30 -

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      March 31, 2026